APPENDIX IN SUPPORT OF
PLAINTIFF-APPELLANT'S EMERGENCY MOTION

| Exhibit | Description | Appendix Page Number |
|---|---|---|
| 1. | District Court Docket Sheet | App.001 – App.010 |
| 2. | Final Rule | App.011 – App.107 |
| 3. | Motion for Preliminary Injunction (ECF No. 3) | App.108 – App.112 |
| 4. | Brief in Support of Motion for Preliminary Injunction (ECF No. 4) | App.113 – App.145 |
| 5. | Appendix in Support of Motion for Preliminary Injunction (ECF No. 5) | App.146 – App.208 |
| 6. | Order Granting Motion for Expedited Briefing (ECF No. 15) | App.209 – App.210 |
| 7. | Opposition to Motion for Preliminary Injunction (ECF No. 22) | App.211 – App.215 |
| 8. | Brief in Support of Opposition to Motion for Preliminary Injunction (ECF No. 23) | App.216 – App.249 |
| 9. | Court Request for Recusal (ECF No. 39) | App.250 – App.251 |
| 10. | Reply in Support of Motion for Preliminary Injunction (ECF No. 41) | App.252 – App.268 |
| 11. | Supplemental Appendix in Support of Motion for Preliminary Injunction (ECF No. 42-1) | App.269 – App.273 |
| 12. | Order on Expedited Briefing Regarding Venue (ECF No. 45) | App.274 – App.276 |
| 13. | Notice of Intention to File Motion to Transfer (ECF No. 46) | App.277 – App.280 |
| 14. | Motion to Expedite Consideration of Preliminary Injunction Motion (ECF No. 47) | App.281 – App.286 |
| 15. | Memorandum in Support of Motion to Expedite Consideration of Preliminary Injunction Motion (ECF No. 48) | App.287 – App.305 |
| 16. | Order Denying Motion for Expedited Consideration (ECF No. 51) | App.306 – App.308 |
| 17. | Motion to Transfer (ECF No. 52) | App.309 – App.313 |
| 18. | Memorandum in Support of Motion to Transfer (ECF No. 53) | App.314 – App.337 |

| 19. | Appendix in Support of Motion to Transfer (ECF No. 54) | App.338 – App.373 |
| 20. | Supplemental Brief on Venue and Response to Motion to Transfer Venue | App.374 – App.396 |
| 21. | Appendix in Support of Supplemental Brief on Venue and Response to Motion to Transfer Venue | App.397 – App.410 |
| 22. | Notice of Appeal | App.411 – App.416 |

# EXHIBIT 1

APPEAL

# U.S. District Court
## Northern District of Texas (Fort Worth)
## CIVIL DOCKET FOR CASE #: 4:24−cv−00213−P

Chamber of Commerce of the United States of America et al v. Consumer Financial Protection Bureau et al
Assigned to: Judge Mark Pittman
Cause: 05:551 Administrative Procedure Act

Date Filed: 03/07/2024
Jury Demand: None
Nature of Suit: 899 Other Statutes: Administrative Procedure Act/Review or Appeal of Agency Decision
Jurisdiction: Federal Question

**Plaintiff**

**Chamber of Commerce of the United States of America**

represented by **Jennifer B Dickey**
US Chamber Litigation Center
1615 H Street NW
Washington, DC 20062−0001
202−313−8543
Email: jdickey@uschamber.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Maria C Monaghan**
US Chamber Litigation Center
1615 H Street NW
Washington, DC 20062
202−680−3592
Email: mmonaghan@uschamber.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Murray**
Paul Hastings LLP
2050 M Street NW
Washington, DC 20036
202−551−1730
Email: michaelmurray@paulhastings.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Philip A Vickers**
Cantey Hanger LLP
Cantey Hanger Plaza
600 West 6th St Suite 300
Fort Worth, TX 76102−3685
817/877−2849
Fax: 817/877−2807
Email: pvickers@canteyhanger.com
*ATTORNEY TO BE NOTICED*

**Timothy Derek Carson**
Cantey Hanger LLP
600 W 6th Street, Suite 300
Fort Worth, TX 76102
817−877−2850
Fax: 817−877−2807
Email: dcarson@canteyhanger.com
*ATTORNEY TO BE NOTICED*

**Tor Tarantola**
Paul Hastings LLP
2050 M Street NW
Washington, DC 20036

App.002

202−551−1843
Email: tortarantola@paulhastings.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fort Worth Chamber of Commerce**                represented by   **Michael Murray**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Philip A Vickers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tor Tarantola**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy Derek Carson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Longview Chamber of Commerce**                represented by   **Michael Murray**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Philip A Vickers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Timothy Derek Carson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tor Tarantola**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**American Bankers Association**                represented by   **Thomas J Pinder**
American Bankers Association
1333 New Hampshire Avenue NW
Suite 700
Washington, DC 20036
202−663−5028
Email: tpinder@aba.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Andrew Raymond Doersam**
1333 New Hampshire Ave NW
Washington, DC 20036
202−663−5035
Email: adoersam@aba.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Murray**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Philip A Vickers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Consumer Bankers Association**    represented by    **Michael Murray**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Philip A Vickers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Timothy Derek Carson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tor Tarantola**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Texas Association of Business**    represented by    **Michael Murray**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Philip A Vickers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Timothy Derek Carson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tor Tarantola**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Consumer Financial Protection Bureau**    represented by    **Stephanie Garlock**
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
202–435–7201
Email: stephanie.garlock@cfpb.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Justin Michael Sandberg**
Consumer Financial Protection Bureau

Cfpb
1700 G. St. NW
Washington, DC 20552
202–450–8786
Email: justin.sandberg@cfpb.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Rohit Chopra**                                    represented by   **Stephanie Garlock**
*in his official capacity as Director of the*                       (See above for address)
*Consumer Financial Protection Bureau*                             *LEAD ATTORNEY*
                                                                   *PRO HAC VICE*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Justin Michael Sandberg**
                                                                   (See above for address)
                                                                   *PRO HAC VICE*
                                                                   *ATTORNEY TO BE NOTICED*

V.

**Movant**

**Bank Policy Institute**                          represented by   **Bradley G Hubbard**
*Party and attorney are active (attorney*                          Gibson Dunn & Crutcher LLP
*has been terminated to restrict access to*                        2001 Ross Avenue
*sealed filings.)*                                                 Suite 2100
                                                                   Dallas, TX 75201
                                                                   214–698–3326
                                                                   Fax: 214–571–2954
                                                                   Email: bhubbard@gibsondunn.com
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Eugene Scalia**
                                                                   Gibson, Dunn & Crutcher LLP
                                                                   1050 Connecticut Ave., N.W.
                                                                   Washington, DC 20036
                                                                   202–955–8500
                                                                   Fax: 202–467–0539
                                                                   Email: EScalia@gibsondunn.com
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Jacob T. Spencer**
                                                                   Gibson, Dunn & Crutcher LLP
                                                                   Gibson, Dunn & Crutcher LLP
                                                                   1050 Connecticut Ave. NW
                                                                   Washington
                                                                   Washington, DC 20036
                                                                   617–921–2105
                                                                   Email: JSpencer@gibsondunn.com
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Zachary Faircloth**
                                                                   Gibson Dunn & Crutcher
                                                                   Texas
                                                                   2001 Ross Ave, Ste 2100
                                                                   Dallas, TX 75201
                                                                   214–698–3173
                                                                   Email: zfaircloth@gibsondunn.com
                                                                   *LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/07/2024 | 1 | COMPLAINT against Rohit Chopra, Consumer Financial Protection Bureau filed by Longview Chamber of Commerce, Texas Association of Business, Fort Worth Chamber of Commerce, Chamber of Commerce of the United States of America, American Bankers Association, Consumer Bankers Association. (Filing fee $405; Receipt number ATXNDC−14448397) Clerk to issue summonses for federal and non−federal defendants. In each Notice of Electronic Filing, the judge assignment is indicated, and a link to the Judges Copy Requirements and Judge Specific Requirements is provided. The court reminds the filer that any required copy of this and future documents must be delivered to the judge, in the manner prescribed, within three business days of filing. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information − Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Attachments: # 1 Cover Sheet) (Carson, Timothy) (Entered: 03/07/2024) |
| 03/07/2024 | 2 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by American Bankers Association, Chamber of Commerce of the United States of America, Consumer Bankers Association, Fort Worth Chamber of Commerce, Longview Chamber of Commerce, Texas Association of Business. (Clerk QC note: No affiliate entered in ECF). (Carson, Timothy) (Entered: 03/07/2024) |
| 03/07/2024 | 3 | MOTION for Injunction *(Preliminary Injunction)* filed by American Bankers Association, Chamber of Commerce of the United States of America, Consumer Bankers Association, Fort Worth Chamber of Commerce, Longview Chamber of Commerce, Texas Association of Business (Carson, Timothy) (Entered: 03/07/2024) |
| 03/07/2024 | 4 | Brief/Memorandum in Support filed by American Bankers Association, Chamber of Commerce of the United States of America, Consumer Bankers Association, Fort Worth Chamber of Commerce, Longview Chamber of Commerce, Texas Association of Business re 3 MOTION for Injunction *(Preliminary Injunction)* (Carson, Timothy) (Entered: 03/07/2024) |
| 03/07/2024 | 5 | Appendix in Support filed by American Bankers Association, Chamber of Commerce of the United States of America, Consumer Bankers Association, Fort Worth Chamber of Commerce, Longview Chamber of Commerce, Texas Association of Business re 3 MOTION for Injunction *(Preliminary Injunction)* (Carson, Timothy) (Entered: 03/07/2024) |
| 03/07/2024 | 6 | Emergency MOTION to Expedite *Briefing Schedule on Motion for Preliminary Injunction* filed by American Bankers Association, Chamber of Commerce of the United States of America, Consumer Bankers Association, Fort Worth Chamber of Commerce, Longview Chamber of Commerce, Texas Association of Business (Carson, Timothy) (Entered: 03/07/2024) |
| 03/07/2024 | 7 | New Case Notes: A filing fee has been paid. File to: Judge Means. Pursuant to Misc. Order 6, Plaintiff is provided the Notice of Right to Consent to Proceed Before A U.S. Magistrate Judge. Clerk to provide copy to plaintiff if not received electronically. (bdb) (Entered: 03/07/2024) |
| 03/07/2024 | 8 | Summons issued as to Rohit Chopra, Consumer Financial Protection Bureau, U.S. Attorney, and U.S. Attorney General. (bdb) (Entered: 03/07/2024) |
| 03/07/2024 | 9 | ORDER FOR REASSIGNMENT: The undersigned judge, having taken senior status, desires to have this case re−assigned to an active−status judge. The clerk of the Court is therefore DIRECTED to re−assign this case by random draw to another judge. Case reassigned to Judge Reed C. O'Connor for all further proceedings. Senior Judge Terry R Means no longer assigned to case. (Ordered by Senior Judge Terry R Means on 3/7/2024) (saw) (Entered: 03/07/2024) |
| 03/07/2024 | 10 | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Jennifer Dickey (Filing fee $100; Receipt number ATXNDC−14449918) |

App.006

| | | |
|---|---|---|
| | | filed by Chamber of Commerce of the United States of America (Carson, Timothy) (Entered: 03/07/2024) |
| 03/07/2024 | 11 | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Maria Monaghan (Filing fee $100; Receipt number ATXNDC−14450068) filed by Chamber of Commerce of the United States of America (Carson, Timothy) (Entered: 03/07/2024) |
| 03/07/2024 | 12 | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Thomas Pinder (Filing fee $100; Receipt number ATXNDC−14450075) filed by American Bankers Association (Carson, Timothy) (Entered: 03/07/2024) |
| 03/07/2024 | 13 | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Andrew Doersam (Filing fee $100; Receipt number ATXNDC−14450098) filed by American Bankers Association (Carson, Timothy) (Entered: 03/07/2024) |
| 03/07/2024 | 14 | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number BTXNDC−14450225) filed by American Bankers Association, Chamber of Commerce of the United States of America, Consumer Bankers Association, Fort Worth Chamber of Commerce, Longview Chamber of Commerce, Texas Association of Business (Attachments: # 1 Additional Page(s))Attorney Michael Murray added to party American Bankers Association(pty:pla) (Murray, Michael) (Entered: 03/07/2024) |
| 03/08/2024 | 15 | ORDER: Before the Court are Plaintiffs' Motion for Preliminary Injunction (ECF No. 3 ) and Plaintiffs' Emergency Motion for Expedited Briefing (ECF No. 6 ). The Court finds good cause to expedite the briefing schedule on the requested preliminary injunction. The Court ORDERS Defendants to file a response by March 12, 2024. Plaintiffs may file a reply by March 14, 2024. The Court further ORDERS Plaintiffs to immediately deliver a copy of this Order to Defendants and file a notice on the docket by March 8, 2024 confirming delivery was made. (Ordered by Judge Reed C. O'Connor on 3/8/2024) (saw) (Entered: 03/08/2024) |
| 03/08/2024 | 16 | NOTICE of *Delivery of Order* re: 15 Order Setting Deadline/Hearing,, filed by American Bankers Association, Chamber of Commerce of the United States of America, Consumer Bankers Association, Fort Worth Chamber of Commerce, Longview Chamber of Commerce, Texas Association of Business (Vickers, Philip) (Entered: 03/08/2024) |
| 03/09/2024 | 17 | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Tor Tarantola (Filing fee $100; Receipt number ATXNDC−14453352) filed by American Bankers Association, Chamber of Commerce of the United States of America, Consumer Bankers Association, Fort Worth Chamber of Commerce, Longview Chamber of Commerce, Texas Association of Business (Carson, Timothy) (Entered: 03/09/2024) |
| 03/12/2024 | 18 | Application for Admission Pro Hac Vice with Certificate of Good Standing (Clerk Note: Filer states no fee is to be collected due to prior payment or waiver by MO 16 or prior order.) filed by Rohit Chopra, Consumer Financial Protection Bureau (Attachments: # 1 Proposed Order) (Garlock, Stephanie) (Entered: 03/12/2024) |
| 03/12/2024 | 19 | MOTION for Waiver of the Local Counsel Requirement filed by Rohit Chopra, Consumer Financial Protection Bureau (Attachments: # 1 Proposed Order) (Garlock, Stephanie) (Entered: 03/12/2024) |
| 03/12/2024 | 20 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by Rohit Chopra, Consumer Financial Protection Bureau. (Clerk QC note: No affiliate entered in ECF). (Garlock, Stephanie) (Entered: 03/12/2024) |
| 03/12/2024 | 21 | MOTION for Leave to File Amicus Curiae in Support of Plaintiffs' Motion for Preliminary Injunction filed by Bank Policy Institute (Attachments: # 1 Brief Amicus Curiae, # 2 Proposed Order). Party Bank Policy Institute added. (Hubbard, Bradley) (Entered: 03/12/2024) |
| 03/12/2024 | 22 | RESPONSE filed by Rohit Chopra, Consumer Financial Protection Bureau re: 3 MOTION for Injunction *(Preliminary Injunction)* (Garlock, Stephanie) (Entered: 03/12/2024) |

| 03/12/2024 | 23 | Brief/Memorandum in Support filed by Rohit Chopra, Consumer Financial Protection Bureau re 22 Response/Objection *to Motion for Preliminary Injunction* (Garlock, Stephanie) (Entered: 03/12/2024) |
|---|---|---|
| 03/13/2024 | 24 | ELECTRONIC ORDER granting 10 Application for Admission Pro Hac Vice of Jennifer Dickey. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Reed C. O'Connor on 3/13/2024) (chmb) (Entered: 03/13/2024) |
| 03/13/2024 | 25 | ELECTRONIC ORDER granting 17 Application for Admission Pro Hac Vice of Tor Tarantola. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Reed C. O'Connor on 3/13/2024) (chmb) (Entered: 03/13/2024) |
| 03/13/2024 | 26 | ELECTRONIC ORDER granting 18 Application for Admission Pro Hac Vice of Stephanie Garlock. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Reed C. O'Connor on 3/13/2024) (chmb) (Entered: 03/13/2024) |
| 03/13/2024 | 27 | ELECTRONIC ORDER granting 11 Application for Admission Pro Hac Vice of Maria Monaghan. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Reed C. O'Connor on 3/13/2024) (chmb) (Entered: 03/13/2024) |
| 03/13/2024 | 28 | ELECTRONIC ORDER granting 12 Application for Admission Pro Hac Vice of Thomas Pinder. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Reed C. O'Connor on 3/13/2024) (chmb) (Entered: 03/13/2024) |
| 03/13/2024 | 29 | ELECTRONIC ORDER granting 13 Application for Admission Pro Hac Vice of Andrew Doersam. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Reed C. O'Connor on 3/13/2024) (chmb) (Entered: 03/13/2024) |
| 03/13/2024 | 30 | ELECTRONIC ORDER granting 14 Application for Admission Pro Hac Vice of Michael Murray. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Reed C. O'Connor on 3/13/2024) (chmb) (Entered: 03/13/2024) |
| 03/13/2024 | 31 | ORDER: Before the Court is Bank Policy Institute's Motion to File Amicus Curiae Brief in Support of Plaintiffs' Motion for Preliminary Injunction (ECF No. 21 ).The motion should be, and is hereby, GRANTED. Accordingly, the Clerk is DIRECTED to file Bank Policy Institute's Brief of Amicus Curiae (ECF No. 21 −2) as a separate docket entry as of the date of the Motion. (Ordered by Judge Reed C. O'Connor on 3/13/2024) (saw) (Entered: 03/13/2024) |
| 03/13/2024 | 32 | Brief Amicus Curiae of Bank Policy Institute In Support Of Plaintiffs' 13 Motion For Preliminary Injunction filed by Bank Policy Institute re 3 Motion for Injunction *(Preliminary Injunction)* (saw) (Entered: 03/13/2024) |
| 03/13/2024 | 33 | ORDER: Before the Court is Defendants' Unopposed Motion for Waiver of the Local Counsel Requirement (ECF No. 19 ). The Court GRANTS Defendants' motion and ORDERS that Defendants may proceed without local counsel. The Court further ORDERS Ms. Garlock and Mr. Sandberg to fulfill all local counsel requirements and abide by the Local Rules of this Court. (Ordered by Judge Reed C. O'Connor on 3/13/2024) (saw) (Entered: 03/13/2024) |
| 03/13/2024 | 34 | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC−14462886) filed by Bank Policy Institute (Scalia, Eugene) (Entered: 03/13/2024) |

| 03/13/2024 | 35 | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC–14462924) filed by Bank Policy Institute (Spencer, Jacob) (Entered: 03/13/2024) |
|---|---|---|
| 03/14/2024 | 36 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by Rohit Chopra, Consumer Financial Protection Bureau. (Clerk QC note: Affiliate entry indicated). (Garlock, Stephanie) (Entered: 03/14/2024) |
| 03/14/2024 | 37 | ELECTRONIC ORDER granting 34 Application for Admission Pro Hac Vice of Eugene Scalia. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Reed C. O'Connor on 3/14/2024) (chmb) (Entered: 03/14/2024) |
| 03/14/2024 | 38 | ELECTRONIC ORDER granting 35 Application for Admission Pro Hac Vice of Jacob T. Spencer. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Reed C. O'Connor on 3/14/2024) (chmb) Modified document relationship on 3/14/2024 (bdb). (Entered: 03/14/2024) |
| 03/14/2024 | 39 | Court Request for Recusal: Judge Reed C. O'Connor recused. Pursuant to instruction in Special Order 3–249, the Clerk has reassigned the case to Judge Mark Pittman for all further proceedings. Future filings should indicate the case number as: 4:24–cv–00213–P. (bcr) (Entered: 03/14/2024) |
| 03/14/2024 | 40 | New Case Notes: A filing fee has been paid. File to: Judge Pittman. Pursuant to Misc. Order 6, Plaintiff is provided the Notice of Right to Consent to Proceed Before A U.S. Magistrate Judge. Clerk to provide copy to plaintiff if not received electronically. Attorneys are further reminded that, if necessary, they must comply with Local Rule 83.10(a) within 14 days or risk the possible dismissal of this case without prejudice or without further notice. (bcr) (Entered: 03/14/2024) |
| 03/14/2024 | 41 | REPLY filed by American Bankers Association, Chamber of Commerce of the United States of America, Consumer Bankers Association, Fort Worth Chamber of Commerce, Longview Chamber of Commerce, Texas Association of Business re: 3 MOTION for Injunction (Preliminary Injunction) (Carson, Timothy) (Entered: 03/14/2024) |
| 03/14/2024 | 42 | Unopposed MOTION for Leave to File a Supplemental Appendix in Support of Motion for Preliminary Injunction filed by American Bankers Association, Chamber of Commerce of the United States of America, Consumer Bankers Association, Fort Worth Chamber of Commerce, Longview Chamber of Commerce, Texas Association of Business (Attachments: # 1 Exhibit(s) Proposed Supplemental Appendix) (Carson, Timothy) (Entered: 03/14/2024) |
| 03/15/2024 | 43 | ORDER: Before the Court is Plaintiffs' Unopposed Motion for Leave to File Supplemental Appendix in Support of their Motion for Preliminary Injunction. ECF No. 42 . The Court hereby GRANTS the motion. The Clerk is INSTRUCTED to docket the attachment to the Motion (ECF No. 42 −1) as Plaintiffs' Supplemental Appendix in Support of their Motion for Preliminary Injunction. (Ordered by Judge Mark Pittman on 3/15/2024) (saw) (Entered: 03/15/2024) |
| 03/15/2024 | 44 | Plaintiffs' Supplemental Appendix in Support of their 3 Motion for Preliminary Injunction filed by American Bankers Association, Chamber of Commerce of the United States of America, Consumer Bankers Association, Fort Worth Chamber of Commerce, Longview Chamber of Commerce, Texas Association of Business re 3 MOTION for Injunction (Preliminary Injunction) (saw) (Entered: 03/15/2024) |
| 03/18/2024 | 45 | ORDER: The Court finds it necessary to ORDER expedited briefing regarding venue. (Ordered by Judge Mark Pittman on 3/18/2024)(See order for specifics.) (saw) (Entered: 03/18/2024) |
| 03/19/2024 | 46 | NOTICE of Intention to File Motion to Transfer re: 45 Order Setting Deadline/Hearing filed by Rohit Chopra, Consumer Financial Protection Bureau (Garlock, Stephanie) (Entered: 03/19/2024) |

| 03/19/2024 | 47 | MOTION to Expedite *Consideration of Preliminary−Injunction Motion* filed by American Bankers Association, Chamber of Commerce of the United States of America, Consumer Bankers Association, Fort Worth Chamber of Commerce, Longview Chamber of Commerce, Texas Association of Business Attorney Philip A Vickers added to party American Bankers Association(pty:pla) (Vickers, Philip) (Entered: 03/19/2024) |
| --- | --- | --- |
| 03/19/2024 | 48 | Brief/Memorandum in Support filed by American Bankers Association, Chamber of Commerce of the United States of America, Consumer Bankers Association, Fort Worth Chamber of Commerce, Longview Chamber of Commerce, Texas Association of Business re 47 MOTION to Expedite *Consideration of Preliminary−Injunction Motion* (Vickers, Philip) (Entered: 03/19/2024) |
| 03/19/2024 | 49 | Application for Admission Pro Hac Vice with Certificate of Good Standing (Clerk Note: Filer states no fee is to be collected due to prior payment or waiver by MO 16 or prior order.) filed by Rohit Chopra, Consumer Financial Protection Bureau (Attachments: # 1 Proposed Order)Attorney Justin Michael Sandberg added to party Rohit Chopra(pty:dft), Attorney Justin Michael Sandberg added to party Consumer Financial Protection Bureau(pty:dft) (Sandberg, Justin) (Entered: 03/19/2024) |
| 03/20/2024 | 50 | ELECTRONIC ORDER granting 49 Application for Admission Pro Hac Vice of Justin Michael Sandberg. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Mark Pittman on 3/20/2024) (jaf) (Entered: 03/20/2024) |
| 03/20/2024 | 51 | ORDER: Before the Court is Plaintiffs' Motion for Expedited Consideration of Plaintiffs' Preliminary Injunction Motion. ECF No. 47 . The Court determines that the Motion should be and hereby is DENIED. (Ordered by Judge Mark Pittman on 3/20/2024) (saw) (Entered: 03/20/2024) |
| 03/21/2024 | 52 | MOTION to Transfer Case out of District/Division filed by Rohit Chopra, Consumer Financial Protection Bureau (Garlock, Stephanie) (Entered: 03/21/2024) |
| 03/21/2024 | 53 | Brief/Memorandum in Support filed by Rohit Chopra, Consumer Financial Protection Bureau re 52 MOTION to Transfer Case out of District/Division (Garlock, Stephanie) (Entered: 03/21/2024) |
| 03/21/2024 | 54 | Appendix in Support filed by Rohit Chopra, Consumer Financial Protection Bureau re 52 MOTION to Transfer Case out of District/Division (Garlock, Stephanie) (Entered: 03/21/2024) |
| 03/25/2024 | 55 | RESPONSE filed by American Bankers Association, Chamber of Commerce of the United States of America, Consumer Bankers Association, Fort Worth Chamber of Commerce, Longview Chamber of Commerce, Texas Association of Business re: 52 MOTION to Transfer Case out of District/Division (Carson, Timothy) (Entered: 03/25/2024) |
| 03/25/2024 | 56 | Appendix in Support filed by American Bankers Association, Chamber of Commerce of the United States of America, Consumer Bankers Association, Fort Worth Chamber of Commerce, Longview Chamber of Commerce, Texas Association of Business re 55 Response/Objection, (Carson, Timothy) (Entered: 03/25/2024) |
| 03/25/2024 | 57 | NOTICE OF INTERLOCUTORY APPEAL to the Fifth Circuit by American Bankers Association, Chamber of Commerce of the United States of America, Consumer Bankers Association, Fort Worth Chamber of Commerce, Longview Chamber of Commerce, Texas Association of Business. Filing fee $605, receipt number ATXNDC−14487468. T.O. form to appellant electronically at Transcript Order Form or US Mail as appropriate. Copy of NOA to be sent US Mail to parties not electronically noticed. IMPORTANT ACTION REQUIRED: Provide an electronic copy of any exhibit you offered during a hearing or trial that was admitted into evidence to the clerk of the district court within 14 days of the date of this notice. Copies must be transmitted as PDF attachments through ECF by all ECF Users or delivered to the clerk on a CD by all non−ECF Users. See detailed instructions here. (Exception: This requirement does not apply to a pro se prisoner litigant.) Please note that if original exhibits are in your possession, you must maintain them through final disposition of the case. (Carson, Timothy) (Entered: 03/25/2024) |

EXHIBIT 2

## CONSUMER FINANCIAL PROTECTION BUREAU

**12 CFR Part 1026**

**[Docket No. CFPB–2023–0010]**

**RIN 3170–AB15**

## Credit Card Penalty Fees (Regulation Z)

**AGENCY:** Consumer Financial Protection Bureau.

**ACTION:** Final rule; official interpretation.

**SUMMARY:** The Consumer Financial Protection Bureau (CFPB or Bureau) amends Regulation Z, which implements the Truth in Lending Act (TILA), to address late fees charged by card issuers that together with their affiliates have one million or more open credit card accounts (referred to as "Larger Card Issuers" herein). This final rule adopts a late fee safe harbor threshold of $8 for those issuers and provides that the annual adjustments to reflect changes in the Consumer Price Index (CPI) do not apply to this $8 amount.

**DATES:** *Effective date:* May 14, 2024.

**FOR FURTHER INFORMATION CONTACT:** Adrien Fernandez, Counsel; Krista Ayoub and Steve Wrone, Senior Counsels, Office of Regulations, at 202–435–7700. If you require this document in an alternative electronic format, please contact *CFPB_Accessibility@cfpb.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Summary of the Final Rule

The CFPB is amending provisions in Regulation Z, § 1026.52(b) and its accompanying commentary as they relate to credit card penalty fees.[1] Currently, under § 1026.52(b)(1), a card issuer must not impose a fee for violating the terms or other requirements of a credit card account

under an open-end (not home-secured) consumer credit plan, such as a late payment, exceeding the credit limit, or a returned payment, unless the issuer has determined that the dollar amount of the fee represents a reasonable proportion of the total costs incurred by the issuer for that type of violation as set forth in § 1026.52(b)(1)(i) (so-called cost analysis provisions) or complies with the safe harbor provisions set forth in § 1026.52(b)(1)(ii). Section 1026.52(b)(1)(ii)(A) and (B) currently sets forth a safe harbor of $30 generally for penalty fees, except that it sets forth a safe harbor of $41 for each subsequent violation of the same type that occurs during the same billing cycle or in one of the next six billing cycles.[2] The CFPB has determined that for Larger Card Issuers (*i.e.,* card issuers that together with their affiliates have one million or more open credit card accounts),[3] the discretionary safe harbor dollar amounts for late fees, as currently set forth in § 1026.52(b)(1)(ii)(A) and (B), are too high and, therefore, are not consistent with TILA's statutory requirement that such fees be reasonable and proportional to the omission or violation to which the fee relates. With respect to the current higher safe harbor threshold for late fees for certain subsequent violations, the CFPB also is concerned based on data from certain Larger Card Issuers that this amount is higher than is justified based on consumer conduct and to deter future violations and, indeed, a late fee that is too high could interfere with a consumer's ability to make future payments on the account.

To address these concerns, this final rule amends § 1026.52(b) and its accompanying commentary to help ensure that the safe harbor sets late fees imposed by Larger Card Issuers at amounts that are consistent with the TILA's requirement that such fees be reasonable and proportional to the cost from an omission or violation. First, with respect to Larger Card Issuers, this final rule repeals the current safe harbor threshold amounts in § 1026.52(b)(1)(ii)(A) and (B), adopts in § 1026.52(b)(1)(ii) a late fee safe harbor

dollar amount of $8, and eliminates for late fees a higher safe harbor dollar amount for subsequent violations of the same type that occur during the same billing cycle or in one of the next six billing cycles.[4] Second, with respect to late fees imposed by Larger Card Issuers, this final rule provides that the current provision in § 1026.52(b)(1)(ii)(D) that provides for annual adjustments for the safe harbor dollar amounts to reflect changes in the CPI will not apply to the $8 safe harbor amount for those late fees. This final rule also amends comments 7(b)(11)–4, 52(a)(1)–1.i and iv, 60(a)(2)–5.ii, and sample forms in appendix G to revise current examples of late fee amounts to be consistent with the $8 safe harbor late fee amount discussed above.

This final rule does not adopt the following revisions for Smaller Card Issuers as defined in new § 1026.52(b)(3): (1) repeal of the current safe harbor threshold amounts in § 1026.52(b)(1)(ii)(A) and (B), adoption of $8 late fee safe harbor threshold amount, and elimination of a higher late fee safe harbor dollar amount for subsequent violations; and (2) the elimination of the annual adjustments for the safe harbor threshold dollar amounts. This final rule defines the term "Smaller Card Issuer" in § 1026.52(b)(3) to mean a card issuer that together with its affiliates have fewer than one million open credit card accounts for the entire preceding calendar year.[5] For purposes of defining "Smaller Card Issuer," this final rule incorporates the definition of "open credit card account" from § 1026.58(b)(6), which defines the term to mean a credit card account under an open-end (not home-secured) consumer credit plan and either: (1) The cardholder can obtain extensions of credit on the account; or (2) There is an outstanding balance on the account that has not been charged off. As discussed below, the safe harbors in § 1026.52(b)(1)(ii)(A) and (B), as revised in this final rule pursuant to the annual adjustments in § 1026.52(b)(1)(ii)(D), will continue to apply to late fees imposed by Smaller Card Issuers.

---

[1] When amending commentary, the Office of the Federal Register (OFR) requires reprinting of certain subsections being amended in their entirety rather than providing more targeted amendatory instructions. The sections of regulatory text and commentary included in this document show the language of those sections as amended by this final rule. In addition, the CFPB is releasing an unofficial, informal redline to assist industry and other stakeholders in reviewing the revisions by this final rule to the regulatory text and commentary of Regulation Z. This redline can be found on the CFPB's website, *https://files.consumerfinance.gov/f/documents/cfpb_unofficial-redline_credit-card-penalty-fees_final-rule_2024-01.pdf.* If any conflicts exist between the redline and the text of Regulation Z, its commentary, or this final rule, the documents published in the **Federal Register** are the controlling documents.

[2] Although the safe harbors discussed above apply to charge card accounts, § 1026.52(b)(1)(ii)(C) provides an additional safe harbor when a charge card account becomes seriously delinquent.

[3] This final rule does not define the term "Larger Card Issuer" in the regulatory or commentary text, but this document uses this term to aid understanding of the changes in this final rule and readability of the document. This document uses the term "Larger Card Issuers" to refer to card issuers that are not Smaller Card Issuers as defined in § 1026.52(b)(3) and thus are card issuers that together with their affiliates have one million or more open credit card accounts.

[4] This final rule does not amend the safe harbor set forth in § 1026.52(b)(1)(ii)(C) applicable to charge card accounts.

[5] This final rule contains an exception if a card issuer together with its affiliates had fewer than one million open credit card accounts for the entire preceding calendar year but meets or exceeds that number of open credit card accounts in the current calendar year. In this case, this final rule provides that the card issuer will no longer be a Smaller Card Issuer as of 60 days after meeting or exceeding that number of open credit card accounts. *See* § 1026.52(b)(3)(ii).

Pursuant to the annual adjustments for safe harbor dollar amounts in § 1026.52(b)(1)(ii)(D), this final rule revises the safe harbor threshold amounts in § 1026.52(b)(1)(ii)(A) and (B) to $32, except that it sets forth a safe harbor of $43 for each subsequent violation of the same type that occurs during the same billing cycle or in one of the next six billing cycles. These revised safe harbor threshold amounts of $32 and $43 apply to penalty fees other than late fees for all card issuers (*i.e.,* Smaller Card Issuers and Larger Card Issuers) as well as late fees imposed by Smaller Card Issuers, as noted above.

This final rule also amends comment 52(b)(1)(i)–2.i to make it explicitly clear that costs for purposes of the cost analysis provisions in § 1026.52(b)(1)(i) for determining penalty fee amounts do not include any collection costs that are incurred after an account is charged off pursuant to loan loss provisions. This clarification applies to all card issuers that use the cost analysis provisions in § 1026.52(b)(1)(i) for determining penalty fee amounts, including late fees.

## II. Background

### A. The CARD Act

The Credit Card Accountability Responsibility and Disclosure Act of 2009 (CARD Act) was signed into law on May 22, 2009.[6] The CARD Act primarily amended TILA[7] and instituted new substantive and disclosure requirements to establish fair and transparent practices for open-end consumer credit plans. The CARD Act added TILA section 149, which provides, among other things, that the amount of any penalty fee with respect to a credit card account under an open-end consumer credit plan in connection with any omission with respect to, or violation of, the cardholder agreement, including any late payment fee or any other penalty fee or charge, must be "reasonable and proportional" to such omission or violation.[8]

At the time of its passage, the CARD Act required the Board of Governors of the Federal Reserve System (Board) to issue rules establishing standards for assessing the reasonableness and proportionality of such penalty fees.[9] In issuing these rules, the CARD Act required the Board to consider (1) the cost incurred by the creditor from an omission or violation; (2) the deterrence of omissions or violations by the cardholder; (3) the conduct of the cardholder; and (4) such other factors deemed necessary or appropriate by the Board.[10] The CARD Act authorized the Board to establish different standards for different types of fees and charges, as appropriate.[11] The CARD Act also granted the Board discretion to provide an amount for any penalty fee or charge that is presumed to be reasonable and proportional to the omission or violation to which the fee or charge relates.[12] As discussed in more detail below, the authority to implement TILA, including TILA section 149, transferred from the Board to the CFPB in 2011.

### B. The Board's Implementing Rule

On June 29, 2010, the Board issued a final rule implementing new TILA section 149 in its Regulation Z, 12 CFR 226.52(b) (2010 Final Rule).[13] The Board's Regulation Z, § 226.52(b) provided that a card issuer must not impose a fee for violating the terms or other requirements of a credit card account, such as a late payment, exceeding the credit limit, or returned payments, unless the issuer has determined that the dollar amount of the fee represents a reasonable proportion of the total costs incurred by the issuer for that type of violation as set forth in § 226.52(b)(1)(i). Alternatively, if the card issuer did not want to use the cost analysis provisions in § 226.52(b)(1)(i) to determine the late fee amount, the issuer could use the safe harbors set forth in § 226.52(b)(1)(ii).[14] The Board set the safe harbor amounts in § 226.52(b)(1)(ii) at $25 generally for penalty fees, except that it set forth a safe harbor of $35 for each subsequent violation of the same type that occurs during the same billing cycle or in one of the next six billing cycles.[15] Although the safe harbors discussed above applied to charge card accounts, the Board's Regulation Z, § 226.52(b)(1)(ii) also provided an additional safe harbor when a charge card account becomes seriously delinquent.[16] The Board's Regulation Z, § 226.52(b)(1)(ii)(D) provided that the safe harbor dollar amounts would be adjusted annually to the extent that changes in the CPI would result in an increase or decrease of $1.[17]

The Board's Regulation Z, § 226.52(b)(2) also contained other restrictions on card issuers for imposing penalty fees. Specifically, § 226.52(b)(2)(i) prohibited issuers from imposing penalty fees that exceed the dollar amount associated with the violation.[18] In addition, § 226.52(b)(2)(ii) prohibited issuers from imposing multiple penalty fees based on a single event or transaction.[19]

### C. Transfer of Authority for TILA to the CFPB and the CFPB's Rule

The Board's 2010 Final Rule implementing TILA section 149 took effect on August 22, 2010.[20] Nearly one year later, on July 21, 2011, the Board's rulemaking authority to implement the provisions of TILA, including TILA section 149, transferred to the CFPB pursuant to sections 1061 and 1100A of the Consumer Financial Protection Act of 2010 (CFPA).[21]

On December 22, 2011, the CFPB issued an interim final rule issuing its Regulation Z, 12 CFR part 1026, to reflect its assumption of rulemaking authority over TILA.[22] As set forth in the interim final rule, the CFPB's Regulation Z, § 1026.52(b) contained the same restrictions on penalty fees as set forth in the Board's Regulation Z, § 226.52(b).[23]

The dollar safe harbor amounts adopted by the Board in 2010 have been adjusted pursuant to § 1026.52(b)(1)(ii)(D).[24] Section 1026.52(b)(1)(ii) currently sets forth a safe harbor of $30 generally for penalty fees, except that it sets forth a safe harbor of $41 for each subsequent violation of the same type that occur during the same billing cycle or in one of the next six billing cycles.[25]

### D. A Decade of the Late Fee Safe Harbor

In the wake of the Board's and the CFPB's implementation of TILA section 149, late fees represent almost all

---

[6] Public Law 111–24, 123 Stat. 1734 (2009).

[7] 15 U.S.C. 1601 *et seq.*

[8] CARD Act section 102, 123 Stat. 1740 (15 U.S.C. 1665d(a)).

[9] CARD Act section 102, 123 Stat. 1740 (15 U.S.C. 1665d(b)).

[10] CARD Act section 102, 123 Stat. 1740 (15 U.S.C. 1665d(c)).

[11] CARD Act section 102, 123 Stat. 1740 (15 U.S.C. (1665d(d)).

[12] CARD Act section 102, 123 Stat. 1740 (15 U.S.C. (1665d(e)).

[13] 75 FR 37526 (June 29, 2010).

[14] 12 CFR 226.52(b)(1).

[15] 12 CFR 226.52(b)(1)(ii)(A) and (B).

[16] 12 CFR 226.52(b)(1)(ii)(C).

[17] 12 CFR 226.52(b)(1)(ii)(D).

[18] 12 CFR 226.52(b)(2)(i).

[19] 12 CFR 226.52(b)(2)(ii).

[20] 75 FR 37526 at 37526.

[21] Public Law 111–203, 124 Stat. 1376, 1955–2113 (2010).

[22] 76 FR 79768 (Dec. 22, 2011); *see also* 81 FR 25323 (Apr. 28, 2016).

[23] 76 FR 79768 at 79822.

[24] Comment 52(b)(1)(ii)–2.

[25] Although the safe harbors discussed above apply to charge card accounts, § 1026.52(b)(1)(ii)(C) provides an additional safe harbor when a charge card account becomes seriously delinquent. Specifically, § 1026.52(b)(1)(ii)(C) provides that, when a card issuer has not received the required payment for two or more consecutive billing cycles on a charge card account that requires payment of outstanding balances in full at the end of each billing cycle, it may impose a late payment fee that does not exceed 3 percent of the delinquent balance.

penalty fee volume on credit cards. Over-the-limit fees are now practically nonexistent and fees for returned payments account for less than one percent of total fee volume based on Y–14+ data collected from a group of mass market and specialized issuers.[26]

Prior to the passage of the CARD Act in 2009, the average late fee was $33 for issuers in the CFPB's Credit Card Database (CCDB) which includes information on the full consumer and small business credit card portfolios of large credit card lenders, covering approximately 85 percent of all credit card accounts in the U.S. between April 2008 and April 2016.[27] With the effective date of the safe harbor threshold amounts in 2010, the average late fee in the CCDB declined by over $10 to $23 in the fourth quarter of 2010.[28]

However, from 2010 through the onset of the COVID–19 pandemic, issuers had steadily been charging consumers more in credit card late fees each year—growing to over $14 billion in total late fee volume for issuers contained in the Y–14+ data in 2019.[29] At the end of 2012, the average late fee for major issuers in the CCDB reached about $27.[30] It remained at about that level until rising to $28 in 2018 for issuers in the Y–14+, consistent with the first safe harbor adjustment to reflect changes in the CPI in 2014.[31] In 2019, the average late fee charged by credit card issuers in the Y–14+ rose to $31, approaching nominal pre-CARD Act levels.[32] In 2020, the average late fee for issuers in the Y–14+ data stayed at $31.[33]

Total late fee volume for issuers contained in the Y–14+ exceeded pre-pandemic levels in 2022, following declines in both 2020 and 2021 given record-high payment rates and public and private relief efforts, as discussed in the 2023 Proposal (88 FR 18906 (Mar. 29, 2023)).[34] Data published after the 2023 Proposal found issuers in the Y–14+ reported $14.5 billion in late fees in 2022, up from $11.3 billion in 2021, $11.9 billion in 2020, and slightly above $14.2 billion in 2019.[35] The average late fee increased from $31 in 2021 to $32 in 2022 across both first-time and repeat incidents of late payment, explaining part of the increase in total volume in 2022.[36]

### E. Credit Card Issuers' Use of the Late Fee Safe Harbor

Currently, § 1026.52(b)(1)(ii) sets forth a safe harbor of $30 generally for a late payment, except that it sets forth a safe harbor of $41 for each subsequent late payment within the next six billing cycles. A card issuer is not required to use the cost analysis provisions in § 1026.52(b)(1)(i) to determine the amount of late fees if it complies with these safe harbor amounts.[37]

As noted in the 2023 Proposal, an analysis by the CFPB in 2022 of credit card agreements submitted to the CFPB's Credit Card Agreement Database in the fourth quarter of 2020 found no evidence of any issuers using the cost analysis provisions to charge an amount higher than the safe harbor.[38] Most top issuers by outstanding balances have taken advantage of the increased safe harbors as annually adjusted to reflect changes in the CPI by increasing their fee amounts.[39] Eighteen of the top 20 issuers by outstanding balances contracted a maximum late fee at or near the higher safe harbor amount of $40 in 2020 based on analysis of the maximum late fee disclosed by an institution in agreements submitted to the CFPB's Credit Card Agreement Database in the fourth quarter of that year.[40] Yet, the most common maximum late fee disclosed in agreements submitted to the CFPB was $25, as driven by the practices of smaller banks and credit unions not in the top 20

issuers by asset size.[41] Finally, a small but growing number of issuers offer credit card products with no late fees.[42]

An analysis by the CFPB in 2023 of credit card agreements submitted to the CFPB's Credit Card Agreement Database in the second quarter of 2023 was consistent with the 2022 results. The CFPB did not find evidence of issuers using the cost analysis provision to charge an amount higher than the safe harbor. Of the approximately 30 to 35 submitters that the CFPB would expect to be Larger Card Issuers, most of those issuers continued to contract at a maximum late fee at or near the higher safe harbor amount of $41 in 2023 with all Larger Card Issuers in the Y–14+ data charging a maximum late fee between $38 and $41. For Larger Card Issuers, the maximum late fee in their submitted agreements ranged from $20 to $41 with 13 issuers charging $40 and 11 charging $41. Smaller Card Issuers with more than 10,000 accounts submitting agreements to the CPFB's Credit Card Database continue to charge far below the late fee safe harbor. Only six Smaller Card Issuers for whom the CFPB has data charged a maximum late fee of $41. Over two-thirds of the sample of Smaller Issuers charge $25 or less per late payment and 10 already charge $8 or less.

Some Larger Card Issuers may be disincentivized to lower late fee amounts below the safe harbor, given that the industry as a whole continues to rely on late fees as a source of revenue and many consumers may not shop for credit cards based on the amount of the late fee. For the Larger Card Issuers in the Y–14+ data, late fees represented 10 percent of charges to consumers in 2020, but individual card issuers' revenue from late fees varied.[43] The share of late fees for Larger Card Issuers in the Y–14+ data ranged from approximately five to 30 percent of total consumer charges in 2019. Among issuers there is a strong correlation between reliance on late fees and concentration of subprime accounts. Yet, the industry as a whole continues to rely on late fees as a source of revenue.[44]

As noted in the 2023 Proposal, many consumers may not shop for credit cards based on the amount of late fees, which also may lessen card issuers incentive to charge late fees lower than the safe harbor amount. Survey data suggest that other factors, such as rewards, annual fees, and annual percentage rate(s)

[26] Consumer Fin. Prot. Bureau (CFPB), *The Consumer Credit Card Market*, at 62–67 (Oct. 2023) (2023 Report), *https://files.consumerfinance.gov/f/documents/cfpb_consumer-credit-card-market-report_2023.pdf*. *See* part V for a description of the Y–14+ data.

[27] CFPB, *Card Act Report*, at 23 (Oct. 2013) (2013 Report), *https://files.consumerfinance.gov/f/201309_cfpb_card-act-report.pdf*. From 2008 to 2015, the CFPB used the CCDB to measure the amount of average late fees to include in the CARD Act reports that the CFPB releases every two years. In its 2017 report, the CFPB started using the Y–14 data to measure the amount of average late fees to include in its CARD Act reports and began using the Y–14+ data to calculate metrics including average late fee beginning with its 2019 report. *See* part V for a description of the Y–14 and Y–14+ data.

[28] *Id.*

[29] CFPB, *Credit Card Late Fees*, at 4 (Mar. 2022) (Late Fee Report), *https://files.consumerfinance.gov/f/documents/cfpb_credit-card-late-fees_report_2022-03.pdf*.

[30] 2013 Report, at 23.

[31] CFPB, *The Consumer Credit Card Market*, at 69 (Dec. 2019) (2019 Report), *https://files.consumerfinance.gov/f/documents/cfpb_consumer-credit-card-market-report_2019.pdf*.

[32] Late Fee Report, at 6.

[33] Late Fee Report, at 5; CFPB, *The Consumer Credit Card Market*, at 55 (Sept. 2021) (2021 Report), *https://files.consumerfinance.gov/f/*

documents/cfpb_consumer-credit-card-market-report_2021.pdf.

[34] 2021 Report, at 117; 2023 Report, at 65.

[35] 2023 Report, at 65.

[36] *Id.*

[37] *See* comment 52(b)(1)–1.i.A.

[38] Late Fee Report, at 14.

[39] *Id.*

[40] *Id.* The Credit Card Agreement Database is available at *https://www.consumerfinance.gov/credit-cards/agreements*.

[41] Late Fee Report, at 14.

[42] *Id.* at 15.

[43] *Id.* at 13.

[44] *Id.* at 14.

(APR), drive credit card usage.[45] In addition, recent academic work [46] directly observed that credit card offers highlight rewards, annual fees, and APRs more than late fees based on the position of the information and the size of the font.[47] Only 6.06 percent of the 611,797 card offers in their data spanning from 1999 to 2007 mentioned late fees on the front page, with an average font size of 9.56. In contrast, (1) rewards were displayed on the front page 93.68 to 100 percent of the time (depending on the type of rewards) with an average font size of 12.12 to 16.56; (2) the annual fee was disclosed on the front page 78.02 percent of the time with an average font size of 13.39; and (3) APRs were displayed on the front page 27.95 percent of the time with an average font size of 13.02. The CFPB notes that the authors of the study explained that most of the analysis reported in the paper excludes the post-2007 data to abstract from the impact of the 2008 financial crisis and the CARD Act.[48] However, the authors also stated that ''the main results are qualitatively and quantitatively very similar if we include data until 2016.'' [49] Since the CFPB issued the 2023 Proposal, other survey data indicate that late fee amounts are less impactful to consumers than annual fees, rewards, intro sign-up bonuses, credit limits, other benefits, and promotional or ongoing interest rates when deciding whether to apply for a new credit card or choosing whether to use an existing credit card.[50]

*F. Consumer Impact of Late Fees*

As noted in the 2023 Proposal, late fees represented over one-tenth of the $120 billion issuers charged to consumers in interest and fees in 2019, totaling over $14 billion in that year.[51] Since the CPFB issued the 2023 Proposal, this remains true as late fees represented over one-tenth of the more than $130 billion issuers in the Y–14+ charged to consumers in interest and fees in 2022, totaling over $14 billion that year.[52] A small share of accounts in low credit score tiers incur a high proportion of late fees.[53] Overall, the average deep subprime account in the Y–14 data [54] was charged $138 in late fees in 2019, compared with $11 for the average superprime account.[55] The higher incidence of late fees for accounts in lower tiers, combined with higher average charges for repeat late fees within six billing cycles of the initial late fee, drives this disparity.[56]

Credit card accounts in the Y–14 data held by cardholders living in the U.S.' poorest neighborhoods paid twice as much on average in total late fees than those in the richest areas.[57] Cardholders in majority-Black areas paid more in late fees for each card they held with major credit card issuers in 2019 than majority white areas.[58] And people in areas with the lowest rates of economic mobility paid nearly $10 more in late fee charges per account compared to people in areas with the highest rates of economic mobility.[59]

*G. Other Consequences to Consumers of Late Payment*

When a consumer does not make at least the minimum payment by the periodic statement due date, a late fee may not be the only consequence. However, the effect of a missed payment depends on cardholder conduct both prior to and after the due date.

For cardholders who typically pay their balance in full every month (so-called transactors), a late payment generally means both a late fee and new interest incurred for carrying or revolving a balance. For the cardholders who do not roll over a balance in the month before or after a late fee is assessed, the loss of a grace period [60] and coinciding interest charges may pose a similar or even greater burden than the late fee itself. For cardholders who regularly revolve a balance from one month to the next, a late fee is the main financial consequence of a missed payment if the payment is made prior to the next statement due date, as the additional interest charges on the unpaid minimum amount due for a limited number of days will likely be minimal.

However, if a consumer does not make at least the minimum payment due for more than one billing cycle, non-payment may carry more severe consequences. After approximately 30 days, consumers' credit scores may decline after issuers report the delinquency to credit bureaus. A card issuer also may take actions to reprice new transactions on the account according to a penalty rate, if permitted under § 1026.55(b)(3).[61] After 60 days, issuers may take action to reprice the entire outstanding balance on the account according to a penalty rate, if permitted under § 1026.55(b)(4). At any point as an account becomes more delinquent, an issuer may take steps to reduce a cardholder's credit line or suspend use of the card, limit their earning or redemption of rewards, or increase outreach to collect the outstanding debt. After 180 days of delinquency, an issuer will typically close and charge off the credit card account which may carry a large and long-term financial penalty for a consumer.

**III. Summary of Rulemaking Process**

*A. Advance Notice of Proposed Rulemaking*

On June 22, 2022, the CFPB issued an advance notice of proposed rulemaking (ANPR) seeking information from credit card issuers, consumer groups, and the public regarding credit card late fees and late payments, and card issuers' revenue and expenses.[62] The CFPB received 43 comments in response to the ANPR.

Consumer group commenters generally made a number of recommendations with respect to restrictions on late fees, including that the CFPB should more closely tailor the late fee safe harbor to the amount of the debt owed by the cardholder, such as by establishing a sliding scale for the safe harbor amount so that late fees are proportional to the account balance.

Card issuers and their trade associations that commented on the ANPR generally opposed revisions to

---

[45] Karen Augustine, *U.S. Consumers and Credit: Rising Usage*, Mercator Advisory Group, at 40 (2018).

[46] Hong Ru & Antoinette Schoar, *Do Credit Card Companies Screen for Behavioural Biases?* (Feb. 21, 2023), BIS Working Paper No. 842, *https://ssrn.com/abstract=3549532*.

[47] *Id.* This survey used detailed information from Comperemedia on more than 1.3 million individual credit card offers that were sent to a set of representative households in the United States between 1999 and 2016. Thus, the CFPB expects that this survey likely focused on Larger Card Issuers, which represent the bulk of the credit card market in terms of outstanding balances. *Id.* at 3.

[48] *Id.* at 12.

[49] *Id.*

[50] Auriemma Consulting Group, Impact of Late Fee and Interchange Regulation, Variable Rates, and Credit Card Value Proposition Preferences (Oct. 2023).

[51] Late Fee Report, at 4.

[52] 2023 Report, at 65.

[53] Late Fee Report, at 7; 2023 Report, at 65.

[54] The Y–14 data are discussed in more detail in part V.

[55] Late Fee Report, at 8.

[56] *Id.*

[57] *Id.* at 9.

[58] *Id.* at 10.

[59] *Id.* at 11.

[60] A grace period is a period within which credit extended may be repaid without incurring a finance charge due to a periodic interest rate. *See, e.g.*, § 1026.6(b)(2)(v) and comments 5(b)(2)(ii)–3.i and 54(a)(1)–2.

[61] If a consumer does not make the required payment by the due date, § 1026.55(b)(3) permits a card issuer to take actions to reprice new transactions on the account according to a penalty rate in certain circumstances. The CFPB understands, however, that most card issuers do not take actions to reprice new transactions to the penalty rate until the consumer is more than 60 days late. 2021 Report, at 51.

[62] 87 FR 38679 (June 29, 2022).

Regulation Z's safe harbor provisions related to late fees, including lowering the safe harbor amounts. Several industry trade association commenters also asserted that because lowering the safe harbor would have a significant impact on small financial institutions, the CFPB must comply with the Small Business Regulatory Enforcement Fairness Act (SBREFA) by convening a SBREFA panel in any late fee rulemaking.

*B. 2023 Proposal*

On February 1, 2023, the CFPB issued a notice of proposed rulemaking containing several proposed amendments to Regulation Z, which implements TILA, to better ensure that the late fees charged on credit card accounts are "reasonable and proportional" to the late payment as required under TILA. This notice of proposed rulemaking was published in the **Federal Register** on March 29, 2023 (2023 Proposal).[63] The CFPB generally proposed that the final rule, if adopted, would take effect 60 days after publication in the **Federal Register**.

As described more fully below, the CFPB proposed to amend provisions in § 1026.52(b) and its accompanying commentary as they relate to credit card late fees. Because late fees are by far the most prevalent penalty fees charged by card issuers and the CFPB's current data primarily relate to late fees, the CFPB's proposed changes to the restrictions in § 1026.52(b) were limited to late fees, although the CFPB solicited comments on whether the proposed amendments should apply to other penalty fees.

The proposal would have amended § 1026.52(b) and its accompanying commentary to help ensure that late fees are reasonable and proportional. First, the proposal would have amended § 1026.52(b)(1)(ii) to lower the safe harbor dollar amount for late fees to $8 and to no longer apply to late fees a higher safe harbor dollar amount for subsequent violations of the same type that occur during the same billing cycle or in one of the next six billing cycles.[64] Second, the proposal would have provided that the current provision in § 1026.52(b)(1)(ii)(D) that provides for annual adjustments to reflect changes in the CPI for the safe harbor dollar amounts would not apply to the safe harbor amount for late fees. Third, the proposal would have amended § 1026.52(b)(2)(i)(A) to provide that late fee amounts must not exceed 25 percent

---

[63] 88 FR 18906 (Mar. 29, 2023).

[64] The proposal would not have amended the safe harbor set forth in § 1026.52(b)(1)(ii)(C) applicable to charge card accounts.

---

of the required payment; currently, late fee amounts must not exceed 100 percent. The proposal also would have amended comments 7(b)(11)–4, 52(a)(1)–1.i and iv, and 60(a)(2)–5.ii to revise current examples of late fee amounts to be consistent with the proposed $8 safe harbor late fee amount. The CFPB also solicited comment on whether card issuers should be prohibited from imposing late fees on consumers that make the required payment within 15 calendar days following the due date. In addition, the CFPB solicited comment on whether, as a condition of using the safe harbor for late fees, it may be appropriate to require card issuers to offer automatic payment options (such as for the minimum payment amount), or to provide notification of the payment due date within a certain number of days prior to the due date, or both.

The CFPB proposed one clarification that would have applied to penalty fees generally. Specifically, the proposal would have amended comment 52(b)(1)(i)–2.i to make it explicitly clear that costs for purposes of the cost analysis provisions in § 1026.52(b)(1)(i) for determining penalty fee amounts do not include any collection costs that are incurred after an account is charged off pursuant to loan loss provisions. In addition, the CFPB solicited comment on several issues related to penalty fees generally. First, the CFPB solicited comment on whether the same or similar changes described above should be applied to other penalty fees, such as over-the-limit fees, returned-payment fees, and declined access check fees, or in the alternative, whether the CFPB should finalize the proposed safe harbor for late fees and eliminate the safe harbors for other penalty fees. Second, the CFPB solicited comment on whether instead of revising the safe harbor provisions set forth in § 1026.52(b)(1)(ii) as they apply to late fees as discussed above, the CFPB should instead eliminate the safe harbor provisions in § 1026.52(b)(1)(ii) for late fees or should instead eliminate the safe harbor for all penalty fees, including late fees, over-the-limit fees, returned-payment fees, and declined access check fees. If the safe harbor provisions were eliminated, card issuers would need to use the cost analysis provisions set forth in § 1026.52(b)(1)(i) to determine the amount of the penalty fees (subject to the limitations in § 1026.52(b)(2)). The CFPB also solicited comment on whether, in that event, the cost analysis provisions would need to be amended and, if so, how.

The CFPB received approximately 57,900 responses to the 2023 Proposal.

Of those responses, around 56,800 were from consumers that generally supported the 2023 Proposal. The vast majority of these consumer letters had the same content, and specifically supported the proposed $8 safe harbor threshold amount for late fees. In certain consumer letters, consumers who supported the proposal included additional information, such as their experiences with late fees. Some consumers who supported the proposal indicated they had limited income and that even a small late fee can impact consumers on a tight budget. Some consumers who supported the proposal indicated that they were charged a late fee in the past because (1) their mailed payment was not received by the card issuer by the due date because of slower postal service; (2) they paid on the due date but after the cut off time on the due date; (3) they forgot to pay on time because of vacations, medical issues, or family issues; or (4) they experienced cash flow issues because of unexpected expenses, such as an illness, and in some cases were not able to change the due date for their payments.

Around 350 individual consumers, including approximately 170 individuals who identified themselves as "bankers" who submitted the same letter, opposed the proposed $8 safe harbor amount. The individuals who identified themselves as bankers asserted that the CFPB should withdraw the proposal and restart the rulemaking process after taking into consideration small business' input through the SBREFA process.

Consumer group commenters generally supported the 2023 Proposal. These consumer group commenters expressed strong support for: (1) the CFPB's proposed safe harbor of $8 for credit card late fees; and (2) the CFPB's proposal to limit the dollar amount associated with a late payment to 25 percent of the required minimum periodic payment due immediately prior to assessment of the late payment.

The CFPB received around 100 comment letters from industry commenters. Industry commenters generally opposed the proposal, including the following proposed changes: (1) lowering the late fee safe harbor amount to $8 and eliminating the higher safe harbor amount for subsequent late payments; (2) eliminating the annual adjustment provisions for late fee amounts; (3) limiting late fee amounts to 25 percent of the require minimum payment; and (4) clarifying that costs for purposes of the cost analysis provisions in § 1026.52(b)(1)(i) for determining penalty fee amounts do not include any

collection costs that are incurred after an account is charged off pursuant to loan loss provisions.

One Member of Congress was concerned about the impact of the 2023 Proposal on small issuers. This commenter advised that the CFPB either work to ensure that the cost analysis provisions—an alternative to the safe harbor—would not impose undue burdens on small issuers or that the CFPB consider a separate safe harbor for small issuers that more accurately reflects their unique costs.

The Office of Advocacy, an independent office within the Small Business Administration (SBA), expressed concern that the CFPB's analysis of pre-charge-off costs from the Y–14 issuers does not accurately represent the collection costs for late payments of smaller issuers. The agency also criticized the CFPB for insufficiently considering the extent to which the proposed $8 safe harbor amount would cover the collection costs of smaller issuers.

The CFPB also received comments from other types of entities, namely several academics, law firms, and financial regulatory advocacy groups. The comments from these entities varied, with some of these entities generally supporting the 2023 Proposal, and some of them generally opposing it. These comments, as well as the other comments received by the CFPB on the 2023 Proposal, are discussed in more detail below in part VII.

*C. CARD Act Consultation With Certain Federal Agencies*

Consistent with the CARD Act, the CFPB consulted with the following agencies regarding rules that implement TILA section 149, both before issuing the 2023 Proposal and before issuing this final rule: (1) the Comptroller of the Currency; (2) the Board of Directors of the Federal Deposit Insurance Corporation (FDIC); and (3) the National Credit Union Administration Board.[65] The CFPB also consulted with the Board and several other Federal agencies, before issuing the 2023 Proposal and before issuing this final rule, as discussed in part IX.

**IV. Legal Authority**

*A. Section 1022 of the CFPA*

Section 1022(b)(1) of the CFPA authorizes the CFPB to prescribe rules "as may be necessary or appropriate to enable the CFPB to administer and carry out the purposes and objectives of the Federal consumer financial laws, and to

prevent evasions thereof." [66] Among other statutes, the CFPA and TILA are Federal consumer financial laws.[67] Accordingly, in issuing this final rule, the CFPB exercises its authority under the CFPA section 1022(b)(1) to prescribe rules under TILA and the CFPA that carry out the purposes and objectives and prevent evasion of those laws.

*B. The Truth in Lending Act*

As amended by the CFPA, TILA section 105(a) [68] directs the CFPB to prescribe regulations to carry out the purposes of TILA, and provides that such regulations may contain additional requirements, classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for all or any class of transactions, that, in the judgment of the CFPB, are necessary or proper to effectuate the purposes of TILA, to prevent circumvention or evasion thereof, or to facilitate compliance. Pursuant to TILA section 102(a), a purpose of TILA is to assure a meaningful disclosure of credit terms to enable the consumer to avoid the uninformed use of credit and compare more readily the various credit terms available to the consumer. This stated purpose is tied to Congress' finding that economic stabilization would be enhanced and competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit.[69] Thus, strengthened competition among financial institutions is a goal of TILA, achieved through the effectuation of TILA's purposes.

As described above, the CARD Act was signed into law on May 22, 2009,[70] and the Act amended TILA [71] by adding section 149, which provides, among other things, that the amount of any penalty fee with respect to a credit card account under an open-end consumer credit plan in connection with any omission with respect to, or violation of, the cardholder agreement, including any late payment fee or any other penalty fee or charge, must be "reasonable and

proportional" to such omission or violation.[72]

At the time of its passage, the CARD Act added section 149(b) to TILA, which required the Board to issue rules establishing standards for assessing the reasonableness and proportionality of such penalty fees, with a statutory deadline of February 22, 2010, for issuing this required rule.[73] Section 149(d) also authorized the Board to establish different standards for different types of fees and charges, as appropriate.[74] The CARD Act also allowed, but did not require, the Board to issue rules to provide for a safe harbor amount for any such penalty fee that is presumed to be reasonable and proportional to such omissions or violations.[75] This grant of discretionary authority did not include a deadline. The Board issued a rule on June 29, 2010, completing the required rulemaking (now contained in the CFPB's Regulation Z, 12 CFR 1026.52(b)(1)(i)). That required rulemaking included cost analysis provisions that enabled issuers to determine the late fee amount that were reasonable and appropriate under the statute. In addition, the Board exercised its discretionary power to include optional safe harbor provisions that issuers could elect to use as an alternative to the cost analysis provisions (now contained in the CFPB's Regulation Z, 12 CFR 1026.52(b)(1)(ii)).

On July 21, 2011, the Board's rulemaking authority to implement the provisions of TILA, including the discretionary authority to issue rules regarding penalty fee safe harbors in TILA section 149(e), transferred to the CFPB pursuant to sections 1061 and 1100A of the CFPA.[76]

For the reasons discussed in this final rule, the CFPB is amending certain provisions in Regulation Z that impact the amount of late fees that Larger Card Issuers can charge.

With respect to late fees charged, pursuant to section 149(e), the CFPB has analyzed whether the current safe harbor threshold amounts for late fees should be presumed to be reasonable and proportional to a cardholder's omission or violation. In considering whether and what is the appropriate amount for the safe harbor, the CFPB

---

[65] 15 U.S.C. 1665d(b) and 1665d(e).

[66] 12 U.S.C. 5512(b)(1).

[67] CFPA section 1002(14); codified at 12 U.S.C. 5481(14) (defining "Federal consumer financial law" to include the "enumerated consumer laws" and the provisions of the CFPA); CFPA section 1002(12); codified at 12 U.S.C. 5481(12) (defining "enumerated consumer laws" to include TILA).

[68] 15 U.S.C. 1604(a).

[69] TILA section 102(a), codified at 15 U.S.C. 1601(a).

[70] Public Law 111–24, 123 Stat. 1734 (2009).

[71] 15 U.S.C. 1601 *et seq.*

[72] CARD Act section 102, 123 Stat. 1740 (15 U.S.C. 1665d(a)).

[73] CARD Act section 102, 123 Stat. 1740 (15 U.S.C. 1665d(b)).

[74] CARD Act section 102, 123 Stat. 1740 (15 U.S.C. 1665d(d)).

[75] CARD Act section 102, 123 Stat. 1740 (15 U.S.C. 1665d(e)).

[76] Public Law 111–203, 124 Stat. 1376 (2010).

looked to whether the safe harbor is a "reasonable and proportional" fee, as originally prescribed by the Board, such that any fee under the safe harbor amount should be presumed to have met that standard. In addition, the CFPB is guided by, but was not required to consider, the four statutory factors applicable to the Board's 2010 Final Rule: (1) the cost incurred by the creditor from an omission or violation; (2) the deterrence of omissions or violations by the cardholder; (3) the conduct of the cardholder; and (4) such other factors deemed necessary or appropriate.

As described below and pursuant to its rulemaking authority under TILA sections 105(a) and 149(e),[77] the CFPB has determined that the current safe harbor thresholds are too high with respect to late fees charged by Larger Card Issuers, and therefore, repeals the safe harbor provisions with respect to late fees charged by those issuers. The CFPB then establishes a new safe harbor of $8 applicable to late fees charged by Larger Card Issuers. Separately, at this time and as described below, the CFPB is not exercising its discretionary authority to impose the new $8 threshold amount on Smaller Card Issuers.

## V. Data Considered for This Rulemaking

### A. The CFPB's Proposal

The CFPB considered four primary data sources in developing the 2023 Proposal, as described below: (1) Y–14; (2) Y–14+; (3) credit card debt collection data received from an information order made pursuant to section 1022(c)(4) of the CFPA; and (4) the CFPB's Credit Card Agreement Database.

### Y–14 Data

First, as explained in the 2023 Proposal, the CFPB relied upon data that the Board collects as part of its Y–14M (Y–14) data.[78] Since June 2012, the Board has collected these data monthly from bank holding companies with total consolidated assets exceeding $50 billion (from June 2012 to November 2019) and exceeding $100 billion (from

December 2019 to present).[79] For this collection, surveyed financial institutions report comprehensive data on their assets on the last business day of each calendar month. These data are used to support the Board's supervisory stress test models and provide one source of data for the CFPB's biennial report to Congress on the consumer credit card market.

The Y–14 data contain confidential supervisory information.[80] Given this and as detailed in the 2023 Proposal, the CFPB could not release the raw data, but did provide the data in summary form and explained the source of the data, the analysis, and the metrics used in its analysis. The 2023 Proposal began by explaining that these data contain reported information on the following four metrics used in developing the 2023 Proposal:

*Late Fee Income:* Reported net fee income assessed for late or nonpayment accounts in a given domestic credit card portfolio by card type (*e.g.*, general purpose or private label). This is late fee income for the CFPB's purposes in developing the 2023 Proposal.

*Collection Costs:* Reported costs incurred to collect problem credits that include the total collection cost of delinquent, recovery, and bankrupt accounts. Issuers report these aggregate costs monthly for their domestic credit card portfolios and separately by credit card type.[81] These reported costs do not include projected losses, and the dollar amount of charge-offs and any associated recoveries.[82]

---

[77] 15 U.S.C. 1604(a).

[78] *See* Bd. of Governors of the Fed. Rsrv. Sys., Report Forms FR Y–14M, *https://www.federalreserve.gov/apps/reportforms/reportdetail.aspx?sOoYJ+5BzDYnbIw+U9pka3sMtCMopzoV* (for more information on the Y–14M collection). The CFPB is one of several government agencies with whom the Board shares the data. Information in the Y–14 data do not include any personal identifiers. Additionally, accounts associated with the same consumer are not linked across or within issuers. The Y–14 data also do not include transaction-level data pertaining to consumer purchases.

*Late Fee Amount:* Reported amount of the late fee charged on a particular account in a particular month.

*Total Required Payments:* Reported total payment amount on a particular account in a particular month, including any missed payments or fees that were required to be paid in a particular billing cycle. This typically includes the minimum payment due, past due payments, and any amount reported as over the credit limit.

As described in the 2023 Proposal, the Y–14 data received by the CFPB covered the period from the middle of 2012 through September 2022 and are provided by certain Larger Card Issuers that account for just under 70 percent of outstanding balances on U.S. consumer credit cards as of year-end 2020. With respect to credit card data, the 2023 Proposal explained that, for purposes of its analysis, the CFPB generally used the complete portfolio data (including late fee income and collection costs) for all the Y–14 issuers included in the data collection. The 2023 Proposal also explained that the analysis generally used a random 40 percent subsample of account information (including late fee amounts and total required payments) reported by card issuers included in the data collection. For the purposes of the analysis using these data in the 2023 Proposal, the CFPB only considered account- and portfolio-level data for issuers in a given month for consumer general purpose and private label credit cards for which there existed data on late fee income, collection costs, late fee amounts, and total required payments in the Y–14 data.

### Determination of Post-Charge-Off Collection Costs Using Credit Card Debt Collection Data Received From an Information Order Made Pursuant to Section 1022(c)(4) of the CFPA

In the 2023 Proposal, the CFPB stated its understanding that collection costs in the Y–14 data are total collection costs, therefore include both pre-charge-off and post-charge-off collection costs because, as described in the 2023 Proposal, the Board requires that issuers report in the Y–14 data "costs incurred to collect problem credits that include *the total collection cost* of delinquent, recovery, and bankrupt accounts" (emphasis added). While the line item reported to the Board for the Y–14 data relates to total collection costs, the Board's 2010 Final Rule generally explains that the collection costs used for determining late fees under the cost analysis provisions in § 1026.52(b)(1)(i) are limited to the use of pre-charge off collection costs. As explained in the 2023 Proposal and as the Board noted in

---

[79] In the 2023 Proposal, the CFPB incorrectly indicated that the Y–14 data from June 2012 to the present is collected from bank holding companies with total consolidated assets exceeding $50 billion. In fact, in December 2019, the Board adjusted the cutoff threshold from $50 million to $100 billion. This difference in the threshold to submit Y–14 data does not impact the CFPB's analysis because the CFPB was merely describing the issuers covered by that data, which the CFPB still used in its totality. The increased threshold did not impact the analysis of pre-charge-off collection costs set forth in the section-by-section of § 1026.52(b)(1)(ii) because that analysis focused on periods after 2019.

[80] The Board's instructions to Y–14 issuers provide: As these data will be collected as part of the supervisory process, they are subject to confidential treatment under exemption 8 of the Freedom of Information Act. 5 U.S.C. 552(b)(8). In addition, commercial and financial information contained in these information collections may be exempt from disclosure under Exemption 4. 5 U.S.C. 552(b)(4). Disclosure determinations would be made on a case-by-case basis. *https://www.federalreserve.gov/apps/reportingforms/Download/DownloadAttachment?guid=dce3da6a-55b4-4fb4-8730-3fec04d32627.*

[81] Types include General Purpose, Private Label, Business, and Corporate cards.

[82] Issuers report projected losses, the dollar amount of charge-offs and any associated recoveries, interest expense, and loan loss provisions separately.

that 2010 Final Rule ''it would be inconsistent with the purpose of the [CARD Act] to permit card issuers to begin recovering losses and associated costs through penalty fees rather than through upfront rates.''[83] The Board further noted that ''it would be inconsistent with TILA section 149(c)(1) to permit the costs of the loss to be included as 'costs incurred by the creditor from [an] omission or violation,' which could be construed to mean that it is appropriate to exclude losses where—as here—card issuers do not incur losses as a result of the overwhelming majority of violations.''[84]

The CFPB did not propose to amend the Board's rule in this respect and further noted that this limitation was appropriate given that card issuers write accounts off as a loss when an account has been charged off; therefore, any cost in collecting amounts owed to a card issuer that incurred post-charge-off is related to mitigating a loss as opposed to the cost of a violation of the account terms.[85]

Given that the rule's cost analysis provisions in § 1026.52(b)(1)(i) limit the collection costs to costs that are incurred pre-charge off, consistent with the statute, the CFPB similarly limited its calculation of the appropriate safe harbor to this pre-charge off cost in the Y–14 data by excluding the post-charge-off collection costs. As explained in the 2023 Proposal, to do this, the CFPB estimated the percentage of collection costs that may occur after charge-off so that they could be excluded from the collection costs in the Y–14 data.

To determine what percentage of Y–14 data were pre-charge off, the CFPB examined confidential information gathered in the course of its statutory functions[86] on commissions paid to third-party debt collectors for charged-off accounts that six major card issuers paid in 2019 and 2020, representing 91 percent of balances and 93 percent of collection costs among portfolios with positive collection expenses reported in the Y–14 data in the twelve months leading up to August 2022.[87] In the 2023

Proposal, the CFPB noted that the most significant post-charge-off collection costs are likely to be commissions paid to third-party debt collectors for charged-off accounts. The CFPB stated its understanding that such commission payments, made to third-party debt collection companies, would be made almost exclusively in connection with accounts that have been charged off, and represent a conservative estimate of post-charge-off collection costs, as there may be other costs associated with collections post-charge-off beyond such commission payments.

As explained in the 2023 Proposal, the methodology for estimating post-charge-off commissions considered the amount of charged-off balances and then estimated the commission on the volume of recovered balances by using the recovery and commission rates. For example, if an issuer had a total of $1 million in newly charged-off balances in a given year, a cumulative recovery rate for that year of five percent, and a post-charge-off commission rate of 20 percent, the CFPB estimated the post-charge-off commission costs to be $10,000. As noted in the proposal, to calculate the post-charge-off collection costs as a share of total cost of collections, the CFPB then divided the estimated post-charge-off commission costs by the total collection costs the bank reported in the Y–14 data. For issuers who sell debt, the cost of collections calculation used charge-off balances net of asset sales. The commission rate for each issuer is an average weighted by the share of post-charge-off balances in each tier placement (*e.g.,* primary, secondary, and tertiary placements).

Based on these commission expenses that these six major card issuers paid in 2019 and 2020 to third-party debt collectors for charged-off accounts, the CFPB explained in the 2023 Proposal that it estimated that these post-charge-off costs are around 25 percent of total collection costs for these issuers; the average ratio was 27 percent in 2019 and 21 percent in 2020. In 2019, the median ratio of estimated post-charge-off commission costs to annual collection costs in the Y–14 for individual issuers was 28 percent; in 2020, it was 23 percent. Based on these data, in the 2023 Proposal, the CFPB estimated that pre-charge-off collection costs were equal to 75 percent of the collection costs included in the Y–14 data for purposes of its analysis related

to the proposed changes to the safe harbor thresholds for late fees in § 1026.52(b)(1)(ii).

Y–14+ Data

As discussed in the 2023 Proposal, the CFPB also considered Y–14+ data in developing the proposal. The Y–14+ data include confidential information gathered in the course of statutory functions from the Board's Y–14 data and a diverse group of specialized issuers.[88] The additional data that included specialized issuers were used to calculate the average late fee charged by Y–14+ issuers in 2019 and 2020. As explained in the proposal, in 2019, the average late fee charged by issuers in the Y–14+ data was $31. In the proposal, the CFPB noted that because the average late fee charged by the Y–14+ issuers is lower than the current maximum safe harbor of $41 and yet issuers still generate late fee income that is more than five times the ensuing (estimated) pre-charge-off collection costs since August 2021, the CFPB preliminarily concluded that $8 is likely to recover the average issuer's pre-charge-off collection costs. In addition, in the proposal, the CFPB used the average late fee charged by Y–14+ issuers in 2020 in forming its expectation that the proposed $8 amount would have a proportionately smaller impact on smaller issuers' late fee income, due to smaller issuers' having lower late fee amounts. In 2020, the average late fee for issuers in the Y–14+ data was $31. The CFPB noted that it collects card agreements from more smaller issuers than issuers for which the CFPB has financial data. Based on the CFPB's 2022 review of agreements from over 500 credit card issuers having more than 10,000 credit card accounts, the CFPB established that issuers outside the top 20 by outstanding credit card balances charged smaller late fees in 2020 than issuers within the top 20.

CFPB's Credit Card Agreement Database

In the 2023 Proposal, the CFPB discussed a 2022 review conducted by the CFPB of credit card agreements submitted to the CFPB's Credit Card Agreement Database in the fourth quarter of 2020 to determine the maximum late fee amount charged across agreements by issuers submitting to that database. As discussed above, the 2023 Proposal relied on these data in

[83] 75 FR 37526 at 37538.

[84] *Id.*

[85] In the 2023 Proposal, the CFPB proposed to amend comment 52(b)(1)(i)–2.i to make it explicitly clear that costs for purposes of the cost analysis provisions in § 1026.52(b)(1)(i) for determining penalty fee amounts do not include any collection costs that are incurred after an account is charged off pursuant to loan loss provisions.

[86] The CFPB collected these confidential data through an information order pursuant to section 1022(c)(4) of the CFPA.

[87] As part of its review of the practices of credit card issuers for its biennial review of the consumer credit card market, the CFPB surveys several large issuers to better understand practices and trends in

credit card debt collection. These data provided in response to data filing orders served as the basis of this calculation. For more information on these data, *see* 2021 Report, at 17.

[88] The CFPB received the information from the specialized issuers through an information order pursuant to section 1022(c)(4) of the CFPA which provides that the CFPB will treat the information received in response to the order in accordance with its confidentiality regulations at 12 CFR 1070.40 through 1070.48.

developing preliminary conclusions about the potential impact the proposed $8 late fee safe harbor threshold amount would have on card issuers, including smaller issuers.

## B. CFPB Revenue and Collection Costs Report

At the time it issued the 2023 Proposal, the CFPB also published a related report, ''Credit Card Late Fees: Revenue and Collection Costs at Large Bank Holding Companies'' (Revenue-Costs Report).[89] Although the CFPB recognized that it could not publish the confidential Y–14 data, as discussed above, the Revenue-Costs Report provides additional information on the monthly values for the aggregate late fee revenue and collection costs for general purpose and private label credit cards in the Y–14 data since 2016. The Revenue-Costs Report includes the total number of accounts in these portfolios, aggregate interest revenue for these accounts, the CFPB's estimate of pre-charge-off collection costs, total account balances, and the weighted ratio of late fee income to estimated pre-charge-off collection costs.[90] The CFPB provided this information in order to enable commenters to better understand how the CFPB determined the relationship between late fee revenue and pre-charge-off collection costs for Y–14 issuers for purposes of the 2023 Proposal. The Revenue-Costs Report shows that revenue from late fees has consistently far exceeded pre-charge-off collection costs over the last several years.

## C. Comments Received Related to Data and Analysis

### Using Y–14 Data Without Releasing Underlying Data

Several credit unions, industry trade associations, and individuals on behalf of a credit union, one law firm representing several card issuers, and one academic commenter criticized the CFPB for failure to release the underlying Y–14 data. These commenters asserted they did not have the ability to understand or evaluate the CFPB's proposal in a thorough and meaningful way or to replicate the CFPB's analysis due to the lack of insight into the underlying data,

methodology used, and analyses that form the basis of the 2023 Proposal. Several of these commenters asserted that the failure to disclose the raw Y–14 data relied upon in the rulemaking conflicts with requirements under section 553 of the Administrative Procedure Act (APA).[91]

One of the credit union commenters urged the CFPB to provide a breakdown of the components used to arrive at the proposed $8 late fee safe harbor and the source of the data. One of the industry trade association commenters noted that the CFPB failed to provide a clearly defined list of data inputs that banks provide in reporting collection costs on the Y–14 data. The law firm representing several card issuers asserted that, although the CFPB compiled and released a set of aggregated and anonymized values at the same time as the proposal, it did not include an explanation of which Y–14 data fields it used to populate the document, how and why the CFPB designated the data for inclusion in the categories the document sets forth, or how the CFPB ensured that the data categorizations were consistent from bank to bank—all of which it claimed prevented commenters from assessing the validity and accuracy of the proposal or the conclusions it supports.

One of the industry trade association commenters also expressed concerns that the CFPB did not provide information about the distribution of the ratio of late fee income to future collection costs for the Y–14 issuers; and about whether the CFPB used all of the issuers in the Y–14 data in analyzing the ratio of late fee income to future collection costs.

The academic commenter focused on a narrower set of data related to a Y–14 seven-month analysis. These data were used to support analysis in the proposal that lower late fees in month seven do not affect the late payment rate. This commenter asserted that these claims would require further review and validation by industry and urged the CFPB to release the underlying Y–14 data used in this seven-month analysis.

Several of the industry trade association commenters and the academic commenter also requested that the CFPB release further anonymized or aggregated Y–14 data to the public and postpone the rulemaking until it could release these additional data.

The CFPB disagrees with the commenters that the 2023 Proposal failed to provide sufficient data or description of methodology for commenters to offer meaningful

comment. The CFPB also does not agree that it is improper to cite supervisory or other confidential data gathered for statutory functions or shared by the Board pursuant to those statutory functions in the rulemaking process; this is information the CFPB obtains as part of its lawful and authorized activities, and it provides insight into the issues addressed here. CFPB's published reports were collected through its supervision function, and the CFPB's regulations protect confidential supervisory information from disclosure. As noted above, the Board's instructions to the Y–14 issuers indicates that the Y–14 data are collected as part of the supervisory process and are subject to confidential treatment under certain exemptions of the Freedom of Information Act.[92] The CFPB was authorized to use this robust dataset if it complied with the Board's confidentiality conditions, and it would have been unreasonable to burden the industry with duplicative data requests. Also, as noted above, the CFPB collects certain information pursuant to information orders under section 1022(c)(4) of the CFPA and those orders provide that the CFPB will treat the information received in response to the order in accordance with its confidentiality regulations at 12 CFR 1070.40 through 1070.48. Courts have held that an agency can rely on confidential information in its rulemaking so long as the agency discloses information to allow interested parties to comment on the methodology and general data.[93] The CFPB disclosed how it obtained the data, the methodologies used to analyze the data, the number of accounts reviewed, characteristics about the accounts reviewed, and the results of the various studies.

As noted above, the 2023 Proposal provides a detailed description of each of the four sources of data used in the rulemaking: (1) Y–14; (2) Y–14+; (3) credit card debt collection data received from an information order made pursuant to section 1022(c)(4) of the CFPA; and (4) the CFPB's Credit Card Agreement Database. Although the CFPB did not release the raw Y–14 data used in developing the 2023 Proposal, it took several steps to release aggregate data, as well as providing detailed descriptions of methodology and analysis, so that commenters could evaluate and provide meaningful

---

[89] CFPB, *Credit Card Late Fees: Revenue and Collection Costs at Large Bank Holding Companies* (Revenue-Costs Report) (Feb. 2023), *https:// files.consumerfinance.gov/f/documents/cfpb_credit-card-late-fees-revenue-collection-costs-large-bank_ 2023-01.pdf.*

[90] Since not every issuer in the Y–14 data reports values for every month, the Revenue-Costs Report also included the number of portfolios that are included in the aggregate for the applicable month.

[91] 5 U.S.C. 553(b), (c).

[92] *See supra* note 80.

[93] *See NRDC* v. *Thomas,* 805 F.2d 410, 418 n.13 (D.C. Cir. 1986); *see also Riverkeeper Inc.* v. *EPA,* 475 F.3d 83, 112 (2d Cir. 2007); *rev'd on other grounds,* 556 U.S. 208 (2009).

comment on the CFPB's data and analysis.

As noted above, contrary to what some commenters stated, the 2023 Proposal explained the source of the Y–14 data (from the Board), as well as the specific question about estimating collection costs for late fees that was used to generate the data. In the 2023 Proposal, the CFPB also described the four types of Y–14 data that it used for the analysis in the proposal, namely, late fee income, collection costs, late fee amount, and total required payments.[94] The 2023 Proposal further detailed the relevant years of data examined, as well as the reasons why the CFPB preliminarily determined it was appropriate to rely on data from the Y–14 issuers, noting that those issuers constituted approximately 70 percent of the market. The CFPB also adequately described in the 2023 Proposal how it used the Y–14 data in the analysis, including the methodology it used to calculate the ratio of collection costs to late fee income.[95] As described in the 2023 Proposal, that methodology involved the CFPB comparing each month's late fee income for a particular portfolio to the portfolio's average estimated pre-charge-off collection costs for that month, where that estimate was based on estimated pre-charge-off collection costs that occurred two through six months later.[96] The CFPB developed monthly estimates of this late fee income-to-cost ratio for each year from 2013 up to early 2022. The CFPB also described the methodology for conducting the Y–14 seventh-month analysis in relation to the impact of higher subsequent late fees on late payment incidence, which included conducting statistical analysis on a random subsample from account-level data available in 2019 from the Y–14 data to investigate whether the lower late fee amount in month seven leads to a discontinuous jump in late payments in the seventh month after the last late payment.[97]

As noted above, the CFPB also issued along with the 2023 Proposal the Revenue-Costs Report at the time of the proposal to aid in the ability of commenters to examine data from issuers and provide additional analysis and methodology, enhancing the ability of commenters to offer meaningful comment. The Revenue-Costs Report included additional monthly values for the aggregate late fee revenue and collection costs for general purpose and private label credit cards in the Y–14 data since 2016.[98] The report also provided (1) the number of portfolios that are included in the aggregate for the applicable month; (2) the total number of accounts in these portfolios, (3) aggregate interest revenue for these accounts, and (4) the CFPB's estimate of pre-charge-off collection costs, total account balances, and the weighted ratio of late fee income to estimated pre-charge-off collection costs. Many credit unions and individuals on behalf of credit unions and one industry credit union trade association used the information in the Revenue-Costs Report to compare the average pre-charge-off collection cost and the average late fee income per account for the Y–14 issuers to the average pre-charge-off collection cost and the average late fee income per account for the credit card industry. Specifically, using the information in the Revenue-Costs Report, these commenters calculated the annual average pre-charge-off collection cost and the annual average late fee income per account for the Y–14 issuers ($0.22 and $13.80 respectively) using monthly averages for the 12-month period ending September 2022 contained in the Revenue-Costs Report and compared these data to the annual average pre-charge-off cost per account and the average late fee income for the credit union industry that the commenters collected ($0.33 and $7 respectively).

Throughout the process, the CFPB sought to provide as much information as possible to ensure that commenters could themselves analyze the CFPB methodology, critique data, and provide feedback. Indeed, as described below, the CFPB received approximately 10 comments that specifically analyzed the CFPB's use of the Y–14 data, as well as the CFPB's methodology and analysis.

For example, the CFPB received comments that criticized the CFPB's bottom line late fee estimate and offered contrary amounts based on issuers' own analysis using the CFPB's methodology. Other commenters also provided meaningful feedback on the source of the data and data fields. The CFPB has determined this feedback further supports the fact that throughout this rulemaking (including an ANPR that sought data from issuers), the CFPB has sought to share as much information as possible. For comparison, the CFPB's rulemaking, unlike the original 2010 rule, analyzed and presented 10 years of data specifically from card issuers' own reports of collection costs. While these raw data could not be disclosed, the CFPB published data in an aggregate form, and in both the 2023 Proposal and the related Revenue-Costs Report, the CFPB described its methodology and analysis to further the ability of commenters to meaningfully examine, understand, and comment on the data.

### Y–14 Data as Representative of Issuers' Collection Costs and Late Fee Income

As noted in the 2023 Proposal, the Y–14 data provided 10 years of information related to total collection costs, which as required by the Board is defined to include ''costs incurred to collect problem credits that include the total collection cost of delinquent, recovery, and bankrupt accounts.''

Several industry trade associations and one law firm representing several card issuers asserted that the CFPB improperly relied on this Y–14 data field in developing the proposal because that ''total collection cost'' line item may be underinclusive of some issuers' collection costs. The law firm representing several card issuers asserted that there are expenses caused by late payments that are not included in the ''total collection cost'' line item relied on by the CFPB in the Y–14 data. For example, this commenter asserted that technology-related expenses associated with delinquent customer servicing and processing platforms, forms of customer communications for consumers in delinquent status, payment-processing expenses associated with programs for late payers, and costs associated with supporting collection activities such as human resources, risk management, and legal may not be reported.

Several industry trade associations asserted that the CFPB's analysis of this line item from the Y–14 data incorrectly excludes attributable expenses and overhead, including systems expenses and risk department expenses related to consumer credit card accounts. These

---

[94] 88 FR 18906 at 18910–11.

[95] *Id.* at 18916–18.

[96] For example, if an issuer were to report late income of $15 million in January for a portfolio and total collection costs for that portfolio of $20 million in March through July, the CFPB estimated $15 million in pre-charge-off collection costs in March through July and calculated an average monthly collection cost of $3 million for purposes of this analysis—resulting in a ratio of late fee income of $15 million to collection cost of $3 million for this portfolio for the month of January. In the 2023 Proposal, the CFPB noted that its preliminary findings based on the weighted average of this ratio across issuers and market segments were robust to shifting, expanding, or shortening the time period of delay in collection costs as they relate to late fee income.

[97] *Id.* at 18920. The CFPB observed in the Y–14 data that, consistent with the safe harbor provisions of the current rule, consumers who paid late again within the six months after a late payment paid higher late fees during those six months than they paid after the initial late fee.

[98] *See supra* note 89.

trade association commenters also stated that the amount excluded the costs of funding delinquent accounts (*i.e.,* costs to fund the balances for longer than expected because of late payments), and these commenters asserted that indirect costs represent real and reasonable expenses associated with late and delinquent accounts. While these commenters did not provide data for the costs associated with all late payments, these commenters did provide data for accounts that were late for 60 days or more and estimated that these 60-day plus delinquent accounts cost issuers $46.30, including $33.00 in direct expenses, $9.00 in attributable expenses, and $4.30 in funding costs.

Another industry trade association asserted that the Y–14 total collection cost line item on which the CFPB relied is not a sufficiently uniform or defined data set for purposes of assessing card issuer collection costs associated with late payments, due to variations in the way that the largest banks report their data. Specifically, this commenter asserted that Y–14 data are reported for stress-testing purposes, and as a result, institutions may not report it in a uniform way because for stress-testing purposes, it is less important whether an institution reports a particular cost in this line item or in another line item for costs, so long as the institution reports that particular cost in some way in the reporting forms overall. According to this commenter, some banks include certain overhead and fixed costs such as real estate and information technology (IT) in the total collection cost line item, while others do not. This commenter further asserted that the share of total collection costs across an institution's divisions may result in variation of how they report the Y–14 collection cost line item. In addition, this commenter asserted that not all reporting banks include commissions paid to third party collections agencies after a loan is charged off, which could mean that the reported amount is underinclusive.

This same industry trade association commenter also asserted that the Y–14 data on late fee income may be overstated. This commenter asserted that the Y–14 item for late fee income is the sum of fees assessed during the month minus fee reversals and refunds applied during the month (which included reversals due to charge off). According to this commenter, however, in accordance with banks' loss mitigation practices, each month some delinquent accounts may be modified through re-aging or converted into fixed payment plans, while others may be closed in a debt settlement, without

explicit reversal of late fees but with concessions to the borrower. This commenter asserted that these implicit reversals of fee income are not captured in the Y–14 item for net fees assessed for some issuers, which therefore may overstate those issuers' realized late fee income.

Although several commenters stated that there were potential variations in the Y–14 data, the CFPB has determined that such data are relevant and an important source of information on total collection costs and late fee income. As discussed below, the CFPB notes that the Y–14 data contains 10 years of data that is collected directly from certain Larger Card Issuers by the Board, using its supervisory powers, and these issuers accounted for just under 70 percent of outstanding balances on U.S. consumer credit cards as of year-end 2022. The Y–14 dataset contains data fields that are clearly worded to collect data relevant to this rulemaking, such as late fee income and collection expenses. The CFPB notes that many of the studies cited by industry commenters, and discussed in the section-by-section analysis of § 1026.52(b)(1)(ii) in part VII, used smaller subsets of the Y–14 data or notably similar precursors for their analysis related to late fees and late payments. The CFPB recognizes that there may be some potential variation in the Y–14 data collected based on the variation of inputs from card issuers, but as discussed below, the CFPB has determined that some variations in the costs that issuers' consider to be collection costs are consistent with the cost analysis provisions in § 1026.52(b)(1)(i) and are not likely to impact the analysis related to the $8 late fee safe harbor threshold for Larger Card Issuers set forth in the section-by-section analysis of § 1026.52(b)(2)(ii).

With respect to the argument that some issuers may exclude post-charge off amounts from the total collection costs line item, the plain definition provided by the Board for such data contains no such exclusion. The total collection cost line item instructs issuers to report "costs incurred to collect problem credits that include the *total* collection cost of delinquent, recovery, and bankrupt accounts" (emphasis added). Given that the definition is inclusive of total collection costs, the CFPB has determined it appropriately relied upon this line item.

In addition, as explained in the 2023 Proposal and above, this total collection costs line-item requests cost data that are generally consistent with the collection costs that may appropriately be considered under the cost analysis provisions in § 1026.52(b)(1)(i), except

with respect to post-charge-off collection costs.

Current comment 52(b)(1)(i)–6.i provides that for purposes of § 1026.52(b)(1)(i), the costs incurred by a card issuer as a result of late payments include the costs associated with the collection of late payments, such as the costs associated with notifying consumers of delinquencies and resolving delinquencies (including the establishment of workout and temporary hardship arrangements). The Y–14 total collection costs line item, therefore, provides a source of data that enables the CFPB to examine more than a decade of late fee collection cost information that is relevant to the rule.

The one difference in the data, as discussed in the CFPB's 2023 Proposal, is that the Board's Y–14 late fee cost information includes post-charge off collection costs. As a result, and as described in detail in the proposal, the CFPB used a ratio based on debt collection agreements to appropriately limit the total collection costs to pre-charge off collection costs. With respect to the one comment that some issuers may not include commissions paid to third party collections agencies after a loan is charged off when reporting total collection costs in the Y–14 data, the CFPB recognizes that some issuers may not report post-charge-off costs but would expect that these issuers are outliers since the plain language of the instruction for the Y–14 data asks for total collection costs, which would cover both pre-charge-off and post-charge-off collection costs. In addition, the comments do not suggest that most card issuers exclude post-collection costs from the Y–14 data. As such, the CFPB has determined that it is appropriate to exclude the estimated ratio of post-charge-off collection costs from the Y–14 data for total collection costs when setting the safe harbor amount to be consistent with the collection costs that may be considered for purposes of the cost analysis provisions in § 1026.52(b)(1)(i).

The CFPB also recognizes that there may be some variation in the particular costs that issuers report in the Y–14 total collection costs line item with respect to late payments. For example, several trade association commenters indicated that some banks include certain overhead and fixed costs such as real estate and IT in the total collection cost line item, while others do not. Nonetheless, the CFPB has determined that these variations do not undermine the reliance on this data field to help the CFPB determine total collection costs related to late payments, particularly given that the total collection costs line

item is nearly the same as the definition for collection costs in the rule, and that this data field allows the CFPB to examine 10 years of data that were not available at the time of the original rule.

The CFPB notes that the cost analysis provisions in § 1026.52(b)(1)(i) also would involve a certain amount of variability from issuer to issuer in terms of which costs the issuer determines are related to collecting late payments for purposes of determining late fees amounts. As a general matter, if a card issuer is using the cost analysis provisions § 1026.52(b)(1)(i), the card issuer has the responsibility to determine whether certain costs it incurs relate to the collection of late payments based on all relevant facts and circumstances, within the framework set forth in § 1026.52(b)(1)(i) and related commentary. For example, while not all overhead costs would be costs of collecting late payment, some overhead costs may be incurred as a result of collecting late payments, depending on all the relevant facts and circumstances. A card issuer, however, must be able to demonstrate to the regulator responsible for enforcing compliance with TILA and Regulation Z that its determination is consistent with § 1026.52(b)(1)(i) and related commentary.[99] Thus, the CFPB has determined that that some variations in the costs that issuers' consider to be collection costs are consistent with the cost analysis provisions in § 1026.52(b)(1)(i) and are not likely to impact the analysis related to the $8 late fee safe harbor threshold for Larger Card Issuers set forth in the section-by-section analysis of § 1026.52(b)(2)(ii). The CFPB also notes that many of the studies cited by industry commenters, and discussed in the section-by-section analysis of § 1026.52(b)(1)(ii) in part VII, used smaller subsets of the Y–14 data or notably similar precursors for their analysis related to late fees and late payments. As such, the Y–14 data is more than sufficient to make appropriate estimates of (1) the collection costs that the Y–14 issuers incur in collecting late payments for purposes of guiding the CFPB in determining an appropriate safe harbor threshold amount for late fees charged by Larger Card Issuers; and (2) how

collection costs for Larger Card Issuers change over time in relation to changes in the CPI.

With respect to the late fee income reported in the Y–14 data, some industry commenters suggest that the reported late fee income may be overinclusive because it includes late fees where there has not been an explicit reversal of late fees, yet there have been concessions to the borrower as a result of delinquent accounts being modified through re-aging or converted into fixed payment plans or closed in a debt settlement. Although there may be instances where the late fees are waived, subject to a concession, or otherwise removed or reduced, the CFPB has determined that some overinclusion based on fee waivers would not significantly impact the ratio of pre-charge-off collection costs to late fee income discussed in the section-by-section analysis of § 1026.52(b)(1)(ii).

Further, in response to the commenter, the CFPB also notes the fact that certain fees may be waived is generally consistent with the fact that the cost analysis provisions only permit certain uncollected fees to be considered under § 1026.52(b)(1)(i). Specifically, comment 52(b)(1)(i)–5 provides that for purposes of § 1026.52(b)(1)(i), a card issuer may consider fees that it is unable to collect when determining the appropriate fee amount under the cost analysis provisions. Fees that the card issuer is unable to collect include fees imposed on accounts that have been charged off by the card issuer, fees that have been discharged in bankruptcy, and fees that the card issuer is required to waive in order to comply with a legal requirement (such as a requirement imposed by 12 CFR part 1026 or 50 U.S.C. app. 527). However, fees that the card issuer chooses not to impose or chooses not to collect (such as fees the card issuer chooses to waive at the request of the consumer or under a workout or temporary hardship arrangement) are not relevant for purposes of determining the late fee amount under the cost analysis provisions.

The CFPB also notes that it has repeatedly provided opportunities for issuers to provide specific data about their late fees, including in an ANPR, and it has carefully considered all such data that were provided, in addition to seeking out and considering additional data on its own. The Y–14 data provide the best means for the CFPB to examine relevant collections costs and late fee income data in order to determine what costs are incurred and to guide its determination of an appropriate safe

harbor threshold for late fees, except with respect to Smaller Card Issuers, as discussed in part VI below. The CFPB is not using the Y–14 collection costs and late fee income data to cap the late fee amounts that issuers can charge. If the $8 late fee safe harbor amount adopted as part of this final rule for those issuers that are subject to this safe harbor amount is not sufficient to cover a particular card issuer's pre-charge-off costs in collecting late payments, the card issuer can charge a higher amount consistent with the cost analysis provisions in § 1026.52(b)(1)(i) and the requirements in § 1026.52(b)(2). In other words, to the extent that an issuer has higher costs and determines the safe harbor amount is too low based on its own cost analysis calculation, that issuer may charge a higher late fee. The Y–14 data, therefore, are not used to create a limit on fees, but rather to ensure that the CFPB's discretionary safe harbor is appropriate and consistent with the statutory requirement that is intended to limit fees to those that are "reasonable and proportional" to the late payment.

Thus, for the reasons discussed above, the CFPB has determined that it is appropriate to use the Y–14 data for total collection costs and late fee income in this final rule to estimate (1) the collection costs that the Y–14 issuers incur in collecting late payments and the late fee income they collect for purposes of guiding the CFPB in determining an appropriate safe harbor threshold amount for late fees charged by Larger Card Issuers; and (2) how collection costs for Larger Card Issuers change over time in relation to changes in the CPI.

*Y–14 Data Do Not Include Cost Information for Smaller Issuers*

As discussed in part VI below, many smaller issuers and industry trade associations, several individual consumers on behalf of credit unions, one Member of Congress, and the Office of Advocacy, an independent office within the SBA, expressed concern that the CFPB's analysis of pre-charge-off costs from the Y–14 issuers does not accurately represent the collection costs for late payments of smaller issuers. These comments are discussed in more detail in part VI.

*D. The Final Rule*

Consistent with the 2023 Proposal, the CFPB considered four primary data sources in developing this final rule: (1) Y–14; (2) Y–14+; (3) credit card debt collection data received from an information order made pursuant to section 1022(c)(4) of the CFPA; and (4)

---

[99] The CFPB's determinations are consistent with how the Board viewed the costs analysis provisions when it adopted its version of these provisions in § 226.52(b)(1)(i). 75 FR 37526 at 37536. See also *id.* at 37540 where the Board discussed whether all overhead costs should be excluded from the cost analysis provisions and noted that it believes that the determination of whether certain costs are incurred as a result of violations of the account terms or other requirements should be made based on all the relevant facts and circumstances.

the CFPB's Credit Card Agreement Database.

Y–14 Data

For the reasons discussed above, the CFPB has determined that it is appropriate to consider the Y–14 data as one basis for adopting the changes to Regulation Z contained in this final rule. Prior to issuing the 2023 Proposal, the Y–14 data received by the CFPB covered the period from the middle of 2012 through September 2022 and are provided by certain Larger Card Issuers that are covered by the $8 amount. These issuers accounted for just under 70 percent of outstanding balances on U.S. consumer credit cards as of year-end 2022. Consistent with the 2023 Proposal, with respect to credit card data, in this final rule, the CFPB generally uses the complete portfolio data (including late fee income and collection costs) for all the card issuers included in the data collection. The CFPB also generally uses only a random 40 percent subsample of account information (including late fee amounts and total required payments) reported by card issuers included in the data collection. Consistent with the 2023 Proposal, the CFPB for this final rule only considered account- and portfolio-level data for issuers in a given month for consumer general purpose and private label credit cards for which there existed non-zero data on late fee income, collection costs, late fee amounts, and total required payments in the Y–14 data.

For this final rule, the CFPB relied upon the data in the proposal for its analysis. After issuing the 2023 Proposal, the CFPB received 14 more months of data for the Y–14 issuers (account-level data through November 2023, portfolio data up to August 2023). These additional data did not change the CFPB's original findings or rationale as set forth in 2023 Proposal. Because the data are relevant, however, the CFPB has determined that it is appropriate to explain how those new data supplement and support its original data and analysis. The CFPB's use of the Y–14 data (including the supplemental data received after the 2023 Proposal was issued) is discussed in more detail in part VII.

Determination of Post-Charge-Off Collection Costs Using Credit Card Debt Collection Data Received From an Information Order Made Pursuant to Section 1022(c)(4) of the CFPA

In addition, for the reasons discussed above, and consistent with the 2023 Proposal, the CFPB has determined that it is appropriate to subtract an estimate of the post-charge-off collection costs from the total collection costs Y–14 data. Consistent with the 2023 Proposal, for this final rule, the CFPB used commissions paid to third-party debt collectors for charged-off accounts to estimate the percentage of collection costs that may occur after charge-off. The CFPB understands that such commission payments, made to third-party debt collection companies, would be made almost exclusively in connection with accounts that have been charged off, and represent a conservative estimate of post-charge-off collection costs, as there may be other costs associated with collections post-charge-off beyond such commission payments. Consistent with the 2023 Proposal, the CFPB's methodology for estimating post-charge-off commissions considered the amount of charged-off balances and then estimated the commission on the volume of recovered balances by using the recovery and commission rates.[100]

As discussed above, for the 2023 Proposal, the CFPB estimated from debt collection reports the commission expenses that six major card issuers paid in 2019 and 2020 and based on those data, the CFPB estimated that these post-charge-off costs are around 25 percent of total collection costs for these issuers. Based on those data, for the 2023 Proposal, the CFPB estimated that pre-charge-off collection costs were equal to 75 percent of the collection costs included in the Y–14 data for purposes of its analysis related to the proposed changes to safe harbor thresholds for late fees in § 1026.52(b)(1)(ii).

For this final rule, the CFPB relied upon the data in the proposal for its analysis. In addition, after the Proposal's release—as part of the CFPB's 1022(b)(2) market gathering for purposes of its CARD Market Report—the CFPB also obtained updated data for 2021 and 2022 related to commission expenses that the CFPB collected for its most recent biennial review of the consumer credit card market released in October 2023. These additional data did not

change the CFPB's original findings or rationale. Because the data are relevant, however, the CFPB has determined it is appropriate to explain how those new data supplement and support its original data and analysis. Based on commission expenses that six major card issuers paid in 2021 and 2022 to third-party debt collectors for charged-off accounts, the CFPB estimated that these post-charge-off costs are around 20 percent of total collection costs for these issuers; the average ratio was 20 percent in 2021 and 21 percent in 2022. In 2021, the median ratio of estimated post-charge-off commission costs to annual collection costs for the six major issuers surveyed was 19.0 percent; in 2022, it was 23.7 percent. Thus, for 2021 and 2022, the CFPB estimated that pre-charge-off collection costs were equal to 80 percent of the collection costs. These new data indicate pre-charge-off collection costs in 2021 and 2022 that were similar, though slightly higher than in the proposal and, therefore, supplemented and supported the CFPB's data and analysis. Both the estimates of pre-charge-off collection costs for Y–14 issuers used in the 2023 Proposal (based on the 75 percent estimate) and developed using the supplemental information (based on the 80 percent estimate) are discussed in more detail in the section-by-section analysis of § 1026.52(b)(1)(ii) for purposes of its analysis related to the final changes to the safe harbor thresholds for late fees for Larger Card Issuers.

Y–14+ Data

Consistent with the 2023 Proposal, the CFPB also considered Y–14+ data in developing this final rule. As noted above, the Y–14+ data include confidential information from the Board's Y–14 data and a diverse group of specialized issuers. In the 2023 Proposal, these additional data that included specialized issuers were used to calculate the average late fee charged by Y–14+ issuers in 2019 and 2020. As explained in the proposal, in 2019 and 2020, the average late fee charged by issuers in the Y–14+ data was $31. The updated data from the Y–14+ issuers further support this original analysis because, based on the CFPB calculations, they show that the average late fee charged by those issuers was $31 in 2021 and $32 in 2022.

In addition, after issuing the 2023 Proposal, the CFPB obtained updated confidential total collection costs and late fee income data from specialized issuers that are included in the Y–14+ data. In particular, the CFPB requested from these issuers' data for total

---

[100] For example, if an issuer had a total of $1 million in newly charged-off balances in a given year, a cumulative recovery rate for that year of five percent, and a post-charge-off commission rate of 20 percent, the CFPB would estimate the post-charge-off commission costs to be $10,000. To calculate the post-charge-off collection costs as a share of total cost of collections, the CFPB then divided the estimated post-charge-off commission costs by the total collection costs the bank reported in the Y–14 data. For issuers who sell debt, the cost of collections calculation uses charge-off balances net of asset sales. The commission rate for each issuer is an average weighted by the share of post-charge-off balances in each tier placement (*e.g.*, primary, secondary, and tertiary placements).

collections costs and late fee revenue using the same instructions for this data request that are used in the Y–14 data collection. These additional data did not change the CFPB's original findings or rationale. Because the data are relevant, however, the CFPB has determined it is appropriate to explain how those new data supplement and support its original data and analysis. These additional data are consistent with the CFPB's determination in this final rule based on the data used for the proposal related to Y–14 issuers that the average Larger Card Issuer would recover pre-charge-off collection costs even if late fees were reduced to one-fifth of their current level.

The average late fees charged by the Y–14+ issuers in 2020 and 2022 and the data on total collections costs and late fee income from the specialized issuers in the Y–14+ are discussed in more detail in the section-by-section analysis of § 1026.52(b)(1)(ii).

CFPB's Credit Card Agreement Database

As noted above, in the 2023 Proposal, the CFPB discussed a 2022 review conducted by the CFPB of credit card agreements submitted to the CFPB's Credit Card Agreement Database in the fourth quarter of 2020 to determine the maximum late fee amount charged across agreements by issuers submitting to that database. Since the 2023 Proposal was issued, the CFPB in 2023 conducted a subsequent review of agreements submitted to that database as of the second quarter of 2023 to determine the maximum late fee amount charged across agreements by issuers submitting to that database.

These additional data did not change the CFPB's original findings or rationale. Because the data are relevant, however, the CFPB has determined it is appropriate to explain how those new data supplement and support its original data and analysis. As discussed in part II.E, the results of the 2023 survey of agreements to determine the maximum late fee amount charged across agreements by issuers submitting to that database are consistent with the results of the 2022 survey of agreements with respect to the maximum late fee amount charged across agreements by issuers submitting to that database. The data from the 2022 review of agreements and the 2023 review of agreements are discussed in more detail in part II.E and the section-by-section analysis of § 1026.52(b)(1)(ii).

## VI. Certain Provisions Not Applicable to Issuers That Together With Their Affiliates Have Less Than One Million Open Credit Card Accounts

### A. The CFPB's Proposal

The 2023 Proposal would have applied the revisions in the proposal to all card issuers of credit card accounts under an open-end (not home-secured) consumer credit plan. Specifically, the 2023 Proposal would have applied the following proposed revisions to all issuers of such accounts: (1) the $8 late fee safe harbor threshold and the elimination of the higher late fee safe harbor amount for subsequent violations; (2) the elimination of the annual adjustments for the proposed $8 safe harbor threshold, (3) the restriction on late fee amounts to 25 percent of the required minimum payment; and (4) the clarification in comment 52(b)(1)(i)–2.i that the collection costs to calculate penalty fees under the cost analysis provisions does not include post-charge-off collection costs.

With respect to proposed revisions to the late fee safe harbor amounts, in the 2023 Proposal, the CFPB recognized its estimates of pre-charge-off collection costs incurred by card issuers were based on late fee income and collection cost data from larger issuers that report to the Y–14 collection, as well as data from some additional Y–14+ issuers. The CFPB did not have data equivalent to the Y–14 data for smaller issuers' pre-charge-off collection costs, but the CFPB stated that it had no reason to expect that smaller issuers would have substantially higher pre-charge-off collection costs than larger issuers. Based on a 2022 review of about 2,500 credit card agreements from over 500 card issuers (as discussed in part II.E), the CFPB also noted that smaller issuers appeared to charge lower late fee amounts, and therefore, any reduction in late fee amounts would have a proportionately smaller impact on their late fee income. Specifically, in the 2023 Proposal, the CFPB noted that (1) in 2020, the average late fee charged by larger issuers included in the Y–14+ data was $31;[101] (2) the CFPB collects card agreements from more smaller issuers than issuers for which the CFPB has financial data; and (3) based on the review of agreements, as described above in part II.E, the CFPB established that issuers outside the top 20 by outstanding credit card balances

charged smaller late fees in 2020 than issuers within the top 20.[102] In the 2023 Proposal, the CFPB solicited comment on this analysis and the potential impact on smaller issuers of the proposed $8 safe harbor amount, including whether smaller issuers could provide data or evidence related to the cost of collecting late payments. The CFPB also solicited comment on whether the pre-charge-off collection costs for smaller issuers differ from such costs for larger issuers, and if so, how the costs differ.

For the reasons described below, including the CFPB's review of the comment letters about collection costs, as well as the CFPB's concerns about impact on consumers and competition, the CFPB is not adopting at this time certain proposed changes for Smaller Card Issuers as defined in new § 1026.52(b)(3). The term "Smaller Card Issuer" is defined to mean a card issuer that together with its affiliates had fewer than one million open credit card accounts as defined in § 1026.58(b)(6) for the entire preceding calendar year.[103] Specifically, the following proposed changes are not being adopted at this time for Smaller Card Issuers (1) the $8 late fee safe harbor threshold and the elimination of the higher late fee safe harbor amount for subsequent violations; and (2) the elimination of the annual adjustments for the safe harbor threshold dollar amounts.

For these Smaller Card Issuers, the safe harbor thresholds in § 1026.52(b)(1)(ii)(A) through (C) will continue to apply to late fees that they charge (as revised in this final rule) pursuant to the annual adjustment provisions in § 1026.52(b)(1)(ii)(D)). In addition, the annual adjustment provisions for the safe harbor dollar amount thresholds to reflect changes in the CPI in § 1026.52(b)(1)(ii)(D) will continue to apply to late fees imposed by Smaller Card Issuers. Also, as discussed in the section-by-section analysis of § 1026.52(b)(2)(i), the proposed provisions to restrict late fee amounts to 25 percent of the required minimum payment are not being finalized in this final rule with respect to any card issuers, including Smaller Card Issuers. In contrast, the clarification in comment 52(b)(1)(i)–2.i that the collection costs for calculating penalty fee amounts under the cost analysis provisions in § 1026.52(b)(1)(i) do not include post-charge-off collection costs is being adopted for all card issuers, including Smaller Card Issuers, because this provision is intended to

---

[101] 2021 Report, at 55. The average late fee charged by issuers included in the Y–14+ data is based on the Y–14 data and data collected from other specialized card issuers in response to an information order pursuant to section 1022(c)(4) of the CFPA.

[102] Late Fee Report, at 14.

[103] See supra note 5.

clarify the existing rule and commentary.

*B. Comments Received*

*Impact on credit unions and small card issuers—$8 late fee safe harbor amount.* Many banks and credit unions, industry trade associations, and individual consumers on behalf of credit unions, one Member of Congress, and the Office of Advocacy, an independent office within the SBA, expressed concern that the CFPB's estimated pre-charge-off collection costs for Y–14 issuers that the CFPB used in its analysis to support the proposed $8 do not accurately represent the pre-charge-off collection costs for late payments of smaller issuers.

Many credit unions and individuals on behalf of credit unions and one industry credit union trade association commenter asserted that (1) credit union call report data indicate that credit card late fees incurred per member per year are only $2.65; (2) annual total pre-charge-off collection costs per credit card account offered by credit unions amounted to $0.33, which is 10 cents higher than the pre-charge-off collection costs per credit card account for large issuers that the CFPB notes in the proposal; (3) and the ratio of monthly late fees to total pre-charge-off costs for the credit union industry is 2.8, compared to 5.7 for large issuers in 2022. These commenters also asserted that credit unions (1) have much lower fee-to-cost ratios than big card issuers because credit unions are not-for-profit, community focused, relationship-oriented financial institutions; and (2) face higher pre-charge-off collection costs as compared to big banks that can achieve economies of scale based on their numbers of customers and employees.

Many credit unions and individuals on behalf of credit unions and three industry trade association commenters asserted that Federal credit unions did not have the same options as larger issuers to recover potential lost revenue from late fees, and this could impact their ability to offer credit cards to consumers. Specifically, these commenters explained that Federal Credit Union Act limits Federal credit unions' ability to increase APRs in order to recover revenue losses resulting from a lower late fee safe harbor amount. Two of these industry trade associations indicated that National Credit Union Administration (NCUA) Board's action in January 2023 regarding the Federal Credit Union Act currently imposes a

cap of 18.0 percent on the APR.[104] The other industry trade association asserted that the Federal Credit Union Act makes the credit union business model fundamentally different than that of the largest credit card issuers and that these limitations should not be ignored by the CFPB.

Many credit unions and individuals on behalf of credit unions and one industry credit union trade association commenter asserted that credit unions already offer some of the lowest late fees in the market, which benefits consumers. One of the credit union commenters asserted that its net earnings are returned to members in the form of higher annual percentage yields (APYs), lower APRs, and greater servicing.

More than fifty individual commenters on behalf of credit unions asserted that the proposal, if adopted, would have potentially massive unintended consequences, including that some credit unions would leave the market. They asserted that this, in turn, could limit credit availability and increase industry consolidation, and would restrict credit unions' ability to offer solutions to consumers experiencing real financial hardship. A bank and a community bank trade association commenter expressed similar comments and indicated that the 2023 Proposal, if adopted, ultimately would force many community banks to exit the credit card market, leaving consumers, and in particular, rural consumers, fewer options for financial services.

A credit union trade association commenter asserted that the 2023 Proposal, if adopted, would (1) make it more difficult for credit unions to balance safety and soundness considerations with the desire to provide credit access to all consumers, especially those building or rebuilding their credit; and (2) further consolidate credit card issuers, strengthening the largest providers that may compensate lower late payment fees with product add-ons and other practices that are not consumer friendly. This commenter also asserted that (1) use of the cost-analysis provisions are not feasible for credit

unions; (2) while the risk of operating outside of the safe harbor provision is common for the largest credit card issuers with large legal departments, not-for-profit credit unions are in a different position; (3) even when the fee is reasonable, it would be a safety and soundness concern to charge more than $8 as the risk of class action lawsuits continues to grow; (4) defending a reasonable fee through litigation is cost prohibitive for a not-for-profit financial institution and could severely impact their operations; and (5) while the safe harbor late fee amount proposed would not be a legal cap it may become an effective cap for credit unions, once again only benefiting the largest credit card issuers.

Many credit unions and individuals on behalf of credit unions urged the CFPB to exempt credit unions from its rulemaking as credit unions do not profit from any fees assessed to their members and the data are clear that credit unions already offer some of the lowest fees available in the market. Some of these commenters indicated that if the CFPB is hesitant to exempt just a particular type of financial institution, in light of the considerable impact that the 2023 Proposal is likely to have on small entities, the CFPB should consider a broader exemption for small entities, currently defined by the SBA's size standard of $850 million in total assets. These commenters asserted this would allow smaller entities to continue to maintain their ability to cover the costs of offering credit card accounts and remain competitive in the marketplace. An industry credit union trade association commenter asserted that one possible way to negate the impact of the 2023 Proposal on credit unions is to scale the rule for larger and smaller issuers.

One Member of Congress noted from the Congressional Research Service that smaller issuers sometimes serve more subprime cardholders who are more likely to make late payments which therefore implies that certain smaller issuers would face higher than average collection costs from late payments. The commenter noted that although the CFPB's proposal asserts that credit cards represent only a small percentage of credit unions' assets and revenues, the loss of late fee revenue would represent a distinct impact on credit unions because as nonprofits, they are unable to raise funds from stockholders. This commenter advised that the CFPB either work to ensure that the cost analysis provisions—an alternative to the safe harbor—would not impose undue burdens on small issuers or that the CFPB consider a separate safe harbor for

---

[104] The Federal Credit Union Act generally limits Federal credit unions to a 15 percent interest rate ceiling on loans. However, the NCUA Board may establish a temporary, higher rate for up to 18 months after considering certain statutory criteria. National Credit Union Administration Letter (23–FCU–02), *Permissible Loan Interest Rate Ceiling Extended* (Mar. 2023), *https://ncua.gov/regulation-supervision/letters-credit-unions-other-guidance/permissible-loan-interest-rate-ceiling-extended-2*. A January 2023 NCUA Board action established a temporary 18 percent interest rate ceiling through September 10, 2024. *See id.*

smaller issuers that more accurately reflects their unique costs.

The Office of Advocacy, an independent office within the SBA, criticized the CFPB for insufficiently considering the extent to which the proposed $8 safe harbor amount would cover the collection costs of smaller issuers. This agency asserted that (1) determining a late fee amount under the cost analysis provisions may not be feasible for smaller institutions; (2) small institutions may not have ready access to professional staff or consultants to develop a late fee that qualifies under the cost analysis provisions, and also may lack the information systems to provide the necessary support to determine the late fee amount under those provisions; and (3) for that reason, smaller institutions may rely on safe harbors to be certain that they are complying with the law. As such, this agency noted that an adequate safe harbor amount that reflects the costs that small entities incur in processing late payments is necessary to prevent small institutions from incurring potential legal fees if they were to use the incorrect late fee amount under the cost analysis provisions. The commenter further asserted that consumers, including small businesses, may choose to obtain their credit cards from small depository institutions that offer credit cards for a variety of reasons, including the ability of consumers with low credit scores to obtain a credit card that may otherwise be unavailable. The commenter also expressed concern that if the safe harbor amount does not cover the costs of providing the service, small depository institutions may decide to stop issuing credit cards.

*Impact on credit unions and small card issuers—elimination of annual adjustment.* Several banks and credit unions, and a few credit union trade associations urged the CFPB to consider the impact eliminating the annual adjustments for safe harbor threshold amounts to reflect changes in the CPI may have on credit unions and small card issuers. For example, one credit union and one credit union trade association asserted that credit unions typically have higher than average per account collection costs than larger banks. This credit union trade association further asserted that credit unions currently report that fee revenue does not cover the full cost of delinquency and collections. Another credit union trade association asserted that credit unions have less diversified revenue streams to make up for costs in other areas. A bank commenter indicated that small issuers have a

smaller credit base by which economic effects may be mitigated. Yet another credit union trade association asserted that (1) elimination of the annual adjustments would increase credit card losses and that Federal credit unions are subject to interest rate caps; and (2) credit unions would have a limited ability to recoup credit card losses.

*Impact on credit unions and small card issuers—25 percent limitation.* As discussed in more detail in the section-by-section analysis of § 1026.52(b)(2)(i), several banks, credit unions and industry trade associations and one individual commenter urged the CFPB to consider the disproportionate impact the 25 percent limitation may have on credit unions, small card issuers, and private label card issuers.

*Lack of SBREFA panel.* Many banks and credit unions, industry trade associations, and individuals on behalf of credit unions, the Office of Advocacy, an independent office within the SBA, and one law firm representing several card issuers asserted that the 2023 Proposal, if adopted, would have a significant economic impact on a substantial number of small entities (SISNOSE) and thus the CFPB is required to hold a small business review panel (SBREFA panel) under the Regulatory Flexibility Act (RFA) prior to finalizing the rulemaking. These comments are discussed in more detail in part X.

*C. The Final Rule*

For the reasons discussed below, the CFPB is not adopting at this time the following proposed changes for Smaller Card Issuers that are defined in § 1026.52(b)(3) as a card issuer that together with its affiliates had fewer than one million "open credit card accounts" as defined in § 1026.58(b)(6) for the entire preceding calendar year: [105] (1) the $8 late fee safe harbor threshold and the elimination of the higher late fee safe harbor amount for subsequent violations; and (2) the elimination of the annual adjustments for the safe harbor threshold. For Smaller Card Issuers, at this time, the safe harbor thresholds set forth in § 1026.52(b)(1)(ii)(A) through (C) will continue to apply to late fees charged by Smaller Card Issuers (as revised in this final rule pursuant to the annual adjustment provisions in § 1026.52(b)(1)(ii)(D)). In addition, the annual adjustment provisions for the safe harbor thresholds to reflect changes in the CPI in § 1026.52(b)(1)(ii)(D)) will continue to apply to late fees imposed by Smaller Card Issuers. Also, as

discussed in the section-by-section analysis of § 1026.52(b)(2)(i), the proposed provisions to restrict late fee amounts to 25 percent of the required minimum payment are not being finalized in this final rule with respect to any card issuers, including Smaller Card Issuers. In contrast, the clarification in comment 52(b)(1)(i)–2.i that the collection costs for calculating penalty fee amounts under the cost analysis provisions in § 1026.52(b)(1)(i) do not include post-charge-off collection costs is being adopted for all card issuers, including Smaller Card Issuers, because this provision is intended to clarify the existing rule and commentary.

The CFPB also explains below that the limit to qualify as a Smaller Card Issuers is set at one million open credit card accounts. The CFPB has determined that a one million open credit card account limit for this final rule is appropriate because comment letters have highlighted several concerns specific to these Smaller Card Issuers. The CFPB has determined that, based on comment letters from smaller issuers, the 2023 Proposal's late fee $8 safe harbor threshold would have impacted Smaller Card Issuers more significantly than Larger Card Issuers, and that Smaller Card Issuers might not have been as capable of responding by using the cost analysis provisions to cover their pre-charge-off collection costs related to late payments. Taken together, this result could harm consumers and the credit card market as a whole.

The CFPB has determined to act cautiously and ensure that all card issuers, large and small, can at least cover pre-charge-off collection costs with their late fees. If Smaller Card Issuers have higher pre-charge-off collections costs than Larger Card Issuers, Smaller Card Issuers may need to rely on the cost analysis provisions in § 1026.52(b)(1)(i) to cover their pre-charge-off collection costs, resulting in heightened compliance burden for issuers with less assets to cover them. Alternatively, Smaller Card Issuers may choose to forgo those compliance burdens by using the safe harbor threshold amount even if it does not cover their pre-charge-off collection costs rather than use the cost analysis provisions in § 1026.52(b)(1)(i). The CFPB anticipates that under this final rule Larger Card Issuers generally will recoup their applicable pre-charge-off collection costs using late fees, either using the safe harbor (which is more likely to be enough for the average Larger Card Issuer) or using the cost-analysis provisions (the compliance

[105] *See supra* note 5.

burdens of which Larger Card Issuers are more capable of absorbing). Since the CFPB recognizes that Smaller Card Issuers may face additional challenges in recouping pre-charge off collection costs using late fees, it is exercising caution and not finalizing the proposal with regard to Smaller Card Issuers.

Smaller Card Issuer commenters indicated that if the 2023 Proposal were adopted, they might leave the market or cease offering credit cards to certain consumers, particularly those with lower credit scores. It is unclear to the CFPB whether Smaller Card Issuers would actually leave the market entirely because they could not cover their pre-charge-off collection costs through the proposed $8 late fee safe harbor threshold. However, if they did, the CFPB is concerned about the potential detriment of these actions to consumers. Based on comments, the CFPB recognizes that consumers may choose to obtain their credit cards from small depository institutions that offer credit cards for a variety of reasons, including the access to credit cards issued by small credit unions with substantially lower annual percentage rates [106] and the ability of consumers with low credit scores to obtain a credit card that may otherwise be unavailable. Further, the top 10 issuers by average credit card outstandings represented 83 percent of credit card loans in 2022,[107] and a further reduction in competition could be detrimental to all consumers in the credit card market.

Based on its review of comment letters, data from the proposal, and market expertise, the CFPB has determined that the appropriate definition of "Smaller Card Issuer" is issuers that together with their affiliates had fewer than one million open credit card accounts for the entire preceding calendar year.[108] By using the one million open credit card account limit to qualify as a Smaller Card Issuers, based on its review of both public and confidential data, the CFPB expects the new $8 safe harbor amounts would apply to approximately the largest 30 to 35 issuers by outstanding balances (out of around 4,000 financial institutions that offer credit cards). This would cover over 95 percent of the of the total outstanding balances in the credit card market as of the end of 2022.

The new safe harbor limit for Larger Card Issuers, which covers issuers that

together with their affiliates have one million or more open credit card accounts, is consistent with the Y–14 data used in the CFPB's proposal to determine pre-charge off collection costs, as it would cover the Y–14 issuers for which the CFPB had total collections and late fee revenue data prior to the 2023 Proposal, the specialized issuers in the Y–14+ for which the CFPB obtained total collections and late fee revenue data after issuing the 2023 Proposal, and about a dozen other similarly sized issuers with large credit card portfolios. In choosing this threshold, the CFPB has determined it is appropriate to limit the rule at this time to the larger issuers that either submitted data to or had economies of scale similar to those issuers that provided Y–14 and Y–14+ data because those data support the CFPB's conclusion that the 2010 Final Rule's safe harbor amounts as to those Larger Card Issuers were not reasonable and proportional to the costs of the omission or violation, as required by the statute. For similar reasons and administrability, the CFPB has determined that it is appropriate at this time to only eliminate the annual adjustment provisions in § 1026.52(b)(1)(ii)(D) to the late fees charged by Larger Card Issuers. As discussed in the section-by-section analysis of § 1026.52(b)(1)(ii)(D), the data the CFPB uses to compare collections costs to changes in the CPI relate to certain Larger Card Issuers (namely, the Y–14 issuers).

The CFPB recognizes that the new $8 safe harbor amount will apply to about one dozen issuers for which the CFPB does not have total collections data and late fee revenue data. Based on the CFPB's market expertise and analysis of comment letters, the CFPB has determined that it is appropriate to apply this new safe harbor amount to those issuers because they have substantial credit card portfolios and, therefore, the CFPB expects they will have economies of scale similar to the Y–14+ issuers in collecting late payments and the resources to use the cost analysis provisions in § 1026.52(b)(1)(i) to determine the late fee if the $8 safe harbor threshold amount fails to cover pre-charge off collections costs.

The CFPB has determined that basing the limitation on the number of open credit card accounts, rather than total asset size for the institution or bank holding company (such as the $100 billion threshold for inclusion in the Y–14 data), or on the amount of credit card outstanding balances held by the issuer, better captures card issuers with larger credit card portfolios that may have

similar economies of scale to the Y–14 issuers but may not meet a threshold based on total asset size or outstanding balances. The CFPB recognizes that some banks or credit unions with smaller total assets than Y–14 issuers, nonetheless, still may have significant credit card portfolios and would benefit from economies of scales of larger card operations with the resources to reasonably use the cost analysis provisions in § 1026.52(b)(1)(i) to determine the late fee if the $8 safe harbor threshold amount fails to cover pre-charge off collections costs, even without other lines of business that could provide additional assets. The CFPB also notes that its focus on the number of open credit card accounts as opposed to total asset size or the amount of credit card outstanding balances for purposes of this final rule is consistent with the CFPB's focus on an issuers' number of open credit card accounts for purposes of an exception to obligations of issuers to submit credit card agreements to the CFPB under § 1026.58.[109]

## VII. Section-by-Section Analysis

*Section 1026.7   Periodic Statement*

*7(b) Rules Affecting Open-End (Not Home-Secured) Plans*

*7(b)(11) Due Date; Late Payment Costs*

Section 1026.7(b) sets forth the disclosure requirements for periodic statements that apply to open-end (not home-secured) plans. Section 1026.7(b)(11) generally requires that for a credit card account under an open-end (not home-secured) consumer credit plan, a card issuer must provide on each periodic statement: (1) the due date for a payment and the due date must be the same day of the month for each billing cycle; and (2) the amount of any late payment fee and any increased periodic rate(s) (expressed as APRs) that may be imposed on the account as a result of a late payment.

Currently, comment 7(b)(11)–4 provides that for purposes of disclosing the amount of any late payment fee and any increased APR that may be imposed on the account as a result of a late payment under § 1026.7(b)(11), a card issuer that imposes a range of late payment fees or rates on a credit card account under an open-end (not home-secured) consumer credit plan may state the highest fee or rate along with an indication lower fees or rates could be imposed. Current comment 7(b)(11)–4 also provides an example to illustrate how a card issuer may meet the

---

[106] For Y–14+ issuers, the average APR was 22.7 percent for general purpose cards at the end of 2022, while Federal credit unions are limited to charging an APR of 18 percent. *See supra* note 104; 2023 Report, at 53.

[107] 2023 Report, at 19.

[108] *See supra* note 5.

[109] *See* § 1026.58(c)(5).

standard set forth above, stating that a phrase including the late payment fee could be "up to $29" complies with this standard.

**The CFPB's Proposal**

The 2023 Proposal would have amended comment 7(b)(11)–4 to read "up to $8" so that the late fee amount in the example would be consistent with the proposed $8 late fee safe harbor amount set forth in proposed § 1026.52(b)(1)(ii).

**Comments Received and the Final Rule**

The CFPB received no comments on the proposed revisions to comment 7(b)(11)–4. This final rule adopts comment 7(b)(11)–4 as proposed. Even though Smaller Card Issuers as defined in new § 1026.52(b)(3) are not subject to the new $8 late fee safe harbor threshold amount adopted in § 1026.52(b)(1)(ii) in this final rule, the CFPB has determined it is useful to revise the late fee amount in the example to be $8, consistent with the new $8 late fee safe harbor threshold amount that applies to Larger Card Issuers.

*Section 1026.52   Limitations on Fees*

*52(a) Limitations During First Year After Account Opening*

*52(a)(1) General Rule*

Section 1026.52(a)(1) generally provides that the total amount of fees a consumer is required to pay with respect to a credit card account under an open-end (not home-secured) consumer credit plan during the first year after account opening must not exceed 25 percent of the credit limit in effect when the account is opened. Section 1026.52(a)(2) provides that late payment fees, over-the-limit fees, and returned-payment fees; or other fees that the consumer is not required to pay with respect to the account are excluded from the fee limitation set forth in § 1026.52(a)(1).

Current comment 52(a)(1)–1 provides that the 25 percent limit in § 1026.52(a)(1) applies to fees that the card issuer charges to the account as well as to fees that the card issuer requires the consumer to pay with respect to the account through other means (such as through a payment from the consumer's asset account to the card issuer or from another credit card account provided by the card issuer). Current comment 52(a)(1)–1 also provides four examples to illustrate the provision set forth above. The two examples in current comment 52(a)(1)–1.i and iv contain late fee amounts of $15.

**The CFPB's Proposal**

The 2023 Proposal would have amended the two examples in comment 52(a)(1)–1.i and iv to use a late fee amount of $8, so that the late fee amounts in the examples would be consistent with the proposed $8 late fee safe harbor amount set forth in proposed § 1026.52(b)(1)(ii).

**Comments Received and the Final Rule**

The CFPB received no comments on the proposed revisions to comment 52(a)(1)–1.i and iv. This final rule adopts comment 52(a)(1)–1.i and iv substantially as proposed, with minor changes to make clear that the card issuer in the examples is not a Smaller Card Issuer as defined in § 1026.52(b)(3). Even though Smaller Card Issuers as defined in new § 1026.52(b)(3) are not subject to the new $8 late fee safe harbor threshold amount adopted in § 1026.52(b)(1)(ii) in this final rule, the CFPB has determined it is useful to revise the late fee amounts in the examples to be $8, consistent with the new $8 late fee safe harbor threshold amount that applies to Larger Card Issuers. This final rule also makes technical changes to cross references in comments 52(a)(1)–2 and 52(a)(1)–4.ii.C to conform to OFR style requirements.

*52(b) Limitations on Penalty Fees*

*52(b)(1) General Rule*

Section 1026.52(b) provides that a card issuer must not impose a fee for violating the terms or other requirements of a credit card account under an open-end (not home-secured) consumer credit plan unless the issuer has determined that the dollar amount of the fee represents a reasonable proportion of the total costs incurred by the issuer for that type of violation as set forth in the cost analysis provisions in § 1026.52(b)(1)(i) or complies with the safe harbor provisions set forth in § 1026.52(b)(1)(ii). It further provides that a card issuer must not impose such a fee unless the fee is consistent with certain prohibitions set forth in § 1026.52(b)(2), including a prohibition in § 1026.52(b)(2)(i)(A) on imposing a penalty fee that exceeds the dollar amount associated with the violation, which currently prohibits late fees that exceed 100 percent of the required minimum payment.[110] The commentary to § 1026.52(b) explains that penalty fees subject to its provisions include late fees, returned-payment fees, and fees for over-the-limit transactions, among others.[111]

---

[110] *See* comment 52(b)(2)(i)–1.
[111] *See* comment 52(b)–1.

**The CFPB's Proposal**

In the 2023 Proposal, the CFPB proposed to amend § 1026.52(b)(1)(ii) to lower the safe harbor dollar amount for late fees to $8 (currently set at $30) and to provide that the higher safe harbor dollar amount for subsequent violations of the same type that occur during the same billing cycle or in one of the next six billing cycles (currently set at $41) does not apply to late fees.[112]

In addition, as discussed in more detail below, the CFPB proposed to provide that the current provision in § 1026.52(b)(1)(ii)(D) that provides for annual adjustments for the safe harbor dollar amounts to reflect changes in the CPI would not apply to the safe harbor amount for late fees. Also, as discussed in the section-by-section analysis of § 1026.52(b)(2)(i) below, the CFPB proposed to amend § 1026.52(b)(2)(i)(A) to provide that late fee amounts may not exceed 25 percent of the required minimum payment.

The CFPB also proposed one clarification that would apply to penalty fees generally. Specifically, the CFPB proposed to amend comment 52(b)(1)(i)–2.i to make it explicitly clear that costs for purposes of the cost analysis provisions in § 1026.52(b)(1)(i) for determining penalty fee amounts do not include any collection fees that are incurred after an account is charged off pursuant to loan loss provisions.

The CFPB did not propose to amend the lead-in text of § 1026.52(b)(1). However, for consistency with the proposed amendments to other provisions in § 1026.52(b) and for clarity, the CFPB proposed certain amendments to the commentary to § 1026.52(b) introductory text and (b)(1). Specifically, the CFPB proposed to amend comment 52(b)–1.i.A to make it explicitly clear that a late payment fee or late fee is any fee imposed for a late payment and to include a cross-reference to § 1026.60(b)(9) and accompanying commentary for further guidance. The CFPB also proposed to amend comment 52(b)–2, which provides an illustrative example of how to round a penalty fee to the nearest whole dollar in compliance with the rule. The proposed amendments would have reduced the dollar amounts of late fees in the example to reflect amounts that would be permissible under the CFPB's proposals to lower the late fee safe harbor amount to $8 and to cap late

---

[112] As discussed in the section-by-section analysis of § 1026.52(b)(1)(ii)(C) below, the CFPB did not propose to lower or otherwise change the safe harbor amount of a late fee that card issuers may impose when a charge card account becomes seriously delinquent.

fees at 25 percent of the required minimum payment. In addition, the CFPB proposed to add new comment 52(b)–5 to clarify that any dollar amount examples in the commentary to § 1026.52(b) relating to the safe harbors in § 1026.52(b)(1) are based on the original historical safe-harbor thresholds of $25 and $35 for penalty fees other than late fees, and on the proposed threshold of $8 for late fees. This proposed clarification would have helped to explain why the dollar amounts for penalty fees other than late fees in the examples in the commentary are different from the ones set forth in the regulatory text in § 1026.52(b)(1)(ii)(A) and (B).

The CFPB also proposed to amend comments 52(b)(1)–1.i.B and C, which illustrate the relationship between the cost analysis provisions in § 1026.52(b)(1)(i) and the safe harbor provisions in § 1026.52(b)(1)(ii). Specifically, the CFPB proposed to amend the illustrative example in comment 52(b)(1)–1.i.B to reflect a late fee amount consistent with the proposal. In addition, because the CFPB proposed to substantially amend the safe harbor provisions for late fees, the CFPB proposed to remove references to late fees from the illustrative examples in comment 52(b)(1)–1.i.C and replace them with references to over-the-limit fees.

In addition, the CFPB proposed to amend comment 52(b)(1)–1.ii, which illustrates the relationship between the penalty fee limitations in § 1026.52(b)(1) and the prohibitions in § 1026.52(b)(2). The proposed amendments would have reduced the dollar amount of a late fee in the example to reflect an amount that would be consistent with the CFPB's proposal to lower the late fee safe harbor amount.

The CFPB solicited comment on all aspects of these proposed amendments to the commentary to § 1026.52(b) introductory text and (b)(1), including comment on what additional amendments may be needed to help ensure clarity and compliance certainty.

Comments Received and the Final Rule

The CFPB received no comments on the proposed clarifications to the commentary to § 1026.52(b) introductory text and (b)(1). For purposes of clarity and compliance certainty, this final rule adopts amendments to the commentary to § 1026.52(b) introductory text and (b)(1) substantially as proposed, with minor changes reflecting the CFPB's decision not to finalize the new $8 late fee safe harbor amount for Smaller Card Issuers as defined in new § 1026.52(b)(3) or to

restrict late fee amounts to 25 percent of the required minimum payment. Accordingly, consistent with the proposal, comment 52(b)–1.i.A is revised to clarify that a late payment fee or late fee is any fee imposed for a late payment and to include a cross-reference to § 1026.60(b)(9) and accompanying commentary for further guidance. The CFPB finds this clarification necessary given the slight variations in terms used to describe late fees in Regulation Z. Also, consistent with the proposal, the illustrative example of rounding the amount of a penalty fee to the nearest dollar in comment 52(b)–2 is revised to lower the late fee amounts to be consistent with the new $8 late fee safe harbor amount for Larger Card Issuers. The CFPB finds that this revision and similar revisions to the commentary discussed below are helpful to facilitate compliance with the new $8 late fee safe harbor amount for card issuers to which it applies.

Consistent with the proposal, this final rule also adds new comment 52(b)–5 to clarify that any dollar amount examples in the commentary to § 1026.52(b) relating to the safe harbors in § 1026.52(b)(1) are based on the original historical safe-harbor thresholds of $25 and $35 for penalty fees other than late fees, and on the threshold of $8 for late fees. In a minor change from the proposal, the comment also clarifies that the $8 threshold is applicable to card issuers other than Smaller Card Issuers as defined in § 1026.52(b)(3) (namely, Larger Card Issuers as that term is used in this document). This new comment helps to explain why the dollar amounts for penalty fees set forth in the examples in the commentary are different from the ones set forth in the regulatory text in § 1026.52(b)(1)(ii)(A) and (B).

In addition, this final rule amends the illustrative example in comment 52(b)(1)–1.i.B to reflect a late fee amount consistent with the $8 late fee safe harbor amount for Larger Card Issuers. In addition, because the CFPB in this final rule is substantially amending the safe harbor provisions for late fees with respect to Larger Card Issuers, this final rule removes references to late fees from the illustrative examples in comment 52(b)(1)–1.i.C and replaces them with references to over-the-limit fees, the amounts of which remain the same in this final rule for all card issuers. In addition, this final rule reduces the amount of the late fee in the illustrative example in comment 52(b)(1)–1.ii for consistency with the lower $8 late fee safe harbor amount for Larger Card Issuers.

*52(b)(1)(i) Fees Based on Costs*

As noted above, under the cost analysis provisions in § 1026.52(b)(1)(i), a card issuer may impose a fee for violating the terms or other requirements of an account consistent with the general rule in § 1026.52(b)(1) if the card issuer has determined that the dollar amount of the fee represents a reasonable proportion of the total costs incurred by the card issuer as a result of that type of violation. Section 1026.52(b)(1)(i) further provides that a card issuer must reevaluate that determination at least once every 12 months and sets forth certain other requirements and conditions that apply if, as a result of the reevaluation, the card issuer determines that either a lower or higher fee represents a reasonable proportion of the total costs incurred by the card issuer as a result of that type of violation.

The CFPB's Proposal

The CFPB did not propose to amend the text of § 1026.52(b)(1)(i). However, for purposes of clarity and compliance certainty, the CFPB proposed to amend comment 52(b)(1)(i)–2.i to make it explicitly clear that the costs that card issuers can consider for purposes of determining the amount of a penalty fee under the cost analysis provisions in § 1026.52(b)(1)(i) do not include collection costs that are incurred after an account is charged off in accordance with loan-loss provisions.

Comment 52(b)(1)(i)–1 currently provides that card issuers may include in the costs for determining the amount of a penalty fee ''the costs incurred . . . as a result of [the] violation.'' Comment 52(b)(1)(i)–2 addresses amounts not considered costs incurred by a card issuer as a result of violations of the terms or other requirements of an account for purposes of § 1026.52(b)(1)(i). Comment 52(b)(1)(i)–2.i provides that one such amount that cannot be considered as costs incurred for purposes of § 1026.52(b)(1)(i) are losses and associated costs (including the cost of holding reserves against potential losses and the cost of funding delinquent accounts).

The CFPB proposed to amend comment 52(b)(1)(i)–2.i to make it explicitly clear that the ''losses and associated costs'' that card issuers may not consider as costs incurred for purposes of § 1026.52(b)(1)(i) include any collection costs that are incurred after an account is charged off in accordance with loan-loss provisions. The CFPB's proposal, therefore, would have made it explicit that for any collection costs that a card issuer incurs

after an account has been charged off are not considered costs incurred for purposes of § 1026.52(b)(1)(i). The CFPB understood that when an account has been charged off, the card issuer has written the account off as a loss; therefore, any cost in collecting amounts owed to a card issuer that are incurred post-charge-off is related to mitigating a loss as opposed to the cost of a violation of the account terms. As the Board noted in its 2010 Final Rule, "it would be inconsistent with the purpose of the [CARD Act] to permit card issuers to begin recovering losses and associated costs through penalty fees rather than through upfront rates." [113]

The CFPB solicited comment on this proposed clarification of the commentary to § 1026.52(b)(1)(i), including comment on whether any additional clarification may be needed. The CFPB also solicited comment on whether there are other specific clarifications that should be made to the provisions of the commentary providing guidance on how to perform a cost analysis under the rule.

Comments Received

Many consumer groups in a joint letter, a credit union, and a credit union trade association expressed support for the CFPB's proposal that comment 52(b)(1)(i)–2.i be amended to clarify that costs for purposes of the cost analysis provisions in § 1026.52(b)(1)(i) for determining penalty fee amounts do not include any collection costs that are incurred after an account is charged off pursuant to loan loss provisions. The consumer groups indicated that card issuers consider charged off accounts to be a loss, therefore, such accounts should be considered a loan loss. The consumer groups also indicated that card issuers build loss rates into the price of credit (*e.g.,* interest, including any penalty interest rate). The credit union trade association noted that credit unions' late fees cover pre-charge off collection costs.

As discussed below, many industry commenters, including several trade associations, and a few individual commenters expressed concerns with the CFPB's proposal that comment 52(b)(1)(i)–2.i be amended to clarify that costs for purposes of the cost analysis provisions in § 1026.52(b)(1)(i) for determining penalty fee amounts do not include any collection costs that are incurred after an account is charged off pursuant to loan loss provisions.

*Relationship to late fees.* Several credit unions and banks, a few individual commenters, one law firm

representing several card issuers, and a few industry trade associations indicated that post-charge-off costs, including collection costs, are related to late fees and should not be distinguished from pre-charge-off costs. A trade association and a credit union indicated that card issuers consider costs across the entire span of a cardholder's account and charge-off recoveries are accounted for in the overall profitability of a portfolio. Another industry trade association commenter specifically indicated that including the risk of some account missing payments, which ultimately lead to losses for card issuers, in pricing a late fee is appropriate under card issuers' risk-based pricing function and is consistent with the CARD Act's statutory factors. A credit union and an industry trade association indicated that costs associated with contacting the cardholder, be it before or after an account is charged off, are substantially related to the late payment and should be factored into the late fee. Several banks and credit unions, a law firm representing several card issuers, and an industry trade association further expanded what costs card issuers' face post-charge-off which collectively included internal and supplier expenses; court costs and vendor commissions associated with the recovery of unpaid balances; technology expenses; and people-related expenses for recoveries including the usage of third-party debt collectors.

An individual commenter, a law firm representing several card issuers, and an industry trade association characterized charge-off as an accounting concept. These commentors collectively noted that charge-off as an accounting entry is mandated by regulators; this accounting concept was unrelated to collection costs and designed to ensure appropriate financial reporting of credit losses; and has no impact on the collectability or obligation of the debt and the only difference between pre-charge-off and post-charge-off delinquencies is the amount of time the debt has been in delinquent status. Similarly, an individual commenter noted that card issuers do not relinquish its contract rights to collect payment when accounts are charged-off.

A law firm representing several card issuers indicated that costs associated with post-charge-off collection activities are actually more like pre-charge-off collection costs, as opposed to losses, because card issuers cannot recoup those costs from consumers.

A law firm representing several card issuers, an industry trade association and a regulatory advocacy group

characterized the distinction between pre-and-post-charge-off collection expenses as arbitrary or arbitrary and capricious. The law firm noted that the CFPB's proposal is arbitrary and capricious because it did not explain why a card issuer writing off costs for its own accounting purposes means that the card issuer has not incurred the cost of collecting these payments.

An industry trade association indicated that the provision the CFPB proposed to amend is currently consistent with the statutory factor that the CFPB be guided by the cost incurred by the creditor from an omission or violation. This commenter explained that in the commentary to Regulation Z, the Board excluded the costs of reserves held against potential losses and costs of funding delinquent amounts from what may be recovered through late fees. This commenter expressed concerns that the CFPB did not explain why the Board appropriately excluded these costs from losses when statutorily guided by the cost incurred by the creditor from an omission or violation.

*Credit reporting related costs.* An individual commenter highlighted that while reporting to credit bureaus is not a direct collection expense, credit bureau disputes are directly related to collections. The individual commenter noted that disputes only originate on reports of charge-off or delinquency and, in general, the level of monthly disputes ranges from 0.3 percent to 0.5 percent of all accounts reported in the last seven years. The commenter indicated these dispute reasons are evidence that credit bureau disputes are directly related to collections. Further, the individual commenter noted that working on these disputes is costly and card issuers that lend more frequently to credit challenged consumers will likely incur these costs more frequently.

*Relationship to funds for other products and services.* A few credit unions and an industry trade association indicated that excluding post-charge-off collection costs would reduce the funds available for other products and services. One of the credit unions noted that reduced funds for other products and services may lead to reduced access and higher costs to other members utilizing these services. Another credit union specifically noted that excluding post-charge-off collection costs would also hinder innovation to offer improved mobile and online platforms.

*Certain pre-charge-off costs.* An industry trade association indicated that there are pre-charge-off costs beyond collections-related expenses including costs associated with pre-charge-off

[113] 75 FR 37526 at 37538.

customer service, commissions, grants, program development, and collections strategies.

*Relationship to CARD Act.* Several industry trade associations, a regulatory advocacy group, and a law firm representing several card issuers indicated that the CFPB's proposal to clarify that costs for purposes of the cost analysis provisions in § 1026.52(b)(1)(i) for determining penalty fee amounts do not include any collection costs that are incurred after an account is charged off pursuant to loan loss provisions is not supported by the CARD Act. One of those industry trade associations specified that the CARD Act requires a broader consideration of the costs to issuers, namely the cost incurred by the creditor from such violation or omissions. Several other trade associations went a step further and indicated that this clarification is not supported in statute or regulation, and that the statute or regulation would have expressly limited the costs analysis provision to pre-charge-off collection costs if that was the intent. Similarly, the law firm representing several card issuers noted that the proposal ignores the express language of the CARD Act regarding what constitutes a permissible late fee. This law firm specified that the CFPB conflated two concepts within the CARD Act—the requirement that late fees be reasonable and proportional to the omission or violation to which the fee relates and that the CFPB be guided by the cost incurred by the creditor from an omission or violation. This commenter indicated that by interchanging the two concepts the CFPB creates a new and narrower standard to facilitate the reduction of late fees. This commenter further indicated that the proposal also contradicts this narrower standard because it seeks to impose a standard that makes late fees equal to pre-charge-off collection costs and not late fees that are reasonable and proportional to those costs.

Another industry trade association indicated that, in addition to the proposal running afoul of the CARD Act, it may also come into conflict with the Due Process and Takings Clauses of the Fifth Amendment as it may deprive card issuers their property rights to return on capital invested.

Another industry trade association suggested that the CFPB should reopen the existing regulation to address conflicts with the CARD Act to the extent that card issuers start using the cost analysis provisions. This commenter specifically suggested that the current regulation is in error because it permits the recovery of a fee that

represents a reasonable proportion of the total costs incurred by the card issuer as a result of that type of violation, but those limitations are not found in the statute.

*Specific data provided.* An individual commenter and a credit union provided the CFPB with relevant data to its proposal that comment 52(b)(1)(i)–2.i be amended to clarify that costs for purposes of the cost analysis provisions in § 1026.52(b)(1)(i) for determining penalty fee amounts do not include any collection costs that are incurred after an account is charged off pursuant to loan loss provisions. The individual commenter submitted publicly available financials of two FDIC-insured institutions. The individual indicated that these data show that non-interest income like annual fees and late fees are not enough to cover charge-offs. The credit union estimated that costs associated with servicing a delinquent credit card account (including costs related to salaries, vendor costs, notifications, and alerts) to be $53 per credit card and $105,442 per year, and noted these costs exceed the current safe harbor amounts. This commenter also indicated that credit cards consist of 10 percent of its loan portfolio but 27 percent of the accounts it collects.

*Additional issue.* In addition to the comments on the proposed clarifications of the commentary to § 1026.52(b)(1)(i), consumer groups recommended in a joint letter that the CFPB revise the examples in comment 52(b)(1)(i)–6.ii to lower the late fee amounts closer to the proposed $8 safe harbor amount, because otherwise, the commentary could be read to provide that significantly higher late fees based on the cost analysis provisions would be reasonable and proportional.

The Final Rule

For the reasons stated herein, the CFPB is adopting the amendment to clarify comment 52(b)(1)(i)–2.i as proposed and therefore this amendment applies to both Larger Card Issuers and Smaller Card Issuers. This final rule also makes technical changes to cross references in comments 52(b)(1)(i)–6.ii.B and C, 52(b)(1)(i)–7.ii.B and C, and 52(b)(1)(i)–8.iii.B and C to conform to OFR style requirements.

With respect to the comments that post-charge-off costs are related to the cost of a late fee violation and should not be distinguished from pre-charge-off costs, comment 52(b)(1)(i)–2.i explains that card issuers may not consider "losses and associated costs" as costs incurred for purposes of the cost analysis provisions found in § 1026.52(b)(1)(i) and provides examples

of what constitutes losses including the cost of holding reserves against potential losses and the cost of funding delinquent accounts. The Board's 2010 Final Rule does not characterize these specific examples as to what constitutes a "loss" as exhaustive. Instead, these examples were added into comment 52(b)(1)(i)–2.i to address specific comments received in its rulemaking process.[114] The amendment adopted here, like the examples implemented in the Board's 2010 Final Rule, provides further clarification on what constitutes a "loss."

As discussed in the 2023 Proposal, even if "loss" is an accounting term, the purpose of excluding post-charge-off costs is to exclude those costs that are not directly linked to the violation of the late payment, and, indeed, where in the vast majority of instances, the consumer who pays late may never be subject to post-charge off collection or written off as a loss. As the CFPB explained in the proposal, the costs in collecting amounts owed to a card issuer that are incurred post-charge-off are substantially related to mitigating a loss as opposed to the cost of a violation of the account terms.

With respect to comments that the amendment is not supported by the CARD Act, the Board in its 2010 Final Rule received similar comments including that " 'costs incurred by the creditor from [an] omission or violation' does not expressly exclude losses and that definitions of 'cost' typically include 'loss.' "[115] The CFPB agrees with the Board when it noted that "Section 149(c)(1) refers to 'costs incurred by the creditor from [an] omission or violation,' which could be construed to mean that it is appropriate to exclude losses where—as here—card issuers do not incur losses as a result of the overwhelming majority of violations."[116] If losses and post-charge off costs were included in the late fee amount calculation, the majority of consumers who pay late fees—whose accounts were merely delinquent and not written off—would be compensating issuers for losses that have nothing to do with their own late payment violations, but rather result from the small minority of delinquent accounts that might be written off. The Board explained, and the CFPB agrees, that this is contrary to the statutory requirement that late fees be related to the cost of the omission or violation, here the cost of paying late,

[114] 75 FR 37526 at 37538–9.
[115] *Id.* at 37538.
[116] *Id.*

rather than the cost of writing off certain accounts.

Further, the Board noted in its 2010 Final Rule that, if losses were included, it could result in obscuring the cost of credit, which was contrary to an express purpose of the CARD Act. As explained in the 2010 Final Rule, "it would be inconsistent with the purpose of the [CARD Act] to permit card issuers to begin recovering losses and associated costs through penalty fees rather than through upfront rates." [117] The CARD Act was enacted to "establish fair and transparent practices relating to the extension of credit." [118] The Board recognized in its 2010 Final Rule that "if card issuers were permitted to begin recovering losses and associated costs through penalty fees rather than upfront rates" then "transparency in credit card pricing would be reduced because some consumers overestimate their ability to avoid violations and therefore may discount upfront penalty fee disclosures." [119]

The CFPB notes that issuers have other mechanisms to recover costs associated with post-charge off accounts, like the APR. To that extent, the CFPB acknowledges commenters who provided specific data on financial institutions whose non-interest income like annual fees and late fees are not enough to cover charge-offs. However, as noted above, card issuers use periodic rates to account for losses, and in fact, this is the justification for risk-based pricing that is the norm in the market. Permitting issuers to recover losses, like post-charge-off costs, through late fees is not the intent of the CARD Act; issuers have other means to recover such costs such as through upfront rates.

With respect to comments that certain costs associated with pre-charge-off customer service, commissions, grants, program development, collection strategies, and credit bureau disputes should be considered as collection costs, the purpose of this amendment is not to create an exhaustive list of what card issuers can consider as collection costs but to clarify what is already in the text of the commentary. The CFPB here has determined that there is a need to clarify that for card issuers using the cost analysis provisions in § 1026.52(b)(1)(i) to determine penalty fees post-charge-off collection costs are losses and therefore cannot be used in the analysis.

With respect to comments that excluding post-charge-off collection

costs would reduce the funds available for other products and services and that it would hinder the ability to improve mobile and online platforms, the CFPB notes that pursuant to the CARD Act, the amount of any penalty fee, including any late payment fee, must be "reasonable and proportional" to any omission with respect to, or violation of, the cardholder agreement.[120] Therefore, in considering which costs should be considered for purposes of setting an amount for penalty fees pursuant to the cost analysis provisions, it would be inappropriate to consider penalty fees' subsidization of other products and services that card issuers may offer.

In adopting the amendment to comment 52(b)(1)(i)–2.i, the CFPB also rejects the notion raised by commenters that it is in violation of the Due Process and Takings Clauses of the Fifth Amendment. There is no public taking, and further, the discretionary $8 safe harbor is set at a threshold that will likely enable the average Larger Card Issuer to continue to recover pre-charge-off collection costs, and Larger Card Issuers can elect to use the cost analysis provisions if the safe harbor amount is insufficient for recovery of their pre-charge-off collection costs. In addition, as described above, Larger Card Issuers generally can adjust other fees or interest rates in order to recover any lost revenue.

Additionally, the CFPB declines to revise the examples in comment 52(b)(1)(i)–6 to lower the late fee amounts closer to the $8 safe harbor amount, as recommended. The CFPB views the revision as unnecessary and notes that an illustrative example is neither representative nor determinative of a reasonable and proportional late fee amount determined pursuant to the cost analysis provisions.

### 52(b)(1)(ii) Safe Harbors

**The Board's Implementing Rule and Findings**

In the 2010 Final Rule implementing TILA section 149, the Board established penalty fee safe harbor amounts of $25 for the first violation and $35 for any additional violations of the same type that occur during the same billing cycle or in one of the next six billing cycles. In doing so, the Board indicated that it "believes that these amounts are generally consistent with the statutory factors of cost, deterrence, and consumer conduct." [121] In interpreting TILA section 149(a), the Board found that "it appears that Congress intended

the words 'reasonable and proportional' . . . to require that there be a reasonable and generally consistent relationship between the dollar amounts of credit card penalty fees and the violations for which those fees are imposed, while providing the Board with substantial discretion in implementing that requirement." [122]

*The Board's Consideration of Costs.* The cost-related data on which the Board relied were limited. Although the Board received more than 22,000 comments on its proposed rule, the Board noted that "relatively few provided any data" supporting a particular safe harbor amount.[123] While one commenter suggested the average cost of collecting late payments for credit card accounts issued by the largest issuers was $28, the Board noted the comment "significantly overstates the fee amounts necessary to cover the costs incurred by large issuers as a result of violations," as it included costs not incurred as a result of violations, such as the cost of funding balances that would have been charged off regardless of fees.[124]

Given these limitations, instead of relying on data related to the costs of collecting late payments in setting the safe harbor dollar amounts in its Regulation Z, § 226.52(b)(1)(ii)(A) and (B), the Board primarily considered the following information in setting the safe harbor dollar amounts: (1) the dollar amounts of late fees currently charged by credit card issuers; (2) the dollar amounts of late fees charged with respect to deposit accounts and consumer credit accounts other than credit cards; (3) State and local laws regulating late fees; (4) the safe harbor threshold for credit card default charges established by the United Kingdom's Office of Fair Trading (OFT) in 2006; (5) data related to deterrence that provide evidence on whether the experience of incurring a late payment fee makes consumers less likely to pay late for a period of time; and (6) data submitted by a large credit card issuer that indicated that consumers who pay late multiple times over a six-month period generally present a significantly greater credit risk to issuers than consumers who pay late a single time.[125]

In establishing the safe harbor amounts, the Board concluded that "it is not possible based on the available information to set safer harbor amounts that precisely reflect the costs incurred by a widely diverse group of card

---

[117] *Id.*
[118] Pub. L. 111–24, 123 Stat. 1734 (2009).
[119] 75 FR 37526 at 37538.

[120] CARD Act section 102, 123 Stat. 1740 (15 U.S.C. 1665d(a)).
[121] 75 FR 37526 at 37527.

[122] *Id.* at 37532.
[123] *Id.* at 37541.
[124] *Id.*
[125] *Id.* at 37540–43.

issuers and that deter the optimal number of consumers from future violations," [126] and stated its belief that the safe harbor amounts established in the rule were "generally sufficient to cover issuers' costs and to deter future violations." [127] The Board further concluded that, based on the comments received in response to its proposal, the $25 safe harbor in § 226.52(b)(1)(ii)(A) for the first violation was sufficient to cover the costs incurred by most small issuers as a result of violations. [128]

With respect to late payments, the Board stated its belief that large issuers generally incur fewer collection and other costs on accounts that experience a single late payment and then pay on time for the next six billing cycles than on accounts that experience multiple late payments during that period. [129] The Board further reasoned that even if $25 is not sufficient to offset all of the costs incurred by some large issuers as a result of a single late payment, those issuers will be able to recoup any unrecovered costs through upfront APRs and other pricing strategies. [130]

With respect to the higher safe harbor amount in § 226.52(b)(1)(ii)(B), the Board explained its belief that when an account experiences additional violations that occur during the same billing cycle or in one of the six billing cycles following the initial violation, $35 would generally be sufficient to cover any increase in the costs incurred by the card issuer. [131] As discussed in more detail below, the Board also explained its belief that the $35 safe harbor amount would have a reasonable deterrent effect on additional violations [132] and was consistent with the consumer's conduct in engaging in multiple violations of the same type within six billing cycles. [133]

*The Board's Consideration of Deterrence.* The Board did not expressly discuss how it took deterrence into account in setting the initial $25 penalty fee amount; instead, the Board limited its discussion of that factor to the role it played in the Board's decision to set a higher safe harbor amount for any additional violation of the same type that occurred during the same billing cycle or in one of the next six billing cycles. While the Board noted that it considered deterrence in setting a higher amount generally, the Board did

not have specific data justifying the $35 amount. The Board noted that one commenter on the proposal submitted the results of applying two deterrence modeling methods to data gathered from all leading credit card issuers in the U.S. According to the commenter, these models estimated that fees of $28 or less have relatively little deterrent effect on late payments but that higher fees are a statistically significant contributor to sustaining lower levels of delinquent behavior. While the Board questioned the assumptions used to arrive at the results in these modeling methods, the Board did accept that increases in the amount of penalty fees can affect the frequency of violations. [134]

With respect to the higher $35 fee for repeat penalty fees that occur during the same billing cycle or in one of the next six billing cycles, the Board explained its belief that a higher penalty fee amount is consistent with the deterrence factor set forth in TILA section 149(c)(2) insofar as—after a violation has occurred—the amount of the fee increases to deter additional violations of the same type that occur during the same billing cycle or in one of the next six billing cycles. [135] The Board also explained its belief that although upfront disclosure of a penalty fee may be sufficient to deter some consumers from engaging in certain conduct, other consumers may be deterred by the imposition of the fee itself. For these consumers, the Board explained its belief "that imposition of a higher fee when multiple violations occur will have a significant deterrent effect on future violations." [136] The Board specifically pointed to one study of four million credit card statements, which found that a consumer who incurs a late payment fee is 40 percent less likely to incur a late payment fee during the next month compared to a consumer who was not late, although this effect depreciates approximately 10 percent each month. [137] Although this study indicated that the imposition of a penalty fee may cease to have a deterrent effect on future violations after four months, the Board concluded that imposing an increased fee for additional violations of the same type that occur during the same billing cycle or in one of the next six billing cycles is consistent with the intent of the CARD Act. The Board pointed to this study as

evidence indicating that, as a general matter, penalty fees may deter future violations of the account terms. [138]

The Board's Consideration of Consumer Conduct. The Board also took consumer conduct into account in adopting the higher $35 fee for repeat penalty fees that occur during the same billing cycle or in one of the next six billing cycles. [139] The Board explained its belief that "multiple violations during a relatively short period can be associated with increased costs and credit risk and reflect a more serious form of consumer conduct than a single violation." [140] The Board noted that, based on data submitted by a large credit card issuer, consumers who pay late multiple times over a six-month period generally present a significantly greater credit risk than consumers who pay late a single time. The Board acknowledged that these data also indicate that consumers who pay late two or more times over longer periods (such as 12 or 24 months) are significantly riskier than consumers who pay late a single time. However, the Board did not explain how adding additional costs to these consumers would make them less of a credit risk or consider whether adding costs to consumers who are unable to pay could increase that risk.

The Board stated its belief that, when evaluating the conduct of consumers who have violated the terms or other requirements of an account, it is consistent with other provisions of the CARD Act to distinguish between those who repeat that conduct during the same billing cycle or in one of the next six billing cycles and those who do not. [141] Specifically, the Board noted that (1) TILA section 171(b)(4) provides that, if the APR that applies to a consumer's existing balance is increased because the account is more than 60 days delinquent, the increase must be terminated if the consumer makes the next six payments on time; and (2) TILA section 148 provides that, when an APR is increased based on the credit risk of the consumer or other factors, the card issuer must review the account at least once every six months to assess whether those factors have changed (including whether the consumer's credit risk has declined). [142] The Board did not, however, explain why this is relevant to the question of penalty fees.

---

[126] *Id.* at 37544.

[127] *Id.*

[128] *Id.* at 37542.

[129] *Id.*

[130] *Id.*

[131] *Id.*

[132] *Id.*

[133] *Id.* at 37543.

[134] *Id.* at 37541.

[135] *Id.* at 37533.

[136] *Id.*

[137] Sumit Agarwal *et al.*, *Learning in the Credit Card Market* (April 24, 2013), *https://ssrn.com/abstract=1091623* or *http://dx.doi.org/10.2139/ssrn.1091623*. The Board reviewed a 2008 version of the paper.

[138] 75 FR 37526 at 37533 n.24.

[139] The Board did not refer to consumer conduct in setting the $25 safe harbor amount. *See id.* at 37527.

[140] *Id.*

[141] *Id.* at 37534.

[142] *Id.*

The CFPB's Proposal

The safe harbor provisions in § 1026.52(b)(1)(ii) currently provide that a card issuer may impose a fee for violating the terms or other requirements of an account if the dollar amount of the fee does not exceed $30, as set forth in § 1026.52(b)(1)(ii)(A), or $41 for a violation of the same type that occurs during the same billing cycle or one of the next six billing cycles, as set forth in § 1026.52(b)(1)(ii)(B). In addition, § 1026.52(b)(1)(ii)(C) provides a special safe harbor that applies when a charge card account becomes seriously delinquent. Under that provision, when a card issuer has not received the required payment for two or more consecutive billing cycles on a charge card account that requires payment of outstanding balances in full at the end of each billing cycle, the issuer may impose a late payment fee that does not exceed 3 percent of the delinquent balance.

The CFPB proposed to amend § 1026.52(b)(1)(ii) to provide that a card issuer may impose a fee for a late payment on an account under the safe harbor if the dollar amount of the fee does not exceed $8.[143] The CFPB further proposed to amend § 1026.52(b)(1)(ii) to provide that other than a fee for a late payment, a card issuer may impose a fee for violating the terms or other requirements of an account if the dollar amount of the fee does not exceed the safe harbor amounts in § 1026.52(b)(1)(ii)(A) or (B), as applicable. As such, the proposed $8 safe harbor amount for late fees would have been a single fee amount; it would have applied regardless of whether the fee is imposed for a first or subsequent violation. However, for all other penalty fees, card issuers could still charge amounts not exceeding the amounts in § 1026.52(b)(1)(ii)(A) and (B).

In addition, under the proposal, charge card issuers could still impose a fee pursuant to § 1026.52(b)(1)(ii)(C) when a charge card account becomes seriously delinquent as defined in the rule. The CFPB stated its recognition that the fee described in § 1026.52(b)(1)(ii)(C) is a form of late fee but, for the reasons discussed below, did not propose to lower the safe harbor amount under this special provision for charge cards. However, as discussed in the section-by-section analysis of § 1026.52(b)(1)(ii)(C) below, the CFPB proposed to revise this provision for clarity to provide that a card issuer may

impose a fee not exceeding 3 percent of the delinquent balance on a charge card account that requires payment of outstanding balances in full at the end of each billing cycle if the card issuer has not received the required payment for two or more consecutive billing cycles, notwithstanding the safe harbor late fee amount in proposed § 1026.52(b)(1)(ii). The CFPB emphasized that the proposed $8 safe harbor late fee amount in proposed § 1026.52(b)(1)(ii) would still apply to fees imposed on a charge card account for late payments not meeting the description in § 1026.52(b)(1)(ii)(C).

In addition to the proposed amendments to the late fee safe harbor amounts in § 1026.52(b)(1)(ii), the CFPB proposed amendments to the provision's commentary. The CFPB proposed these amendments for purposes of clarity and consistency with the proposal to lower the late fee safe harbor amount to a fee amount of $8 for the first and subsequent violations.

Existing comment 52(b)(1)(ii)–1 explains the circumstances in which a card issuer may impose a higher penalty fee amount under § 1026.52(b)(1)(ii)(B) for a violation of the same type that occurred during the same billing cycle or one of the next six billing cycles. Because § 1026.52(b)(1)(ii)(B) would have no longer applied under the CFPB's proposal to limit the late fee safe harbor amounts to a fee amount of $8 for the first and subsequent violations, the CFPB proposed to amend comment 52(b)(1)(ii)–1.i to explain additionally that a card issuer cannot impose a late fee in excess of $8, as provided in proposed § 1026.52(b)(1)(ii), regardless of whether the card issuer has imposed a late fee within the six previous billing cycles. The CFPB also proposed to amend the illustrative examples in comment 52(b)(1)(ii)–1.iii.A to remove references to late fees and replace them with references to over-the-limit fees, as § 1026.52(b)(1)(ii)(B) would still apply to such fees under the CFPB's proposed amendments to § 1026.52(b)(1)(ii). In addition, the CFPB proposed to amend the illustrative examples in comments 52(b)(1)(ii)–1.iii.B and C to reflect a late fee amount of $8, consistent with the proposed amendments to § 1026.52(b)(1)(ii), and to make minor technical changes for consistency with the proposal.

In considering all statutory factors, the CFPB preliminarily found that an $8 late fee for the first and subsequent late payments better represents a balance of issuer costs, deterrent effects, consumer conduct, as well as the benefits to issuers that result from relying on a safe harbor amount, like reduced

administrative costs, and the possible beneficial effects of lower late fees on subprime cardholders' repayment behavior. Further, the CFPB preliminarily found that this amount is supported by analysis of the Y–14 data. Finally, the CFPB noted that it took into consideration changes in the market, like automatic payment, that facilitate billing and payment, thus making it easier for card issuers to collect timely payments. For these reasons, the CFPB preliminarily determined that a late fee amount of $8 for the first and subsequent violations is presumed to be reasonable and proportional to the late payment violation to which the fee relates.

The CFPB sought comment on all aspects of its proposal to lower the late fee safe harbor dollar amounts in § 1026.52(b)(1)(ii) to a fee amount of $8 for the first and subsequent violations and provide that a higher safe harbor dollar amount for penalty fees occurring within the same billing cycle or the next six billing cycles does not apply to late fees. In particular, the CFPB sought comment on whether to set a different amount and, if so, what amount and why, including any relevant data or other information. The CFPB also sought comment on whether to retain the higher safe harbor amount and, if so, what amount and why, including any data and other information related to the deterrent effects of the higher amount or its effects on consumer conduct. Further, the CFPB sought comment on whether and why to set a staggered late fee amount with a cap on the maximum dollar amount, such that card issuers could impose a fee of a small dollar amount every certain number of days until the cap is hit. The CFPB sought comment on what small dollar amount and maximum dollar amount cap may be appropriate and why, including any relevant data or other information. The CFPB also sought comment on whether the safe harbor threshold for late fees should be structured as a percentage of the minimum payment amount, and if so, what percentage should be used. In addition, the CFPB sought comment on what other revisions may be appropriate to ensure that credit card late fees imposed pursuant to the safe harbor provisions are reasonable and proportional. In particular, the CFPB sought comment on whether, as a condition of using the safe harbor for late fees, it may be appropriate to require card issuers to offer automatic payment options (such as for the minimum payment amount), or to provide notification of the payment due

---

[143] As discussed in more detail below, there was one proposed exception related to charge card accounts as described in comment § 1026.52(b)(1)(ii)(C).

date within a certain number of days prior to the due date, or both.

The CFPB also invited comment on all aspects on the proposed amendments to the commentary to § 1026.52(b)(1)(ii), including comment on what additional amendments may be needed to help ensure clarity and compliance certainty.

In addition, the CFPB also sought comment on whether to eliminate the safe harbor provisions for late fees, rather than lowering the safe harbor amounts to a fee amount of $8 for the first and subsequent violations as proposed.

The CFPB further sought comment on whether and why to lower the safe harbor amounts in § 1026.52(b)(1)(ii)(A) and (B) (including whether and why to eliminate the higher safe harbor amount for subsequent violations that occur during the same billing cycle or in one of the next six billing cycles) for all other credit card penalty fees, including fees for returned payments, over-the-limit transactions, and when payment on a check that accesses a credit card account is declined. In particular, the CFPB sought comment on what the safe harbor amounts for such fees should be, including any relevant data and information on the costs of such violations to card issuers. In the alternative, the CFPB sought comment on whether to finalize the proposed safe harbor for late fees and eliminate the safe harbors for other penalty fees.

Comments Received

*General.* The CFPB received approximately 100 comment letters from industry participants. These industry commenters generally opposed the proposal to lower the late fee safe harbor amount to $8 amount for the first and subsequent late payments, including the proposal to eliminate the higher safe harbor amount, irrespective of the specific dollar amount. A substantial number of consumers, including approximately 53,600 who submitted comments as part of letter-writing campaign, expressed support for the proposed $8 safe harbor amount. A large but significantly lower number of consumers, including approximately 170 who identified themselves as "bankers" and submitted comments as part of a letter-writing campaign, opposed the proposed $8 safe harbor amount. Consumer groups generally supported the proposed amount.

The comments on the proposed $8 safe harbor amount are discussed in further detail below, first in relation to the statutory factors of costs, deterrence, and consumer conduct, then in relation to other issues and concerns addressed by commenters.

*Costs.* As noted, most industry commenters opposed the proposed $8 safe harbor amount partly on the grounds that it would not cover card issuer's costs associated with late payments. These commenters generally took issue with what they viewed as flaws in the CFPB's analysis of issuers' costs, as discussed in the proposal.

As discussed in more detail in part V, larger issuers and their trade associations criticized the CFPB's analysis of the Y–14 data to determine the proposed $8 amount. These commenters argued, among other things, that the Y–14 data are underinclusive of the actual costs that card issuers incur as a result of late payments. For the reasons discussed in part V, the CFPB has determined that it is appropriate to consider and rely upon the Y–14 data for the Larger Card Issuers that are covered by the changes to Regulation Z contained in this final rule.

As noted in part V, one trade association commenter provided specific data related to costs of late payments. While the commenter did not provide data for the costs associated with all late payments, the commenter did provide data for accounts that were late for 60 days or more and estimated that these 60-day plus delinquent accounts cost issuers $46.30, including $33.00 in direct expenses, $9.00 in attributable expenses, and $4.30 in funding costs.

As discussed in more detail in part VI, many smaller issuers, industry trade associations, and individual consumers on behalf of credit unions, one Member of Congress, and the Office of Advocacy, an independent office within the SBA, expressed concern that the CFPB's estimated pre-charge-off collection costs for Y–14 issuers that the CFPB used in its analysis to support the proposed $8 do not accurately represent the pre-charge-off collection costs for late payments of smaller issuers. These comments are discussed in more detail in part VI.

In support of the proposal, several consumer groups noted that it is important to recognize that the $8 amount is a discretionary safe harbor, and if $8 does not adequately compensate an issuer for its costs in dealing with late payments, the issuer can charge more if they can justify the amount under the cost analysis provisions in § 1026.52(b)(1)(i). These commenters also recommended that card issuers be required to publicly disclose the data to support any late fee amounts they impose pursuant to the cost analysis provisions that are greater than the safe harbor.

For the reasons discussed below, the CFPB is adopting the proposed $8 safe harbor for late fee amounts for Larger Card Issuers. Nonetheless, in this final rule the CFPB is not requiring that card issuers that use the cost analysis provisions in § 1026.52(b)(1)(i) to set the late fee amount to publicly disclose the data to support any late fee amounts they impose pursuant to the cost analysis provisions that are greater than the safe harbor. The CFPB is concerned that card issuers may consider some of the supporting data that would be required to be released publicly under such a requirement to be confidential. The CFPB also notes that the CARD Act does not specifically require card issuers to disclose to the public their underlying costs data. A card issuer that chooses to base its penalty fees on its own determination (rather than on the safe harbors) must be able to demonstrate to the regulator responsible for enforcing compliance with TILA and Regulation Z that its determination is consistent with § 1026.52(b)(1)(i).

*Deterrence.* Many industry commenters expressed concern that the proposed $8 safe harbor amount was too low to deter late payments and would thus result in an increase in late payments and cause harm to consumers and the credit card market. Several individual consumer commenters expressed similar concerns. In a representative comment, a credit union averred that late fees, when set fairly and appropriately, encourage consumers to pay on time, which protects their credit score and helps them develop positive financial habits. If late fees are too low, the commenter stated, consumers are more likely to pay the fee without considering the long-term consequence of lowering their credit scores, higher borrowing costs, reduced ability to access credit, and ultimately less disposable income. A substantial number of other industry commenters also cited lower credit scores and reduced access to credit as likely outcomes of the proposed safe harbor amount. Some of these commenters noted that if the safe harbor is reduced to only $8, consumers may end up paying more late fees over time than they otherwise would. A credit union posited that because $8 is roughly comparable to the price of common items such as a cup of coffee or movie ticket, more consumers may view the amount as a reasonable price to pay in exchange for postponing making their credit card payments. Similarly, an academic commenter asserted that the ability to pay late can be viewed as a typical product, the quantity demanded

of which increases when its price decreases. If the price of paying late becomes cheaper, this commenter reasoned, more borrowers will opt to pay late. One bank criticized the CFPB for positing that even if the proposed amount leads to more late payments, some borrowers may benefit in terms of greater ability to pay revolving debt. Potential consumer benefit, the commenter asserted, is irrelevant to the CFPB's statutorily mandated consideration of whether a penalty fee has a deterrent effect.

Several industry commenters asserted that the CFPB lacked sufficient evidence that the reduced safe harbor amount would have a deterrent effect. Some industry commenters criticized what they viewed as flaws in the CFPB's deterrence analysis, including misreading or failing to give proper weight to existing literature on the deterrence effect of late fees. In particular, one credit union trade association noted that the CFPB failed to present an analysis of the tradeoff between late fees and late payments. This commenter asserted that a consumer is deterred from being late on a payment if the late fee is greater than the net benefit of missing the payment. This commenter also asserted that the CFPB failed to consider in its analysis a study that the Board relied on in its 2010 Final Rule—Agarwal *et al.*—that found that fees cause a reduction in the probability of a late fee the following month. In addition, this commenter cites another study—Grodzicki (2023)—that equally concludes that late payment would be more likely when the fees are less costly. This commenter stated that the CFPB's rationale for rejecting this conclusion—the time period the study covers—is unsatisfactory. Another industry trade association noted that the CFPB's analysis did not adequately weigh the increase in servicing costs as a result of the decreased deterrent effect of late fees.

Furthermore, one bank commenter suggested that the CFPB use reasonable proxies to determine the deterrence effect on the amount of a late fee. Such proxies suggested by the commenter include return check penalties as determined by States, late fees charged on utility bills and student loan late fees. The commenter asserted that these proxies could have been used by the CFPB to determine whether the proposed late fee penalty is reasonable, proportional and would have a deterrent effect.

In addition, one academic commenter and one law firm representing several card issuers asserted that empirical

evidence indicates that paying a late fee encourages borrowers to opt for automatic payments, helping borrowers avoid the higher cost of borrowing by avoiding late fees and decreasing the probability of ultimately defaulting. These commenters further noted that John Gathergood *et al.,* using U.K. data, found that late payment fees are front-loaded, peaking in the first month of card life and declining sharply over the following months. Specifically, one of these commenters noted the study's finding that the share of credit card accounts incurring late payment fees in the study's sample fells from 6 percent in the first month to 2.5 percent by the 23rd month, mainly because the payment of an initial late fee prompted consumers to set up automatic payments.

One trade association commenter, as another example, criticized the CFPB for suggesting—by comparing the effective APR a consumer might incur as a result of late payments in a series of hypothetical situations—that the deterrent effect of an $8 late fee would be similar to the deterrent effect of the current rate structure. The commenter asserted that high APRs may not adequately deter borrowers for ultra-short-term borrowing periods—such as the 10–30 days in the CFPB's hypotheticals—where the absolute dollar amounts are relatively small. This commenter also stated that the CFPB offered no analysis as to whether those APRs would have the presumed deterrent effect and noted that effective APRs may not have the meaningful deterrent effect of late fees because they are a more complicated, nebulous concept for consumers to understand.

Some industry commenters asserted that the proposed $8 safe harbor amount, due to its lack of a deterrence effect, would make it difficult for card issuers to identify riskier consumers and manage for that risk. In this vein, one industry trade association noted that when a consumer pays late, the issuer can incur unanticipated additional interest expense on that balance. This commenter further noted that during the underwriting process for a new consumer, an issuer cannot determine with complete certainty whether the consumer may become chronically delinquent, occasionally delinquent, or always current, and that the consumer's subsequent behavior in using the card determines if they are riskier than average for the cohort. According to this commenter, the late fee is an automatic "stabilizer" that adjusts pricing for riskier consumers based on their actual post-account opening behavior (*i.e.,* a form of implicit risk-based pricing).

This commenter expressed concern that without this stabilizer, a credit card company may need to raise the price of credit to all consumers to cover the additional, unacceptable risk.

A few industry commenters submitted their own data on the purported deterrence effect of late payments in response to the CFPB's request. Those comments along with the data provided are discussed in the deterrence analysis below.

Several industry commenters noted that the CFPB failed to use studies cited by the Board in their 2010 Final Rule. One credit union trade association commenter asserted that the CFPB cherry picked studies that supported its position, rejected older data as no longer relevant when they did not support their position, but accepted even older data when the conclusion was favorable to the CFPB's position. Furthermore, this commenter asserted that the CFPB failed to appropriately consider the role of risk in finance but rather relied on theories of behavioral biases that cannot be applied generally. This commenter also asserted that the CFPB's analysis was not conducted in a transparent and consistent manner.

*Consumer conduct.* Several industry commenters expressed concern that the proposed $8 safe harbor amount would have a negative impact on consumer conduct and result in harm to consumers and the credit card market. Several of these commenters stated that the proposal to eliminate the higher safe harbor amount for subsequent violations would exacerbate these harms, including shifting the costs of late payments from late payers to timely payers. One industry trade association, for example, asserted that the CFPB disregarded differences in consumer behavior that would warrant a higher safe harbor amount and a higher fee for subsequent missed payments—an approach, the commenter reasoned, that would avoid shifting costs to consumers who pay on time. In addition, several of these commenters asserted that the CFPB did not adequately consider the statutory factor of consumer conduct or criticized the CFPB for basing the proposed amount on insufficient evidence of its potential effects on consumer conduct.

In criticizing the CFPB's consideration of consumer conduct in the context of proposing to eliminate the higher safe harbor amount, a bank commenter sought to distinguish the factor from the deterrence effect of late fees. Whereas deterrence requires consideration of what size and type of late fee would deter late payment, the commenter averred, consumer conduct

focuses on the increased risk presented to the issuer by a cardholder who has already paid late at least once. The commenter asserted that because such a cardholder is demonstrably more apt than others to default, a reasonable consideration of the consumer conduct factor would counsel the issuer to appropriately price the cardholder's augmented risk. In addition, this commenter stated that the CFPB's analysis downplays the linkage between incurring a late fee and the increased risk of default by attempting to explain away certain delinquent account behavior as a product of consumer cash flow issues. This commenter further noted that the credit risk posed by consumers who incur a late fee is particularly high for private label-focused issuers due to the higher likelihood of late payment and default occurrences for such portfolios.

In a similar vein, a law firm representing several card issuers asserted that the CFPB's analysis of when consumers make late payments is inapposite to the specific issue of cardholder conduct. The commenter noted that if the problem is with consumer cash flow timing, as the CFPB hypothesizes, most major credit card issuers have mechanisms in place to allow customers to change the due date on their account in order to account for their own paycheck or earning schedules. This commenter further stated that the CFPB's analysis does nothing to address the reality that multiple late payments demonstrate an increased credit risk and reflect a more serious violation of the account terms—even if those payments occur before the account would be reported as late under credit reporting guidelines. In addition, this commenter noted that the existence of an adequate late fee creates an incentive for customers who may experience financial difficulties to call in and discuss the availability of hardship and other programs with their lender.

A bank commenter also noted that late fees prompt numerous consumers to call to discuss the delinquency after billing, giving card issuers the ability to assist consumers. This commenter expressed concern that if the fee is only $8, consumers may not bother to call, and the card issuer will lose an opportunity to provide financial assistance. According to data submitted by the commenter, its contact rate for outbound collection calls is 2 percent to 4 percent, whereas the inbound call rate (the percentage of delinquent accounts who call the bank) for collections is 13 percent to 14 percent. Of the commenter's inbound calls, 27 percent

to 28 percent received one or more late fee credits. This commenter further noted virtually all such calls had a payment or other payment arrangements made.

A financial regulatory advocacy group commented specifically on consumer conduct. In supporting the proposed $8 safe harbor amount, the commenter considered the effects of late fees on consumer conduct in conjunction with their effects on consumers' financial health. The commenter noted that because payments are applied first to cover finance charges and fees, when late fees are tacked on, less of a consumer's payment goes towards reducing the principal balance, thereby adding to the duration and cost of revolving. Viewed from this lens, this commenter asserted, it would seem almost self-evident that reducing the size of late fees would have a positive impact on the financial health of those bearing those fees.

Other factors cited by commenters. In addition to addressing the statutory factors, numerous industry commenters expressed concern that the loss of late fee revenue that would result from the proposed $8 late fee safe harbor amount would adversely affect card issuers and consumers. Credit union commenters in particular expressed this concern. As a representative example, around 20 credit unions and 20 individuals noted, as part of a letter-writing campaign, that when credit unions do charge late fees, the revenue from the fees covers pre-charge off collection costs but also subsidizes products and services that members demand and need, including programs targeted toward consumers with thin credit files. Many credit union and individual commenters cautioned that the loss in late fee revenue would require credit unions and other card issuers to tighten credit standards and consider harmful tradeoffs involving the very consumers who are most at risk of paying late fees. Specifically, these commenters asserted that credit unions will need to recoup lost late fee revenue through higher interest rates (while still complying with the Federal Credit Union Act's interest rate cap, a consideration banks do not face) [144] or broad-based fees, such as maintenance fees, on other credit card services.

In the same vein, many credit union commenters asserted that additional fees and higher rates would have a negative impact on all credit union members and potential members, including those unbanked and underbanked communities where credit unions are seeking to expand access to

financial services. Some noted that credit unions may need to balance reduced fee revenue by cutting spending on branch expansion and staff to serve their membership. Other commenters noted that these losses, and thus the adverse consequences, would be magnified in the current inflationary environment. A State credit union trade association stated that banks and other financial institutions that generally are not subject to statutory rate caps will simply keep raising their interest rates to make up for lost fee revenue and thus the rule, if finalized, would have little to no effect on protecting consumers from high-cost rate or fee practices.

In discussing the potential consequences resulting from lost late fee revenue, some industry commenters expressed concerns related to risk management and safety and soundness. For example, one bank commenter asserted that the CFPB's proposed late fee safe harbor amount fails to take into account that card issuers set fees, including late fees, on a risk-adjusted basis, whereby fees applied to cardholders who do not pay in a timely manner are set so as to compensate for additional financing cost, cost of collection, funding cost, and—most of all—higher rates of loss on amounts borrowed so that, together, interest plus fees minus losses and costs make for a viable business. This commenter further asserted that setting fees on a risk-adjusted basis is essential to running a safe and sound credit card business, and to providing credit to customers who would not otherwise get it. A State bank trade association commenter noted that when its member banks establish terms and conditions for their credit plans, the late fee safe harbor weighs heavily in assuring that the bank's cost of credit match the higher costs of delinquency to targeted revenue and asking those who create such higher costs to bear those costs directly is necessary to maintain safety and soundness in the sub-prime space. In addition, a credit union commenter noted that the disruption of cash flows resulting from a higher frequency of late payments under the proposal could necessitate the acquisition of replacement dollars to meet the credit union's cash obligations, such as by accessing its lines of credit or issuing a certificate of deposit (CD) to members. This commenter further noted that such efforts to ensure that its cash flow obligations are met would impose additional administrative and finance costs on the institution.

The Final Rule

For card issuers that are not Smaller Card Issuers (namely, Larger Card

---

[144] See supra note 104.

Issuers as that term is used in this document), this final rule revises § 1026.52(b)(1)(ii) to (1) repeal the current safe harbor threshold amounts in § 1026.52(b)(1)(ii)(A) and (B), (2) adopt in § 1026.52(b)(1)(ii) a late fee safe harbor dollar amount of $8, and eliminate for late fees a higher safe harbor dollar amount for subsequent violations of the same type that occur during the same billing cycle or in one of the next six billing cycles [145] and (3) provide that the current provision in § 1026.52(b)(1)(ii)(D) that provides for annual adjustments for the safe harbor dollar amounts to reflect changes in the CPI will not apply to the $8 safe harbor amount for those late fees, as discussed in more detail in the section-by-section analysis of § 1026.52(b)(1)(ii)(D).

For the reasons discussed in part VI, the CFPB is not adopting at this time the changes discussed above for Smaller Card Issuers that are defined in § 1026.52(b)(3) to mean a card issuer that together with its affiliates had fewer than one million "open credit card accounts" as defined in § 1026.58(b)(6) for the entire preceding calendar year.[146] For Smaller Card Issuers, the safe harbor thresholds set forth in § 1026.52(b)(1)(ii)(A) through (C) still will apply to late fees charged by Smaller Card Issuers.[147] In addition, the annual adjustments for the safe harbor thresholds to reflect changes in the CPI in § 1026.52(b)(1)(ii)(D) still will continue to apply to late fees imposed by Smaller Card Issuers.

Pursuant to the annual adjustments for safe harbor dollar amounts to reflect changes in the CPI in § 1026.52(b)(1)(ii)(D), this final rule revises the safe harbor threshold amounts in § 1026.52(b)(1)(ii)(A) and (B) to $32, except that it sets forth a safe harbor of $43 for each subsequent violation of the same type that occurs during the same billing cycle or in one of the next six billing cycles. As discussed in more detail in the section-

§ 1026.52(b)(1)(ii)(A) and (B), these revised safe harbor threshold amounts of $32 and $43 apply to penalty fees other than late fees for all card issuers (i.e., Smaller Card Issuers and Larger Card Issuers) as well as late fees imposed by Smaller Card Issuers, as noted above.

Repeal of Current Late Fee Safe Harbor Threshold Amounts and Adoption of $8 Late Fee Safe Harbor Threshold for Larger Card Issuers

In adopting this final rule, the CFPB has determined that the existing safe harbors in § 1026.52(b)(1)(ii), as applicable to late fees charged by Larger Card Issuers, are too high to be "reasonable and proportional" to a consumer's late payment. The CFPB therefore is repealing the existing safe harbors in § 1026.52(b)(1)(ii)(A) and (B) with respect to late fees charged by Larger Card Issuers.

In the 2023 Proposal, the CFPB proposed to replace the existing safe harbors of $30 for the first violation and $41 for subsequent violations, but it also requested comment on whether to eliminate the safe harbor provisions.[148] The CFPB proposed a replacement safe harbor of $8 based on a conservative estimate that $8 would, on average, be at or higher than a late fee amount calculated by the average card issuer using the cost analysis provisions in existing § 1026.52(b)(1)(i), which the CFPB did not propose to change.

This final rule adopts the $8 safe harbor threshold for late fees charged by Larger Card Issuers, in part, based on the Y–14 data collected from certain Larger Card Issuers from 2013 up to September 2022 which show that late fee revenue is at least five times higher than relevant costs since August 2021. The $8 late fee safe harbor threshold for Larger Card Issuers is conservative because, instead of dividing the average late fee per incident for Y–14+ issuers ($31 in 2020) by five or dividing the current lower regulatory threshold ($30) by five, it divides the highest safe harbor late fee of $41 by five to reach the $8 safe harbor threshold amount.[149]

In other words, in adopting this final rule, the CFPB has determined that the existing safe harbors of $30 and $41 are

too high with respect to late fees charged by Larger Card Issuers and should be replaced with respect to late fees charged by those issuers. As discussed above, the Board set the original safe harbors based on very limited cost-related data as compared to what the CFPB has available to it now.[150] Because the Board had no data directly related to issuers' costs of collecting late payments, it set the safe harbor dollar amounts based on indirect considerations of costs, including the following: (1) dollar amount of late fees charged on credit cards at the time; (2) dollar amount of late fees on other products, (3) State and local laws regulating late fees; (4) safe harbor thresholds used in the United Kingdom; (5) data relating to deterrence; and (6) data submitted by one card issuer.[151] The Board admitted that "it is not possible based on the available information to set safe harbor amounts that precisely reflect the costs incurred by a widely diverse group of card issuers and that deter the optimal number of consumers from future violations."[152]

The CFPB now has an extensive dataset, which relates to collection costs of certain Larger Card Issuers, that allows it to judge whether the original safe harbors are adequately tailored to reflect the average outcome of the cost analysis provisions in § 1026.52(b)(1)(i) with respect to late fees charged by Larger Card Issuers. As discussed in part V and below, the CFPB has data from the 16 largest card issuers, in the Y–14 dataset, showing that the total late fee income from the first three quarters in 2022 was $4.46 billion, while estimated pre-charge off collection costs amounted to only $896 million.[153] As discussed below, this ratio has been five or above from August 2021 through March 2022 (based on data used in the 2023 Proposal) and has increased considerably since the preparation of the 2023 Proposal.

In addition, as noted in part II.E, the CFPB has observed in its 2022 survey of credit card agreements that it appears there are no Larger Card Issuers who set their late fees based on the cost analysis provisions in § 1026.52(b)(1)(i), suggesting that the safe harbor is set so high that there is no issuer, even outlier

---

[145] This final rule does not amend the safe harbor set forth in § 1026.52(b)(1)(ii)(C) applicable to charge card accounts.

[146] See supra note 5. Also, as discussed in the section-by-section analysis of § 1026.52(b)(2)(i), the proposed provisions to restrict late fee amounts to 25 percent of the required minimum payment are not being finalized at this time with respect to any card issuers, including Smaller Card Issuers. Nonetheless, the clarification in comment 52(b)(1)(i)–2.i that the collection costs for calculating the late fee amount under the cost analysis provisions in § 1026.52(b)(1)(i) do not include post-charge-off collection costs is being adopted for all card issuers, including Smaller Card Issuers.

[147] This final rule revises the safe harbor threshold amounts in § 1026.52(b)(1)(ii)(A) and (B) as discussed in more detail below in the section-by-section of § 1026.52(b)(1)(ii)(A) and (B).

[148] See 88 FR 18906 at 18924.

[149] Were the CFPB to take the less conservative approach, it would divide the average late fee per incident for Y–14+ issuers ($31 in 2020) by five, to reach a final rule of roughly $6, which is likely closer to the market average cost-per-late-payment incident for Larger Card Issuers. This conclusion is also consistent with subsequent data collected by the CFPB after issuance of the 2023 Proposal, which showed that the average late fee per incident for Y–14+ issuers in 2022 was $32.

[150] 75 FR 37526 at 37541.

[151] Id. at 37540–43.

[152] Id. at 37542.

[153] Based on data collected after the 2023 Proposal was issued, the CFPB has data from the 20 card issuers in the Y–14+, showing that the total late fee income between October 2021 and September 2022 was $11 billion, while estimated pre-charge off collection costs amounted to only $2.16 billion.

issuers with higher than average costs for Larger Card Issuers, who would generate more revenue through that method.[154] This suggests that the discretionary safe harbor, which protects issuers from needing to show that fees are reasonable and proportional, is set at a level that is too high for Larger Card Issuers and may, therefore, allow them to charge late fees that are not consistent with the statutory protections.

Furthermore, the safe harbor thresholds have increased by $5–6 due to annual adjustments to reflect changes in the CPI made pursuant to § 1026.52(b)(1)(ii)(D) since the thresholds were first adopted in 2010, and thus, for this reason, the threshold amounts warranted independent reconsideration. As the CFPB notes in the section-by-section analysis of § 1026.52(b)(1)(ii)(D), collection costs observed in Y–14 data from certain Larger Card Issuers do not appear to be rising lockstep with inflation particularly when considering the month-to-month changes in inflation versus those costs.

Additionally, the Board's conclusion with regard to the original safe harbor threshold amounts did not appear to consider whether it could have been too high, only that it was "generally sufficient to cover issuer's costs and to deter future violations." [155] The Board did not appear to consider whether the safe harbor was so high as to do *more* than just cover costs and deter future violations. In other words, the Board failed to consider whether the discretionary safe harbor might be set at an amount that permitted issuers to recover late fees that were too high, and thus, were not reasonable and proportional to the violation and, therefore, were inconsistent with the statute. The Board's failure to consider both whether the safe harbor was high enough *and* whether it was too high is an independent reason to repeal the existing late fee safe harbor threshold amount in § 1026.52(b)(1)(ii)(A) and (B) with respect to late fees charged by Larger Card Issuers.

And lastly, much of the evidence used originally by the Board was not relevant to the question of whether the safe harbor was set at an appropriate level. For example, evidence of State, local, or international government approaches reflects the policy decisions of those legislative bodies. Such evidence is not

determinative of whether the safe harbor appropriately meets the applicable standards in the CARD Act. In addition, setting the thresholds based on then existing late fee amounts, set by issuers before the CARD Act passed, assumes that Congress merely intended to curtail further increases, rather than lower late fees from the then-existing baseline. The CFPB sees no evidence in the legislative history to justify this assumption, and rather, concludes that the safe harbor threshold amount should be set based on the cost-analysis provisions.[156] The safe harbor is a discretionary option, and therefore, it should not be so high that it allows fees that are contrary to the statutory standard. Without the safe harbor, card issuers can rely on the cost analysis provisions to ensure they are charging individually calculated fees that comply with the statute.

In addition, the CFPB received around 56,800 comments letters from consumers that generally supported the proposed $8 late fee safe harbor threshold. Many consumers indicated that they thought the current late fees charged by issuers are too high, and some consumers indicated they had limited income and that even a small late fee can impact consumers on a tight budget.

Thus, for the reasons discussed above including the CFPB's analysis of the Y–14 data, in this final rule, the CFPB repeals the existing safe harbor threshold amounts in § 1026.52(b)(1)(ii)(A) and (B) with respect to late fees charged by Larger Card Issuers.[157]

As a result, the CFPB has determined that, at this time and based on current data and commenter feedback, it is appropriate to revisit and amend the safe harbor as applied to Larger Card Issuers. Establishing a safe harbor is an exercise of discretionary rulemaking authority, and thus, a safe harbor need not exist.[158] Moreover, the existence of a safe harbor means that card issuers are deemed to be presumptively in compliance with the CARD Act. As a result, a safe harbor has the potential to enable card issuers to charge amounts

that would otherwise not be in compliance with the Act.

Given this, the CFPB has determined that, in light of its data and analysis, it is appropriate to repeal the existing safe harbor threshold amounts in § 1026.52(b)(1)(ii)(A) and (B) with respect to late fees charged by Larger Card Issuers, and then to amend the safe harbor to the lower $8 amount. The decision to repeal of the safe harbor is independent of, and severable from, the decision below that $8 is an appropriate safe harbor threshold amount with respect to late fees charged by Larger Card Issuers. Accordingly, if the $8 safe harbor for Larger Card Issuers were stayed or determined to be invalid, the remainder of the regulation shall continue in effect without a safe harbor for late fees charged by Larger Card Issuers.

The CFPB's Analysis of Data and Consideration of Statutory Factors Related to the $8 Late Fee Safe Harbor Threshold for Larger Card Issuers

As an initial matter, the CFPB is not statutorily required to consider the statutory factors of costs, deterrence, and consumer conduct in setting the discretionary safe harbor amounts under TILA section 149(e). Instead, in setting discretionary safe harbor amounts, TILA section 149(e) specifies that the CFPB may issue rules to provide an amount for any penalty fee or charge that is presumed to be reasonable and proportional to the omission or violation to which the fee or charge relates. As discussed below, the CFPB analyzed whether the current safe harbor threshold amounts for late fees should be presumed to be reasonable and proportional to a cardholder's omission or violation. In considering whether and what is the appropriate amount for the safe harbor, the CFPB looked to whether the threshold is a reasonable proxy for the definition of a "reasonable and proportional" fee such that any fee under the threshold should be presumed to have met that standard.

In implementing this standard, the CFPB primarily focused on whether a particular late safe harbor amount would cover the pre-charge-off collection costs of the average Larger Card Issuer. The CFPB has determined that it is appropriate to focus on the pre-charge-off collection costs of the average Larger Card Issuer to determine a reasonable proxy for the definition of a "reasonable and proportional" because this allows the average Larger Card Issuer to obtain the benefits of relying on the safe harbor without having to incur the compliance burden of conducting the cost analysis set forth in

---

[154] This conclusion also is consistent with the review of credit card agreements that the CFPB conducted in 2023, as discussed in more detail in part II.E.

[155] 75 FR 37526 at 37542.

[156] In fact, the legislative history suggests that Congress intended to lower late fees. 155 Cong. Rec. 5314, 5315, 5319 (2009).

[157] The CFPB recognizes that it is repealing the existing safe harbor solely as to late fees charged by Larger Card Issuers. As described in detail in part VI, the CFPB has determined it is appropriate to limit this repeal with respect to late fees charged by Larger Card Issuers.

[158] *See* 15 U.S.C. 1665d(e) (unlike a required rulemaking to define "reasonable and proportional" as prescribed in 15 U.S.C. 1665d(b), Congress indicated that the CFPB "may" issue a safe harbor and is merely "authorized" to issue a safe harbor but is not required to do so).

§ 1026.52(b)(1)(i) but does not allow these Larger Card Issuers to charge an amount that exceeds the costs for most Larger Card Issuers.

*Costs.* As discussed below, the CFPB analyzed the Y–14 data and other information in considering the pre-charge-off collection costs of a late payment violation to Larger Card Issuers.[159] Based on that analysis, the CFPB has determined that for Larger Card Issuers a late fee safe harbor amount of $8 for the first and subsequent violations would cover the average Larger Card Issuers' costs from late payments while providing those card issuers with compliance certainty and administrative simplicity and, therefore, reduce their compliance costs and burden.

In considering the costs of late payments to Larger Card Issuers, the CFPB considered only those (estimated) pre-charge-off collection costs that card issuers are permitted to consider for purposes of determining the amount of a late fee under the cost analysis provisions in § 1026.52(b)(1)(i) and related commentary. As provided in the commentary to § 1026.52(b)(1)(i), such costs for late fees (1) include the costs associated with the collection of late payments, such as the costs associated with notifying consumers of delinquencies and resolving delinquencies (including the establishment of workout and temporary hardship arrangements); and (2) exclude losses and associated costs (including the cost of holding reserves against potential losses and the cost of funding delinquent accounts). As discussed in the section-by-section analysis of § 1026.52(b)(1)(i), consistent with the Board's 2010 Final Rule, the CFPB in this final rule makes it explicitly clear that costs for purposes of the cost analysis provisions in § 1026.52(b)(1)(i) for determining penalty fee amounts do not include any collection costs that are incurred after an account is charged off pursuant to loan loss provisions. The CFPB has determined that considering pre-charge-off collection costs as the "costs" of a late payment is consistent with Congress' intent to: (1) allow card issuers generally to use late fees to pass on to consumers the costs issuers incur to collect late payments or missed payments; (2) ensure that those costs are spread among consumers and that no individual consumer bears an unreasonable or disproportionate share; and (3) prevent card issuers from

recovering losses and associated costs through late fees rather than through upfront rates.

As discussed in part V, the reported collection costs in the Y–14 data include costs incurred to collect problem credits that includes the total collection cost of delinquent, recovery, and bankrupt accounts. The CFPB concludes that the collection costs data in the Y–14 are consistent with the costs included for the cost analysis provisions in § 1026.52(b)(1)(i) except that the collection costs in the Y–14 data include post-charge-off collection costs. As discussed in part V, in the 2023 Proposal, the CFPB estimated that approximately 75 percent of collection costs incurred by card issuers are incurred pre-charge-off. Thus, the CFPB's estimate of pre-charge-off collection costs is based on only 75 percent of the collection costs in the Y–14 data for purposes of its analysis related to the final changes to the safe harbor thresholds in § 1026.52(b)(1)(ii), as discussed in more detail below. However, as discussed below, the conclusions are similar even if the CFPB assumes that pre-charged-off collection costs are 80 percent of total collection costs incurred by card issuers, consistent with the estimated post-charge-off commission rates for 2021 and 2022, as discussed in more detail in part V.

In developing the $8 late fee safe harbor amount adopted in this final rule, the CFPB carefully considered several sources of data and other information to determine the amount that would cover the average Larger Card Issuer's pre-charge-off collection costs. As discussed in part V, and described in detail below, the CFPB reviewed and analyzed major issuers' late fee income, collection costs, late fee amounts, and required payment information contained in the Y–14 data, a source that was not available when the Board set the initial safe harbor amounts in 2010. That analysis indicates that late fees generally generate revenue that is multiple times higher than the Y–14 issuers' collection costs. As discussed in more detail in part II.E, in 2022, the CFPB also reviewed issuers' stated late fee amounts in card agreements that issuers are required by the CARD Act to submit quarterly to the CFPB. Based on these data, the CFPB expects that even if late fees were reduced to one-fifth of current levels (implying late fees of $8 or less), most Y–14 issuers would recover pre-charge-off collection costs.

Using this one-fifth estimate, the CFPB calculated the $8 fee by dividing $41 by five and rounding to the nearest dollar. The CFPB conservatively chose

to use $41, the highest late fee charged in the market, in the interest of caution. A less conservative approach would have used $30 (the safe harbor for the first fee) or $31 (the average late fee per incident for Y–14+ issuers in 2020), resulting in a $6 safe harbor.

To estimate the fee income to collection cost ratio for Larger Card Issuers, the CFPB used the late fee income data and 75 percent of the collection costs contained in the Y–14 data (referred to below as "estimated pre-charge-off collection costs"). Using the Y–14 data, the CFPB analyzed monthly late fee income and estimated pre-charge-off collection costs for the consumer segments of major issuers' credit card portfolios, namely the consumer general purpose and private label portfolios. For the 16 consumer portfolios with continuous cost data for the first three quarters of 2022 (adding up to about 73 percent of total consumer credit card balances at the end of September 2022), total late fee income in the first three quarters added up to $4.46 billion, while total collection costs added up to $1.19 billion with pre-charge-off collection costs estimated to be $896 million (where the pre-charge off collection costs are estimated to be 75 percent of the total collection costs).[160]

In reviewing the monthly data, the CFPB observed that late payments exhibit seasonal patterns. The CFPB also considered that there may be a delay between when a late fee was assessed and when the issuer incurs substantial collection costs associated with the account. For these reasons, the CFPB compared each month's late fee income for a particular portfolio to the portfolio's average estimated pre-charge-off collection costs for that month, where that estimate was based on estimated pre-charge-off collection costs that occurred two through six months later.[161] Consistent with the data used

---

[159] See part V for the CFPB's determination that it is appropriate to consider the Y–14 data in adopting the changes to Regulation Z contained in this final rule.

[160] Based on data collected after the 2023 Proposal was issued, the CFPB has data from 20 card issuers in the Y–14+ data. For these Larger Card Issuers, total late fee income added up to $11 billion between October 2021 and September 2022, while total collection costs added up to $2.7 billion with pre-charge-off collection costs estimated to be $2.16 billion (where pre-charge-off collection costs are estimated to be 80 percent of the total collection costs).

[161] For example, if an issuer were to report late fee income of $24 million in January for a portfolio and total collection costs for that portfolio of $25 million in March through July, the CFPB estimated $20 million in pre-charge-off collection costs in March through July and calculated an average monthly collection cost of $4 million for purposes of this analysis—resulting in a ratio of late fee income of $24 million to collection cost of $4 million for this portfolio for the month of January. The CFPB found that its findings based on the
Continued

for the 2023 Proposal, the CFPB developed monthly estimates of this late fee income-to-cost ratio for each year from 2013 up to September 2022. The analysis showed that an average of this ratio across issuers and market segments, weighted by the number of accounts reported in the Y–14 data, has been fairly stable since early 2019 (and was higher before 2019). As shown in Figure 1 below, late fee income has always been higher than three times subsequent estimated pre-charge-off collection costs, and more than four times as high in all but seven pandemic months (April-June 2020 and February-May 2021, coinciding with pandemic stimulus payments, when there was a reduction in late fee income without a corresponding decline in average collection costs in subsequent months). Since August 2021, late fee income has exceeded the relevant estimated pre-charge-off costs more than fivefold, which resembles the period before the pandemic.

**Figure 1:** Ratio of late fee income to future collection costs



Based on this analysis, the CFPB expects that the average Larger Card Issuer would recover pre-charge-off collection costs even if late fees were reduced to one-fifth of their current level. In the 2022 survey of credit card agreements discussed in part II.E, all but one issuer among those in the Y–14 data (representing the majority of balances in the credit card market) disclosed late fees "up to" $40 or $41 (the current maximum safe harbor amount) in their most recent card agreements submitted to the CFPB. Given the finding that, in the most recent data, late fee income is greater than five times estimated pre-charge-off collection costs, the CFPB expects that an $8 late fee would still recover the average Larger Card Issuer's pre-charge-off collection costs, as that fee represents one-fifth of the maximum late fee amount, which is necessarily greater than average fee income per late payment. This conclusion is also consistent with additional information from the CFPB's 2023 survey of credit card agreements in the CFPB's Credit Card Agreement Database, which the CFPB conducted after it issued the 2023 Proposal. As discussed in more detail in part II.E, of the 30–35 submitters the CFPB would expect to be Larger Card Issuers, 13 issuers charged at maximum late fee in their submitted agreements of $40 and 11 charged $41 with the minority charging between $35 and $39 and only two charging a maximum late fee below $35.

As discussed in part V, since issuing the 2023 Proposal, the CFPB obtained Y–14 data for 14 more months than were available for the analysis in the 2023 Proposal. In addition, the CFPB obtained updated data related to post-charge-off commission rates for 2021 and 2022, and based on that data estimated that pre-charged-off collection costs were 80 percent of the collection costs incurred by Y–14 issuers for those years. Figure 2a below shows the ratio of fee income to collection cost ratio for Y–14 issuers, using the late fee income data and 80 percent of the collection costs contained in the Y–14 data, including the 14 more months of Y–14 data.

---

weighted average of this ratio across issuers and market segments as discussed in the analysis below

are robust to shifting, expanding, or shortening the

time period of delay in collection costs as they relate to late fee income.

**Figure 2a:** Ratio of late fee income to future pre-charge-off collection costs (Y–14)



The CFPB has determined that these updated Y–14 data yield a ratio that is consistent with the determination that a $8 late fee safe harbor threshold would recover the average Larger Card Issuer's pre-charge-off collection costs. As shown in Figure 2a above, the ratio has been above five for those additional 14 months and above six for the last 11 months.

In addition, as discussed in part V, after issuing the 2023 Proposal, the CFPB obtained total collection costs and late fee income data from specialized issuers that are included in the Y–14+ data but do not report under the Y–14. The CFPB collected confidential quarterly data from the five specialized issuers that are included in the Y–14+ data for their consumer cards in all quarters in 2019 through 2022, split by whether the accounts in a given portfolio are general purpose or private label cards, through an information

order pursuant to section 1022(c)(4) of the CFPA.[162] Respondents were instructed to provide the amounts of non-interest expense in costs incurred to collect problem credits, defined as total collection cost for delinquent, recovery, and bankrupt accounts, and net late fee income. These definitions are identical to those provided in the Y–14 collection for collections expense and late fee income. Four issuers provided timely and verifiable collections costs and late fee income data, and those four issuers represented over one-third of late fee volume for the Y–14+ in 2022.[163]

As the responses to the information order described above yielded quarterly data, the CFPB is not able to calculate the same ratio of late fee income to estimate pre-charge-off collection costs two-to-six months later for each portfolio as it did for the weighted average in Figure 1 above from the Y–

14 data alone. To make use of the most widely available data from certain Larger Card Issuers but treat them consistently, the CFPB calculated a similar ratio but of a quarter's total late fee income to the same quarter's estimated pre-charge-off collection costs (where pre-charge-off costs are estimated to be 80 percent of the total collection costs) for each portfolio in the above information order or in the Y–14 data with three months of non-zero collection costs reported for that quarter. Figure 2b below shows the market-wide weighted average of these ratios from 2019 to 2022, weighted by the number of accounts. This calculation also suggests that late fee incomes recently are so far above pre-charge-off collection costs (using 80 percent of total collection costs) that a five-fold decrease in the safe harbor is reasonable.

---

[163] One specialized issuer's submissions were not provided on the same timeline and did not align with data from previous submissions, as such, those

data are not used for the purpose of this analysis using the specialized issuer's submissions.

**Figure 2b:** Ratio of late fee income to pre-charge-off collection costs (Y-14+)



As discussed in part VI, the CFPB recognizes that the new $8 safe harbor amount will apply to approximately a dozen issuers for which the CFPB does not have total collections data and late fee revenue data. The CFPB has determined that it is appropriate to apply this new safe harbor amount to those issuers because they together with their affiliates have at least one million open credit card accounts which result in economies of scale similar to Y–14+issuers. Specifically, and based on the CFPB's expertise and markets research, the CFPB expects that these issuers will have similar mechanisms to more efficiently collect late payments and to do so at a lower cost than for Smaller Card Issuers, and thus would have similar pre-charge off collection costs to the Y–14+ issuers. Further, unlike Smaller Card Issuers, these Larger Card Issuers derive substantial revenue from credit card portfolios, and therefore, are more likely to have resources that would allow them to use the cost analysis provisions in § 1026.52(b)(1)(i) to determine the late fee if the $8 safe harbor threshold amount fails to cover pre-charge off collections costs.

Since the issuance of the proposal, the CFPB also obtained some additional data through an information order pursuant to section 1022(c)(4) of the CFPA as part of its statutorily required,

bi-annual CARD Markets Report.[164] In gathering the data for this report, one question related to the average monthly *all-in* cost of *pre-charge-off* collections. Based on these data, the average monthly all-in cost of pre-charge off collections related to the "delinquent inventory" was $18.61 for eight Larger Card Issuers in 2021 and $14.58 in 2022. These data ranged from a high of over $40 to a low of $2, but most were between $10 and $20. Although these data relate to pre-charge-off collection cost from the "delinquent inventory" of the month, the CFPB has determined they are not an accurate representation of pre-charge off collection costs for late payments because the data potentially exclude those consumers who pay almost immediately, and this is a significant number of consumers. In 12 months of account-level Y–14 data (the second half of calendar year 2022 and the first half of 2023), most portfolios have 20–30 percent as many accounts with month-end delinquency noted than how many accounts saw late fees assessed. The CFPB would expect that the average pre-charge off collection costs per month-end delinquent account would be higher than the average pre-

charge-off collection costs per late payment because late payments where consumers pay almost immediately are less costly to collect then those accounts with month-end delinquencies.

In addition, as discussed above, an industry trade association commenter also provided information on costs for accounts that are at least 60 days late, which again is a subgroup of all late payment incidents. This trade association asserted that the average costs per delinquent account that is at least 60 days late is $46.30, including $33.00 in direct expenses, $9.00 in attributable expenses, and $4.30 in funding costs. The CFPB has determined that these cost data for delinquent accounts that are at least 60 days late are not as relevant as the Y–14 data in understanding Larger Card Issuers' average pre-charge-off collection costs with respect to all late payments, as opposed to a certain subset of late payments (*i.e.,* at least 60 days late). The CFPB expects that accounts that are more than 60 days late likely represent a minority of late fee incidences but may generate most of the collection costs. In addition, the trade association's cost data includes some costs that are not permitted to be considered under the cost analysis provisions in § 1026.52(b)(1)(i). For example, current comment 52(b)(1)(i)–2.i provides that amounts that cannot be considered as costs incurred for purposes of § 1026.52(b)(1)(i) are losses and associated costs (including the cost of

[164] In 2009, Congress passed the CARD Act. Among the CARD Act's provisions was a requirement that the Board report every two years on the state of the consumer credit card market. With the passage of the CFPA in 2010, that requirement transferred to CFPB alongside broader responsibility for administering most of the CARD Act's provisions.

holding reserves against potential losses and the cost of funding delinquent accounts). The commenter also indicated that the direct expenses include post-charge-off collection costs, which this final rule makes explicitly clear are not included in the costs that are permitted to be considered for purposes of § 1026.52(b)(1)(i). Also, it is unclear whether the attributable expenses would be costs permitted to be considered for purposes of § 1026.52(b)(1)(i) without knowing the facts and circumstances surrounding those expenses.

The CFPB also notes that average late fees for Y–14+ issuers are lower than the disclosed maximum late fees. As discussed in part II.D, in 2020, the average late fee charged by issuers in the Y–14+ data was $31.[165] Reasoning that the average late fees are lower than the current maximum safe harbor of $41 and yet still generate late fee income that is again more than five times the ensuing (estimated) pre-charge-off collection costs since August 2021, the CFPB concludes that $8 is likely to recover the average Larger Card Issuer's pre-charge-off collection costs.[166]

The CFPB acknowledges that not all issuers in the Y–14+ data incur the average pre-charge-off collection costs. By using estimates of pre-charge-off collection costs per paid incident using the Y–14 data from September 2021 to August 2022 (consistent with the data used in the 2023 Proposal), the CFPB estimates that fewer than four of the 12 card issuers in the Y–14 data have estimated pre-charge-off collection costs that are significantly higher than one-fifth of their late fee income. For these issuers, the proposed $8 safe harbor amount may not have been enough to fully recover estimated pre-charge-off collection costs, such that the benefits of using the cost analysis provisions may

[165] Late Fee Report, at 6. To gain further insights into how the average late fee compares to the disclosed maximum late fee in the agreements, the CFPB analyzed a 40 percent random subsample of tradelines of Y–14 data from 2019 to observe the incidence of late fees and the fee amounts assessed. The CFPB observed that the average late fees have been lower than the amounts in the card agreements for several reasons, including (1) some late fees did not occur within six months of an earlier late fee and thus are set at the lower safe harbor amount; and (2) some late fees reflect the current limitation in § 1026.52(b)(2)(i)(A) and related commentary that prohibits late fees from exceeding the minimum payment amount that is due. The CFPB also observed that some late fees are imposed but later reversed and that some late fees are charged to accounts that never make another payment.

[166] This conclusion is also consistent with subsequent data collected by the CFPB after issuance of the 2023 Proposal, which showed that the average late fee per incident for Y–14+ issuers in 2022 was $32.

outweigh the administrative simplicity of using the safe harbor.

This result is also consistent when the CFPB considers the additional data it obtained since the publication of the 2023 Proposal, namely (1) using 14 additional months of Y–14 data; (2) estimating the pre-charge-off costs are 80 percent of the total collections costs in the Y–14 data; and (3) considering data submitted by the specialized card issuers in the Y–14+.

By using estimates of pre-charge-off collection costs (80 percent of total collection costs) per paid incident using the Y–14+ data from calendar year 2022, the CFPB estimates that fewer than six of the 16 issuers with a continuous history of non-zero collection costs had estimated pre-charge-off collection costs that were significantly higher than one-fifth of their late fee income. For the remaining issuers, who represent less than 30 percent of accounts and around a fourth of late fee income in this set, the proposed $8 safe harbor amount may not have been enough to fully recover estimated pre-charge-off collection costs in 2022, such that the benefits of using the cost analysis provisions may outweigh the administrative simplicity of using the safe harbor. While both the data considered for the proposal and this more recent, supplementary data suggest that the $8 late fee safe harbor amount adopted in this final rule would cover pre-charge-off collection costs for most Y–14+ issuers in years resembling 2022, the CFPB acknowledged in the 2023 Proposal and continues to recognize that some Larger Card Issuers may not recover pre-charge-off collection costs for all portfolios at all times under the lower safe harbor. The CFPB, however, notes that the safe harbor is discretionary, and these issuers can choose to determine the late fee amount using the cost analysis provisions in § 1026.52(b)(1)(i), rather than using the proposed $8 safe harbor amount, if $8 is insufficient to recover their pre-charge-off collection costs. Larger Card Issuers also may undertake efforts to reduce collection costs or use interest rates or other charges to recover some of the costs of collecting late payments. Building those costs into upfront rates would provide consumers greater understanding regarding the cost of using their credit card accounts.

The CFPB notes that the CARD Act does not require the CFPB to establish a late fee safe harbor amount that covers the costs for all issuers or the entire costs of the omission or violation in all instances. Instead, TILA section 149(e) authorizes the CFPB to issue rules to provide, for any penalty fee or charge,

a safe harbor amount that is presumed to be reasonable and proportional to the omission or violation to which the fee or charge relates. The CFPB is concerned that setting a higher safe harbor amount for late fees in order to cover the pre-charge-off collection costs of all Larger Card Issuers could result in an amount that exceeds the costs for most Larger Card Issuers. As discussed in part II.E the CFPB also is concerned that Larger Card Issuers may have a disincentive to charge a lower fee amount than the safe harbor amount, even if their average collection costs are less than the safe harbor amount, given the industry's reliance on late fees as a source of revenue and that many consumers may not shop for credit cards based on the amount of the late fee.

The CFPB notes that the analysis based on the Y–14 data discussed above does not consider any potential changes in consumer behavior in response to the change in the late fee safe harbor amount in this final rule for Larger Card Issuers. In particular, the discussion does not take into account the possibility that reduced late fees will lead to more late payments at Larger Card Issuers. However, the CFPB also expects that any increase in the frequency of late payments, if any, as a result of the reduced late fee safe harbor amount, would increase both fee income and collection costs at Larger Card Issuers. Even if more consumers pay late at Larger Card Issuers because of the decreased amount, the CFPB concludes that the increased number of late payments are unlikely to be more costly, on average, to administer and collect than the current number of late payments. Therefore, the CFPB expects that collection costs to Larger Card Issuers would not increase by more than fee income. Further, as discussed below, the CFPB's analysis of Y–14 data and other information suggests that the proposed $8 safe harbor amount for the first and subsequent late payments would still have a deterrent effect on late payments.

In addition, the CFPB has determined that the $8 late fee safe harbor provision in § 1026.52(b)(1)(ii) adopted as part of this final rule would continue to save costs for Larger Card Issuers that use the safe harbor. As discussed above, in considering the appropriate safe harbor amount for late fees, the CFPB is guided by the factors in TILA section 149(c), which provides that the CFPB can consider such other factors that the CFPB deems necessary or appropriate. The CFPB finds that it is both necessary and appropriate, when considering the portion of Larger Card Issuers' pre-charge-off costs that a late fee safe

harbor amount would cover, to consider the benefits to Larger Card Issuers from use of the safe harbor, including compliance certainty, administrative simplicity, and reduced litigation risk. The CFPB also finds that for Larger Card Issuers, a late fee safe harbor amount of $8 for the first and subsequent late payments would cover the average Larger Card Issuers' costs from late payments while providing those card issuers with compliance certainty and administrative simplicity and, therefore, reduce their compliance costs and burden.

For the foregoing reasons, the CFPB determines that a late fee of $8 for the first and subsequent violations is appropriate to cover pre-charge-off collection costs for Larger Card Issuers on average while providing those issuers compliance certainty and administrative simplicity.

Even if the CFPB were required to consider the statutory factors of costs, deterrence, and consumer conduct in setting the discretionary safe harbor amounts, the CFPB has determined that TILA section 149(e) does not require that the CFPB weigh all of the factors equally in determining what safe harbor amount is a reasonable proxy for the definition of a ''reasonable and proportional'' fee. In this regard, the CFPB has determined that the cost factor deserves the most weight of these factors in setting the precise late fee safe harbor amount because it is most closely correlated to the consequences to the issuer of a consumer's late payment. In other words, costs are the best guide to what constitutes a ''reasonable and proportional'' fee. The CFPB has determined that the data described above allows the CFPB to quantify the pre-charge-off collection costs of Larger Card Issuers and set a late fee safe harbor amount that will allow the average Larger Card Issuer to recover its pre-charge-off collection costs. By contrast, the CFPB has determined that deterrence and consumer conduct—while important—are less determinative than costs in setting a precise late fee safe harbor amount. Not only are deterrence or consumer conduct harder to quantify, but the link between the late fee amount and deterrence or consumer conduct is more tenuous. For instance, as noted by consumer commenters on the 2023 Proposal, consumers indicated that there were various reasons why they incurred a late fee in the past, including (1) their mailed payment was not received by the card issuer by the due date because of slower postal service; (2) they paid on the due date but after the cut off time on the due date; (3) they forgot to pay on time

because of vacations, medical issues, or family issues; or (4) they experienced cash flow issues because of unexpected expenses. Thus, while deterrence and consumer conduct can help corroborate a safe harbor amount set based on costs, the CFPB believes that the deterrence and consumer conduct factors could not justify a safe harbor amount that is disproportionate to costs.

Nonetheless, while the CFPB has determined that deterrence or consumer conduct should not be the primary factors in deciding the precise late fee safe harbor amount for Larger Card Issuers, the CFPB has determined based on the analysis discussed below that the $8 late fee safe harbor amount will still have a deterrent effect on late payments, and that the $8 late fee safe harbor amount better reflects a consideration of consumer conduct than do the higher safe harbor amounts set by the Board.

*Deterrence.* After careful consideration of the comments, the CFPB determines that the available evidence for Larger Card Issuers suggests that an $8 safe harbor amount will have a deterrent effect on late payments. The CFPB also determines that some cardholders may benefit from the $8 safe harbor threshold amount in terms of a greater ability to repay revolving debt, including some cardholders who may experience an increase in late payments under the lower safe harbor amount. The CFPB also notes that card issuers have methods other than higher late fees to deter late payment behavior and to facilitate timely payments. For example, card issuers may decrease the cardholder's credit line, limit their earning or redemption of rewards, or impose penalty rates in certain circumstances. Card issuers also may offer automatic payment and provide notification within a certain number of days prior to the payment due date. The CFPB's reasons for making these determinations, including its analysis of available evidence, are discussed below.

As a threshold matter, the CFPB acknowledges, as it acknowledged in the 2023 Proposal, that a late fee of any dollar amount has some deterrent effect that is more than no late fee at all. Some of the comments received, as discussed above, support the CFPB's determination by noting that a safe harbor late fee amount of $8 would have a lesser deterrent effect than the current amounts, rather than no deterrent effect. The CFPB also recognizes, as it recognized in the 2023 Proposal, that generally a lower late fee amount has less theoretical deterrence than a higher amount, though whether that will manifest in lower repayment rates in

light of the other salient factors is uncertain. As such, the many comments asserting that a late fee amount of $8 may result in a higher frequency of late payments, as discussed above, are consistent with the assumptions in the CFPB's deterrence analysis. The CFPB rejects the notion, implicit in many comments opposing the $8 late fee amount, that consideration of deterrence necessitates, as a matter of law or policy, setting a safe harbor amount that will have the maximum theoretical deterrence effect. In addition, the CFPB recognizes, as it recognized in the 2023 Proposal, that it does not have direct evidence concerning what consumers would do in response to a fee reduction similar to the one in this final rule. The CFPB notes, however, that the Y–14 data and other information on which its deterrence analysis is based, as discussed below, have become available since the Board issued its 2010 Final Rule and constitute a far richer body of evidence than that on which the Board relied. It should be noted that by the same logic, those commenters expressing concern regarding the potential deterrence effect of a lower late fee likewise had no direct evidence to proffer in support.

As discussed in the 2023 Proposal, for purposes of considering the deterrence effect of the $8 safe harbor amount, the CFPB analyzed available data from certain Larger Card Issuers to consider the extent to which lower late fees for both the first and subsequent late payments could potentially lessen deterrence. Specifically, in making its determination that the $8 safe harbor amount will still have a deterrent effect on late payments, the CFPB considered (1) a comparison of the $8 late payment safe harbor amount to minimum payment amounts on accounts in the Y–14 data; and (2) available empirical evidence on the effects of credit card late fees on the prevalence of late payments. The CFPB notes that whether a consumer is late in making a required payment depends in part on the consequences of paying late, including penalty fees for late payments and other consequences such as increased interest charges and potential credit reporting consequences (as discussed in part II.G and in more detail below). From the point of view of a rational consumer faced with the decision of whether to make a minimum balance payment on time or to put off the payment until later, the decision represents a tradeoff weighing the value to the consumer of retaining the money for longer against the total costs of paying late. For the median minimum payment amount of

approximately $100 for accounts that paid late in the Y–14 data from October 2021 through September 2022, the CFPB's analysis found that the costs of paying late are quite steep both under current late payment fee amounts and under the $8 safe harbor amount.[167] For example, a consumer who effectively borrows a minimum payment amount of $100 until the next due date (that is, who makes a payment one month late) and pays a $8 late fee would be incurring an effective APR of 96 percent, even ignoring other consequences. In addition, a consumer who effectively borrows a minimum payment amount of $40 for 10 days (past due) and pays a $8 late fee would be incurring an effective APR of 730 percent. As the median minimum due was $39 for all cardholders between October 2021 and September 2022 in the Y–14 data,[168] and around half of late payers made a payment in less than 10 days past the due date, the effective APR could be higher than 730 percent for some consumers. Based on that analysis, the CFPB determines that an $8 late fee safe harbor amount for Larger Card Issuers will still serve as a powerful deterrent to those consumers who pay attention to financial penalties.

In addition to the analysis discussed above, the CFPB considered available empirical evidence on the effects of credit card late fees on the prevalence of late payments. In particular, the CFPB considered (1) a 2023 paper analyzing the effect of the reduction of late fee amounts that became effective as a result of the CARD Act in 2010; (2) analysis by the CFPB using Y–14 data of how the prevalence of late payments is affected by increases in late fee amounts during the six months following a violation; and (3) other empirical investigations into the correlates of late fee amounts and late fee incidence as discussed below.

As discussed in the 2023 Proposal, in analyzing the available data, the CFPB notes a 2023 paper by Grodzicki *et al.,* which contains an empirical analysis that concluded that a decrease in the late fee amount stemming from the Board's 2010 Final Rule raised the likelihood of a cardholder paying late.[169] The CFPB rejects the notion,

advanced by one commenter, that it cherrypicked evidence to support its deterrence analysis, or even ignored evidence that may be viewed as conflicting with its conclusion. To the contrary, the CFPB recognizes that the 2023 paper suggests that consumers may engage in more late payments when they are less costly to consumers. However, as noted in the 2023 Proposal, the CFPB does not consider this to be robust evidence that the $8 safe harbor late fee amount would not have a deterrent effect. As discussed in the 2023 Proposal, the CFPB also notes that the paper focused on the late fee variations resulting from the limitations on penalty fee amounts in the Board's 2010 Final Rule and thus could be confounded by other market changes coinciding with the rule going into effect. In particular, the late fee provisions in the Board's 2010 Final Rule were implemented in August 2010, as the U.S. economy was still dealing with the aftermath of the Great Recession,[170] and thus it was difficult to attribute consumer finance statistical trends to particular events. Moreover, the Board's 2010 Final Rule affected all consumers and all issuers, so there was no suitable control group of consumers that were charged the same amount of late fees before and after the implementation of the Board's 2010 Final Rule. Thus, the 2023 paper compared consumer behavior in the year before and the year after August 2010, and the causal attribution of an increase in late payments to a reduction of the late fee amount is hard to prove due to the general economic uncertainty around that time. As discussed above, a credit union trade association took issue with the CFPB's questioning the 2023 paper's findings based on the time period studied. The CFPB emphasizes that the chief problem with the study is that its authors could not convincingly distinguish the effects of the financial crisis and other regulatory reforms under the CARD Act from the effects of lowering late fees. The CFPB also notes that the 2023 paper relied on an older and smaller version of the Y–14 data than that on which the CFPB's analysis is based.

In developing the deterrence analysis, the CFPB also analyzed Y–14 data from 2019, where the variation in late fees does not correspond to other big

changes or differences that might plausibly affect late payment. As discussed above, the current rule sets a higher late fee safe harbor amount for instances where another late payment occurred over the course of the preceding six billing cycles. The CFPB conducted statistical analysis to investigate whether the lower late fee amount in month seven leads to a distinct rise in late payments (Y–14 seventh-month analysis). Specifically, the CFPB estimated whether there is a discontinuous jump in late payments in the seventh month after the last late payment.[171] This analysis focused on this potential jump to isolate the potential impact that the lower late fee that would apply in month seven might have on late payment rates, given that month seven is generally comparable to month six other than the lower late fee amount. In a random subsample from account-level data available in 2019 from the Y–14 data, this statistical analysis did not support that the lower late fees in month seven have an effect on the late payment rate, at conventional confidence levels. In addition, as a separate observation, the CFPB observed that for consumers that incurred a higher fee for a late payment during the six months after the initial late payment, the payment of that higher late fee did not lead to a discernibly lower chance of late payment for a third time in the future than for those consumers whose second late fee was lower because they paid late seven or more months after their first late payment.

The CFPB acknowledges that the variation in late payments in the Y–14 seventh-month analysis discussed above is not the same as the changes that will result from this final rule. Nonetheless, the CFPB has determined that this evidence suggests the prevalence of late payments is not highly sensitive to the level of late fees at the current order of magnitude.

As discussed in the 2023 Proposal, an advantage of the Y–14 seventh-month analysis is that it avoids confounding factors that often are found in other studies of late fees, including the 2023 paper by Grodzicki *et al.,* discussed above. Studies that compare behaviors of consumers facing higher or lower fees (if late) with consumers in a comparison group are often fraught with multiple confounding factors that may also vary

---

[167] For more information about the distribution of minimum payment amounts for late accounts in the Y–14 data, *see* Figure 5 and related discussion in the section-by-section analysis of § 1026.52(b)(2)(i).

[168] For purposes of the calculations of the distribution of the minimum payment amounts in the Y–14 data, the calculations do not include account-months where a late fee was charged but the minimum due was reported to be $0.

[169] Daniel Grodzicki, *et al., Consumer Demand for Credit Card Services,* Journal of Financial Services

Research 63, 272–311 (2023), *https://doi.org/10.1007/s10693-022-00381-4.*

[170] The Great Recession began in the fourth quarter of 2007 and ended in the second quarter of 2009. *See generally* Nat'l Bureau of Econ. Res., *Business Cycle Dating Committee Announcement* (Sept. 20, 2010), *https://www.nber.org/cycles/sept2010.html.*

[171] The CFPB observed in the Y–14 data that, consistent with the safe harbor provisions of the current rule, consumers who paid late again within the six months after a late payment paid higher late fees during those six months than they paid after the initial late fee.

across time periods, issuers, products, or consumer behavior in each group.

The CFPB notes that the finding from the Y–14 seventh-month analysis described above is still contingent upon the fact that some consumers understand that their issuers charge lower late fees starting the seventh month after an initial violation. The CFPB recognizes that the higher late fees for subsequent late payments within the next six billing cycles might be more of a deterrent if consumers understood them better in 2022 than they did in 2019, but the CFPB has no evidence to indicate that is the case. However, as discussed in the 2023 Proposal, the CFPB's analysis is not dependent on all issuers charging the lower late fee safe harbor amount more than six months after a late payment nor the higher late fee safe harbor amount within the six billing cycles. As long as some card issuers made use of the higher safe harbor, as the analysis described above shows that they did, the CFPB should still have been able to detect an increase in the deterrent effect of their fee structure.

The CFPB also notes that because the Y–14 seventh-month analysis discussed above focused on a potential discrete jump in late payments more than six months after a preceding late payment, it also allowed for late payments to trend down as more time passed after a late payment. As described above, the CFPB did not see the lower late fee amount that could be charged in month seven change this downward trend.

The CFPB also determines that other publicly available studies on late fees suggest that the $8 safe harbor amount will still have a deterrent effect on late payments. As discussed in the 2023 Proposal, empirical investigations into the correlates of late fee amounts [172] and late fee incidence [173] have noted that late fee payment can often be avoided by small and relatively costless changes in behavior. This suggests that the lower $8 late fee safe harbor amount will still be higher than the costs of making a timely payment. Further, the CFPB determines that the triggers that make cardholders avoid the current prevailing late fees—including notices provided by card issuers—also will make cardholders avoid a $8 late fee.

With respect to other publicly available studies, the CFPB notes (as it did in the 2023 Proposal) that the

Board—in support of setting higher late fee safe harbor amounts for violations that occur in the following six billing cycles after a late payment—pointed in its 2010 Final Rule to a 2008 study by Agarwal *et al.* of four million credit card statements. That study found that a consumer who incurs a late payment fee is 40 percent less likely to incur a late payment fee during the next month, although this effect depreciates approximately 10 percent each month. [174] As noted above, one credit union trade association commenter criticized the CFPB for not taking the 2008 study into account in its deterrence analysis. However, as discussed in the 2023 Proposal, the CFPB in fact consulted the last available revision of the cited working paper by Agarwal *et al.*, from 2013. Based on that analysis, the CFPB determines that the study is of limited relevance as to whether the late fee amount impacts late payment incidence, for two reasons. First, the study considers the months following any late fee and compares them to months with no recent late payment. That comparison is not the same as comparing to months in which a payment was late, but a lower late fee (or even a $0 late fee) was charged. Second, even if the study had compared to months in which a payment was missed but no late fee was charged, that comparison still would not be relevant to this final rule, in that this final rule reduces the safe harbor amount to $8; it does not completely eliminate the late fee.

In addition, the CFPB notes that the Y–14 seventh-month analysis discussed above shows that in the surrounding months reoffending rates trend down with each month after the last late payment. That seventh-month analysis, however, did not show a jump in late payment rates in month seven after the last late fee, which suggests that the higher late fee amount during the prior six months is not contributing to this downward trend. The CFPB also notes that the 2013 study by Agarwal *et al.* did not separate the effects of the late fee itself from other possible consequences of a late payment, such as additional finance charges, a lost grace period, penalty rates, and reporting of the late payment to a credit bureau, which could affect the consumer's credit score. Given these other consequences of a late payment as discussed in more detail below and in part II.G, it is not clear that the lower late fee safe harbor amount would meaningfully affect the decreased chance that consumers will pay late again after an initial late payment in

ways similar to those established in this 2013 study.

As discussed in the 2023 Proposal, in adopting the late fee safe harbor amounts in its 2010 Final Rule, the Board also considered the limitations that the United Kingdom's OFT placed on credit card default charges in 2006. The CFPB notes that it is not aware of evidence suggesting that the £12 ($21 on April 5, 2006, $13.40 in November 2022) limit the OFT imposed on default charges (including late fees) in 2006 meaningfully increased late payments in the United Kingdom (U.K.). The OFT ruled on April 5, 2006, that it would presume default charges higher than £12 unfair and challenge the company unless exceptional business factors drove the decision for the company to charge higher fees. As fees were routinely as high as £25 ($43.75 on April 5, 2006) until that spring, this episode is the closest to what the CFPB would foresee as the outcome to its proposal: a salient reduction in late fees impacting a large portion of the marketplace at once, letting both issuers and cardholders learn and adapt to the lower later fees. As such, the CFPB has taken it into account in its deterrence analysis.

As discussed above, two academic commenters suggested that the CFPB consider for purposes of its deterrence analysis a study by John Gathergood *et al.* [175] The CFPB agrees that the study merits consideration and thus has taken it into account in developing this final rule. Using U.K. data, that study found that the occurrence of late fees incurred by consumers on credit card accounts are front-loaded, peaking in the first month of card life and declining sharply over the following months. Specifically, one of the commenters noted the study's finding that the share of credit card accounts incurring late payment fees in the study's sample fell from 6 percent in the first month to 2.5 percent by the 23rd month, mainly because the payment of an initial late fee prompted consumers to set up automatic payments. The CFPB notes that, arguably, this work proves again that many missed payments are often mistakes that can be easily avoided through a number of means, including autopay. Even if issuers see no cheaper way to effectively promote autopay than through the imposition of late fees, that is no reason for issuers to keep the revenue from late fees above cost or even to cross-subsidize other

---

[172] Nadia Massoud, *et al.*, *The Cost of Being Late? The Case of Credit Card Penalty Fees*, 7 Journal of Financial Stability, at 49–59 (2011).

[173] Sumit Agarwal, *et al.*, *The Age of Reason: Financial Decisions Over the Life Cycle and Implications for Regulation*, 2 Brookings Papers on Economic Activity, at 51–117 (2009).

[174] *See* Agarwal *et al.*, *supra* note 137.

[175] John Gathergood *et al.*, ''*How Do Consumers Avoid Penalty Fees? Evidence From Credit Cards*'' (Dec. 11, 2019), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2960004.*

cardholders through the imposition of late fees. Considering the fact that U.S. late payment rates are higher than the cited 2.5 percent for cards older than two years in the U.K., the CFPB is not convinced that charging late fees is even an effective way to promote autopay in the current American context.

Some industry commenters submitted additional data on deterrence in response to the CFPB's request for additional data. The CFPB appreciates these submissions but does not find the data persuasive. In particular, one large industry trade association submitted the results from a survey of 2,000 consumers it conducted for the purpose of identifying the fee point at which consumers would likely be deterred from paying their credit card bills late. The commenter reported that, among other things, the survey found that late fees are more effective in motivating consumers to pay bills on time than negative credit score impacts. Almost half of consumers (46 percent) said that avoiding late fees was the most important reason to pay credit card bills on time, and 30 percent said that doing the responsible thing was the most important reason to pay on time. Only 15 percent said that concerns about credit ratings was the most important reason to pay on time. This commenter further reported that the survey found that the CFPB's proposed $8 safe harbor would not motivate many consumers to pay their credit card bills on time. In the survey, more than 4 in 5 consumers (83 percent) said that a $10 late fee would be insufficient to deter them from paying a credit card bill late. Only 6 percent of respondents said that a fee of $10 would have a deterrent effect. For those who have paid a late fee in the past year, the deterrence effect of a $10 fee is even lower: only 4.3 percent said that such a fee would deter them from paying late.

The CFPB notes that the submitted survey asked consumers about the primary reason they avoid a late fee. As such, it is consistent with current fees being excessive that 46 percent of consumers pay on time primarily to avoid late fees, while only 30 percent would do so to do the responsible thing. The posed question does not shed light on whether concerns about a credit rating or the other listed reasons (or other reasons not even listed) in combination with a $8 late fee would be sufficient for most consumers not to breach a contract. It is unclear from the results submitted whether the amount of the hypothetical late fee was meant or understood to be considered in isolation or alongside the other consequences of a missed payment. For example, did

respondents say that a $10 fee would not deter them because they thought that the fee would be the only consequence of a missed payment? Would respondents have said something else had they known (and understood) the loss of the grace period or larger interest payments? The survey results leave these questions unanswered.

Although the survey did ask respondents if they would be deterred by a late fee amount below $5, $10, and $15, the reported "yes" response rates in the single digits are missing crucial context—specifically, whether the respondents would indeed have said they would be deterred by late fee amounts close to $30 and $41. The survey is hypothetical. In practice, the vast majority of cardholders pay on time in the vast majority of months. The survey results submitted to the CFPB do not show whether respondents, within the hypothetical world posited by the survey, indicated whether $30 is at or near the price point at which they would be deterred from making a late payment. In other words, the results reveal nothing about the extent to which a $30 late fee determines consumers' payment behavior in the real world.

An additional reason why the survey is of limited value is that, based on the results provided to the CFPB, the survey seems to have posited a hypothetical world in which it is assumed that respondents had the money to pay the bill and were aware of the due date. In practice, consumer commenters indicated that they pay late for a variety of reasons, including (1) their mailed payment was not received by the card issuer by the due date because of slower postal service; (2) they paid on the due date but after the cut-off time on the due date; (3) they forgot to pay on time because of vacations, medical issues, or family issues; or (4) they experienced cash flow issues because of unexpected expenses, such as an illness. To the extent consumers are late in paying because of mail delivery issues, they are inattentive to their account, or they are so cash-constrained that they are unable to make a minimum payment, the amount of the late fee may have little effect on whether they pay late.

Further, the appendix to the comment letter mentions that the contractor used the Van Westendorp's Price Sensitivity Meter [176] to "identify the fee point at

which consumers would likely be deterred from paying their credit card bills late," indicating the commenter gathered much more data about purported demand for late fees than the data related to just three price points that it chose to share. That type of data might be useful, given that a careful consideration of deterrence needs to trade off additional deterrence against other cost and benefits of higher fees. It is crucial to know whether deterrence would be meaningfully higher at $20, or maybe $50, in order to consider whether that higher deterrence is indeed worth the harm to consumers from those higher fee amounts. The survey responses that the commenter chose to share prove that there is not meaningfully more deterrence at $15 than at $5, but nothing about the comparative deterrent effect of $30 or $41. This final rule maintains the stance of the 2023 Proposal that late fee amounts can have some deterrent effect, and higher amounts have more, but a $30 or $40 late fee amount would not be sufficiently more of a deterrent than an $8 late fee amount to justify late fees far above cost, especially given the other negative consequences of a late payment. The final rule further maintains the stance, as supported by consumer commenters, that many late payments are due to reasons that would not be responsive to any level of deterrent.

A regulatory advocacy group commenter submitted data from its recent poll of approximately 1,100 consumers regarding credit card late fees. The commenter reported the poll shows that by a 21-point margin, respondents believe that a decrease in the penalty will result in more people making late payments. Further, 53 percent of those surveyed believe they will be more likely to make late payments on their credit cards if the late payment penalty is reduced from $30 to $8. A large trade association commenter cited the same poll results as direct evidence of what consumers would do in response to a reduction in late fee amounts similar to the one proposed.

The CFPB acknowledges that the direction of the response to a fee change in these results seems correct, and that such a reaction has never really been in doubt in the CFPB's development of this final rule. Lower fee amounts would be less deterrent than higher fee amounts, but this observation provides scant evidence to help the CFPB ensure that

---

[176] The Van Westendorp Price Sensitivity Meter is a comprehensive, multi-question survey model that indirectly measures potential buyers' willingness to pay. Instead of asking potential buyers to identify a single price point, the Van Westendorp model helps assess willingness across a range of prices. *See* Rebecca Shaddix, *How To Price Your Product: A Guide To The Van*

*Westendorp Pricing Model, Forbes* (June 22, 2020), at: *https://www.forbes.com/sites/rebeccasadwick/2020/06/22/how-to-price-products/?sh=4cbfd2055c75.*

late fees are reasonable and proportional, as guided by the factors of deterrence, cost, and consumer conduct. The CFPB also finds that responses to questions posed to consumers about hypothetical late payment amounts are less informative than are the effects of late payment fees that consumers actually incur, such as those studied in the seventh-month analysis of certain Larger Card Issuers' Y–14 data discussed above.

In addition, a bank commenter asserted that it has consistently found that late fee assessments under the current safe harbor amounts reduce the incidents of recurring delinquencies and submitted its own data in support of the statement. According to the commenter, between 2019 and 2021, 43 percent of its 30-day delinquent cardholders did not subsequently enter a 60-day delinquency after incurring a late fee. Furthermore, over the same time period, 48 percent of 60-day its delinquent cardholders who were assessed two late fees did not enter a 90-day delinquency status.

The CFPB notes that the disclosed information does not show the effects of charging a late fee, let alone the effects of charging the $41 current safe harbor amount, against the counterfactual of charging an $8 safe harbor amount. The fact that a decreasing share of late payers be delinquent for one, two, or three months is fully consistent with the CFPB's understanding of consumer behavior in this market and with the CFPB's analysis of the effects of late fee charges and other consequences of late payments, as discussed herein. The commenter did not formulate how many more cardholders would be delinquent for 30, 60, and 90 days or more if no late fee were charged or if a $8 late fee were assessed after a late payment.

As discussed above, one credit union trade association asserted that the CFPB failed to present in the 2023 Proposal an analysis of the tradeoff between late fees and late payments. This commenter asserted that a consumer is deterred from being late on a payment if the late fee is greater than the net benefit of missing the payment. Similarly, one credit union commenter expressed concern that if the late fee amount is set too low, consumers are more likely to pay the fee without considering the long-term consequence of lowering their credit scores, higher borrowing costs, reduced ability to access credit, and ultimately less disposable income. Many other industry commenters expressed similar concerns. In response, the CFPB notes that calculating consumers would trade off the total costs of a missed payment against the

full array of benefits of missing the deadline on minimum payments. The CFPB notes, however, that the total costs of a late payment are higher than just the late fee, as the 2023 Proposal and this final rule have enumerated.[177] In addition, in practice, many late payments are due to circumstances beyond consumers' control.

Also, as discussed above, several commenters posited that because $8 is roughly comparable to the price of common items such as a cup of coffee or movie ticket, more consumers may view that amount as a reasonable price to pay in exchange for postponing making their credit card payments. The CFPB reiterates that some late payments are the result of circumstances beyond consumers' control.[178] Moreover, the CFPB notes that some consumers pay late simply because they do not have enough funds to pay the minimum payment. As noted in part III.B, some consumer commenters indicated that they have limited income and that even a small late fee can impact their tight budget. For consumers in these circumstances, a $30 late fee is simply adding to the unpayable debt amount.

For the reasons discussed above, the CFPB finds that the available evidence and the CFPB's study of the Y–14 data of certain Larger Card Issuers indicate that the $8 safe harbor amount for the first and subsequent late payments will still have a deterrent effect on late payments, although that effect may be lessened to some extent, and other factors may be more relevant (or may become more relevant) toward creating deterrence.

In addition, for the reasons discussed herein, the CFPB determines that some consumers may benefit from the $8 safe harbor threshold amount, including some consumers who may experience an increase in late payments under the lower safe harbor amount. With respect to those consumers, the CFPB notes, as it did in the 2023 Proposal, that for the more constrained cardholders, like

subprime borrowers, who pay a disproportionate proportion of late fees, the current, higher late fee may be impacting cardholder repayment conduct—*i.e.,* the higher late fee amount could have gone toward a payment on the account. As discussed in part IX, the CFPB estimates that reducing the safe harbor for late fees to $8 for Larger Card Issuers will likely reduce late fee revenue by billions of dollars. This expected savings will benefit consumers. The money saved by cardholders on late fees may go toward repayment. As discussed in the 2023 Proposal, the 2023 paper by Grodzicki *et al.,*[179] described above, with all the caveats noted there, found such a pattern for subprime cardholders: A decrease in late fees after the implementation of the CARD Act increased borrowing for prime borrowers but triggered repayment for subprime cardholders.[180] If this prediction holds true for the late fee safe harbor amount in this final rule, it would imply that lowering late fees may provide some benefits to subprime consumers in terms of a greater ability to repay revolving debt.[181] This effect might also lower issuers' losses from delinquencies, as it could subsequently reduce the likelihood and the severity of default in the population most prone to default.[182]

The CFPB rejects the notion, as one commenter asserted, that potential benefits to the vast majority of consumers (including subprime consumers) who obtain credit cards through larger issuers are irrelevant to the analysis because those benefits are not among the specific statutory factors

---

[177] The CFPB also notes that the benefits need not be restricted to the alternative use of funds, such as the opportunity cost of investing the minimum payment due for a short time. Rather, they also include the cognitive and other costs of initiating other transactions in advance of the due date in such a way as to ensure that the consumer has available funds at the last possible moment at which they can initiate a payment that the issuer would accept as timely.

[178] As discussed in part III.B, some consumers commenting on the 2023 Proposal stated that they had incurred late fees because (1) their mailed payment was not received by the card issuer by the due date because of slower postal service; (2) they paid on the due date but after the cut off time on the due date; or (3) they forgot to pay on time because of vacations, medical issues, or family issues.

[179] *Supra* note 169.

[180] Although the paper found that lower late fees may cause subprime cardholders to pay late more often, it also found that lower late fees may cause subprime cardholders to make a larger payment when they ultimately make the payment. This paper explained that this latter effect on subprime cardholders might result from the lower late fee amount lessening the need for subprime cardholders to focus on avoiding late fees and instead allowing some subprime cardholders to start to pay more attention to the high cost of their revolving debt.

[181] As discussed in part V, the Y–14+ data that the CFPB considered in developing the proposal and this final rule include data from specialized card issuers. Those issuers make up a majority of subprime credit card balances.

[182] Even if lower late fees would decrease losses from delinquencies, issuers may still prefer higher late fees to maximize profits. As current late fee levels generally produce profits to issuers on the average late payment, the CFPB does not take the prevalence of high fees as strong evidence that lower fees would raise issuers' losses from delinquency. Even if lowering late fee amounts reduced delinquency, doing so might not be in issuers' interest: A $1 reduction in the late fee amount might decrease delinquency losses by less than $1 per incident, and thus lower profits.

for determining an appropriate safe harbor amount for penalty fees. As discussed above, while the factors in TILA section 149(c) are not strictly controlling, that statutory provision includes such other factors that the CFPB deems necessary or appropriate. In its analysis of the Y–14 data, the CFPB finds that the combined beneficial effects for consumers are an appropriate consideration for this rulemaking. The CFPB also finds that a late fee safe harbor amount of $8 for the first and subsequent late payments strikes the appropriate balance of deterrence considerations and considerations of those beneficial effects.

In addition, as discussed in the 2023 Proposal, the CFPB notes that card issuers have available methods and tools other than charging higher late fees to deter late payment behavior, and thereby minimize the potential frequency and cost to card issuers of late payments. In particular, as discussed in part II.G, for cardholders who typically pay their balance in full every month (so-called transactors), a late fee is in addition to new interest incurred for carrying or revolving a balance. For these consumers, who do not roll over a balance in the month before or after a late fee is assessed, the loss of a grace period and coinciding interest charges may pose a similar or even greater deterrent effect than the late fee itself. For some consumers, card issuers may also report the late payment to a credit bureau, which could affect the consumers' credit scores. The CFPB notes that since the Board's 2010 Final Rule went into effect, many credit card issuers, financial institutions, and third parties have begun providing free credit scores to consumers.[183] Access to real-time changes in consumers' credit scores have likely increased their awareness of any decline related to late payments, contrary to some commenters' assertions that consumers do not think about such things. Thus, the deterrent effect of any negative credit score impact is likely greater than in 2011—and the potential impact encourages payment within one billing cycle of the due date without the imposition of additional financial penalties.

Further, as noted, card issuers may decrease the cardholder's credit line, limit the cardholder's earning or redemption of rewards, or impose penalty rates in certain circumstances—all of which can have a deterrent effect.

For example, if a consumer does not make the required payment by the due date, § 1026.55(b)(3) permits a card issuer to take actions to reprice new transactions on the account according to a penalty rate in certain circumstances. After 60 days, § 1026.55(b)(4) permits issuers to take steps to reprice the entire outstanding balance on the account according to a penalty rate in certain circumstances.

As discussed above, several commenters expressed concerns about the negative consequences that consumers may incur—including higher APRs and lower credit scores—if a lower late fee safe harbor amount results in an increase in late payments. Further, as noted in the 2023 Proposal, card issuers have non-punitive methods to facilitate timely payments, including, for example, automatic payment and notification within a certain number of days (e.g., five days) prior to the due date that the payment is coming due. Both the availability and adoption of these methods have increased since the Board issued its 2010 Final Rule. In 2013, issuers tracking the number of consumers making payments online reported that an average of 38 percent of consumers made at least one non-automatic payment online or through automatic payment;[184] in 2022, 61 percent of active accounts made at least one non-automatic online payment online in the last cycle of the year, and 20 percent of accounts made at least one automatic payment in the last cycle of the year.[185] Even in the past few years, digital enrollment has grown, with 76 percent of active accounts enrolled in an issuer's online portal in 2022 (a 3 percentage point increase from 2017), 76 percent enrolled in a mobile app (a 25 percentage point increase from 2017), and 67 percent receiving only e-statements (a 23 percentage point increase from 2017).[186]

The CFPB expects that these other methods, and the negative consequences resulting from missed payments, will decrease the likelihood of late payments not only in cases where card issuers consider the deterrent effects of lower late fees to be insufficient, but for other reasons as well. As discussed above, Larger Card Issuers also may offset lost revenue from lower late fees by increasing interest rates, which would indirectly make late payments more costly than without this response. Also, issuers may have less ability to charge consumers higher late fees to maximize

profits and thus may be more inclined to take other, more efficient steps to deter late payments, including providing timely reminders of an upcoming due date, well-chosen due dates aligned with cardholders' cash flow, and encouraging automatic payments.

Some industry commenters, as discussed above, expressed concern that a late fee safe harbor amount of $8, due to its diminished deterrence effect, would make it difficult for card issuers to identify riskier consumers and manage for that risk, and thus result in higher costs to card issuers. The CFPB finds these concerns unwarranted. As discussed above, the CFPB determines that the $8 safe harbor will cover pre-charge-off collection costs for the average Larger Card Issuer. As also discussed above, the CFPB determines that this result is the approach most consistent with the CARD Act's requirements and purpose. To manage credit risk and post-charge-off collection costs resulting therefrom, card issuers can continue to customize rates using risk based-pricing, and to adjust those rates and apply penalty rates— consistent with limitations in the CARD Act as implemented in Regulation Z— if they indeed learn something from consumers' delinquency.

The CFPB also declines to look to proxies, as one commenter suggested, such as returned-check penalties under State laws, late fees charged on utility bills, and student loan late fees. The CFPB notes that those violations do not trigger financial consequences, such as a missed grace period or a month's worth of interest on the balance and new purchases that otherwise would not have applied. As such, the penalty fees for those violations are inapt proxies for purposes of the CFPB's deterrence analysis.

*Consumer conduct.* Based on the available evidence and careful consideration of the comments, with respect to the late fee safe harbor threshold amount for Larger Card Issuers, the CFPB determines that an $8 late fee safe harbor amount for the first and subsequent late payments for Larger Card Issuers better reflects a consideration of the Y–14 data related to consumer conduct than do the higher amounts set by the Board. The CFPB is aware that the Board noted in the 2010 Final Rule noted that "consumers who pay late multiple times over a six-month period generally present a significantly greater credit risk than consumers who pay late a single time." [187] The CFPB is

---

[183] CFPB, *The Consumer Credit Card Market*, at 174–176 (Dec. 2017) (2017 Report), *https://files.consumerfinance.gov/f/documents/cfpb_consumer-credit-card-market-report_2017.pdf.*

[184] 2013 Report, at 68.

[185] These categories are not mutually exclusive. 2023 Report, at 131–132.

[186] *Id.* at 131.

[187] 75 FR 37526 at 37534.

also aware that the Board further noted that "when evaluating the conduct of consumers . . . it is consistent with other provisions of the Credit Card Act to distinguish between those who repeat that conduct during the next six billing cycles and those who do not." [188] However, as discussed in the 2023 Proposal, the CFPB's analysis of the Y–14 data and other relevant information indicates that it not clear that multiple violations during a relatively short period are associated with increased credit risk and thus reflect a more serious consumer violation. Based on the account-level Y–14 data from October 2021 to September 2022 from certain Larger Card Issuers, the CFPB estimates that only 13.6 percent of accounts incurred a late fee and then no additional payments were made on that account. In addition, based on Y–14 data, for accounts that incurred a late fee, the CFPB estimates that a third of accounts paid the amount due within five days of the payment due date, half the accounts paid the amount due within 15 days of the payment due date, and three out of five accounts paid the amount due within 30 days of the payment due date.

In addition, as discussed in the 2023 Proposal, the CFPB understands that the Metro 2 reporting format used by the industry for reporting information to credit bureaus does not consider a payment to be late if it is made within 30 days of the due date. Thus, for risk management purposes, the industry itself does not appear to consider the consumer's conduct in paying late to be a serious form of consumer conduct until the consumer is 30 or more days late. As discussed above, the CFPB estimates that a majority of accounts become current before card issuers even consider the consumer late for credit reporting purposes.

An academic commenter, as discussed above, stated that the CFPB's analysis does nothing to address the reality that multiple late payments demonstrate an increased credit risk and reflect a more serious violation of the account terms—even if those payments occur before the account would be reported as late under credit reporting guidelines. The CFPB does not accept the notion that a late fee safe harbor amount should reflect a more expansive idea of what constitutes an increased credit risk or serious violation than does the credit reporting format that the credit card industry has adopted. The CFPB further notes that, for the subset of consumers who do make their credit card payment 30 or more days late, the

[188] Id.

consequences of being reported to a credit bureau are potentially quite costly. In this respect, reporting late payments to the credit bureaus is just one of the several other tools and methods that card issuers can employ to address the conduct of late-paying consumers.

Further, the CFPB has determined that permitting risk-based pricing in setting the amount of a late fee is generally inconsistent with the CARD Act's requirement that late fees be reasonable and proportional to the cost of the omission or violation. This type of pricing would enable issuers to set late fee amounts based on estimation of risk among groups of consumers, as compared with the statutory requirement that late fees be based on the actual violation, rather than the potential risk of consumers. Moreover, the safe harbor is a discretionary amount that is presumptively reasonable and proportional, and use of risk-based pricing could result in a higher late fee amount than the cost of the omission or violation for many Larger Card Issuers. Further, the CFPB disagrees that this pricing is necessary to manage the risk presented by consumers who pay late more than once within the next six billing cycles. As a basic matter, bona fide late fees are excluded from the definition of finance charge in Regulation Z and thus are not reflected in TILA's cost of credit. It is difficult to square why a fee that is not considered a price component for all other purposes under TILA and Regulation Z should be treated as one for purposes of risk management. Indeed, as discussed in the 2023 Proposal, increasing the APR is among the methods other than late fees that card issuers have to address credit risk. Specifically, card issuers that charge an interest rate are permitted by § 1026.55(b)(3) to reprice new transactions on the account according to a penalty rate in certain circumstances. In addition, after 60 days, § 1026.55(b)(4) permits these issuers to take actions to reprice the entire outstanding balance on the account according to a penalty rate in certain circumstances. In addition, card issuers may take steps to reduce a cardholder's credit line.

The CFPB recognizes that a special rule in § 1026.52(b)(1)(ii)(C), as discussed below in the section-by-section analysis of that provision, permits card issuers to impose a late fee that does not exceed 3 percent of the delinquent balance on a charge card account that requires payment of outstanding balances in full at the end of each billing cycle, when a charge card

issuer has not received the required payment for two or more consecutive billing cycles. As the Board noted in the 2010 Final Rule, this provision is intended to provide charge card issuers with more flexibility to charge higher late fees and thereby manage credit risk when an account becomes seriously delinquent, because charge card issuers do not apply an APR to the account balance and therefore cannot respond to serious delinquencies by increasing that rate. Thus, the Board acknowledged in its rationale for adopting this special rule that for most card issuers, increasing the rate is an appropriate tool for managing the risk resulting from seriously delinquent accounts. As discussed below, the CFPB is not substantively amending the current safe harbor set forth in § 1026.52(b)(1)(ii)(C). The CFPB recognizes that card issuers do not charge interest on charge card accounts, and thus would not be able to use the interest rate charged on the account to manage credit risk.

As discussed in the 2023 Proposal, in considering consumer conduct, the CFPB also recognizes that some consumers may pay late chronically but otherwise make a payment within 30 days for a number of reasons, including cash flow issues, that do not necessarily indicate that they are at significant risk of defaulting on the credit. For example, consumers may make a credit card payment after the due date from the next paycheck to smooth out expenses and avoid paying overdraft fees. As discussed above, some commenters asserted that the CFPB placed too much emphasis on cash flow issues in its analysis, with one commenter noting that if the problem is with consumer cash flow timing, as the CFPB hypothesizes, most major credit card issuers have mechanisms in place to allow customers to change the due date on their account in order to account for their own paycheck or earning schedules. The CFPB encourages the use of such mechanisms. However, even with the availability of those mechanisms, the CFPB notes, as it did in the 2023 Proposal, that a 2021 study suggests that some consumers who are paid on a bi-weekly basis may not make the required payment by the due date but will make the required payment within 30 days after the due date from their next paycheck. In addition, as discussed in part III.B, some consumer commenters who supported the proposal indicated that they had been charged a late fee because they experienced cash flow issues due to unexpected expenses, such as an illness,

and in some cases were not able to change the due date for their payments.

As discussed above, a bank commenter expressed concern that if a late fee is only $8, consumers may not bother to call, and the card issuer will lose an opportunity to provide financial assistance. The CFPB notes that $8 is a significant sum for many consumers, particularly deep subprime consumers who pay a disproportionately large share of credit card late fees. Indeed, as discussed part III.B, some consumers who supported the proposal indicated they had limited income and that even a small late fee can impact consumers on a tight budget. The CFPB also notes that card issuers have other options for offering financial assistance besides waiting for delinquent cardholders to call. These include proactively contacting such cardholders through email, letters, and web and mobile notifications. The CFPB encourages card issuers to use nonintrusive methods of reaching out to cardholders. The CFPB also notes, as a financial regulatory advocacy group commented, that because credit card payments are applied first to cover finance charges and fees, when late fees are tacked on, less of a consumer's payment goes toward reducing the principal balance. For consumers, this in turn adds to the duration and cost of revolving an outstanding balance. The CFPB anticipates, as the commenter asserted, that the lower safe harbor amount may have a positive impact on the financial health of consumers who bear late fees, and that it is necessary and appropriate to take that effect into consideration in conjunction with safe harbor amount's effects on consumer conduct.

*Other factors cited by commenters.* As discussed above, many industry commenters recommended that the CFPB consider certain additional factors in establishing a safe fee late harbor amount. Specifically, several industry commenters cited lost late fee revenue and the resultant negative impacts on card issuers as factors meriting establishing a safe harbor amount significantly higher than $8 or leaving the current safe harbor amounts intact. Several credit union commenters, for example, stated that revenue from late fees covers pre-charge off collection costs but also subsidizes products and services that members demand and need, including programs targeted toward consumers with thin credit files. A dramatic cut in that revenue, these commenters cautioned, would necessitate cutting or eliminating those programs. Other commenters expressed concern that it would necessitate raising rates.

The CFPB notes that to the extent that industry commenters raising these concerns are Smaller Card Issuers as defined in § 1026.52(b)(3) (*i.e.,* card issuers that together with their affiliates have fewer than one million open credit card accounts for the entire preceding calendar year),[189] they will still be permitted under this final rule to impose late fees pursuant to the safe harbor provisions in § 1026.52(b)(1)(ii)(A) and (B) (as revised by this final rule) for the reasons discussed in part V. However, the CFPB emphasizes, for all card issuers, that the CARD Act as implemented by Regulation Z permits card issuers to recover through late fee revenue only pre-charge-off costs associated with late payments; it does not provide that card issuers may also fund other programs and services through excess late fee revenue. Thus, as discussed above, in setting the $8 late fee safe harbor amount, the CFPB has indeed considered late fee revenue resulting from the imposition of late fees in that amount, but only in evaluating the extent to which an $8 late fee would cover card issuers' pre-charge-off collection costs. As discussed above, the CFPB expects that an $8 late fee is sufficient to cover the pre-charge-off collection costs of the average Larger Card Issuer. Those whose pre-charge-off collection costs are not fully covered may impose late fees pursuant to the cost analysis provisions in § 1026.52(b)(1)(i).

As discussed above, one bank and one State bank trade association cited safety and soundness concerns as another factor that the CFPB should consider. One of these commenters asserted that setting fees on a risk-adjusted basis is essential to running a safe and sound credit card business, as well as to providing credit to customers who would not otherwise get it. A State bank trade association commenter noted that when its member banks establish terms and conditions for their credit plans, the late fee safe harbor weighs heavily in assuring that the bank's cost of credit match the higher costs of delinquency to targeted revenue and asking those who create such higher costs to bear those costs directly is necessary to maintain safety and soundness in the sub-prime space. The CFPB notes that, if these banks are Smaller Card Issuers, they are not covered by the $8 safe harbor threshold amount adopted in this final rule because it is limited to the Larger Card Issuers (as that term is used in this document), for the reasons discussed in part VI.

The CFPB also notes, however, that even if these banks are covered by this final rule the available evidence does not support the suggestion that late fees imposed pursuant to the current safe harbor amounts are adjusted or priced according to risk. In the 2022 survey of agreements as discussed in part II.E, most of the top 20 card issuers based on outstanding balances impose late fees at or near the safe harbor amounts—little to no adjusting or pricing is done at all. Moreover, none of these top issuers appear to be charging late fee amounts above the current late fees safe harbor amounts to adjust for particularly risky consumers. This conclusion also is supported by the data the CFPB collected through its 2023 survey of agreements discussed in part II.E, showing that most Larger Card Issuers charged a maximum late fee at or near the higher safe harbor amount of $41 in 2023 but did not go beyond that level. Further, as discussed in the analysis of consumer conduct above, the CFPB notes that card issuers have many other tools at their disposal for managing the higher risks posed by cardholders who chronically pay late. These include raising the rates on those cardholders' accounts, consistent with certain limitations in the CARD Act. The CFPB also notes that none of the prudential regulators with which it consulted on this final rule, as discussed in part III.C, raised safety and soundness concerns.

Additional Issues

As discussed above, the CFPB requested comment on a number of different issues related to its proposal to lower the late fee safe harbor amount to $8 for first and subsequent violations, including eliminating the late fee safe harbor, alternative approaches to determining the late fee safe harbor amount, or whether to impose certain conditions on the use of the safe harbor or on assessing late fees generally. The CFPB also request for comment on a number of issues related to penalty fees generally, including whether to extend the $8 safe harbor amount to all penalty fees, such as over-the-limit fees, returned-payment fees, and declined access check fees. The CFPB is not finalizing any of these alternative approaches or conditions for the reasons discussed below.

*Eliminate the safe harbor for late fees and adopt no replacement safe harbor.* The CFPB received some comments on whether to eliminate the safe harbor for late fees altogether, *i.e.,* eliminate the existing safe harbor without adopting a new one. An individual commenter noted that for simplicity, eliminating the safe harbor altogether might better

---

[189] *See supra* note 5.

serve the CFPB's aims. This commenter also noted, however, that the 2023 Proposal would still accomplish the CFPB's goals and would be more in line with the intent of the law. A few industry commenters responded in opposition to entirely eliminating the safe harbor for late fees. A bank, for example, asserted that doing so would lead, among other things, to a drastic uptick in operational complexity for issuers, complexity in the CFPB's oversight, and consumer uncertainty. An industry trade association stated that the CFPB had not provided any evidence or support for why the late fees safe harbor should be eliminated altogether. For the reasons discussed above, the CFPB has made an independent determination to repeal the existing safe harbor for late fees charged by Larger Card Issuers. Nonetheless, for the reasons discussed above, the CFPB is also adopting a new $8 safe harbor for Larger Card Issuers.

The CFPB restates its conclusion, as discussed above, that establishing a safe harbor amount is an exercise of discretionary rulemaking authority, and thus, a safe harbor need not exist. The CFPB also reiterates its expectation that some Larger Card Issuers will opt to use the cost analysis provisions in § 1026.52(b)(1)(i) to set the amount of their late fees. The CFPB disagrees that the cost analysis will be an operational challenge for Larger Card Issuers with sophisticated businesses. These institutions should be able to track their pre-charge off collection costs and perform the mathematics necessary to calculate a cost-basis fee.

*Establish a different safe harbor amount for late fees.* Although many commenters implicitly recommended that the CFPB establish a late fee safe harbor amount higher than $8, only a few commenters responded to the CFPB's specific request for comment on whether it should establish a different amount for late fees and, if so, what that amount would be. A credit union trade association recommended that if the CFPB determines that current late fee amounts are too high for consumers, it should reinstate the late fee amount of $25 initially established by the Board pursuant to the CARD Act. Another credit union commenter, through its trade association, suggested that the CFPB consider providing a different safe harbor amount for variable rate credit cards vs. fixed rate cards. The commenter noted that an $8 late fee may be appropriate for variable rate cards, given that in the current rising interest rate environment, minimum payment amounts would continue to increase, thus offsetting a reduction in late fee

amounts for such cards. A consumer commenter recommended that the CFPB set a minimum late fee safe harbor amount of $8 and a maximum one of $30, reasoning that this would help to avoid a high fee for a small balance while still leaving allowance for the higher fee on large balances. Another consumer commenter recommended that the late fee safe harbor amount be set at 8 percent of the balance.

A few commenters responded to the CFPB's request for comment on whether to adopt a staggered late fee safe harbor amount with a cap on the maximum dollar amount, such that card issuers could impose a fee of a small dollar amount every certain number of days until a cap is hit. All opposed the idea, asserting that it would add needless complexity, be expensive to implement, or would confuse consumers.

For the reasons discussed in detail above, this final rule for Larger Card Issuers repeals the current safe harbor threshold amounts in § 1026.52(b)(1)(ii)(A) and (B) as they apply to late fees and sets late fee safe harbor threshold amount of $8. The CFPB determines that this approach better ensures that late fees imposed by Larger Card Issuers for the first and subsequent violations are reasonable and proportional than do any of the other approaches suggested by commenters, many of which would result in late fee amounts that are too high or would add unnecessary complexity to the rule.

*Conditions on using safe harbor or on assessing late fees generally.* Several commenters responded to the CFPB's request for comment on whether to impose certain conditions on using the late fee safe harbor or on assessing late fees generally, such as requiring card issuers to offer autopay or provide additional notices to consumers. Several consumer groups expressed support for imposing both conditions for late fees generally. These commenters noted that the vast majority of card issuers, including smaller ones, currently provide an autopay option. With respect to offering additional notices, these commenters urged the CFPB to require issuers to provide a notice by postal mail before imposing a late fee on cardholders who only receive statements online. They suggested that such notice should include a warning that a late fee will be imposed if the cardholder does not make a payment within seven days and should also inform cardholders of their right to receive paper statements and provide an easy way to exercise this right. These commenters expressed concern that card issuers' aggressive pushing of

online-only statements has resulted in some consumers paying late because they have missed an email or other electronic notification that a statement is available.

Industry commenters generally opposed imposing either condition, with the exception of at least two card issuers that expressed support for requiring issuers to offer an autopay option. In opposing both conditions, one large industry trade association stated its belief that because the two ideas, along with a 15-day courtesy period, are only briefly referenced in the proposal, the CFPB cannot move forward on the matters absent (1) more work on the CFPB's part to understand the benefits and burdens of this approach; and (2) far more opportunity for the public to understand the specifics of any proposed approach with an opportunity to meaningfully comment. Accordingly, the commenter concluded, a new proposed rule would be required if the CFPB sought to pursue these ideas. Another industry trade association commenter stated that TILA does not authorize the CFPB to make the safe harbor subject to prerequisites or conditions, reasoning that if Congress intended to so limit card issuers' ability to use the safe harbor, it would have made any such prerequisites or conditions explicit in the statute or expressly granted the CFPB the authority to adopt such prerequisites or conditions. This commenter also expressed concern that a regulatory requirement that card issuers provide one or both of these options in order to rely on the safe harbor would limit issuer flexibility and increase compliance costs.

With respect to autopay, industry commenters noted that most card issuers already offer an autopay option, as well as the option for mail-in payments, online payments, and phone payments. Some noted that many consumers prefer to pay by other means even when autopay is an option and may be concerned about maintaining control over the timing and amount of their payments in order to avoid nonsufficient funds (NSF) or overdraft fees. A credit union commenter expressed concern that requiring issuers to offer an autopay option could be especially burdensome for smaller credit unions. This commenter noted that because some smaller financial institutions must outsource an autopay service for members who opt in for automatic payments, requiring all credit unions to employ this service would be an added expense, which would ultimately force the smaller credit unions to pass these costs on to their

members. A card issuer commenter also noted that complying with such a requirement might well be beyond the capabilities and means of smaller issuers.

With respect to additional notices, one industry trade association noted that issuers currently often send multiple proactive payment reminders prior to the payment due date across multiple channels, including through email, push notifications in an app, and prompting users when they log into their online account. Additionally, this commenter noted that email alerts may be sent each month when a credit card statement is generated, which includes the statement balance, minimum payment amount, due date, and links to other resources to answer questions customers may have related to the credit card program. This commenter further noted that consumers can also often set their own alerts, including payment due and credit card past due notices. While acknowledging that these alerts have had a positive impact on consumer behavior, this commenter asserted that the CFPB provided no data or evidence suggesting the effectiveness or ineffectiveness of these notifications and services; nor did it provide any evidence that additional notifications or services would reduce late payments or suggest alternative notifications or services that issuers should be employing.

A card issuer commenter noted the relatively low take-up rate for the expanded alert registration system that it rolled out a part of the online account opening process a few years ago, whereby consumers are prompted to enroll and select which types of alerts they want to receive, if any. This commenter reported that even with all of those processes, reminders and ease of registration, the percentage of accounts that have selected payment alerts by type are 14.9 percent by text, 13.4 percent by email, and 1.5 percent by push notification (through mobile app). This commenter further stated that as it does not want to harass or create dissatisfaction for its customers, it is incredibly important to engage them when and how they want to be engaged. In addition, this commenter noted that each alert delivery method has its own legal implications as a result of Federal laws—such as the Telephone Consumer Protection Act (TCPA)—designed to protect consumers from unwanted communications. This commenter suggested that if the CFPB has determined that additional notifications are warranted, it should seek Congressional exceptions to the TCPA and other applicable laws, as well as the

preemption of any applicable State laws.

The CFPB declines to impose conditions on using the late fee safe harbor or on assessing late fees generally. The CFPB will continue to consider whether these additional regulatory requirements are appropriate.

*Extend $8 safe harbor amount to all penalty fees.* Five industry commenters responded to the CFPB's request for comment on whether to extend the $8 safe harbor amount to all penalty fees, such as over-the-limit fees, returned-payment fees, and declined access check fees. All opposed such an extension. None provided data on other penalty fees in response to the CFPB's request. In opposing the idea, industry commenters generally asserted that the 2023 Proposal lacked sufficient empirical evidence or legal justification for lowering the safe harbor amounts of all penalty fees. An industry trade association, for example, asserted that because the CFPB had not provided any reasoned justification for adjusting any other penalty fees, changes to other fees related to a credit card account would not be a logical outgrowth of the proposal and thus could not be finalized without notice and comment.

Several consumer groups in a joint letter supported lowering the safe harbor amount for all penalty fees, expressing particular concern that card issuers will try to push cardholders into over-the-limit transactions. These commenters posited that while over-the-limit fees virtually disappeared because of the CARD Act's requirement that issuers must obtain the consumer's consent or opt in for over-the-limit transactions, that might not be a permanent condition. These commenters further noted that as can be seen from the experience for overdrafts in the early 2010s, banks are very good at overcoming the stickiness of defaults and getting consumers to opt in to a harmful product.

The CFPB declines to extend the $8 safe harbor amount to all penalty fees or otherwise lower the safe harbor amounts of those fees. As discussed in part II.D, late fees are by far the most prevalent penalty fees charged by card issuers and as such pose the greatest consumer protection concerns at this time. Moreover, the CFPB's current data and other evidence primarily relate to late fees charged by Larger Card Issuers. For these reasons, the CFPB is not adopting the $8 late fee safe harbor amount to all penalty fees or otherwise lower the safe harbor amounts of those fees. As discussed in more details in the section-by-section analysis of § 1026.52(b)(1)(ii)(A) and (B), this final

rule adjusts the safe harbor threshold amounts in § 1026.52(b)(1)(ii)(A) and (B) for penalty fees other than late fees imposed by Larger Card Issuers pursuant to the annual adjustment provisions in § 1026.52(b)(1)(ii)(D). The CFPB will monitor the market for any notable increases in the prevalence of other types of penalty fees, including over-the-limit fees.

*52(b)(1)(ii)(A) and (B)*

The CFPB did not include in its 2023 Proposal the annually adjusted amounts for 2023 (effective for the year 2024) for § 1026.52(b)(1)(ii)(A) and (B) pursuant to 5 1026.52(b)(1)(ii)(D). The APA does not require notice and opportunity for public comment if an agency finds that notice and public comment are impracticable, unnecessary, or contrary to the public interest.[190] Pursuant to this final rule, as discussed in more detail below, § 1026.52(b)(1)(ii)(A) and (B) and comment 52(b)(1)(ii)–2.i.J is added to update the threshold amounts. The amendments in this final rule adjusting the amounts in § 1026.52(b)(1)(ii)(A) and (B) are technical and non-discretionary, as they merely apply the method previously established in Regulation Z for determining adjustments to the thresholds. For these reasons, the CFPB has determined that publishing a notice of proposed rulemaking and providing opportunity for public comment are unnecessary. The amendments adjusting the amounts in § 1026.52(b)(1)(ii)(A) and (B), discussed in more detail below, are adopted in final form.

The Final Rule

Section 1026.52(b)(1)(ii)(D) provides that amounts in § 1026.52(b)(1)(ii)(A) and (B) will be re-calculated annually using the CPI that was in effect on the preceding June 1; the CFPB uses the Consumer Price Index for Urban Wage Earners and Clerical Workers (CPI–W) for this adjustment. If the cumulative change in the adjusted value derived from applying the annual CPI–W to the current amounts in § 1026.52(b)(1)(ii)(A) and (B) has risen by a whole dollar, those amounts will be increased by $1.00. Similarly, if the cumulative change in the adjusted value derived from applying the annual CPI–W level to the current amounts in § 1026.52(b)(1)(ii)(A) and (B) has decreased by a whole dollar, those amounts will be decreased by $1.00.[191]

The CFPB did not issue a final rule adjusting the amounts in § 1026.52(b)(1)(ii)(A) and (B) in 2022 for

[190] 5 U.S.C. 553(b)(B).
[191] *See* comment 52(b)(1)(ii)–2.

adjustments with an effective date of January 1, 2023. This adjustment analysis therefore considers both the percentage change from April 2021 to April 2022 and from April 2022 to April 2023 as reflected in the CPI–W index, which was reported by the Bureau of Labor Statistics on May 11, 2022, and May 10, 2023, respectively. The adjustment to the permissible fee thresholds of $32 for a first violation penalty fee and $43 for a subsequent violation being adopted in this final rule reflects an 8.9 percent increase in the CPI–W from April 2021 to April 2022 and a 4.6 percent increase in the CPI–W from April 2022 to April 2023. Accordingly, the CFPB is revising § 1026.52(b)(1)(ii)(A) and (B) to state that the fee imposed for violating the terms or other requirements of an account shall not exceed $32 and $43, respectively. The CFPB is also amending comment 52(b)(1)(ii)–2.i to preserve a list of the historical thresholds for this provision. This final rule also makes technical changes to cross references in the heading for and lead-in paragraph in comment 52(b)(1)(ii)–2 to conform to OFR style requirements.

*52(b)(1)(ii)(C)*

As noted above, the CFPB did not propose to lower the safe harbor amount of a late fee that card issuers may impose under the special rule in § 1026.52(b)(1)(ii)(C) when a charge card account becomes seriously delinquent. For the reasons discussed below, the CFPB is not finalizing any substantive changes to the special rule, but it is finalizing certain technical changes to the provision and its commentary.

The CFPB's Proposal

Under the special rule § 1026.52(b)(1)(ii)(C), a card issuer may impose a fee of 3 percent of the delinquent balance on a charge card account that requires payment of outstanding balances in full at the end of each billing cycle if the card issuer has not received the required payment for two or more consecutive billing cycles. This safe harbor provision, as discussed above, is intended to provide charge card issuers with more flexibility to charge higher late fees and thereby manage credit risk when an account becomes seriously delinquent, because charge card issuers do not apply an APR to the account balance and therefore cannot respond to serious delinquencies by increasing that rate, as other card issuers can. For clarity, the CFPB proposed to amend the special rule to provide that card issuers may impose a fee on a charge card account in those

circumstances notwithstanding the limitation on the amount of a late payment fee in proposed § 1026.52(b)(1)(ii). In addition, the CFPB proposed to amend comment 52(b)(1)(ii)–3, which provides illustrative examples of the application of § 1026.52(b)(1)(ii)(C). The 2023 Proposal would have amended these examples to use a $8 late fee amount, consistent with the proposed changes to the late fee safe harbor amount in proposed § 1026.52(b)(1)(ii). The 2023 Proposal also would have amended a cross reference contained in comment 52(b)(1)(ii)–3.iii so that it would correctly reference paragraph i.

Comments Received

The CFPB received one comment on its preliminary decision not to propose lowering the safe harbor amount of a late fee that card issuers may impose under the special rule in § 1026.52(b)(1)(ii)(C). In that comment, several consumer groups jointly urged the CFPB to revise the special rule to explicitly state that it is only applicable if there is no possibility of interest being charged on a balance for the account, given that the lack of interest rate applied to charge card balances is the rationale for the special rule. The commenters noted that there appear to be no traditional charge cards left on the market that do not charge interest at all. The commenters further noted their concern that without the suggested revision, issuers will start offering a "charge card balance" feature on credit cards in order to take advantage of the ability to impose late fees of three percent of the balance. The CFPB declines to adopt the recommended clarification because it is unnecessary. Section 1026.2(a)(15)(iii) defines a charge card as a credit card on an account for which not periodic rate (*i.e.,* interest) is used to compute a finance charge. Thus, a credit card that charges interest on balances is not a charge card by definition—and therefore does not qualify for the special rule in § 1026.52(b)(1)(ii)(C)—regardless of how the card issuer labels or markets that card.

The Final Rule

For the reasons discussed above and below, the CFPB is adopting as proposed revisions to the special rule § 1026.52(b)(1)(ii)(C) regarding the safe harbor amount that card issuers may impose when a charge card account becomes seriously delinquent. Accordingly, the CFPB has determined not to lower that particular late fee amount. Specifically, the revisions clarify that card issuers may impose a

fee on a seriously delinquent charge card account notwithstanding the limitation on the amount of a late payment fee in § 1026.52(b)(1)(ii). This clarification is necessary because, as discussed above, the CFPB is finalizing amendments to § 1026.52(b)(1)(ii) for Larger Card Issuers that repeal the current safe harbor threshold amounts in § 1026.52(b)(1)(ii)(A) and (B) as they apply to late fees charged by Larger Card Issuers and set a late fee safe harbor threshold amount of $8 for the first and subsequent violations for Larger Card Issuers. As noted in the proposal, charge card issuers do not apply an APR to the account balance and therefore cannot respond to serious delinquencies by increasing that rate, as other card issuers can. The CFPB determines that preserving the special rule's current safe harbor amounts is necessary and appropriate to provide charge card issuers with more flexibility to charge higher late fees and thereby manage credit risk resulting from seriously delinquent accounts.

The CFPB is also adopting amendments to comment 52(b)(1)(ii)–3, which provides illustrative examples of the application of § 1026.52(b)(1)(ii)(C), substantially as proposed. Specifically, an amendment to comment 52(b)(1)(ii)–3 clarifies that the card issuer in the examples is not a Smaller Card Issuer as defined in § 1026.52(b)(3). This final rule also amends the examples to use a $8 late fee amount, consistent with the changes to the late fee safe harbor amount in § 1026.52(b)(1)(ii). In addition, this final rule amends the cross reference in comment 52(b)(1)(ii)–3.iii so that it correctly references paragraph i. This final rule also makes a technical change to a cross reference in comment 52(b)(1)(ii)–3.ii to conform to OFR style requirements.

*52(b)(1)(ii)(D)*

Section 1026.52(b)(1)(ii)(D) provides that the dollar safe harbor amounts for penalty fees set forth in § 1026.52(b)(1)(ii)(A) and (B) will be adjusted annually by the CFPB to reflect the changes in the CPI. The Board included this provision in its Regulation Z, § 226.52(b)(1)(ii)(D) as part of its 2010 Final Rule where it determined that changes in the CPI, while not a perfect substitute, would be "sufficiently similar to changes in issuers' costs and the deterrent effect of the safe harbor amounts." [192] In reaching this determination, the Board rejected commentators' arguments that the Board should adjust the safe harbor amounts as appropriate through rulemaking

---

[192] 75 FR 37526 at 37543.

because the Board believed that this approach would be inefficient.[193]

The CFPB's Proposal

The CFPB proposed to no longer apply the annual adjustments to the safe harbor amount for late fees. The 2023 Proposal would have accomplished this by including the $8 proposed late fee safe harbor amount in the lead in text to § 1026.52(b)(1)(ii), instead of including it in § 1026.52(b)(1)(ii)(A) or (B). Thus, § 1026.52(b)(1)(ii)(D), which only applies the annual adjustments to the dollar safe harbor amounts in § 1026.52(b)(1)(ii)(A) and (B), would have no longer applied to the late fee safe harbor amount. The CFPB proposed one technical change to the cross reference to § 1026.52(b)(1)(ii)(A) and (B) used in § 1026.52(b)(1)(ii)(D) to conform to OFR style requirements. In addition, for clarity, the 2023 Proposal would have amended the lead-in paragraph in comment 52(b)(1)(ii)–2 to indicate that the annual adjustments in § 1026.52(b)(1)(ii)(D) do not apply to late fees. Under the proposal, § 1026.52(b)(1)(ii)(D) would have continued to apply to the dollar amount safe harbor amounts that apply to other penalty fees, such as over-the-limit fees, and returned-payment fees. With respect to the dollar amount of the late fee safe harbor, the CFPB would have then monitored the safe harbor amount for late fees for potential adjustments as necessary.

The CFPB noted that to reflect changes in the CPI, annual or otherwise, are not statutorily required. TILA section 149, however, does statutorily require that any late payment fee or any other penalty fee or charge, must be "reasonable and proportional" to such omission or violation. When the Board determined that the dollar safe harbor amounts for penalty fees should be subjected to annual adjustments, it did not expressly consider the effect such adjustments may have on the reasonableness and proportionality of the late payment fee (or any other penalty fee). The Board also did not provide any other data or evidence to support these adjustments as necessary. Instead, the Board summarily stated that annual adjustments would be "sufficiently similar to changes in issuers' costs and the deterrent effect of the safe harbor amounts"[194] and also considered efficiency, which is not statutorily required. The Board did not go into further details on why annual adjustments would be similar to changes in issuers' costs and the deterrent effect of the safe harbor amounts.

In the proposal, the CFPB analyzed relevant data from certain Larger Card Issuers that were not available to the Board to take into consideration the statutorily mandated reasonable and proportional standard by considering the costs incurred as a result of the violation in determining whether a fee amount is reasonable and proportional. The CFPB, based on these data, preliminarily determined that annual adjustments based on the CPI are not necessarily reflective of how the cost of late payment to issuers changes over time and, therefore, may not reflect the "reasonable and proportional" standard in the statute. The proposal stated that while Larger Card Issuers' costs do appear to be trending up, it does not appear that they are doing so lockstep with inflation particularly when considering the month-to-month changes in inflation versus costs. Additionally, there are factors outside of inflation that may impact when issuers' cost goes up and by how much. Figure 3 below shows monthly per-account collection costs in the Y–14 collection (for all consumer portfolios with positive costs that month, solid line) and the Consumer Price Index for all Urban Consumers (CPI–U) price index since 2013 (dashed). Given that the costs fluctuate more than the price level, the CFPB preliminarily determined that any overarching trend in costs is better dealt with through ad hoc adjustments when the safe harbor amounts are revisited.

**Figure 3:** Collection Cost and Price Index Trends (Y-14)



Thus, in the 2023 Proposal, the CFPB considered the cost incurred as a result of a late payment violation and preliminarily determined that the proposal was more aligned with Congress' intent for late fees to be reasonable and proportional than the current provision which requires the CFPB to adjust the safe harbor amounts to reflect changes in the CPI regardless of what the exact changes are, if any, in actual costs incurred by the card issuer.

As noted above, the Board also briefly considered deterrence and efficiency when making the determination to implement annual adjustments to reflect changes in the CPI. In the 2023 Proposal, the CFPB preliminarily determined that deterrence should not be the driving factor in whether the late fee safe harbor amount should be adjusted annually according to the CPI, nor should it outweigh considerations of issuers' costs. The CFPB noted while it

---

[193] Id.

[194] Id.

is possible for the deterrent effect of the safe harbor amount to be eroded year-to-year with inflation, there are three overriding considerations as to why that does not necessarily mean there should be annual adjustments to reflect changes in the CPI. First, the CFPB preliminarily determined that it does not intend to tightly peg the deterrent effect to a specific value and recognizes there may be a range of values under which the deterrent effect would be suitable. The CFPB preliminarily determined that the deterrence of the proposed safe harbor amount was sufficiently high so that the CFPB was not concerned by the lesser deterrence of a potentially eroded real value under realistic trajectories for medium-term inflation before any potential readjustment could be put in effect. Second, similar to the analysis of collection costs above, the CFPB preliminarily found that the deterrent effect does not move in lockstep with the CPI. Third, the CFPB preliminarily determined that the CFPB monitors the market so, under the proposal, the CFPB would have been able to adjust the safe harbor amount on an ad hoc basis based on this monitoring, at which point the CFPB would have again considered the deterrent effect when promulgating a new safe harbor amount. While TILA section 149 authorizes the CFPB to consider other factors that the CFPB deems necessary and appropriate in issuing rules to establish standards for assessing whether the amount of any penalty fee is reasonable and proportional, the CFPB preliminarily determined that consideration of costs incurred, and the deterrent effect, outweigh consideration of efficiency to help ensure that late fee amounts are reasonable and proportional.

The CFPB solicited comment on the proposal to eliminate the annual adjustments to reflect changes in the CPI for the late fee safe harbor amount, including data and evidence as to why the adjustment may or may not reflect the reasonable and proportional standard. The CFPB also sought comment on potential future monitoring or other approaches to ensure that the late fee amount is consistent with the reasonable and proportional standard. The CFPB also solicited comments on whether annual adjustments to reflect changes in the CPI should be eliminated for all other penalty fees subject to § 1026.52(b), including over-the-limit fees, returned-payment fees, and declined access check fees.

Comments Received

A few individual commenters, a credit union, and two financial regulatory advocacy groups expressed support for the CFPB's proposal to no longer apply the annual adjustments to the safe harbor amount for late fees. Both the regulatory advocacy groups along with one individual supported the CFPB's analysis that collection costs do not increase in lockstep with the cost of living. One of the regulatory advocacy groups did, however, urge the CFPB to consider that reducing the safe harbor amount to $8 and eliminating future annual adjustments for late fees could cause card issuers to reduce their minimum payment formula or maintain minimum payments at a lower amount than would otherwise be expected.

As discussed in more detail below, many banks and credit unions, a few industry trade associations, and a few individuals expressed concerns with the CFPB's proposal to no longer apply the annual adjustments to the safe harbor amount for late fees.

*Relationship to costs incurred by financial institutions.* Several banks and credit unions and industry trade associations, and a few individual commenters, expressed concerns that elimination of annual adjustments to reflect changes in the CPI for late fees would eventually cause card issuers' costs to outpace the safe harbor amount. One industry trade association explained that this in turn would effectively reduce the safe harbor amount over time and, as a few commenters indicated, "quickly" reduce the real value of the safe harbor amount to $0. A credit union and several industry trade associations specifically indicated that costs associated with collection (*e.g.,* wage and utility increases and postage costs) will rise due to inflation and if the safe harbor is not annually adjusted for inflation, then the safe harbor amount will no longer be reasonable and proportional to costs incurred by card issuers from consumers paying late.

A bank and two trade associations argued that if the late fee is no longer reasonable and proportional to costs due to the elimination of annual adjustments then card issuers would experience financial strain which could lead to increased consumer fees and reductions in customer service, technology, and access to credit for lower income consumers.

*Inflation adjustments used in other financial regulations.* A few banks and credit unions and several industry trade associations highlighted that annual inflation adjustments are commonly used in other financial regulations under the authority of the CFPB. For example, a few of the trade associations pointed out that the Federal Civil Penalties Inflation Adjustment Act of 1990 requires the CFPB to adjust for inflation the maximum amount of each civil penalty within the CFPB's jurisdiction. One trade association also specifically highlighted the CFPB's recent regulation implementing section 1071 of the Dodd-Frank Act contained an inflation adjustment, which will occur every five years, for the revenue threshold for covered small businesses.

*Monitoring for adjustments.* A few individual commenters and trade associations cautioned the CFPB against manually monitoring the market for adjustments as it would be time-consuming for the CFPB, burdensome for both the CFPB and the financial industry, create uncertainty, and provides little consolation for eliminating the annual adjustments.

*Alternative suggestions.* A bank and a few industry trade associations provided the CFPB with alternative suggestions to eliminating the annual adjustment. One bank commenter urged the CFPB to consider providing for an inflation adjustment that takes place every few years, instead of annually, similar to Regulation CC, 12 CFR part 229. A credit union trade association requested that the CFPB consider a required reevaluation of the safe harbor amounts every two years to determine whether an increase is appropriate. Finally, another industry trade association further urged, if the final rule included the elimination of the annual adjustment, that the CFPB consider clarifying how it would address adjustments and provide a date by which the annual adjustments would no longer be in effect, preferably two years after the implementation of the final rule.

*Specific data provided.* Two individuals and a law firm representing several card issuers provided the CFPB with specific data related to the CFPB's proposal to no longer apply the annual adjustments to the safe harbor amount for late fees. The law firm adjusted the proposed $8 to reflect the amount it would have been in 2010 and states that the late fee would be approximately $5.74 which is substantially less than what consumer groups were proposing to the Board in its 2010 rulemaking. One individual commenter provided the CFPB with a chart showing that the real value of the CFPB's $8 proposed late fee amount would be cut in half in 10 years at the current inflation rate. The other individual commenter indicated that holding the safe harbor steady would have resulted in the safe harbor declining by 15 percent in real terms since the beginning of 2020.

Two bank commenters and an industry trade association commenter

expressed concerns in response to the CFPB's solicitation of comments on whether the CFPB's proposal to no longer apply the annual adjustments to the safe harbor amount for late fees should apply to all other credit card penalty fees. One bank and one industry trade association were generally concerned that extending the proposal to other penalty fees was not adequately addressed or analyzed in the CFPB's 2023 Proposal and therefore should not be considered as a part of the final rule. Another bank commenter indicated that, just like late fees, the elimination of annual adjustments to reflect changes in the CPI should not apply to other credit card penalty fees because the cost of everything goes up with time.

The Final Rule

For reasons set forth herein, the CFPB is adopting the amendment as proposed for Larger Card Issuers as that term is used in this document (*i.e.*, card issuers except Smaller Card Issuers as defined in § 1026.52(b)(3)). The CFPB is effectuating this in this final rule by including the $8 late fee safe harbor amount in the lead in text to § 1026.52(b)(1)(ii), instead of including it in § 1026.52(b)(1)(ii)(A) or (B). With respect to Smaller Card Issuers, this final rule is adding § 1026.52(b)(1)(ii)(E) to provide that a Smaller Card Issuer, as defined in § 1026.52(b)(3), may impose a fee for a late payment on an account if the dollar amount of the fee does not exceed the amount in § 1026.52(b)(1)(ii)(A) or (B), as applicable, notwithstanding the limitation on the amount of a late payment fee in the lead-in text to § 1026.52(b)(1)(ii). The CFPB is retaining § 1026.52(b)(1)(ii)(D), with one technical change to the cross reference to § 1026.52(b)(1)(ii)(A) and (B) used in § 1026.52(b)(1)(ii)(D) to conform to OFR style requirements. As such, it still provides that the amounts in § 1026.52(b)(1)(ii)(A) and (B) will be adjusted annually by the CFPB to reflect changes in the CPI. Therefore, with regard to late fees, the amounts in § 1026.52(b)(1)(ii)(A) and (B), which are subject to the annual adjustments found in § 1026.52(b)(1)(ii)(D), apply only to Smaller Card Issuers. The CFPB is not adopting the proposed amendment to the lead-in paragraph in comment 52(b)(1)(ii)–2 to indicate that the annual adjustments in § 1026.52(b)(1)(ii)(D) do not apply to late fees because under this final rule annual adjustments in § 1026.52(b)(1)(ii)(D) are still applicable to late fees for Smaller Card Issuers.

In eliminating the annual adjustments for Larger Card Issuers, the CFPB is not persuaded by the commenters who expressed concerns that by doing so card issuer costs would outpace the safe harbor amount and late fees assessed at the safe harbor would not be reasonable and proportional to card issuers' costs. The CFPB understands that Larger Card Issuers' costs do not appear to be rising lockstep with inflation particularly when considering the month-to-month changes in inflation versus costs based on the Y–14 data. Figure 3 above, which was also provided in the 2023 Proposal, illustrates that monthly per-account collection costs in the Y–14 collection (for all consumer portfolios with positive costs that month) and the CPI–U price index since at least 2013 have not fluctuated at the same rate. The CFPB has also included Figure 4 below demonstrating that, like the CPI–U, monthly per-account collection costs in the Y–14 collection (for all consumer portfolios with positive costs that month) and the CPI–W price index since at least 2013 have not fluctuated at the same rate.[195] The CFPB is also not persuaded by commenters who suggested alternatives to the 2023 Proposal including that the CFPB adjust the safe harbor amounts in different increments of time such as every 2 or 5 years. The CFPB has determined that just like annual adjustments, issuers' costs do not trend up in lockstep with inflation even if the adjustments occurred in different increments of time.

[195] In the 2023 Proposal, the CFPB incorrectly compared monthly per-account collection costs in the Y–14 collection to the CPI–U price index. The CFPB adjust the amounts in § 1026.52(b)(1)(ii)(A) and (B) to the CPI–W not the CPI–U. However, the discrepancy does not impact the CFPB's overall analysis because, as shown in Figure 4, like Figure 3, the monthly per-account collection costs do not move in lockstep with the CPI–W price index.

**Figure 4:** Collection Cost and Price Index Trends (Y-14 and CPI-W)



The CFPB has further considered and determined that deterrence is not a driving factor in whether the late fee safe harbor amount should be annually adjusted according to the CPI, nor should it outweigh considerations of issuers' costs. The CFPB acknowledges that it is possible for the deterrent effect of the safe harbor amount to be eroded year-to-year with inflation. However, the CFPB has determined that (1) it does not intend to tightly peg the deterrent effect to a specific value and recognizes there may be a range of values under which the deterrent effect would be suitable; further, the deterrence of the $8 safe harbor amount is sufficiently high so that the CFPB is not concerned by the lesser deterrence of a potentially eroded real value under realistic trajectories for medium-term inflation before any potential readjustment could be put in effect; (2) the deterrent effect does not move in lockstep with the CPI; and (3) the CFPB monitors this market and will continue to do so in order to, among other things, consider the deterrent effect when promulgating a new safe harbor amount when making adjustments to the safe harbor amount on an ad hoc basis. The CFPB acknowledges commenters who highlighted that the CFPB adjusts for inflation in other regulations, but here, the CFPB is not statutorily required to make annual adjustments like it is in certain other statutes such as the Federal Civil Penalties Inflation

Adjustment Act of 1990 and the Fair Credit Reporting Act. Instead, when considering the appropriate safe harbor amount the CFPB is guided by certain statutory factors it has considered here such as costs to issuers and deterrence.

Given that the costs fluctuate more than the price level and any erosion in deterrence should not outweigh consideration of issuers' costs, that CFPB has determined that any overarching trend in costs and other factors that affect whether the late fee safe harbor amount is reasonable and proportional for Larger Card Issuers is better dealt with through ad hoc adjustments when the safe harbor amounts are revisited.

The CFPB also acknowledges commenters who provided concerns and specific data about the effect eliminating the annual adjustments could have on the real value of the safe harbor amount. For example, some industry commenters expressed concerns that the real value of the safe harbor amount would ''quickly'' be reduced to $0. A law firm representing several card issuers adjusted the $8 safe harbor to reflect the amount it would have been in 2010 which would have been approximately $5.74. An individual commenter showed that the $8 amount would be cut in half in 10 years at the current inflation rate. A different individual commenter indicated that holding the safe harbor steady would have resulted in the safe-

harbor cap declining by 15 percent in real terms since the beginning of 2020. Although the CFPB acknowledges the real value of the safe harbor could decline with time (1) it would not happen as quickly as commenters suggested; for example, it would have taken 53 years to erode a nominal $8 set over the summer of 1970 to $1 and (2) because erosion would not occur quickly, the CFPB maintains that monitoring the market for any such erosion and making ad hoc adjustments as needed is appropriate.

The CFPB further acknowledges comments that expressed concerns that manually monitoring the market and making ad hoc adjustments would be burdensome to the CFPB and card issuers. The CFPB is obligated to monitor[196] and report[197] on the credit card market and any ad hoc adjustments would necessarily be implemented in a way that provide notice to card issuers of any changes.

As discussed in more detail in part VI, the CFPB acknowledges commenters that expressed concerns surrounding the impact eliminating the annual adjustments may have on credit unions and small card issuers. Also as discussed in more detail in part VI, the CFPB is not amending § 1026.52(b) in this final rule to eliminate annual adjustments to the safe harbor threshold

[196] 12 U.S.C. 5512(c).
[197] 15 U.S.C. 1616(a).

amounts available to Smaller Card Issuers.

The CFPB received only a few responses to its request for comment on whether the elimination of the annual adjustments should be applied to all penalty fees covered by § 1026.52(b). The few commenters that did express concern highlighted that they were generally concerned extending the proposal to other penalty fees was not adequately addressed or analyzed in the CFPB's 2023 Proposal and that, just like late fees, the elimination of annual adjustments to reflect changes in the CPI should not apply to other credit card penalty fees because the cost of everything goes up with time. Although the CFPB rejects the broad notion that the cost of everything goes up with time, it has declined to adopt the elimination of the annual adjustments for all other credit card penalty fees covered by § 1026.52(b) because at this time the CFPB does not have the same in-depth data to base its decision as it does with late fees.

*52(b)(1)(ii)(E)*

As discussed in part VI, with respect to Smaller Card Issuers as defined in § 1026.52(b)(3), the CFPB is not adopting at this time the $8 late fee safe harbor threshold and the elimination of the higher late fee safe harbor amount for subsequent violations. In addition, as discussed in part VI and in the section-by-section analysis of § 1026.52(b)(1)(ii)(D), with respect to Smaller Card Issuers, the CFPB also is not adopting the proposed elimination of the annual adjustments for the late fee safe harbor threshold.

Accordingly, the CFPB is adopting a new § 1026.52(b)(1)(ii)(E) to implement those decisions. Specifically, § 1026.52(b)(1)(ii)(E) provides that a Smaller Card Issuer, as defined in § 1026.52(b)(3), may impose a fee for a late payment on an account if the dollar amount of the fee does not exceed the safe harbor amount in § 1026.52(b)(1)(ii)(A) or (B), as applicable, notwithstanding the $8 limitation on the amount of a late fee in the lead-in text to § 1026.52(b)(1)(ii). Thus, Smaller Card Issuers as defined in this final rule may continue imposing a late fee pursuant to the safe harbor in an amount that does not exceed the amount in § 1026.52(b)(1)(ii)(A) for a first violation or the amount in § 1026.52(b)(1)(ii)(B) for a late payment violation that occurs during the same billing cycle or one of the next six billing cycles. Further, because the penalty fee dollar amounts in § 1026.52(b)(1)(ii)(A) and (B) are adjusted annually to reflect changes in

the CPI as described in § 1026.52(b)(1)(ii)(D), late fees imposed by Smaller Card Issuers pursuant to § 1026.52(b)(1)(ii)(A) and (B) also will be adjusted annually. The CFPB determines that adopting these separate late fee safe harbor provisions for Smaller Card Issuers is necessary and appropriate for the reasons set forth in part VI.

The CFPB also is adopting a new comment 52(b)(1)(ii)–4 explaining the late fee safe harbor provision for Smaller Card Issuers in § 1026.52(b)(1)(ii)(E). The comment explains that pursuant to the provision, and assuming that the original historical safe harbor threshold amounts apply, a Smaller Card Issuer may impose a late fee of $25 for a first late payment violation under § 1026.52(b)(1)(ii)(A) and a late fee of $35 for a late payment violation that occurs during the same billing cycle or one of the next six billing cycles under § 1026.52(b)(1)(ii)(B), provided that those amounts are consistent with the prohibitions in § 1026.52(b)(2). The CFPB is adopting comment 52(b)(1)(ii)–4 to facilitate compliance.

*52(b)(2) Prohibited Fees*

As previously discussed, a card issuer must not impose a fee for violating the terms or other requirements of a credit card account under an open-end (not home-secured) consumer credit plan unless the dollar amount of the fee is consistent with § 1026.52(b)(1) and (2). Section 1026.52(b)(2) provides certain circumstances where fees are prohibited. Specifically, § 1026.52(b)(2) prohibits (1) fees that exceed the dollar amount associated with the violation; and (2) multiple fees based on a single event or transaction.

In the 2023 Proposal, the CFPB considered whether to require a courtesy period, which would have prohibited late fees imposed within 15 calendar days after each payment due date and be applicable only to late fees assessed if the card issuer uses the safe harbor or alternatively, applicable to all late fees generally (regardless of whether the card issuer assesses late fees pursuant to the safe harbor amount set forth in § 1026.52(b)(1)(ii) or the cost analysis provisions set forth in § 1026.52(b)(1)(i)). The CFPB had preliminary determined that it may be appropriate that the late fee amount essentially be $0 during the courtesy period because card issuers may not incur significant costs to collect late payments immediately after a late payment violation.

Further, the 2023 Proposal noted that given that the late payments may be caused by problems with unavoidable

processing delays, the implementation of a courtesy period also would be consistent with considerations of consumer conduct and deterrence, since, in these circumstances, the consumer attempted to pay timely. To the extent card issuers face increased cost from this 15-day courtesy period, the CFPB also noted that issuers have options that may not have been as readily available at the time of the Board's 2010 Final Rule to encourage timely payment, like sending notifications to consumers to warn them of payment due dates or facilitating automatic payment.

The CFPB solicited comments on whether § 1026.52(b)(2) should be amended to provide for a courtesy period which would prohibit late fees imposed within 15 calendar days after each payment due date. The CFPB additionally solicited comment on whether, if a 15-day courtesy period was required, the courtesy period should be applicable only to late fees assessed if the card issuer is using the late fee safe harbor amount (in which case § 1026.52(b)(1)(ii) would have been amended instead of § 1026.52(b)(2)) or alternatively, if the courtesy period should be applicable generally (regardless of whether the card issuer assesses late fees pursuant to the safe harbor amount set forth in § 1026.52(b)(1)(ii) or the cost analysis provisions set forth in § 1026.52(b)(1)(i)). The CFPB also solicited comment, as well as data, on whether a courtesy period of fewer or greater than 15 days may have been appropriate.

The CFPB noted that the alternative of applying a 15-day courtesy period only to use of the safe harbor late fee amount may have certain unintended effects on the possible late fee amounts assessed under the cost analysis provisions. To illustrate, using the Y–14 data, the CFPB estimated that a 15-day courtesy period tied to the proposed $8 safe harbor would cut the incidence of consumers charged the proposed $8 safe harbor amount by as much as half. This would have caused card issuers who use the proposed $8 safe harbor amount to recover as much as half of what they would have recovered if a 15-day courtesy period was not required. Card issuers who use the proposed $8 safe harbor amount, therefore, would have recovered an average of $4 in late fees per late payment. On the other hand, card issuers that opted to use the cost analysis provisions to assess late fees would not have been required to provide a 15-day courtesy period. This could have resulted in an outcome where card issuers who used the cost

analysis provisions to determine the late fee amount could charge a late fee that is less than the proposed $8 safe harbor amount, for example $6, but still, on average, collect more in total late fees than if they had charged the proposed $8 late fee amount. In this example, card issuers could have charged $6 on 100 percent of incidences, whereas if they had used the proposed $8 safe harbor amount, they could have only charged the proposed $8 on approximately half of the incidences. This could have led to a scenario where consumers who are subject to late fees determined by the cost analysis provisions may have been assessed a lower late fee amount than the proposed $8 late fee safe harbor amount but would have been charged a late fee more frequently than consumers who were subject to the late fee safe harbor amount.

The CFPB additionally solicited comments on whether a 15-day courtesy period should apply to the other penalty fees that are subject to § 1026.52(b), including over-the-limit fees and returned-payment fees, and if so, why it would be appropriate to apply a 15-day courtesy period to these other penalty fees. The proposal inquired, for example, should the CFPB provide consumers with (1) 15 calendar days after the billing cycle ends to bring the balance below the credit limit to avoid being charged an over-the-limit fee; and (2) 15 calendar days after each due date to make the required periodic payment to avoid a returned-payment fee if a payment has been returned. With respect to declined access checks, the CFPB solicited comment on whether a 15-day courtesy period is appropriate and if so, how should it be structured.

Comment Received

*Support for late fee courtesy period.* Many consumer groups in a joint letter, two credit union commenters, two individual commenters, and an industry trade association expressed support in response to the CFPB's solicitation of comments on whether § 1026.52(b)(2) should be amended to provide for a courtesy period which would prohibit late fees imposed within 15 calendar days after each payment due date. The consumer groups provided the CFPB with multiple reasons why it would support a 15-day courtesy period including it would prevent abuses that cause consumers from being trapped into incurring late fees, other payment obligations require a courtesy period before late fees can be imposed, and industry convention shows that, with regards to risk management, payments within 30 days of a due date should not be considered late. The consumer

groups urged the CFPB to apply a 15-day courtesy period to when card issuers use the safe harbor amount or the cost analysis provision. The consumer groups indicated that late fees imposed using the cost analysis provision are likely to be higher than the safe harbor amount and thus card issuers may be inclined to trigger late fees more frequently.

An individual commenter indicated that a courtesy period for payments would help consumers who mail in their payments to not be penalized for any payment that is late due to issues with mail delivery.

Two credit unions and a trade association highlighted that many credit unions and other card issuers currently offer consumers a courtesy period. The trade association specifically noted that courtesy periods more appropriately help consumers who may barely miss the minimum payment due date than a staggered late fee schedule. A credit union commenter specifically noted that a 15-day-or-less courtesy period was preferable to any additional notification requirements because notifications run the risk of confusing consumers.

*Opposition to late fee courtesy period.* Several banks and credit unions, several trade associations, and two individual commenters expressed opposition to the CFPB's solicitation for comments on whether § 1026.52(b)(2) should be amended to provide for a courtesy period which would prohibit late fees imposed within 15 calendar days after each payment due date.

Several banks and credit unions, an industry trade association, and an individual commenter indicated that a 15-day courtesy period was not necessary because card issuers are already required to provide consumers with a periodic statement at least 21 days prior to the payment due date disclosed on the statement which puts consumers on notice when the payment is due and gives consumers enough time to then timely make the required payment. Many of these commenters indicated that this 21-day timeframe is akin to a courtesy period.

Two industry trade associations indicated that a courtesy period would contradict, and thus could not be implemented by a card issuer, § 1026.5(b)(2)(ii)(A)'s requirement that periodic statement be mailed or delivered at least 21 days prior to the payment due date disclosed on the statement. The commenters noted that statutorily a card issuer is permitted to treat payments not received by the due date as late immediately so long as the consumer was sent a periodic statement at least 21 days before the payment is

due. The commenters believe that a courtesy period runs in contradiction to the ability to treat a payment late immediately.

A bank and a credit union indicated that available payment methods provided by card issuers aid and ensure consumers make timely payments.

Many banks and credit unions and industry trade associations, a law firm representing several card issuers, and a financial regulatory advocacy group expressed concerns about the potential negative impacts a 15-day courtesy period may have on consumers.

Many of these commenters indicated that a 15-day courtesy period would generally cause consumer confusion because there would now be a minimum payment due date and a date by which a late fee may be incurred. Many of these commenters further specified that consumers would be confused about when their payment was actually due or that consumers may be confused by what consequences are triggered by missing the minimum payment on the due date versus paying it within the 15-day courtesy period. For example, one credit union expressed concern that a consumer may not be aware that making a payment within the 15-day courtesy period but after the minimum payment due date could still negatively impact the consumer's credit score. An industry trade association indicated that consumers may not be aware that they could lose the grace period on purchases by not making a payment by the minimum payment due date but within the 15-day courtesy period.

Two trade associations and a financial regulatory advocacy group specifically expressed concerns about the potential confusion surrounding the principal payment and interest accrual. These commenters generally indicated that consumers may not be aware that their payment is actually due on the payment due date and not 15 days thereafter and that interest may continue to accrue between the due date and the end of the courtesy period. An industry trade association indicated it would be difficult to develop a disclosure that accurately informs consumers that the courtesy period applies to a late fee but other negative consequences, like interest accrual, would still occur even if the consumer paid within the 15-day period. A financial regulatory advocacy group also expressed concerns that disclosures would be more confusing because it would include both a minimum payment due date and a different date to avoid incurring a late fee.

Several of these industry commenters cautioned the CFPB that a 15-day

courtesy period would lessen the deterrence effect and negatively alter consumers' payment habits by encouraging late payments. However, a bank did indicate that there is little evidence proving that a courtesy period would alter consumer payment habits.

Several industry trade associations, two banks, and one financial regulatory advocacy group expressed concerns that a 15-day courtesy period would cause negative impacts for card issuers. Many of these commenters indicated that a 15-day courtesy period would generally increase delinquencies thereby decreasing card issuers' revenue and negatively impacting card issuers' costs. These commenters collectively noted that an impact on card issuers' cost could raise significant safety and soundness risks; impact card issuers' cash flow and thus affect their liquidity and financial management; impact a card issuers' ability to absorb losses associated with riskier accounts; and cause card issuers to spend more on monitoring and managing delinquent accounts. The financial regulatory advocacy group also noted that it believed the safe harbor amount would need to be as much as double the proposed $8 in order for card issuers to recover their collection costs. A credit union trade association cautioned the CFPB that card issuers may compensate for reduced revenue by raising interest rates or other fees associated with their credit card products. This trade association warned that due to increases in interest rates cardholders may face higher borrowing costs and credit unions may be less competitive in the market.

A few industry trade associations additionally expressed concerns that a 15-day courtesy period would create a substantial credit risk to card issuers. One of the industry trade associations specifically noted that a courtesy period would make underwriting more difficult because card issuers would have to evaluate whether a cardholder is likely to take advantage of a courtesy period. This commenter indicated that this would cause card issuers to take a more conservative approach to ensure they are not exposed to undue financial risk.

An individual commenter and an industry trade association indicated that courtesy periods provided for mortgage payments are not an applicable comparison to courtesy periods for credit card payments. The individual commenter indicated that for mortgage payments the monthly statement does not provide as much advance notice as is required for credit cards. Further, this individual commenter expressed concern about the comparison between

mortgages and credit cards because the risks in mortgage transactions are different in that the mortgages have collateral to offset losses whereas credit cards are unsecured credit. Similarly, the trade association indicated that the CFPB did not adequately explain why mortgages, which are a form of secured lending, are compared to credit cards, a form of unsecured lending.

A few trade associations and one law firm representing several card issuers expressed concerns that the CFPB does not have the authority under TILA to implement a courtesy period. One of these industry trade associations specifically indicated that the CARD Act authorizes the CFPB to regulate only the amount of penalty fees in connection with a violation of a cardholder agreement and not when a violation of such an agreement occurs. The law firm described above specifically expressed concerns that a 15-day courtesy period would redefine when an issuer can consider a payment to be late and this would run contrary to congressional intent and would eliminate limitations created by other statutory provisions.

Several industry trade associations expressed concerns that the proposal lacked data or an overall explanation when the CFPB sought comments on whether § 1026.52(b)(2) should be amended to provide for a courtesy period which would prohibit late fees imposed within 15 calendar days after each payment due date. The trade association indicated that the CFPB did not provide quantification of consumer benefits or harm for the 15-day courtesy period or a courtesy period of any other length. One of the industry trade association commenters indicated that the CFPB, absent a new proposed rule with more specificity, could not implement the 15-day courtesy period because it was not detailed or formally proposed. Another of the trade association commenter indicated that the 15-day courtesy period did not include research specifically on any unintended negative consequences on consumers and credit access.

*Alternative suggestions to late fee courtesy period.* Many consumer groups in a joint letter, one bank and one credit union, and an individual commenter provided the CFPB with alternative suggestions to a 15-day courtesy period. The individual commenter suggested that if a courtesy period was provided than the card issuer should be able to back-date the late fee to the original due date if the payment was not made by the end of the courtesy period. Alternatively, the individual commenter suggested that the card issuer could charge the late fee if the payment was

not made by the due date; however, if the payment was made by the end of the courtesy period, then the fee could be automatically reversed on the next statement. The credit union suggested that a 15-day courtesy period in conjunction with maintaining the safe harbor fee at $30 would provide sufficient guardrails for card issuers who may be abusing late payment fees for profit. The bank indicated that there was not enough statistical evidence to support a 15-day courtesy period and that a 10-day courtesy period may be more reasonable as it aligns with other industries, such as mortgages and other consumer products.

*Specific data provided on late fee courtesy periods.* Many credit unions provided the CFPB with the number of days they currently offer consumers as a courtesy period. The number of days ranged from 4 days to 25 days.

*Courtesy period for penalty fees generally.* Many consumer groups in a joint letter expressed support in response to the CFPB's solicitation of comments on whether § 1026.52(b)(2) should be amended to provide for a courtesy period for all penalty fees. The consumer groups specifically expressed concerns that card issuers will engage in tactics that generate more of these credit card penalty fees.

One bank and one industry trade association indicated they would not be supportive of extending the 15-day courtesy period to all other credit card penalty fees. These two commenters were generally concerned that extending the proposal to other penalty fees was not adequately addressed or analyzed in the CFPB's proposal and therefore should not be considered as a part of the final rule.

The Final Rule

For the reasons stated below, the CFPB has determined it will not be implementing any courtesy period for late fees or other penalty fees at this time. In doing so, the CFPB acknowledges commenters who expressed concerns about the impact a 15-day courtesy period may have on consumers and issuers' costs. Specifically, commenters expressed concerns that a courtesy period would raise issuers' costs and create a substantial credit risk to card issuers including by making underwriting more difficult. Commenters also raised concerns that a courtesy period could cause consumer confusion about when a payment was actually due or that consumers may be confused by what consequences are triggered by missing the minimum payment on the due date versus paying it within the 15-day

courtesy period (*e.g.*, when interest starts accumulating). The CFPB has determined that, absent additional evidence, the potential impacts to card issuers' costs and consumers outweigh the benefits of a mandatory 15-day courtesy period. In addition to the concerns highlighted by commenters, the CFPB previously noted in the 2023 Proposal that a 15-day courtesy period could cut the incidence of consumers charged the proposed $8 safe harbor amount by as much as half and, therefore, card issuers who use the safe harbor amount would have recovered an average of $4 in late fees per late payment. While the CFPB acknowledges the possible benefits raised by commenters, such as helping consumers who mail in their late payments avoid a penalty fee for any mail delivery issues, the potential for card issuers to recoup costs at half the safe harbor amount per late payment combined with other concerns about consumer confusion outweighs the possible benefits to consumers. Additionally, the CFPB understands that consumers who wish to have a courtesy period have that option available to them as some card issuers, primarily credit unions, currently offer courtesy periods for late payments. Based on comments received, the CFPB further acknowledges that some credit unions may offer courtesy periods that are more than 15 days.

In recognizing the availability of courtesy periods, the CFPB acknowledges commenters who discussed the interaction between a courtesy period and § 1026.5(b)(2)(ii)(A)'s requirement that a periodic statement be mailed or delivered at least 21 days prior to the payment due date disclosed on the statement. Specifically, many commenters believed that the 21-day notification of a payment due date was akin to providing a courtesy period. Other commenters noted that comparing courtesy periods for credit cards and mortgages was not an accurate comparison because the 21-day periodic statement provides a longer advance notice, and the risks are different. However, the CFPB notes that the requirement to provide a periodic statement at least 21 days prior to the payment due date is not the same as a courtesy period. Further, although the CFPB is not implementing a 15-day courtesy period, it does reject the notion that it does not have the authority to do so.

The CFPB also acknowledges commenters who provided alternative suggestions including (1) allowing card issuers to back-date late fees to the original due date if the payment was not made by the end of the courtesy period, (2) allowing card issuers to charge the late fee if the payment was not made by the due date but requiring a reversal of the charge if the payment was made within the courtesy period, (3) providing a courtesy period but maintaining a $30 safe harbor amount, and (4) providing for a 10-day courtesy period and not a 15-day period. The CFPB declines to adopt any of the alternative suggestions for the same reasons it is declining to adopt the courtesy period that the CFPB put forth in the 2023 Proposal. Absent additional evidence, the potential impacts to consumers and card issuers' costs outweigh the benefits at this time.

### *52(b)(2)(i) Fees That Exceed Dollar Amount Associated With Violation*

Section 1026.52(b)(2)(i)(A) provides that a card issuer must not impose a fee for violating the terms or other requirements of a credit card account under an open-end (not home-secured) consumer credit plan that exceeds the dollar amount associated with the violation. For late fees, accompanying comment 52(b)(2)(i)–1 provides that the dollar amount associated with a late payment is the full amount of the required minimum periodic payment due immediately prior to assessment of the late payment. Thus, § 1026.52(b)(2)(i)(A) prohibits a card issuer from imposing a late payment fee that exceeds the full amount of the required minimum periodic payment.

In implementing TILA section 149, the Board noted that the prohibition of fees based on violations of the terms or other requirements of an account that exceed the dollar amount associated with the violation as set forth in its Regulation Z, § 226.52(b)(2)(i)(A) would be consistent with Congress' intent to prohibit penalty fees that are not reasonable and proportional to the violation.[198] The Board in its reasoning addressed issuers' concerns that when the dollar amount associated with a violation is small, § 226.52(b)(2)(i)(A) could limit the penalty fee to an amount that is neither sufficient to cover the issuer's costs nor to deter future violations.[199] The Board explained that while it is possible that an issuer could incur costs as a result of a violation that exceed the dollar amount associated with that violation, this would not be the case for most violations.[200] Additionally, the Board noted that if card issuers could not recover all of their costs when a violation involves a small dollar amount, prohibiting late fees that exceed the full amount of the required minimum periodic payment would encourage them either to undertake efforts to reduce the costs incurred as a result of violations that involve small dollar amounts or to build those costs into upfront rates, which would result in greater transparency for consumers regarding the cost of using their credit card accounts.[201] Furthermore, the Board considered the deterrent effect and believed that violations involving small dollar amounts are more likely to be inadvertent and therefore the need for deterrence is less pronounced.[202]

The Board also considered whether compliance with its Regulation Z, § 226.52(b)(2)(i)(A) would be burdensome on card issuers and concluded that it would not be overly burdensome.[203] The Board explained that, although card issuers may incur substantial costs at the outset, because § 226.52(b)(2)(i)(A) required a mathematical determination, issuers should generally be able to program their systems to perform the determination automatically.[204]

When implementing comment 52(b)(2)(i)–1, the Board clarified that the dollar amount associated with a late payment is the full amount of the required minimum periodic payment due immediately prior to the assessment of the late payment. Industry commenters had argued that the dollar amount associated with a late payment should be the outstanding balance on the account because that is the amount the issuer stands to lose if the delinquency continues and the account eventually becomes a loss.[205] However, the Board explained that relatively few delinquencies result in losses, and the violation giving rise to a late payment fee is the consumer's failure to make the required minimum periodic payment by the payment due date.

### The CFPB's Proposal

The CFPB proposed to amend § 1026.52(b)(2)(i)(A) to limit the dollar amount associated with a late payment to 25 percent of the required minimum periodic payment due immediately prior to assessment of the late payment. The CFPB also proposed to revise comment 52(b)(2)(i)–1 in the following two ways: (1) to clarify that the required minimum periodic payment due immediately prior to assessment of the

---

[198] 75 FR 37526 at 37544.
[199] *Id.* at 37545.
[200] *Id.*

[201] *Id.*
[202] *Id.*
[203] *Id.*
[204] *Id.*
[205] *Id.*

late payment is the amount that the consumer is required to pay to avoid the late payment fee, including as applicable any missed payments and fees assessed from prior billing cycles; and (2) to revise several examples consistent with the proposed 25 percent limitation.

Like the Board's reasoning in the 2010 Final Rule, the proposal intended to ensure that late fees are reasonable and proportional, even late fees that are imposed when consumers are late in paying small minimum payments. However, the CFPB preliminarily determined that restricting the late fee to 25 percent of the minimum payment is more consistent with Congress' intent to prohibit penalty fees that are not reasonable and proportional to the violation than the current rule that allows for a card issuer to potentially charge a late fee that is 100 percent of the minimum payment.

For example, the proposal stated that when considering collection costs incurred by card issuers, it is likely that allowing a late fee that is 100 percent of the minimum payment is not reasonable and proportional to such costs. Generally, most card issuers do not incur collection costs that are 100 percent of the amount they are trying to collect. The CFPB preliminarily determined that lowering the limitation on late fees to 25 percent of the minimum payment due would still likely allow card issuers to cover

contingency fees paid to third-party agencies for collecting the amount of the minimum payment prior to account charge-off. The CFPB understood, based on information obtained through orders pursuant to section 1022(c)(4) of the CFPA for purposes of compiling the CFPB's periodic CARD Act reports to Congress, that card issuers that contract with third-party agencies for pre-charge-off collections pay a contingency fee that is a percentage of the amount collected, which may include an amount (if collected) exceeding the minimum payment. These contingency fees can range from 9.5 percent to 23 percent, further supporting that the proposed 25 percent of minimum payment due is more reasonable and proportional than permitting 100 percent of the minimum payment.[206] It appears that the Board did not consider or have access to such figures when it limited the dollar amount associated with a late payment to 100 percent of the required minimum periodic payment. With these additional data, the CFPB proposed a limitation on late fees that it preliminarily determined would be more reasonable and proportional than what was set forth in the Board's 2010 Final Rule.

The CFPB recognized that the proposed 25 percent limitation would most likely impact the amount of the late fee a card issuer can charge when (1) the minimum payment is small, and (2) the card issuer is using the cost

analysis provisions in § 1026.52(b)(1)(i) generally to set the late fee amount. Based on the distribution of minimum payments in the Y–14 data, the CFPB estimated that this may occur infrequently. Y–14 data from October 2021 to September 2022 show that for those months in which an account was late, only 12.7 percent of accounts had a minimum payment of $40 or less. Additionally for those months in which an account was late, at least 48.5 percent of accounts had a minimum payment above $100. If a card issuer had used the proposed late fee safe harbor of $8, however, the instances where 25 percent of the minimum payment may be less than the proposed $8 safe harbor appeared to have been even less frequent. For instance, based on the distribution of minimum payments due in the Y–14 on a monthly basis from October 2021 to September 2022, if card issuers could have only charged up to 25 percent of the minimum payment, only 7.7 percent of accounts would have been charged a late fee of less than $8. Figure 5 below, which was proposed in the 2023 Proposal, plots the cumulative distribution function [207] of total payments due in the range of $1 to $100 in the account-level Y–14 data, for all months that payments were late between October 2021 and September 2022.

**Figure 5:** Distribution of Minimum Payments on Late Accounts (Y-14)



Additionally, when the dollar amount associated with the late payment is

small, the CFPB recognized that the proposal could have had the potential to

limit the late fee to an amount that is insufficient to cover a card issuer's costs

---

[206] 2021 Report, at 137.

[207] The values plotted vertically are the shares of account-months that paid late with minimum

payments at or below the integer dollar amounts shown on the horizontal axis.

in collecting the late payment. However, permitting a late fee that is 100 percent of the minimum payment did not appear to be reasonable and proportional to the consumer's conduct of paying late when the minimum payment is small. For instance, the proposal stated that in situations where the dollar amount associated with the late payment is small and the card issuer is permitted to charge a late fee that is 100 percent of the minimum payment then a consumer is essentially required to pay double the amount of a missed payment in the next billing cycle in addition to the minimum payment due for that next billing cycle. The CFPB preliminarily determined that this result would have been neither reasonable nor proportional to the consumer's conduct in paying late.

Furthermore, as the Board noted in its 2010 Final Rule and which the CFPB preliminarily determined was still relevant in the 2023 Proposal, to the extent card issuers cannot recover all of their costs through a late fee when a late payment involves a small dollar amount, the proposed limitation would have likely encouraged card issuers to undertake efforts to either reduce costs incurred as a result of violations that involve small dollar amounts or to build those costs into upfront rates, which had the additional benefit of resulting in greater transparency for consumers regarding the cost of using credit card accounts. Finally, in the 2023 Proposal, the CFPB preliminarily determined that the Board's explanation that compliance would not be overly burdensome also remained applicable to the CFPB's proposal. The proposal would have similarly required a mathematical determination that issuers should generally be able to program their systems to perform automatically.

In addition, as discussed above, the CFPB proposed to revise comment 52(b)(2)(i)–1 to clarify that the required minimum periodic payment due immediately prior to assessment of the late payment is the amount that the consumer is required to pay to avoid the late payment fee, including as applicable any missed payments and fees assessed from prior billing cycles. The CFPB understood that card issuers report two payment amounts when responding to Y–14 collection efforts, a minimum payment calculated just for that billing cycle and the total amount that is required to be paid that billing cycle which includes missed payment amounts or fees assessed. The CFPB proposed this revision to comment 52(b)(2)(i)–1 to address any potential confusion about the payment amount to

which the proposed 25 percent limitation would apply.

The CFPB solicited comment on the proposed 25 percent limitation discussed above. The CFPB also solicited comment on whether the dollar amount associated with the other penalty fees covered by § 1026.52(b) should be limited to 25 percent of the dollar amount associated with the violation. The proposal inquired, for example, (1) should over-the-limit fees be limited to 25 percent of the amount of credit extended by the card issuer in excess of the credit limit during the billing cycle in which the over-the-limit fee is imposed;[208] (2) should the returned-payment fee be limited to 25 percent of the amount of the required minimum periodic payment due immediately prior to the date on which the payment is returned to the card issuer;[209] and (3) should the declined access check fee be limited to 25 percent of the amount of the check.[210]

*Comments Received*

*Support for 25 percent restriction.* Many individual commenters and many consumer groups expressed support for the CFPB's proposal to limit the dollar amount associated with a late payment to 25 percent of the required minimum periodic payment due immediately prior to assessment of the late payment. Many consumer groups and an individual commenter highlighted that, in particular, this proposal would prevent excessive late fees on small remaining balances. The consumer groups also commented that card issuers may raise minimum payments due as a result of the 25 percent limitation, but expressed to the CFPB that this would be a positive outcome because current minimum payments due result in long repayment periods and higher finance charges for consumers who only pay the minimum each billing cycle.

*Opposition to 25 percent restriction.* As discussed below, many industry commenters, and a few individuals, urged the CFPB to reconsider implementing the proposal to limit the dollar amount associated with a late payment to 25 percent of the required minimum periodic payment due immediately prior to assessment of the late payment.

Several trade associations, a few banks and credit unions, and an individual commenter urged the CFPB to consider the impact the 25 percent limitation would have on card issuers' costs. Commenters expressed concerns that the 25 percent limitation would be an impediment to card issuers' ability to cover current or future increased costs associated with late payments. Two commenters specifically highlighted that many costs associated with a late payment are fixed and do not depend on the minimum payment due. A few of the trade associations urged the CFPB to consider the upfront costs card issuers could incur due to a change in the minimum payment requirement, namely that applications, solicitations, and initial disclosures would need to be amended along with the issuance of a change in terms notice to reflect the new minimum payment calculation. Another trade association reported that one of its credit union members indicated that for certain balances, its current minimum payment due is $40 so with the 25 percent limitation the late fee would be $10 which would not cover its costs (and it would be $2 higher than the proposed safe harbor amount). One bank highlighted that the CFPB indicated 7.7 percent of accounts would have been charged a late fee of less than $8 if card issuers could only charge up to 25 percent between October 2021 to September 2022. This commenter indicated that the CFPB failed to explain why $8 would be a reasonable estimate of costs incurred if nearly 8 percent of late payment incidents would be subject to a fee lower than the proposed safe harbor due to the 25 percent limitation.

A law firm representing several card issuers, an individual commenter, and two trade associations expressed concerns that the 25 percent limitation would lead to a late fee amount that is not reasonable or proportional to a cardholder's omission or violation or otherwise did not properly consider the factors the CFPB is guided by when considering the appropriate safe harbor amount.[211] One industry trade association and the law firm described above broadly indicated the CFPB did not acknowledge any of the guiding factors. A few banks and one industry trade association indicated that the CFPB did not consider the deterrent

---

[208] *See* comment 52(b)(2)(i)–3 for an explanation of the dollar amount associated with an over-the-limit violation.

[209] *See* comment 52(b)(2)(i)–2 for an explanation of the dollar amount associated with a returned-payment violation.

[210] *See* comment 52(b)(2)(i)–4 for an explanation of the dollar amount associated with a declined access check violation.

[211] In considering the appropriate safe harbor threshold amount, the CFPB is guided by factors including (1) the cost incurred by the creditor from an omission or violation; (2) the deterrence of omissions or violations by the cardholder; (3) the conduct of the cardholder; and (4) such other factors deemed necessary or appropriate. CARD Act section 102, 123 Stat. 1740 (15 U.S.C. 1665d(c)).

effect in the 25 percent limitation proposal and a research group further indicated that the deterrent effect was not considered for a safe harbor amount below $8, to the extent that is a possibility due to the 25 percent limitation. One industry trade group and the law firm described above also indicated that the CFPB did not provide the underlying raw data it relied on, and therefore, they could not be sure that the analysis undertaken with respect to the 25 percent limitation set forth in the 2023 Proposal was accurate. An individual commenter indicated that the CFPB disregarded the legal meanings of "reasonable and proportional" and that it would be reasonable for card issuers to impose late fees that are up to the full amount of the payment past due using the same methodology as certain State laws on returned payments.

One credit union indicated that the CFPB inaccurately based the 25 percent limitation on the cost of collecting delinquent accounts pre-charge-off. The commenter expressed concerns with this analysis because accounts assessed late fees pose a higher risk of delinquency and thus charge-off. The commenter noted that all costs incurred on credit unions' credit card products are also incurred by all members and, therefore, all costs should be included in the analysis.

Several banks and credit unions and many trade associations cautioned the CFPB that the 25 percent limitation could potentially cause negative consequences for consumers. One credit union and several trade associations indicated that the 25 percent limitation would cause card issuers to raise their minimum payment requirements in order to charge a higher late fee. Industry commenters and trade associations highlighted various potential consequences that could result from card issuers increasing their minimum payment requirements including an increase in delinquencies and defaults; damage to consumers' credit scores; higher rates for credit cards; decrease in credit availability, and an increase in consumers' future borrowing costs.

Many trade associations also raised concerns that any potential effect that the 25 percent limitation may have on raising card issuers' costs, from upfront costs like additional computer programming needs to the late fee not covering issuers' costs, could cause card issuers to take actions that may have a negative effect on consumers. For example, these commenters asserted that card issuers may raise other fees associated with their credit card products, raise rates, be unable to issue

credit cards, or be unable to provide credit access to as many consumers.

One credit union trade association also cautioned the CFPB that the 25 percent limitation may cause consumers to be less likely to try to avoid late fees by communicating with credit unions that they are experiencing financial difficulties which would ultimately cost both the consumer and the credit union.

*Alternative suggestions to 25 percent restriction.* Many consumer groups in a joint letter, an individual commenter, and a bank provided the CFPB with alternative suggestions to the CFPB's 25 percent limitation proposal. The consumer groups urged the CFPB to consider alternatively limiting the late fee to 25 percent of the minimum payment remaining. Therefore, if a consumer had made a partial payment of the minimum payment due, the late fee would be limited to 25 percent of the remaining minimum amount due and not 25 percent of the total minimum payment.

The individual commenter suggested that a card issuer should be permitted to charge a late fee that is 3 percent of the total underlying debt, similar to § 1026.52(b)(1)(ii)(C). The individual commenter indicated that a card issuer who permits a consumer to pay the underlying debt off over time is taking on a higher credit risk than card issuers that require payments in full. Therefore, all card issuers, at a minimum, should be able to charge 3 percent of the total underlying debt. Similarly, a bank suggested the CFPB tie the late fee to the underlying balance rather than the minimum payment.

*Specific data provided on 25 percent restriction.* Many individual commenters on behalf of a credit union, a few industry trade associations, and a few bank and credit union commenters provided the CFPB with specific data as it relates to the CFPB's proposal to limit the dollar amount associated with a late payment to 25 percent of the required minimum periodic payment due immediately prior to assessment of the late payment.

An industry trade association and many individual commenters on behalf of a credit union indicated that the credit union's late fee of $25 would effectively be reduced to $6.25 under the proposal. The individual commenters also indicated that the CFPB's proposal would require the card issuer to elect the lesser of the proposed $8 safe harbor amount or 25 percent of the missed payment.

One credit union indicated that according to estimates, the 25 percent limitation would result in an average late fee amount of $4.61, which is a 62

percent decrease compared to the credit union's average late fee of $12.13. A bank commenter indicated that more than 53 percent of its accounts have a minimum payment less than $32 and two-thirds of its accounts have a minimum payment below $50.

A few trade associations indicated that one bank reported that 40 percent of its required minimum payments for consumer credit card accounts are under $32. These trade associations also indicated that a small card issuer reported to the trade associations that it estimated 53 percent of its accounts and 29.1 percent of balances have minimum payments under $32.

*Application of 25 percent restriction to all penalty fees.* Many consumer groups in a joint letter expressed support in response to the CFPB's solicitation of comments on whether the CFPB's proposal to limit the dollar amount associated with a late payment to 25 percent of the required minimum periodic payment due immediately prior to assessment of the late payment should extend to all other credit card penalty fees. The consumer groups specifically expressed concerns that card issuers otherwise will begin to engage in tactics to increase the amount of other credit card penalty fees.

One bank and one industry trade association indicated they would not be supportive of extending the 25 percent limitation to all other credit card penalty fees. These two commenters were generally concerned that extending the proposal to other penalty fees was not adequately addressed or analyzed in the CFPB's proposal and therefore should not be considered as a part of the final rule.

The Final Rule

For the reasons stated herein, the CFPB is not adopting, for either Larger Card Issuers or Smaller Card Issuers, the proposed amendment to § 1026.52(b)(2)(i)(A) to limit the dollar amount associated with a late payment to 25 percent of the required minimum periodic payment due immediately prior to assessment of the late payment. Therefore, the CFPB is also not adopting the proposed revision to comment 52(b)(2)(i)–1.[212] In doing so, the CFPB acknowledges comments highlighting the impact a 25 percent limitation may have on issuers' costs. Many commenters specifically noted the impact the 25 percent limitation may have on credit unions and small card

---

[212] This final rule makes technical changes to cross references in comments 52(b)(2)(i)–1.ii, 52(b)(2)(i)–2.ii and iii, and 52(b)(2)(i)–3.ii to conform to OFR style requirements.

issuers. The commenters expressed concerns that credit unions and small card issuers tend to have higher pre-charge-off collection costs and a lower minimum payment. It was also noted that restrictions on Federal credit unions on charging higher interest rates may further impact their potential to recoup their pre-charge-off collections costs they cannot collect through late fees because of the 25 percent limitation. Commenters additionally expressed concerns that not only would the 25 percent limitation prevent card issuers from covering pre-charge-off collection costs related to a late payment but there would also be upfront costs incurred. For example, for card issuers that choose to adjust its minimum payments due, a notice of change in terms would need to be issued.

The CFPB recognizes that some of the concerns discussed above could be addressed by only applying the 25 percent restriction to Larger Card Issuers. Nonetheless, the CFPB has determined that even with respect to Larger Card Issuers, the benefits the 25 percent limitation may have for consumers, such as requiring a more reasonable and proportional late fee for instances where the minimum payment due is small, do not outweigh considerations of card issuers' ability to recoup their pre-charge-off collection costs when they are using the $8 safe harbor threshold. In addition to considering the comments noted above, the CFPB also acknowledges the specific data provided by commenters demonstrating potential late fee amounts based on current minimum payments due. Commenters here highlighted that some card issuers have a large percentage of their accounts with a minimum payment of less than $32. For these cases, the 25 percent limitation would be especially impactful because, as reported in comments, 40 to 53 percent of accounts would have charges under the $8 safe harbor. The CFPB is concerned that when a card issuer cannot charge a significant number of their accounts the $8 safe harbor amount, card issuers' pre-charge-off collection costs may not be covered.

The CFPB also acknowledges commenters who highlighted the potential for card issuers to raise its minimum payments due in response to the 25 percent limitation and the impacts this may have on consumers. These comments noted that in order to combat lower late payment fees that the 25 percent limitation may impose, card issuers might raise minimum payments due. Conversely, other commenters explained that card issuers raising

minimum payments would be a positive for consumers because, according to these commenters, current minimum payments due result in long repayment periods and higher finance charges.

In weighing these considerations, the CFPB has determined not to adopt the 25 percent limitation proposal in order to minimize impacts to minimum balances due. While the CFPB agrees with commenters that raising minimum payments due could be a positive for some consumers, the potential negative impacts of higher minimum payments on consumers, like an increase in delinquencies and defaults in particular for consumers with limited cash flow, do not outweigh any benefits higher minimum payments due may have for consumers.

The CFPB also acknowledges alternative suggestions provided by commenters such as limiting the late fee to 25 percent of the minimum payment remaining or permitting a late fee that is 3 percent of the total underlying debt. The CFPB declines to adopt alternatives suggested for the same reasons the CFPB is not adopting the proposed 25 percent limitation. That is to say, the CFPB has determined that the potential impacts on card issuers' ability to recoup pre-charge-off collection costs does not outweigh the benefits to consumers, and the CFPB is concerned about the impact the 25 percent restriction may have on minimum payments due.

As discussed above, the CFPB received only a few responses to its request for comment on whether the 25 percent limitation should be applied to all penalty fees covered by § 1026.52(b). The CFPB has determined that, like the 25 percent limitation for late payments, the benefits to consumers do not outweigh the impact on card issuers' costs. Additionally, with respect to consumer groups' concern that card issuers will begin to engage in tactics to increase the number of those penalty fees if the CFPB lowers the safe harbor late fee amounts, the CFPB notes that this is less likely because it has not adopted the 25 percent limitation for late fees. As such, a 25 percent limitation for all other credit card penalty fees will not be implemented. In doing so, the CFPB rejects the notion raised by industry commenters that the CFPB could not have adopted the 25 percent limitation with respect to these other penalty fees in this final rule because it did not establish a sufficient factual or legal analysis with respect to these penalty fees.

## 52(b)(2)(ii) Multiple Fees Based on a Single Event or Transaction

Section 1026.52(b)(2)(ii) prohibits card issuers from imposing multiple penalty fees based on a single event or transaction.

### The CFPB's Proposal

The CFPB did not propose to amend the text of § 1026.52(b)(2)(ii). However, the CFPB proposed to revise comment 52(b)(2)(ii)–1 to clarify several examples illustrating this requirement. Specifically, the 2023 Proposal would have amended several examples in comment 52(b)(2)(ii)–1 to reflect a late fee amount of $8, consistent with the proposed amendments to § 1026.52(b)(1)(ii), and to make minor technical changes for consistency with the proposal.

### Comments Received and the Final Rule

The CFPB received no comments on the proposed revisions to comment 52(b)(2)(ii)–1. This final rule adopts comment 52(b)(2)(ii)–1 as proposed with several revisions. Consistent with the proposal, this final rule amends comment 52(b)(2)(ii)–1 to reflect a late fee amount of $8 for purposes of the examples, consistent with the new late fee safe harbor amount applicable to Larger Card Issuers. This final rule also amends comment 52(b)(2)(ii)–1.i and ii to specify that the card issuer for purposes of the examples is not a Smaller Card Issuer pursuant to § 1026.52(b)(3). This final rule also makes a technical change to a cross reference in comment 52(b)(2)(ii)–1.ii.B to conform to OFR style requirements. Even though Smaller Card Issuers are not subject to the $8 late fee safe harbor threshold in § 1026.52(b)(1)(ii), the CFPB has determined it is useful to revise the late fee amounts in the examples to be $8, consistent with the late fee safe harbor threshold amount that applies to Larger Card Issuers.

### 52(b)(3) Smaller Card Issuers

As discussed in part VI, the CFPB is not adopting at this time certain proposed provisions with respect to Smaller Card Issuers. Specifically, with respect to such card issuers, the CFPB is not adopting: (1) the $8 late fee safe harbor threshold and the elimination of the higher late fee safe harbor amount for subsequent violations; and (2) the elimination of the annual adjustments for the safe harbor threshold. To implement that distinction, the CFPB is adopting a definition of Smaller Card Issuer in new § 1026.52(b)(3). The CFPB's reasons for not adopting the provisions as to Smaller Card Issuers, including the reasons for setting the

Smaller Card Issuer definition at one million open credit card accounts, are discussed in detail in part VI. The CFPB's reasons for adopting specific aspects of the Smaller Card Issuer definition are discussed in the section-by-section analysis of § 1026.52(b)(3)(i) and (ii) below.

*52(b)(3)(i)*

Section 1026.52(b)(3)(i) sets forth the general definition of Smaller Card Issuer. It provides that, except as provided in § 1026.52(b)(3)(ii), a card issuer is a Smaller Card Issuer for purposes of the safe harbor late fee provisions in § 1026.52(b)(1)(ii)(E) if the card issuer together with its affiliates had fewer than one million open credit card accounts, as defined in § 1026.58(b)(6), for the entire preceding calendar year.[213] Thus, a card issuer must include its affiliates' open credit card accounts along with its own in determining whether it meets the Smaller Card Issuer definition. The CFPB determines that requiring card issuers to include the open credit card accounts of their affiliates is consistent with the goal of ensuring coverage of Larger Card Issuers and preventing those Larger Card Issuers with more than one million open accounts from relying on affiliates to divide accounts in order to qualify as Smaller Card Issuers—and thus impose higher safe harbor late fee amounts. Section 1026.52(b)(3)(i) further provides that for purposes of the Smaller Card Issuer definition, "affiliate" means any company that controls, is controlled by, or is under common control with another company, as set forth in the Bank Holding Company Act of 1956 (12 U.S.C. 1841 *et seq.*). The CFPB is adopting this common definition of "affiliate" because it is one with which card issuers are familiar and, as such, will facilitate compliance.

The Smaller Card Issuer definition also incorporates the existing definition of open credit card account in § 1026.58(b)(6) of Regulation Z, which is used for purposes of determining whether a card issuer meets certain exceptions to requirements for submitting card agreements to the CFPB. The CFPB is incorporating this open credit card account definition into the definition of Smaller Card Issuer because it is one with which card issuers are familiar and, as such, will facilitate compliance.

Existing § 1026.58(b)(6) defines open account, or open credit card account, broadly as a credit card account under an open-end (not home-secured) consumer credit plan for which either (1) the cardholder can obtain extensions of credit on the account; or (2) there is an outstanding balance on the account that has not been charged off. The definition further provides that an account that has been suspended temporarily is considered an open account or open credit card account. The CFPB notes that this broad definition generally encompasses open credit card accounts that a card issuer keeps on-balance sheet as well as those that a card issuer may have sold or otherwise keeps off-balance sheet (except for accounts that have been charged off). The CFPB determines that this metric more accurately reflects the size of a card issuer's portfolio and ensures that card issuers cannot meet the Smaller Card Issuer definition, and thereby impose higher late fee safe harbor amounts, by simply securitizing their accounts and moving them off-balance sheet.

The CFPB also notes that to meet the Smaller Card Issuer definition in § 1026.52(b)(3), a card issuer together with its affiliates must have fewer than one million open credit card accounts for the entire preceding calendar year. Thus, as explained in new comment 52(b)(3)(i)–1, if a card issuer together with its affiliates had more than one million open credit card accounts from January through October of the preceding calendar year, for example, but had fewer than that threshold number in November and December, the card issuer is not a Smaller Card Issuer in the next calendar year. Further, as also explained in the comment, the card issuer is not a Smaller Card Issuer until such time that the card issuer's number of open credit card accounts, together with those of its affiliates, remains below one million for an entire preceding calendar year.[214] In order to provide clarity and certainty for card issuers, the comment provides that a card issuer must remain below the open credit card account threshold for the entire preceding calendar year in order to meet the Smaller Card Issuer definition. The requirement also provides certainty and consistency for consumers, who might otherwise

experience significant fluctuations in their late fee amounts as their card issuer moves above and below the threshold.

*52(b)(3)(ii)*

Section 1026.52(b)(3)(ii) sets forth an exception to the general definition of Smaller Card Issuer in § 1026.52(b)(3)(i). It provides that if a card issuer together with its affiliates had fewer than one million open credit card accounts for the entire preceding calendar year but meets or exceeds that number of open credit card accounts in the current calendar year, then the card issuer will no longer be a Smaller Card Issuer for purposes of § 1026.52(b)(1)(ii)(E) as of 60 days after meeting or exceeding that number of open credit card accounts.[215] Thus, as explained in new comment 52(b)(3)(ii)–1, the card issuer may not impose a late fee pursuant to § 1026.52(b)(1)(ii)(E) as of 60 days after meeting or exceeding the threshold number of open credit card accounts, because at that point the card issuer is no longer a Smaller Card Issuer. Instead, for purposes of imposing a late fee pursuant to the safe harbor provisions, the card issuer may impose a late fee of no more than $8 pursuant to § 1026.52(b)(1)(ii) as of the 60th day.

The CFPB notes that this approach is similar to the definition of creditor in § 1026.2(a)(17). That definition generally provides, in relevant part, that a creditor is a person who regularly extends consumer credit that is subject to finance charge or is payable by written agreement in more than four installments. It further provides that a person regularly extends consumer credit if, with certain exceptions, that person extended consumer credit more than 25 times in the preceding calendar year. However, the definition also generally provides that if a person did not meet the numerical standard (*i.e.,* 25 extensions of consumer credit) in the preceding calendar year, the numerical standard must be applied in the current calendar year. As such, a person who begins a calendar year beneath the definitional threshold can become a creditor, and subject to all of the Regulation Z requirements that apply to creditors, during that calendar year if the person meets or exceeds the threshold.

---

[213] *See supra* note 5.

[214] Consistent with § 1026.9(c)(2)(i)(A), a Larger Card Issuer that becomes a Smaller Card Issuer would have to provide consumers a change-in-terms notice at least 45 days prior to imposing higher late fee amounts under the safe harbor.

[215] A Smaller Card Issuer that becomes a Larger Card Issuer would not be required to provide consumer a change-in-terms notice prior to imposing lower late amounts under the safe harbor, as the requirement generally does not apply to reductions in fee amounts. *See* § 1026.9(c)(2)(v)(A).

Similarly, under this final rule, the definition of Smaller Card Issuer generally provides that if a card issuer together with its affiliates did not meet the numerical standards (*i.e.,* one million open credit card accounts) in the preceding calendar year, the numerical standard must be applied in the current calendar year. The CFPB is incorporating this concept into the definition of Smaller Card Issuer in order to ensure that the $8 limitation in § 1026.52(b)(1)(ii) becomes applicable to formerly Smaller Card Issuers—and that cardholders of those issuers receive the benefits therefrom—as soon as practicable. To that end, the CFPB determines that a period of 60 days after a formerly Smaller Card Issuer meets or exceeds the threshold, as provided in the definition, is a sufficient amount of time for the card issuer to come into compliance with the limitation in § 1026.52(b)(1)(ii). The CFPB notes that 60 days is the same compliance period accorded to Larger Card Issuers under this final rule as discussed in part VIII.

*Section 1026.58   Internet Posting of Credit Card Agreements*

*58(b) Definitions*

*58(b)(6) Open Account*

The CFPB is adopting a technical amendment to the definition of open account, or open credit card account, in § 1026.58. As discussed in the section-by-section analysis of § 1026.52(b)(3), the CFPB is adopting a definition of Smaller Card Issuer to implement its decision not to finalize certain provisions of this final rule with respect to card issuers with fewer than one million open credit card accounts. That definition incorporates the definition of open account, or open credit card account, in § 1026.58(b)(6). The CFPB is revising § 1026.58(b)(6) to clarify that the definition of open account, or open credit card account, is for purposes of both § 1026.58 and § 1026.52.

*Section 1026.60   Credit and Charge Card Applications and Solicitations*

*60(a) General Rules*

*60(a)(2) Form of Disclosures; Tabular Format*

Section 1026.60(a) provides that a card issuer must provide the disclosures set forth in § 1026.60 on or with a solicitation or an application to open a credit or charge card account. Section 1026.60(a)(2) provides certain format requirements for the disclosures required under § 1026.60. Section 1026.60(a)(2)(i) provides that in certain circumstances the disclosures required by § 1026.60 generally must be disclosed in a tabular format. Section 1026.60(a)(2)(ii) provides that when a tabular format is required, certain disclosures must be disclosed in the table using bold text, including any late fee amounts and any maximum limits on late fee amounts required to be disclosed under § 1026.60(b)(9). Comment 60(a)(2)–5.ii includes a late fee example to illustrate the requirement that any maximum limits on fee amounts must be disclosed in bold text. The current example assumes that a card issuer's late fee will not exceed $35.

The CFPB's Proposal

The CFPB proposed to amend the example to assume that the late fee would not exceed $8, so that the maximum late fee amount in the example would have been consistent with the proposed $8 late fee safe harbor amount set forth in proposed § 1026.52(b)(1)(ii).

Comments Received and the Final Rule

The CFPB received no comments on the proposed revisions to comment 60(a)(2)–5.ii. This final rule adopts comment 60(a)(2)–5.ii as proposed with minor revisions to specify that the card issuer in the example is not a Smaller Card Issuer as defined in § 1026.52(b)(3). The CFPB has determined that revising the example to be consistent with the late fee safe harbor amount of $8 is necessary to reflect the changes to the late fee safe harbor dollar amount as set forth in § 1026.52(b)(1)(ii) for Larger Card Issuers. Notwithstanding the revisions to the late fee safe harbor amount in the example, Smaller Card Issuers as defined in § 1026.52(b)(3) are not subject to the $8 late fee safe harbor threshold adopted in this final rule and may use the relevant safe harbor thresholds set forth in § 1026.52(b)(1)(ii)(A) through (C). This final rule also makes a technical change to a cross reference in comment 60(a)(2)–6.i to conform to OFR style requirements.

*Appendix G to Part 1026—Open-End Model Forms and Clauses*

Appendix G to part 1026 generally provides model or sample forms or clauses for complying with certain disclosure requirements applicable to open-end credit plans, including a credit card account under an open-end (not home-secured) consumer credit plan. The following five sample forms or clauses set forth an example of the maximum late fee amount of "Up to $35" under the heading "Late Payment": (1) G–10(B); (2) G–10(C); (3) G–10(E); (4) G–17(B); and (5) G–17(C). The following two sample forms set forth an example of the maximum late fee amount of "Up to $35" under the heading "Late Payment Warning": (1) G–18(D); and (2) G–18(F). Sample form G–21 sets forth an example of the maximum late fee amount of "Up to $35" under the heading "Late Payment Fee." The following two sample forms or clauses set forth an example of the late fee amount ($35) a consumer may incur if the consumer does not pay the required amount by the due date under the heading "Late Payment Warning": (1) G–18(B); and (2) G–18(G). The following three sample forms set forth an example of the late fee amount ($35) that the consumer was charged in the particular billing cycle under the heading "Fees": (1) G–18(A); (2) G–18(F); and (3) G–18(G).

The CFPB solicited comment on whether the late fee amount of $35 in these sample forms or clauses, as applicable, should be revised to set forth a late fee amount of $8, and whether the maximum late fee amount of "Up to $35" in these sample forms or clauses, as applicable, should be revised to set forth a maximum late fee amount of "Up to $8" so that the late fee amount and maximum late fee amount in the examples are consistent with the proposed $8 late fee safe harbor amount set forth in proposed § 1026.52(b)(1)(ii). The CFPB noted that the 11 forms or clauses discussed above are just samples; card issuers would need to disclose the late fee amount that they charge or the maximum late fee amount on the account, as applicable, consistent with the restrictions in § 1026.52(b).

In addition, as discussed in the section-by-section analysis of § 1026.52(b)(2)(i), in the 2023 Proposal, the CFPB solicited comment on whether to restrict card issuers from imposing a late fee on a credit card account, unless the consumer has not made the required payment within 15 calendar days following the due date. The CFPB solicited comment on whether the following 10 sample forms or clauses that currently disclose an example of the late fee amount ($35) or maximum late fee amount ("Up to $35") that could be incurred on the account should be revised to disclose that a late fee will only be charged if the consumer does not make the required payment within 15 calendar days of the due date: (1) G–10(B); (2) G–10(C); (3) G–10(E); (4) G–17(B); (5) G–17(C); (6) G–18(B); (7) G–

18(D); (8) G–18(F),[216] (9) G–18(G);[217] and (10) G–21.[218] The CFPB also solicited comment on effective ways to help ensure that consumers understand that a 15-day courtesy period only relates to the late fee, and not to other possible consequences of paying late, such as the loss of a grace period or the application of a penalty rate.

In addition, the CFPB noted that the following five samples forms also include disclosures about maximum penalty fee amounts of "Up to $35" for over-the-limit fees [219] and returned-payment fees: (1) G–10(B); (2) G–10(C); (3) G–10(E); (4) G–17(B); and (5) G–17(C). As discussed in the section-by-section analysis of § 1026.52(b)(1)(ii), in the 2023 Proposal, the CFPB solicited comment on whether the $8 safe harbor threshold amount that it proposed for late fees should also apply to other penalty fees, including over-the-limit fees and returned-payment fees. If the CFPB were to adopt the $8 safe harbor threshold amount for all penalty fees, the CFPB solicited comment on whether the CFPB should revise the maximum amount of the over-the-limit fees and returned-payment fees shown on these forms to be "Up to $8." Moreover, as discussed in the section-by-section analysis of § 1026.52(b)(2), in the 2023 Proposal, the CFPB solicited comment on whether the 15-day courtesy period should be provided with respect to all penalty fees, including the over-the-limit fees and returned-payment fees. If the

CFPB were to adopt the 15-day courtesy period for all penalty fees, the CFPB solicited comment on whether the 15-day courtesy period should be disclosed in the five sample forms discussed above with respect to the over-the-limit fee and the returned-payment fee.

Comments Received and the Final Rule

The CFPB received no comments on the revisions to the relevant sample forms or clauses in appendix G on which it solicited comment and is adopting the revisions as discussed below. The final rule amends the applicable sample forms or clauses to include a late fee amount of $8 and a maximum late fee amount of "Up to $8" consistent with the late fee safe harbor amount set forth in § 1026.52(b)(1)(ii) applicable to Larger Card Issuers. Specifically, the final rule amends the following 11 sample forms or clauses: (1) G–10(B); (2) G–10(C); (3) G–10(E); (4) G–17(B); (5) G–17(C); (6) G–18(A); (7) G–18(B); (8) G–18(D); (9) G–18(F); (10) G–18(G); and (11) G–21.

Notwithstanding the changes to the late fee amount in the sample forms or clauses, Smaller Card Issuers as defined in § 1026.52(b)(3) are not subject to the $8 late fee safe harbor threshold adopted in this final rule and may use the relevant safe harbor thresholds set forth in § 1026.52(b)(1)(ii)(A) through (C). The 11 revised forms or clauses are samples and card issuers are required to disclose the late fee amounts, or maximum late fee amount, that it charges consistent with § 1026.52(b).

The CFPB did not receive comments regarding other changes to the sample forms or clauses on which it solicited comment, such as whether the 15-day courtesy period for imposing late fees or other penalty fees, if adopted, should be disclosed in the sample forms or clauses. As discussed in the section-by-section analysis of § 1026.52(b)(2), the CFPB is not adopting the 15-day courtesy period for late fees or other penalty fees. Therefore, the CFPB is not adopting any edits to the sample forms or clauses to disclose a courtesy period related to late fees or any other penalty fees. In addition, as discussed in the section-by-section analysis of § 1026.52(b)(1)(ii), this final rule does not adopt the $8 safe harbor threshold for penalty fees other than late fees imposed by Larger Card Issuers including over-the-limit fees and return payment fees, so this final rule does not adopt any changes to the sample forms or clauses for penalty fees other than late fees.

## VIII. Effective Date

*The CFPB's Proposal*

The CFPB proposed that the final rule, if adopted, would take effect 60 days after publication in the **Federal Register**. The CFPB solicited comment on whether the CFPB should provide a mandatory compliance date that is after the effective date for the proposed changes. The CFPB indicated in the 2023 Proposal that if a mandatory compliance date were adopted, it would be limited to the prohibitions on late fees in § 1026.52(b)(1) and (2), except for the proposed change to § 1026.52(b)(1)(ii)(D) which would provide that future annual adjustments for safe harbor amounts based on changes in the CPI do not apply to the late fee safe harbor amount. The CFPB sought comment on whether card issuers would need additional time after the effective date to make changes to their disclosures to reflect the changes in the late fee amounts that they are charging on credit card accounts. And, if so, when compliance with the proposed changes, if adopted, should be mandatory.

Separately, under TILA section 105(d), CFPB regulations requiring any disclosure which differs from disclosures previously required by TILA part A, part D, or part E must have an effective date of October 1 which follows by at least six months the date of promulgation subject to certain exceptions.[220]

The 2023 Proposal noted that, TILA section 105(d) only applies to any proposed changes requiring disclosures, if adopted, it would not necessitate the October 1 effective date for purposes of the late fee disclosure for two reasons. First, the 2023 Proposal noted that under Regulation Z, card issuers are currently required to disclose the late fees amounts, or maximum late fees amounts, as applicable, that apply to credit card accounts in certain disclosures, and the disclosure of those late fee amounts must reflect the terms of the legal obligation between the parties.[221] In other words, the proposal, if finalized, would not require any disclosure that differed from the current requirement because the proposed change is not substantive but a mere alteration of the disclosed maximum late fee amounts. Second, the change in amount would apply to the safe harbor,

---

[216] Sample Form G–18(F) contains two examples of late fees—one example is the maximum late fee of "Up to $35" under the heading "Late Fee Warning" and the other example is the late fee ($35) that was charged to the consumer in the particular billing cycle under the heading "Fees." The CFPB solicited comment only on whether the 15-day courtesy period should be incorporated into the "Late Fee Warning" to indicate the late fee would only be charged if the consumer does not make the required payment within 15 calendar days after each due date. The 15-day courtesy period disclosure would not have been appropriate for the example of the late fee under the heading "Fee."

[217] Sample Form G–18(G) contains two examples of late fees—one example is the late fee of "$35" under the heading "Late Fee Warning" and the other example is the late fee ($35) that was charged to the consumer in the particular billing cycle under the heading "Fees." The CFPB solicited comment only on whether the 15-day courtesy period should be incorporated into the "Late Fee Warning" to indicate the late fee would only be charged if the consumer does not make the required payment within 15 calendar days after each due date. The 15-day courtesy period disclosure would not have been appropriate for the example of the late fee under the heading "Fee."

[218] Sample Form G–18(A) only provides an example of a late fee that has been charged on the account in that billing cycle (*see* late fee disclosed under the "Fees" heading), so a disclosure of the 15-day courtesy period would not have been appropriate for this disclosure.

[219] These sample forms refer to over-the-limit fees as "over-the-credit-limit fees."

[220] 15 U.S.C. 1604(d).

[221] Section 1026.5(c) requires that "disclosures shall reflect the terms of the legal obligation between the parties."

which is an amount that card issuers may elect but are not required to use.

In addition, if the CFPB were to finalize the proposed 15-day courtesy period, as discussed in the 2023 Proposal, the CFPB solicited comment on whether the 15-day courtesy period and potential disclosure language should have an effective date of "October 1 which follows by at least six months the date of promulgation," consistent with TILA section 105(d).[222]

*Comments Received*

*Disclosure and operational changes.* One industry trade association commenter advised that the CFPB provide a reasonable date within which issuers could adjust their practices and systems, update disclosures and conduct internal evaluations in order to determine whether they would continue to rely on the safe harbor or use the cost analysis provisions in § 1026.52(b)(1)(i) to set the late fee amount. One credit union commenter asserted that an implementation period of at least six months from the effective date of the rule is necessary to allow smaller institutions time to comply with the new requirements. One credit union trade association commenter stressed that smaller issuers would need an extended compliance window to accurately implement the necessary changes to their systems and consumer disclosures. This commenter further advised that the CFPB adopt a staggered implementation strategy such that larger issuers are required to comply before smaller issuers.

One credit union and several industry trade association commenters asserted that the proposed changes, if adopted, would require major adjustments to multiple disclosures, cost calculations and cost composition, and not just adjustments to the $8 late fee in the disclosures as stated in the CFPB's 2023 Proposal. These commenters indicated that issuers would also need to disclose and explain the proposed fee cap of 25 percent of the minimum required payment and how it relates to the proposed $8 late fee, eliminate disclosures for the higher late payment fee for recurring late payments within a six-month period and update their systems to reflect the changes as detailed in the CFPB's proposal. The commenters further asserted that the CFPB's proposed 60-day effective date ignores the full impact of the proposed revisions, if adopted, and the substantial changes to disclosures and systems that would be necessary to comply with the revised regulation. Furthermore, some

of these commenters mentioned that the CFPB's assertion that card issuers are not mandated to use the safe harbor failed to take into account the fact that most card issuers rely on the existing safe harbor and would need to change their disclosures regardless of whether they continue to rely on the safe harbor or opt to disclose late fees calculated under the cost analysis provisions in § 1026.52(b)(1)(i). These commenters concluded that either option would require extensive changes to required disclosures and that the 60-day effective period is impracticable and unworkable.

One financial institution asserted that the CFPB's proposal for the 60-day effective date would be problematic for issuers whose portfolios significantly consist of private label and co-branded credit cards, due to existing contractual limitations that will need to be renegotiated with partners to effectuate changes in account-pricing terms. This commenter asserted that the 60-day effective date provides an unreasonably short amount of time to renegotiate existing contracts and implement new terms and the proposal, if finalized, would disproportionately affect private label and co-branded credit card issuers.

*Impact of TILA section 105(d) on the effective date.* One law firm commenter on behalf of several card issuers and several industry trade association commenters asserted that the CFPB's proposed effective date was in violation of section 105(d) of TILA. These commenters asserted that because the CFPB's 2023 Proposal, if adopted, would require changes to multiple mandatory consumer disclosures, the effective date must be October 1 which follows by at least six months the date of promulgation consistent with TILA section 105(d). One of the trade association commenters indicated that under section 105(d), any proposed changes finalized after March 31, 2023, is statutorily required to have an effective date of October 1, 2024. They explained that the only statutory exception provided to the CFPB under section 105(d) to shorten the effective date is "when it makes a specific finding that such action is necessary to comply with the findings of a court or to prevent unfair or deceptive disclosure practices," neither of which the CFPB mentioned in its proposal. Furthermore, the law firm commenter and several of the industry trade association commenters explained that the two grounds provided by the CFPB for the non-applicability of section 105(d) mischaracterized the proposed changes and that, as long as any changes are to be made to the disclosures, section 105(d) of TILA would apply. These

commenters concluded that it would be arbitrary and capricious for the CFPB to reduce the amount of time statutorily required to amend existing disclosure requirements, or to reclassify existing late fee practices and disclosures as "unfair or deceptive" when they are fully consistent with TILA and the CFPB's Regulation Z current penalty fee safe harbor provision. The law firm described above and several of the industry trade association commenters asserted that the delayed effective date requirements of section 105(d) of TILA are necessary not only to accommodate the changes in disclosures, but also to provide issuers sufficient time to put in place systems to calculate the late fee amounts they can charge customers, which then become the subject of the disclosures. These commenters asserted that the final rule should take effect no earlier than October 1, 2024.

*The Final Rule*

For the reasons discussed below, the CFPB has determined that this final rule will take effect 60 days after publication in the **Federal Register**. The 60-day effective date applies to the following revisions, among others, with respect to late fees imposed by Larger Card Issuers; (1) the repeal of the current safe harbor threshold amounts in § 1026.52(b)(1)(ii)(A) and (B); (2) the adoption of a late fee safe harbor dollar amount of $8 in § 1026.52(b)(1)(ii); (3) the elimination of a higher safe harbor dollar amount for subsequent late fees that occur during the same billing cycle or in one of the next six billing cycles;[223] and (4) the elimination of the annual adjustment provisions for the safe harbor dollar amounts so that those provisions do not apply to the $8 late fee safe harbor amount.

*Disclosure and operational changes.* With respect to the commenters asserting that the 2023 Proposal, if adopted, would require complex changes to their operating systems, the CFPB has determined that Larger Card Issuers likely have the capacity and resources to comply with the revisions discussed above within 60-days of when this final rule is published in the **Federal Register**.

The CFPB notes that several provisions proposed, and for which the CFPB sought comments, have not been adopted under this final rule. For example, the CFPB is not adopting the proposed provisions to restrict late fee amounts to 25 percent of the required minimum payment. In addition, this

---

[222] 15 U.S.C. 1604(d).

[223] This final rule does not amend the safe harbor set forth in § 1026.52(b)(1)(ii)(C) applicable to charge card accounts.

final rule does not adopt the following provisions on which the CFPB sought comment: (1) a 15-day courtesy period; (2) the elimination of safe harbor threshold amounts for other penalty fees; and (3) imposing additional conditions on using the safe harbor threshold amounts (such as providing auto payment options). The CFPB has determined that not adopting these changes in this final rule reduces the extent of operational and disclosure changes referenced by industry commenters. The full impact of this final rule on card issuers' operations is therefore much more limited than the possible revisions discussed in the CFPB's 2023 Proposal. In sum, Larger Card Issuers would have 60 days to delete the existing late fee figure in their disclosures and replace it with $8 or another number computed using the cost analysis provisions, and this change would only have to appear on disclosures mailed or delivered to consumers 60 days after publication of this final rule in the **Federal Register**. The CFPB expects that this effective date will provide Larger Card Issuers with sufficient time to accomplish this task.

With respect to commenters' assertions that card issuers would need to conduct a comprehensive cost analysis to determine whether the new safe harbor late fee adequately covers their cost, the CFPB maintains that this final rule does not mandate Larger Card Issuers to conduct any cost analysis. Due to safety and soundness regulation and general good corporate governance principles, the CFPB expects that Larger Card Issuers have more sophisticated cost accounting systems than Smaller Card Issuers and should be able to calculate a late fee amount based on the cost analysis provisions within 60 days. However, if Larger Card Issuers choose to use the cost analysis provisions as set forth in § 1026.52(b)(1)(i), including the requirement to exclude post-charge off collection costs from its analysis, they must do so and comply with the changes in this final rule by this final rule's effective date. Alternatively, Larger Card Issuers may choose to initially adopt the $8 late fee safe harbor amount while separately conducting a more extensive cost analysis.

With respect to comments on the impact of the 60-day effective date on private label and co-branded card issuers, the CFPB notes that many private label and co-branded card issuers are likely to be Larger Card Issuers (*i.e.*, card issuers that together with their affiliates have one million or more open credit card accounts), and these issuers, whose business focuses on

credit cards, likely have the capacity and resources to make the required disclosures within the 60-day timeframe. In addition, such issuers have the option to initially adopt the $8 late fee safe harbor as they separately renegotiate contract terms with their partners.

With respect to the commenters' requests for a staggered implementation strategy and additional time to comply with the final rule by smaller issuers, the CFPB has determined that this request is not needed. The CFPB notes that Smaller Card Issuers as defined in § 1026.52(b)(3) are not subject to the safe harbor reduction.

Impact of TILA section 105(d) on the effective date. Under TILA section 105(d), CFPB regulations requiring any disclosure which differs from disclosures previously required by TILA part A, part D, or part E, or by any regulation of the Bureau promulgated thereunder must have an effective date of October 1 which follows by at least six months the date of promulgation subject to certain exceptions.[224] The CFPB maintains that TILA section 105(d) does not necessitate the October 1, 2024 effective date for purposes of the late fee disclosure for three reasons. First, as noted in the proposal, under Regulation Z, card issuers are currently required to disclose the late fee amount, or maximum late fee amount, as applicable, that apply to credit card accounts in certain disclosures, and the disclosure of those late fee amounts must reflect the terms of the legal obligation between the parties.[225] This final rule does not change these requirements nor alter any existing disclosure of the maximum late fee amounts; instead, it would solely result in a change to the amount of the late fee disclosed by Larger Card Issuers using the safe harbor, *i.e.*, from a current amount of up to $41 to the new safe harbor of $8.

Second, while the CFPB recognizes that this rule will result in Larger Card Issuers changing the numerical value for late fees in their disclosures for consumers, the CFPB notes that such changes to the numerical amount of late fees are something that card issuers frequently do. For example, card issuers change the disclosure of late fee amounts after the CFPB adjusts the safe harbors for inflation without waiting until the next October 1. Third, the change in amount applies to the safe harbor, which is an amount that card issuers may elect but are not "required" to use.

## IX. CFPA Section 1022(b) Analysis

### A. Overview

This final rule is summarized in part I. In developing this final rule, the CFPB has considered this final rule's potential benefits, costs, and impacts in accordance with section 1022(b)(2)(A) of the CFPA.[226] The CFPB requested comment on the preliminary analysis presented in the 2023 Proposal and submissions of additional data that could inform the CFPB's analysis of the benefits, costs, and impacts, and the discussion below reflects comments received. In developing this final rule, the CFPB consulted with the appropriate prudential regulators and other Federal agencies, including regarding the consistency of this final rule with any prudential, market, or systemic objectives administered by those agencies, in accordance with section 1022(b)(2)(B) of the CFPA.[227] The CFPB also consulted with agencies described in TILA section 149.[228]

### B. Data Limitations and Quantification of Benefits, Costs, and Impacts

The discussion below relies on information that the CFPB has obtained from industry, other regulatory agencies, and publicly available sources, including reports published by the CFPB. These sources form the basis for the CFPB's consideration of the likely impacts of this final rule. The CFPB provides estimates, to the extent possible, of the potential benefits and costs to consumers and covered persons of this final rule, given available data.

Specifically, this discussion relies on the CFPB's analysis of both portfolio and account data from the Y–14 collection, as described in part V above. The discussion also relies on data collected directly from a diverse set of credit card issuers to support the CFPB's biennial report on the state of the consumer credit card market as required by the CARD Act.[229] The CFPB also consulted the academic literature, as well as public comments in response to the Board's 2010 Final Rule, the CFPB's ANPR, and the CFPB's 2023 Proposal that preceded this final rule.

The CFPB acknowledges limitations that prevent an exhaustive determination of benefits, costs, and impacts. Quantifying the benefits, costs, and impacts requires quantifying future consumer and card issuer responses to the changes. It is impossible to predict these responses with certainty given

---

[224] 15 U.S.C. 1604(d).

[225] *See supra* note 221.

[226] 12 U.S.C. 5512(b)(2)(A).

[227] 12 U.S.C. 5512(b)(2)(B).

[228] 15 U.S.C. 1665b and 1665d(e).

[229] *See supra* note 87.

available data and research methods. This reflects in part the fact that the effects of this final rule will depend on choices made by independent actors in response to this final rule, which are inherently difficult to predict with certainty. In particular, the available evidence does not permit a definitive prediction of how changes to late fees will affect late payments and delinquencies or the expected substitution effects across credit cards and between credit cards and other forms of credit. Similarly, the evidence available does not permit definitive conclusions about the cost and effectiveness of steps Larger Card Issuers might take to facilitate timely repayment, collect efficiently, reprice any of their services, remunerate their staff, suppliers, or sources of capital differently, or enter or exit any segment of the credit card market. Having said that, the data and research available is relatively significant and helpful for understanding the likely general effects of this final rule.

In light of these data limitations, the analysis below provides quantitative estimates where possible and a qualitative discussion of this final rule's benefits, costs, and impacts. General economic principles and the CFPB's expertise, together with the available data, provide insight into these benefits, costs, and impacts.

*C. Baseline for Analysis*

In evaluating this final rule's benefits, costs, and impacts, the CFPB considered the impacts against a baseline in which the CFPB takes no action. This baseline includes existing regulations and the current state of the market. In particular, it assumes (1) the continuation of the existing safe harbor amounts for credit card late fees, currently $30 generally and $41 for each subsequent late payment occurring in one of the next six billing cycles; and (2) that these amounts will be adjusted when there are changes to the CPI in accordance with the current provision in § 1026.52(b)(1)(ii)(D).

*D. Comments Received*

General Comments on the 1022(b)(2)(A) Analysis

Several industry trade associations and one academic commenter generally asserted that the cost-benefit analysis for the 2023 Proposal was inadequate. The academic commenter asserted that the cost-benefit analysis was not based on academically vetted and scrutinized economic justifications for a specific safe harbor of $8 in distinction to

another level, whether lower or higher than $30.

One credit union trade association commenter asserted that the 2023 Proposal lacked a sufficient cost-benefit analysis, and the proposal did not contain a comprehensive outline of potential effects. This commenter further asserted that the proposal did not contain a systematic economic analysis of a "but-for world" in which the rule is implemented. This commenter provided the views of a consulting firm hired by the commenter indicating that in the consultant's view, the CFPB did not provide a valid economic analysis of the impact of the 2023 Proposal on: (1) the increased frequency of late payments caused by lower late fees; (2) the changes in APRs, credit limits, minimum payments and other credit card terms caused by lower late fees; (3) the increased risk of charge-offs and losses faced by credit card issuers resulting from the increased frequency of late and skipped payments caused by lower late fees; (4) the much greater difficulty in adapting to lower late fees faced by Federal credit unions that cannot charge APRs of more than 18 percent; (5) which consumers will benefit from, and which consumers will be harmed by, the decrease in late fees and the resulting changes in other credit card terms; and (6) the decrease in access to credit, and the reduction in credit limits for consumers with lower credit scores caused by lower late fees.

The CFPB disagrees with the general assertion that its consideration of benefits and costs of the 2023 Proposal under section 1022(b) of the CFPA was inadequate. The CFPB in its 1022(b) analysis for the 2023 Proposal conducted a thorough analysis of the reasonably available data to estimate, quantify, and monetize benefits and costs to the extent possible. As noted above, the CFPB has limited evidence to predict fully how changes to late fees will affect late payments and delinquencies or the expected substitution effects across credit cards and between credit cards and other forms of credit. While some commenters assumed that such predictions can be made with a high degree of certainty, no commenter offered new and reliable evidence or research to corroborate their assertions. Given the difficulties of precisely foreseeing future impacts, the most viable approach involves a careful examination of the effects from analogous historical events. In developing this final rule, the CFPB undertook a thorough review of available research and data analyzing the impacts of comparable regulatory changes in recent decades that allow

some reasonable extrapolation regarding potential outcomes.

Comments Concerning Proposal's Impact on Consumers

One financial regulatory advocacy group asserted that reducing the amount of late fees charged would have a positive effect on the financial health of consumers especially those who carry over credit balances each month. This commenter asserted that the financial distress suffered by consumers due to the high cost of late fees was further compounded by the limited amount of a consumer's payment that is applied to the principal.

One trade association commenter asserted that the CFPB failed to properly quantify the benefits to consumers, and the commenter claimed that the 2023 Proposal would disproportionately benefit a small portion of consumers at the expense of others. This commenter also asserted that the CFPB's proposal (1) evinced a lack of understanding with respect to issuers' obligations to manage credit risk, which the commenter claimed would require issuers to take actions that may result in a reduction in access to credit, and (2) assumed that the proposed changes would incentivize issuers to do more to encourage on-time payments.

One credit union trade association claimed that the cost-benefit analysis in the 2023 Proposal indicated that there would be many possible negative consequences to consumers of the proposed changes, which the commenter stated would include higher interest rates on credit cards and negative changes to other terms and fee amounts. This commenter claimed that the CFPB indicated that many consumers will be "harmed" by these changes without experiencing any of the benefits. This commenter urged the CFPB to re-examine the cost/benefit balance of the proposal and recognize that it will ultimately cause more harm to more consumers than the benefits to those it will favor.

Several industry trade associations asserted that the CFPB did not adequately reflect the cost of the 2023 Proposal to consumers. These commenters claimed that the vast majority of consumer cardholders will be harmed by the proposal. These commenters also claimed that the proposal (1) would limit the ability of issuers to allocate the cost and risk of late payments to the late paying population and would require issuers to spread these costs across all consumer cardholders; (2) would increase late payments and associated costs; and (3) would cause the cost of credit to

increase, credit availability to drop, and rewards and other credit card features to decline or disappear. These commenters also claimed, somewhat contradictorily, that the CFPB "expressly acknowledges" these consequences with no rebuttal.

One law firm representing several card issuers claimed that while the CFPB acknowledged various costs imposed by the 2023 Proposal, it did not provide adequate support for its assessment that the 2023 Proposal would result in a "net benefit for consumers." This commenter asserted that the 2023 Proposal would benefit only the "very small subset" of the consumer population that regularly pays late fees and claimed that the 2023 Proposal acknowledges that cardholders who never make late payments "would not benefit and would be worse off" due to potential increases in maintenance fees and APRs. This commenter asserted that with respect to the population of consumers with subprime credit scores that regularly pay late fees, the proposal did not adequately consider that any benefits received "would ultimately be offset" by any of the possible outcomes articulated by the CFPB in the 2023 Proposal: increases in the APR; reduced access to credit; increased delinquencies and negative credit reporting; or increases in other credit card fees.

As an initial matter, this rule is intended to tailor the safe harbor to a more reasonable approximation of the existing statutory standard of "reasonable and proportional." In other words, this rule brings the regulations closer in line with the statutory text. The requirement that penalty fees be reasonable and proportional to violations reflects Congress' judgment that penalty fees should not be higher, even if higher fees might have led to lower prices for consumers who do not incur penalties. The CFPB is not in a position to dispute Congress' conclusion that the benefits of the statutory scheme were worth the trade-offs. The CFPB's analysis of the costs, benefits, and impacts of this rule inform the agency's decision, but ultimately, the decision to finalize this rule is based on a conclusion that the rule is more closely aligned with the statute.

The CFPB disagrees with the assertion that its consideration of benefits and costs to consumers was inadequate in the 2023 Proposal. As noted by several commenters, the CFPB discussed in the 2023 Proposal not only the proposed rule's potential benefits to consumers who often incur late fees but also the potential costs to some consumers, in particular those who seldom incur late fees, from potential offsetting changes to the terms of credit card agreements, such as increases in the interest rate, increases in the amount of other fees, or changes in rewards.[230] For example, the 2023 Proposal explained the decrease in late fees would affect different consumers differently depending on how often they pay late and whether they carry a balance. The 2023 Proposal further noted that: (1) Cardholders who never pay late will not benefit from the reduction in late fees and could pay more for their account if maintenance fees in their market segment rise in response—or if their interest rate increases in response and these on-time cardholders also carry a balance; (2) Frequent late payers are likely to benefit monetarily from reduced late fees, even if their higher interest rates or maintenance fees offset some of the benefits; (3) Cardholders who do not regularly carry a balance but occasionally miss a payment would benefit from the proposed changes so long as any increase in the cost of finance charges (including the result of late payments that eliminate their grace period) is smaller than the drop in fees; and (4) Cardholders who carry a balance but rarely miss a payment are less likely to benefit on net.[231]

The CFPB also notes that APRs and other prices reflect the issuer's assessment of individual consumers' likely usage and risk profiles, particularly at Larger Card Issuers. If an issuer prices its product knowing that a consumer is very unlikely to make late payments, then a reduction in late fees will make little difference to the optimal pricing for that consumer, and there is no reason to expect meaningful offsetting price changes for such a consumer. Any offsetting price changes are likely to be more significant for categories of consumers that issuers anticipate are more likely to pay late fees.

These expectations can be correct only as averages for broader groups based on factors the issuer can observe when setting prices for an account, meaning that the effects of the rule on consumers will still depend on whether they make more or fewer late payments relative to others who appear similar. Nonetheless, individualized pricing based on risk profiles limits the extent to which consumers who infrequently pay late are likely to pay more as a result of the rule.

In the 2023 Proposal, the CFPB also considered that for consumers who incur late fees the possibility that the dollar value of additional consumer costs from offsetting price changes could be equal to or greater than the savings to consumers from lower late fees. The CFPB explained that it was unlikely that the fee reductions would be fully offset because (1) offsetting price increases are most likely where markets are most competitive since, in competitive markets where profit margins are low, any reduction in revenue is likely to lead some firms to exit the market, limiting supply and driving prices up for consumers; and (2) recent evidence suggests that profits from credit card issuance are significant, making it unlikely that reduced fee revenue would lead to exit.[232] This reasoning has been empirically validated by the very limited offset found by studies of the fee reductions from the implementation of the CARD Act. The 2023 Proposal cited a prominent academic study as well as its own internal research. Some commenters cited research on the effects of debit card interchange fee limits in the Durbin Amendment.[233] The latest revision of this working paper estimates that banks offset less than half of the lost interchange revenue through increases in checking account fees. Although these findings relate to a different product market, they are generally consistent with the conclusion that lost bank revenue from reduced credit card late fees would not be fully offset.[234]

The CFPB considered the evidence that it deemed to be reliable and that was reasonably available, and commenters did not provide additional sources of reliable data about the effects of late fees on consumers and covered persons that materially alters the CFPB's assessment of the benefits and costs to consumers and covered persons of the 2023 Proposal.

In the 2023 Proposal, the CFPB also considered general economic principles in its analysis. For example, economic principles imply that private firms will weigh costs and benefits of different actions, and that if the benefit of an action is exogenously reduced, those firms will generally change their actions in response. Thus, for example, in the 2023 Proposal, the CFPB considered that firms considering investments in

---

[230] 88 FR 18906 at 18932–36.

[231] *Id.* at 18934.

---

[232] *Id.* at 18933–34.

[233] Vladimir Mukharlyamov & Natasha Sarin, *Price Regulation in Two-Sided Markets: Empirical Evidence from Debit Cards* (Dec. 24, 2022), *https:// papers.ssrn.com/sol3/papers.cfm?abstract_ id=3328579.*

[234] The authors also note that the Durbin amendment's limits on debit card interchange fees may have led banks to issue credit cards more actively, which generate larger interchange fees, which would tend to lessen any reduction in total interchange fees for merchants.

reminders or other mechanisms to discourage late payment would balance the cost of such investments against the benefit, and that the reduction of late fee amounts would affect that cost/benefit calculation.[235]

Comments Concerning Proposal's Impact on Card Issuers

One industry trade association asserted that the CFPB inadequately weighed the costs and reduced deterrent effect of the lower safe harbor described in the 2023 Proposal. In doing so, the commenter also claimed that the CFPB (1) underweighted the costs of compliance with a lower safe harbor regime; and (2) did not adequately quantify the various impacts that its $9 billion estimated reduction in fee revenue will have on the pricing and availability of credit cards. This commenter claimed that the CFPB's inadequate evaluation of the costs associated with the 2023 Proposal render the proposal arbitrary and capricious in violation of the APA.

One bank asserted that the CFPB in the 2023 Proposal did not adequately consider the reduction of access to consumer financial products in its cost-benefit analysis under 1022(b); rather, the bank claimed that the CFPB stated the 2023 Proposal is ''likely to drive some firms out of the market.'' This commenter also claimed that the CFPB in the 2023 Proposal did not adequately consider the impact on covered persons in rural areas.

One law firm representing several clients claimed that the 2023 Proposal's consideration of costs and burdens did not adequately consider the cost of compliance for card issuers. This commenter claimed that the 2023 Proposal would impose disproportionately high costs on credit card issuers that service borrowers with subprime credit scores, many of whom may need to exceed the $8 safe harbor, and such issuers would need to spend significant resources to build internal processes and procedures for calculating and documenting the costs of late fees if they want to use cost analysis provisions set forth in § 1026.52(b)(1)(i). This commenter also claimed that the 2023 Proposal would require such issuers to spend significant resources building out an evidentiary record in order to use the cost analysis provisions, particularly in light of the CFPB's continued public scrutiny of credit card late fees.

One individual commenter claimed that the CFPB has acted arbitrarily and capriciously in not adequately

considering the potential costs to issuers. This commenter asserted that the CFPB did not adequately estimate the possible increase in compliance burden as more credit card issuers would find it necessary to prove their collection costs exceed the safe harbor limits.

One industry trade association questioned whether the CFPB had evidence to support the claim that card issuers could mitigate late payment using other steps. For example, this commenter claimed that the CFPB did not have adequate evidence for the CFPB's statement that card issuers can mitigate the lost revenue by launching additional programs to reduce the incidence of late payments, such as sending reminders and offering automatic or convenient payment options. The commenter asserted that its members report that such measures are common practice now and are not likely to be more effective if cardholders are contacted more frequently.

Two credit union trade associations asserted that the CFPB should not have suggested in the 2023 Proposal that issuers can mitigate the loss of revenue from late fees by taking other measures such as increasing interest rates. For example, these commenters indicated that credit unions face different compliance costs and challenges than larger card issuers particularly as related to use of the cost analysis provisions set forth in § 1026.52(b)(1)(i). Several credit union trade associations and credit union commenters further asserted that Federally chartered credit unions may be prohibited from raising interest rates because they are subject to a statutory interest rate cap so that may not be a feasible mechanism to recover lost revenue.[236]

The CFPB disagrees with the claim that its analysis pursuant to section 1022(b)(2)(A) of the CFPA in the 2023 Proposal does not adequately address the costs to card issuers. As discussed in the 1022(b) analysis of the 2023 Proposal, the CFPB considered a range of potential costs to issuers of complying with the 2023 Proposal.[237] For example, the 2023 Proposal noted that because the proposal would significantly reduce the aggregate value of late fees paid by consumers, the proposal would significantly reduce late fee revenue for issuers.[238] Nor does the CFPB agree with commenters suggesting that affected credit card issuers lack adequate existing means to track pertinent costs in a manner sufficient to

conduct reliable cost analysis as set forth in § 1026.52(b)(1)(i). Given the general sophistication and scale of the Larger Card Issuers covered under the final rule, these institutions have access to substantial data on internal costs and operations.

The CFPB also disagrees with the claim that it did not adequately consider in the 2023 Proposal the potential effects on the pricing and availability of credit cards, as it discussed a range of possible effects on the terms of credit cards and availability of credit cards as a result of reduced late fee revenue. For example, the 2023 Proposal explained that (1) issuers can mitigate the costs of the proposal to some extent by taking other measures (*e.g.,* increasing interest rates or changing rewards); and (2) it is also possible that some consumers' access to credit could fall if issuers could adequately offset lost fee revenue expected from them only by increasing APRs to a point at which a particular card is not viable, for example, because the APR exceeds applicable legal limits.[239] The CFPB also noted that economic theory as well as relevant empirical evidence convinced it that full pass-through to consumers was not likely.

With respect to the criticism by the two credit union trade associations that credit unions face different compliance costs and challenges than larger card issuers particularly as related to use of the cost analysis provisions set forth in § 1026.52(b)(1)(i), the CFPB notes that this final rule will not cover most credit unions because they are Smaller Card Issuers as defined in new § 1026.52(b)(3). As discussed in part VI, the CFPB recognizes that it relied on Y–14 data from certain Larger Card Issuers in the 2023 Proposal, and as discussed in that part, the CFPB also recognizes that smaller credit unions could face different challenges in using the cost analysis provisions in § 1026.52(b)(1)(i) because of economies of scale and other issues.

The CFPB acknowledges that at least four Federal credit unions are likely to be impacted by the final rule. The APR caps reduce these firms' ability to risk-price to certain customers, especially in an environment with higher inflation and prevailing nominal rates of interest. This fact will be heightened by the final rule, which will be a further constraint on credit card pricing for these firms, consistent with the intent of Congress to ensure that penalty fees are reasonable and proportional.

---

[235] *Id.* at 18935.

[236] *See supra* note 104.
[237] *Id.* at 18935–36.
[238] *Id.* at 18935.

[239] *Id.* at 18934–35.

*E. Potential Benefits and Costs to Consumers and Covered Persons*

This section discusses the benefits and costs to consumers and covered persons of the following changes applicable to late fees charged by Larger Card Issuers: (1) the repeal of the current safe harbor threshold amounts, the adoption of a lower safe harbor dollar amount of $8, and the elimination of a higher safe harbor dollar amount for subsequent violations of the same type that occur during the same billing cycle or in one of the next six billing cycles; and (2) the elimination of the annual adjustments for the safe harbor dollar amounts to reflect changes in the CPI set forth in current § 1026.52(b)(1)(ii)(D) to the $8 late fee safe harbor. These two amendments will only apply with respect to late fees charged by Larger Card Issuers (*i.e.,* card issuers that together with their affiliates have million or more open credit card accounts). This final rule does not adopt these two amendments for Smaller Card Issuers.

Pursuant to the annual adjustments for safe harbor dollar amounts in § 1026.52(b)(1)(ii)(D), this final rule also revises the safe harbor threshold amounts in § 1026.52(b)(1)(ii)(A) and (B) to $32, except that it sets forth a safe harbor of $43 for each subsequent violation of the same type that occurs during the same billing cycle or in one of the next six billing cycles. These revised safe harbor threshold amounts of $32 and $43 apply to penalty fees other than late fees for all card issuers (*i.e.,* Smaller Card Issuers and Larger Card Issuers) as well as late fees imposed by Smaller Card Issuers, as noted above.

This final rule also amends certain sample forms and clauses in, and commentary to, Regulation Z to clarify the application of the rule and make conforming adjustments. The CFPB does not separately discuss the benefits and costs of these other amendments but has determined that they will generally lower compliance costs for card issuers and facilitate consumer understanding of the rule. Finally, the discussion below also considers the benefits and costs of certain other alternatives that the CFPB considered.

Potential Benefits and Costs to Consumers and Covered Persons of the $8 Late Fee Safe Harbor Changes

The CFPB is amending § 1026.52(b)(1)(ii) to repeal the current safe harbor amounts for late fees charged by Larger Card Issuers— currently set at $30 and $41 for a first and subsequent violation, respectively—

and to adopt a late fee amount of $8 for the first and subsequent violations.[240] This final rule will eliminate the higher safe harbor amount for subsequent late payment violations with respect to late fees charged by Larger Card Issuers.

As discussed in part VI, based on its review of both public and confidential data, the CFPB estimates that these revised provisions would apply to approximately the largest 30 to 35 issuers by outstanding balances (out of around 4,000 financial institutions that offer credit cards). This would cover over 95 percent of the total outstanding balances in the credit card market. Thus, these revised provisions would cover all of the Y–14+ issuers for which the CFPB has total collections and late fee revenue data, as well as about a dozen other similar issuers with large credit card portfolios.

Potential Benefits and Costs to Consumers of the $8 Late Fee Safe Harbor Changes

In general, this final rule's lower safe harbor amount for late fees of $8 for first and subsequent violations will benefit consumers doing business with Larger Card Issuers who pay late by reducing their late fee amounts. This direct benefit may be offset to the extent that Larger Card Issuers respond to lost fee revenue from consumers in specific risk tiers with price increases elsewhere (like APR) to consumers in that same risk tier, and potentially if consumers respond to reduced late fees in ways that harm them in the long run. The discussion below begins with the direct benefits from lower late fees, then turns to the possibility that those benefits are offset through changes to other prices, and then addresses the potential effects on consumers of changes to late payment behavior.

The direct benefits to consumers who pay late could be as high as the fees saved with the $8 fee amount on violations without or with a recent prior violation—that is, the difference between fees currently charged and the lower $8 amount. For example, for a consumer who would incur a $31 late fee, the savings will be $23. Based on data considered in the 2023 Proposal, the CFPB estimates that aggregate late fees assessed for issuers in the Y–14+ data were $14 billion in 2019 and $12 billion in 2020 and that the average late

fee charged was $31 in 2020.[241] Thus, if fees had been reduced to $8, it would have reduced aggregate late fees charged to consumers by several billion dollars.

To estimate the extent of the reduction, based on data considered in the 2023 Proposal, the CFPB examines Y–14 account-level data for the 12-month period from September 2021 to August 2022. The issuers in this sample represent an estimated 73 percent of aggregate credit card balances and reported collecting $5.688 billion in late fees during the period, and the CFPB estimates that the collected fees would have been $1.451 billion, or 74.6 percent lower, if fees had been $8 rather than the fees actually collected.[242] As noted in the 2023 Proposal, the CFPB does not have account-level data for any issuers other than those included in the Y–14 data. In the 2023 Proposal, the CFPB assumed that the 73 percent of balances covered by these issuers with collection costs in the Y–14 data collection most recently is representative of the fee structure and incidence of the entire market, and provided that these figures would have implied $5.8 billion savings for consumers (not including any fees charged but not ultimately collected). However, as noted in the 2023 Proposal, the Y–14+ data suggest that late fee revenue per account at these Y–14 issuers is less than for other issuers in the Y–14+. This implies an even greater reduction in fee revenue and, in turn, greater consumer savings from Larger Card Issuers not included in the Y–14 data, meaning that $5.8 billion is therefore likely to be an underestimate of the potential reduction in fees. As discussed in the 2023 Proposal, if the 74.6 percent reduction in fee revenue were applied to the total estimated $12 billion in late fees at the Larger Card Issuers included in the Y–14+ from 2020, it would have implied a reduction

---

[240] As discussed in the section-by-section analysis of § 1026.52(b)(1)(ii)(C) in part VII, the CFPB is not lowering or otherwise changing the safe harbor amount of a late fee that card issuers may impose when a charge card account becomes seriously delinquent.

[241] Late Fee Report, at 4. As discussed in part V, the Y–14 data includes information from the Board's Y–14 data and a diverse group of specialized issuers. After issuing the 2023 Proposal, the CFPB also published its 2023 CARD Act report on credit cards, which reports $11.5 billion and $14.5 billion late fee revenue for Y–14+ issuers in 2021 and 2022, respectively. 2023 Report, at 65.

[242] By adjusting the collected late fee revenue with how assessed fee amounts would have changed, this analysis disregards the apparent but immaterial benefits to accounts whose assessed fees are not collected (but charged off). The CFPB estimates that this affects as much as 14 percent of late fee incidents. Also, as many as 5 percent of assessed late fees are reversed in later months (within-month waivers and reversals might already be netted out in the account data the Y–14 collection collects). The analysis here applied the same cap to reversals as to the original fees, thus minimizing the overcounting of benefits.

in fee revenue of approximately $9 billion.[243]

The benefits to consumers, however, will be lower if issuers choose to rely on the cost analysis provisions in § 1026.52(b)(1)(i) in order to set late fees at amounts higher than the $8 safe harbor. By using estimates of pre-charge-off collection costs per paid incident using the Y–14 data from September 2021 to August 2022 (consistent with the data used in the 2023 Proposal), the CFPB expected that fewer than four of the 12 issuers might use the cost analysis provisions to charge late fee amounts above $8 based on their reported pre-charge-off collection costs per paid violation. The CFPB's calculations suggested that if these major issuers rely on the cost analysis provisions in § 1026.52(b)(1)(i) while the others in the Y–14 data use the $8 safe harbor amount, it would lower the mechanical impact of the new safe harbor amounts by 3 percent relative to the case of all Y–14 issuers charging late fees of $8 (from an estimated fee reduction of $4.23 billion for these Y–14 issuers to an estimated $4.11 billion), representing a reduction in fees collected of 72.3 percent for these issuers.[244] In the 2023 Proposal, the CFPB assumed that the 73 percent of balances covered by these issuers with collection costs in the Y–14 data collection is representative of the fee structure and incidence of the entire market, and provided that these figures would have implied $5.6 billion savings for consumers (not including any fees charged but not ultimately collected). However, as discussed above and in the 2023 Proposal, the Y–14 data suggest that late fee revenue per account at these Y–14 issuers is less than for other issuers in the Y–14+. This implies a larger reduction in fee revenue at Larger Card Issuers not in the Y–14 data, meaning that $5.6 billion is therefore likely to be an underestimate of the potential reduction in fees. As discussed in the 2023 Proposal, if the 72.3 percent

reduction in fee revenue were applied to the total estimated $12 billion in late fees at Larger Card Issuers in the Y–14+ from 2020, it will imply a reduction in fee revenue of approximately $9 billion.[245]

After issuance of the 2023 Proposal, the CFPB collected quarterly data on Larger Card Issuers in the Y–14+ sample for 2021 and 2022. Thus, for a similar period, but from October 2021 to September 2022, the CFPB now can compare late fee revenue of the Y–14 analysis sample to the Y–14+ total. The Y–14 issuers whose account level data was used reported $5.8 billion in late fee revenue over this period, which is 53 percent of the $11 billion total for that time period in the Y–14+ data. These data are consistent with the CFPB's expectation as noted above and in the 2023 Proposal that the late fee revenue per account at these Y–14 issuers is less than for other issuers in the Y–14+.

Also, since the issuance of the 2023 Proposal, the CFPB published new estimates for late fee revenue at Larger Card Issuers in the Y–14+ from 2021 and 2022. These data are consistent with the consumer benefits discussed above and in the 2023 Proposal of the $8 safe harbor as applied to the Y–14+ issuers, and in fact, suggest that the consumer benefits may be higher than the $9 billion estimated in the 2023 Proposal. Based on the $14.5 billion estimated late fee revenue for the Y–14+ in 2022, the CFPB estimates that the total consumer benefits at Y–14+ issuers from the mechanical effect (based on a drop-in late fee revenue proportional to the simulated effects in the account-level data) would be $10.5 billion instead of the estimated consumer benefit of $9 billion based on the lower $12 billion total in 2020. In addition, total benefits for consumers holding cards of Larger Card Issuers will be even higher than the estimate based on the Y–14+ data, given that the CFPB estimates that there are about a dozen Larger Card Issuers that are not included in the Y–14+ data.[246]

The above analysis is based on collection expenses as reported in the Y–14 data. Some commenters reported that some issuers that report Y–14 data have collection expenses that they do not account for in their Y–14 reporting of collection expenses. If some Larger Card Issuers have greater costs than they report in the Y–14 data and such costs

can be included for purposes of the cost analysis provisions in § 1026.52(b)(1)(i), it is possible that more Y–14 issuers than reflected above would use the cost analysis provisions, reducing both potential benefits to cardholders and potential costs to issuers.

The above estimates do not consider potential responses by consumers to lower late fees—in particular, the possibility that consumers are more likely to miss a payment due date if the fee for doing so is reduced. If this occurs and more consumers make untimely payments, consumers could face costs for doing so, including costs like increased penalty interest rates or lower credit scores. Such a response will affect the estimates above, as well as the final incidence of the benefits and costs.

As discussed in part VII above concerning deterrence and in the 2023 Proposal's 1022(b) analysis, however, the available evidence leads the CFPB to expect that a $8 late fee will still have a deterrent effect on late payments, although that effect may be lessened by the change to some extent, and other factors may be more relevant (or may become more relevant) towards creating deterrence. Even with a late fee of $8 at Larger Card Issuers, consumers will have incentives to make their minimum payment on time to avoid the late fee and other potential consequences of paying late, such as the potential loss of the grace period, and potential credit reporting consequences. To the extent consumers are late in paying because they are inattentive to their account or because they are so cash-constrained that they are unable to make a minimum payment, the amount of the late fee may have little effect on whether they pay late.

To the extent consumers who pay on time when faced with current late fees will instead respond rationally choose to make a late payment in response to lower late fees that will result from this final rule, those consumers will benefit from the additional flexibility that a lower late fee will afford. For such consumers, the benefit of delaying the minimum payment past the due date, net of the perceived other financial consequences of missing the due date, must be less than their account's existing late fees but greater than the fees that will result from this final rule. Their benefit from this final rule will be less than the difference between the two fees, but it will still add to the total consumer gains from this final rule. More generally, all consumers will benefit from the option value of managing a potential episode of financial distress at lower costs if and when necessary.

---

[243] The CFPB notes that the estimated reduction of fee revenue of approximately $9 billion was for the Y–14+ issuers only and did not factor in additional reduction of fee revenue for other card issuers (namely, Larger Card Issuers that are not included in the Y–14+ and are covered by this final rule, and Smaller Card Issuers that would have been covered by the $8 late fee safe harbor under the proposal but are not covered by the $8 late fee safe harbor under this final rule).

[244] This analysis assumes each issuer sets late fees for all their credit card products using only the safe harbor in § 1026.52(b)(1)(ii) or only the cost analysis provisions in § 1026.52(b)(1)(i). In practice, some issuers may use the safe harbor amount for some credit card products and the cost analysis provisions for others, which could lead the revenue impact of the new safe harbor amount to be different among issuers in the Y–14.

[245] *See supra* note 243.

[246] The CFPB is not aware of estimates of late fee revenue of Larger Card Issuers not in the Y–14+ data. Consumers doing business with Smaller Card Issuers would not be directly impacted by the $8 late fee safe harbor adopted in this final rule.

Since this final rule will reduce Larger Card Issuers' revenue from late fees, these issuers may respond by adjusting interest rates or other card terms to offset the lost income. Issuers' responses will affect both the sum of consumer gains and their distribution across consumers within pricing tiers. Total consumer gains would be the lowest in the unlikely case that Larger Card Issuers made up for all lost revenue and any potential cost increase by changing other consumer prices. Any such offset could manifest in higher maintenance fees, lower rewards, or higher interest on interest-paying accounts.

Offsetting price increases are most likely where markets are most competitive since, in competitive markets, any reduction in revenue is likely to drive some firms out of the market, limiting supply and driving prices up for consumers. As the recent profitability of consumer credit card businesses suggests that these markets are imperfectly competitive, the CFPB expects less than full offset, with consumers gaining in total from reduced late fees.[247] The same observation indicates that the market is unlikely to see any exits and no fewer entries, especially as the final rule directly impacts the late fee revenue of Larger Card Issuers only, who are even less likely to be on the margin of exit or entry. The two pieces of evidence most relevant to set the CFPB's expectations for offset are an academic publication and a CFPB report that includes an analysis of the effects of the fee changes resulting from the Board's 2010 Final Rule implementing the CARD Act.[248] The academic study used a precursor of the Y–14 data and expanded on the

CFPB's analysis in its 2013 CARD report[249] that also compared average outcomes for consumer and small business credit cards but did not conduct a formal causal analysis. The identifying assumption of the academic work is that in the absence of the CARD Act, outcomes for consumer and small business accounts would have maintained parallel trends. The authors found late fees dropping in the subprime segment (with FICO scores below 660 at origination) by 1.5 percentage points of average daily balances as a result of the rule, and around a tenth as large a response at accounts with FICO credit scores above 660.[250] The authors also found that fees that were not subject to the CARD Act restrictions for consumer accounts did not increase to offset lost revenue from regulated fees. The frequency of late payments did not change around the August 2010 implementation date, which suggested to the authors that cardholders did not respond to the reduction in the late fee amount by increasing the frequency of late payments, and thus late fee revenue changed one-for-one with the late fee amounts.

To attempt to identify potential offsetting price changes, the authors develop a theoretical model of pricing offset under imperfect competition and imperfect salience (at the end of their appendix, extended in a separate publication[251]), and calibrate the model to market benchmarks. They conclude from this model that for every dollar in fee reduction, credit card issuers will increase prices by about 19 cents. The empirical investigation rules out offset effects of greater than 61 cents on the dollar with 95 percent confidence.

A third study that some commenters deemed relevant focuses on the effects of debit card interchange fee limits in the Durbin Amendment, which applied to large institutions, and found that less than half of lost interchange revenue was offset through increases to consumer checking account fees.[252] Although these findings relate to a different product market, they are generally consistent with the conclusion that lost bank revenue from reduced

credit card late fees would not be fully offset.[253]

The CFPB reads this evidence as strongly suggesting less than full offset, if any. In considering offsetting changes, Larger Card Issuers will also face competitive pressures from Smaller Card Issuers, which will not be required by this final rule to reduce late fee amounts and therefore may not face similar pressure to increase other fees or APRs.

To illustrate a realistic level of the potential offsetting effect, consider the increase in interest income required to offset 19 percent lost late fee income, using the same calibration as in the academic study.[254] As discussed above, over the 12 months between September 2021 and August 2022, limiting late fees to $8 could have reduced the late fee revenue of Y–14 issuers with cost data by 72.3 percent, or $4.11 billion, even if some issuers use the cost analysis provisions to determine the amount of the late fee as discussed above. Total interest income at the issuers with collection costs in the Y–14 data was $71.4 billion over the same 12 months, so offsetting 19 percent of the lost fee revenue would require increasing interest revenue by $780 million, or 1.1 percent. Were such a proportional change uniform across all accounts, it would be less than 40 basis points on any APR that is below 36 percent.[255] Differentiated, for instance, "risk-based" pricing might imply interest rates rising more than this average in some groups (presumably those who are predicted to generate more late fee revenue) and less

[247] In its latest annual report on credit card profitability to Congress, the Board found that "[c]redit card earnings have almost always been higher than returns on all bank activities, and earnings patterns for 2022 were consistent with historical experience." Bd. of Governors of the Fed. Rsrv. Sys., *Profitability of Credit Card Operations of Depository Institutions* (July 2023), at 4, *https://www.federalreserve.gov/publications/files/ccprofit2023.pdf*. The Board also found that the quarterly average return on credit card assets (ROA) using Y–14 data was stable at around 1.10 percent during the 2014–19 period before the pandemic, while the quarterly average credit card bank ROA using Call Report data was 1.03 percent. These measures dipped below zero early in the COVID–19 pandemic but rebounded to around 2 percent by 2021 for the Y–14. Late and other fees accounted for slightly less than 10 to 30 percent of ROA at reporting firms during the 2014–2021 period. Robert Adams *et al.*, *Credit Card Profitability*, FEDS Notes, Bd. of Governors of the Fed. Rsrv. Sys. (Sept. 9, 2022), *https://doi.org/10.17016/2380-7172.3100*.

[248] Sumit Agarwal *et al.*, *Regulating Consumer Financial Products: Evidence from Credit Cards*, 130 Quarterly J. of Econ., at 111–164 (Feb. 2015), *https://doi.org/10.1093/qje/qju037*; 2013 Report, at 20–37.

[249] 2013 Report, at 35–36.

[250] *See* Agarwal *et al.*, *supra* note 248.

[251] *See* Agarwal *et al.*, *supra* note 248; see Sumit Agarwal *et al.*, *A Simple Framework for Estimating Consumer Benefits from Regulating Hidden Fees*, 43 J. of Legal Studies (Jun. 2014), *https://www.journals.uchicago.edu/doi/abs/10.1086/677856?journalCode=jls*.

[252] *Supra* note 233.

[253] Another study cited by commenters compares the credit card limits relative to total debt of consumers with subprime scores to consumers with better scores and finds that credit cards made up a smaller share of available credit for consumers with subprime scores during the period when the CARD Act was proposed, passed and implemented. Yiwei Dou, Julapa Jagtiani, Joshua Ronen and Ramain Quinn Maingi (2022), "The Credit Card Act and Consumer Debt Structure," Journal of Law, Finance, and Accounting: Vol. 7: No. 1, pp 91–126. *http://dx.doi.org/10.1561/108.00000058*. The CFPB is not convinced that this comparison can establish the causal effect of the CARD Act for consumers with subprime credit scores, as consumers in all credit score categories are likely to have been affected by the provisions of the CARD Act and market responses.

[254] The available evidence suggests that issuers compete fiercely with more salient (though not necessarily transparent) rewards and, to a lesser extent, annual or account maintenance fees. (Other types of penalty fees, such as over-the-limit or returned check fees, are subject to existing CARD Act limits, and in any case apply only in particular circumstances and generate relatively little revenue.) This leads the CFPB to estimate an interest-only response as the full-offset benchmark. *See*, for instance, the academic research cited in *supra* note 248, or Figure 44 of the 2013 Report, at 82.

[255] For data related to total interest income in the Y–14 collection, *see* Revenue-Cost Report, at 6–9.

in other groups, if at all—essentially limiting any offset to within pricing tiers.

Economic theory also suggests the potential for a pass-through greater than what would be required to offset lost fee revenue, if the credit card market is sufficiently adversely selected on APRs.[256] Intuitively, if the offsetting change in APRs leads low-risk consumers to leave the pool of credit card borrowers to a greater degree than it leads higher-risk consumers to leave the pool of credit card borrowers, then the resulting change in average credit risk could lead to further increases in APRs in market equilibrium. However, the CFPB notes that existing evidence on adverse selection in the credit card market suggests that adverse selection is unlikely to be this severe. Most notably, the aforementioned research paper studying the effects of the safe-harbor fee levels in the Board's 2010 Final Rule finds that this high pass-through scenario can be rejected with high statistical confidence.[257] Complementary academic research finds less than full pass-through of other shocks to credit card lenders' costs,[258] and that the effects of adverse selection after the Board's 2010 Final Rule took effect were generally modest.[259] Overall, the CFPB concludes that concerns about adverse selection are unlikely to alter the above analysis's conclusion that any offsetting changes to APRs are likely to be limited.

This middle-of-the-road interest offset estimate for Larger Card Issuers, at least on one that reprices all accounts by the same percentage to recover all lost late fee revenue with higher finance charges, suggests that any losses to credit access will be limited. However, the CFPB acknowledges that late fee revenue has been concentrated on certain market segments, suggesting that any price responses are also likely to be focused in those segments. Risk-based pricing is likely to work by tiers. In particular, interest rates or other charges of subprime credit cards might increase more than for other cards, and some consumers might find these cards too expensive due to higher interest rate

offers. Even if this were to happen, it would not result from a higher average consumer cost of using credit cards but from greater transparency about the cards' actual expected cost of ownership.[260] To the extent consumers consciously decline offers because of the card's actual price becoming more salient, this will constitute a benefit to those consumers.

On the other hand, it is also possible that some consumers' access to credit could fall if Larger Card Issuers could adequately offset lost fee revenue expected from them only by increasing APRs to a point at which a particular card is not viable, for example, because the APR exceeds applicable legal limits.

Any offsetting changes, like the decrease in late fees, would affect different consumers differently depending, for example, on how often they pay late and whether they carry a balance. For example, within any market segment there will be some cardholders who never pay late; such consumers will not benefit from the reduction in late fees and could pay more for their account if maintenance fees in their market segment rise in response—or if interest rates increase in a segment in response and some on-time cardholders in that segment also carry a balance. Frequent late payers are likely to benefit monetarily from reduced late fees, even if higher interest rates or maintenance fees offset some of the benefits. Cardholders who do not regularly carry a balance but occasionally miss a payment will benefit from the changes so long as any increase in the cost of finance charges (including the result of late payments that eliminate their grace period) is smaller than the drop in fees.[261] Cardholders who carry a balance but rarely miss a payment are less likely to benefit on net. Any consumers potentially harmed by changes to terms of credit cards at Larger Card Issuers could potentially switch to cards issued by Smaller Card Issuers, which in turn could deter offsetting salient price responses at the Larger Card Issuers.

Though the late fee changes most directly benefit those who make late payments, the CFPB notes that late fees are collected only from those delinquent cardholders who eventually pay at least

the late fee amount. Some collection costs and charge-off losses are caused by delinquent customers who do not recover before account closure and charge-off. These cardholders will not receive any of the benefits of the lower fees they are nominally assessed but do not pay in practice.[262] Using a subsample of Y–14 account data, the CFPB estimated that around 14 percent of late fees are assessed to accounts that never make another payment.

As mentioned above in Part II.E, consumers may not fully consider late fees when shopping for a credit card.[263] This is true in the baseline and is most likely to remain the case once this final rule is implemented. To the extent this is or will be true, the actual cost of using a credit card is or will be greater than consumers' expected cost and reducing late fees will reduce the difference between the two. Whether or not changes to other prices offset a reduction in late fee revenue, consumers may benefit if, when choosing a credit card, they have a more accurate view of the expected total costs of using the card. To the extent that some consumers become better informed about the terms of credit cards, issuers may respond by offering improved terms, which could benefit even consumers who do not shop around. In addition, consumers might benefit or incur costs from further repricing and restructuring other financial products cross-marketed by credit card issuers and their holding companies. The CFPB is not aware of data that could help quantify such effects.

Recent studies in psychology and economics highlight some patterns likely to affect consumer welfare in the credit card market, depending on how accurately cardholders forecast the likelihood that they will incur late fees. A seminal theoretical study[264] identified and coined the term for naïveté-based discrimination, in which firms recognize that some potential consumers are prone to such systematic mistakes. If this is indeed a feature of credit card markets, "naïve" and "sophisticated" consumers, using the

---

[256] Neale Mahoney & E. Glen Weyl, *Imperfect Competition in Selection Markets*, 99 Review of Economics and Statistics, MIT Press at 637–51 (Oct. 1, 2017), *https://doi.org/10.1162/REST_a_00661*.

[257] Agarwal *et al.*, *supra* note 248.

[258] Tal Gross *et al.*, *The Economic Consequences of Bankruptcy Reform*, 111 (7) American Economic Review, 2309–41 (July 2021), *https://www.aeaweb.org/articles?id=10.1257/aer.20191311*.

[259] Scott Thomas Nelson, *Essays on Household finance and credit market regulation*, Ph.D. Thesis, Massachusetts Institute of Technology, Department of Economics (2018), *https://dspace.mit.edu/handle/1721.1/118066*.

[260] As discussed below, however, the cost of ownership of cards could go up for some consumers and down for others, depending on their usage patterns.

[261] If a consumer pays late and loses the grace period, the consumer will pay interest on the balances. The analysis here focuses on whether an increased interest as a result of the increase in the rate to offset some of the reduction in late fee revenue is greater than the reduction in the late fee.

[262] This holds as long as the additional charged-off balance due to higher late fees does not change the amount the holder of the debt can eventually collect after charge-off, including through litigation or wage garnishment. Even defaulting consumers would benefit otherwise.

[263] Under the final rule, these consumers might also mistakenly choose a credit card of a Smaller Card Issuer, when they would have preferred an offer from a Larger Card Issuers that has lower late fees.

[264] Paul Heidhues & Botond Kőszegi, *Naïveté-Based Discrimination*, 132 (2) The Quarterly Journal of Economics, at 1019–1054 (May 2017), *https://doi.org/10.1093/qje/qjw042*.

terminology of this scholarship, could be affected by this final rule differently. Naïve consumers may mistakenly expect high fees to be unimportant to them, as they are overly optimistic about not missing a payment. Such consumers will benefit from the changes to late fee amounts, which lower the cost of this mistake. Sophisticated consumers, inasmuch they would have been cross subsidized by naïve customers' costly mistakes, may pay higher maintenance fees or interest or collect fewer rewards if the issuer offsets the revenue lost to naïve consumers. The CFPB considers that to the extent there are offsetting changes to card terms, some of these effects are likely but has not quantified their magnitude.

The CFPB acknowledges the possibility that consumers who were more likely to pay attention to late fees than to other consequences of paying late, like interest charges, penalty rates, credit reporting, and the loss of a grace period, might be harmed in the short run if a reduction in late fees makes it more likely that they mistakenly miss payments. The CFPB has not quantified this effect but notes that reducing late fees may increase issuer incentives to find other approaches to make the consequences of late payment salient to consumers, including reminders or warnings.

Other studies in psychology and economics might suggest that penalties can serve as a valuable commitment device, for example helping them to make choices that they prefer in the long term despite the temptation to make different choices in the short term.[265] If some consumers were to value high fees for late payment in this way, then they might experience some harm if lower fees make it harder to responsibly manage their credit card debt. To the extent that late fees benefit some consumers in this way, any harm to such consumers may be mitigated to the extent that this final rule creates additional incentives for issuers to emphasize reminders, automatic payment, and other mechanisms that maintain similar or better payment behavior, as discussed below.

This final rule may benefit consumers indirectly by making late payments less profitable to Larger Card Issuers and thereby increasing Larger Card Issuer incentives to take steps that will encourage on-time payment. Consumers

may benefit from issuer practices such as more effective reminders or convenient payment options. If issuers bear no net cost from late payments, or even profit from them, then they have no incentive to take even inexpensive steps to reduce the incidence of late payments. Even with this final rule changes, Larger Card Issuers will not have incentives to take all steps they could that would efficiently reduce the incidence of late payment since the late fees they do charge mean they do not bear the full cost of late payments. Nonetheless, by limiting Larger Card Issuer revenue from violations that exceed cost, this final rule changes Larger Card Issuer incentives in a way that benefits consumers.

Relative to the 2023 Proposal, this final rule introduces an incentive for credit card issuers that together with their affiliates have close to one million open credit card accounts to stay or get below that threshold for the sake of higher late fee revenues as a Smaller Card Issuer than as a Larger Card Issuer. If this results in the closure of some accounts, maybe dormant accounts, those cardholders will have less liquidity immediately available as well as a potentially worse credit score. Similarly, consumers whose credit card applications are turned down, or who do not receive card offers, because of more stringent underwriting standards by issuers just below the size threshold could incur additional costs of shopping for an additional card and perhaps pay a slightly higher cost of applying for the next best credit card. The CFPB expects few issuers, if any, to be close to the threshold at any given time and change practices just because of this incentive.

**Potential Benefits and Costs to Covered Persons of the $8 Late Fee Safe Harbor Changes**

Because this final rule will significantly reduce the aggregate value of late fees paid by consumers, this final rule will significantly reduce late fee revenue for Larger Card Issuers. As noted above in part II.F, late fee revenue constitutes over one-tenth of the $120 billion issuers in the Y–14+ charged to consumers in interest and fees in 2019, totaling over $14 billion in that year.[266] Since the CPFB issued the 2023 Proposal, this remains true as late fees represented over one-tenth of the more than $130 billion issuers in the Y–14+ charged to consumers in interest and fees in 2022, totaling over $14 billion in that year.[267] As discussed below, Larger Card Issuers can offset losses to

consumer revenue to some extent by taking other measures (*e.g.*, increasing interest rates or changing rewards), and the reduction in late fees could affect consumer choices or market competition in ways that may create benefits or costs to Larger Card Issuers.

Larger Card Issuers' costs and revenue will also be affected by changes in consumer behavior in response to the reduced late fee amounts. In particular, lower late fees at Larger Card Issuers could make some consumers somewhat more likely to make late payments. As discussed above in the section-by-section analysis of § 1026.52(b)(1)(ii) in part VII, the CFPB expects that a $8 late fee will still have a deterrent effect on late payments, although that effect may be lessened by the lower late fee to some extent, and other factors may be more relevant (or may become more relevant) to creating deterrence. For example, as discussed in the 2023 Proposal, and in this final rule (the section-by-section of § 1026.52(b)(1)(ii)), the CFPB expects that consumers may be deterred by factors other than the fee amount, like higher interest rates and potential credit reporting.

As noted in the 2023 Proposal and this final rule, the CFPB also expects that any additional late payments due to the reduced late fee safe harbor amount will generate both additional fee income and additional collection costs relative to an outcome with lower fee amounts but no additional incidents. Even if more consumers pay late because of the decreased late fee amount, the cost of collecting any such additional late payments is unlikely to be greater, per incident, than the cost of collecting late payments under the existing safe harbor. Therefore, the CFPB expects that collection costs to Larger Card Issuers will not increase by more than fee income derived from any additional late payments.

The CFPB recognizes that an increased number of late payments could result in additional delinquencies and ultimately increase credit losses for Larger Card Issuers. But the CFPB is not aware of evidence showing that higher late fees prevent consumers from eventually defaulting on their accounts.[268] Further, if this is a concern,

---

[265] For a discussion of commitment devices most relevant to this context, *see* section 10.2 of John Beshears *et al.*, *Behavioral Household Finance*, Handbook of Behavioral Economics: Applications and Foundations 1, at 177–276 (2018), *https://doi.org/10.1016/bs.hesbe.2018.07.004*.

[266] Late Fee Report, at 4.
[267] 2023 Report, at 65.

[268] For some consumers, a high late fee may contribute to default by increasing their overall debt burden and making it more difficult to recover from delinquency. For example, the 2023 paper by Grodzicki *et al.*, described above in the section-by-section analysis of § 1026.52(b)(1)(ii) in part VII, with all the caveats noted there, found that a decrease in late fees increases borrowing for prime borrowers but triggers repayment for subprime cardholders. This paper explained that this latter effect on subprime cardholders might result from
Continued

the CFPB notes that Larger Card Issuers can take other steps to help reduce the likelihood of consumers missing payments, which would mitigate potential costs of this final rule from increased delinquencies. For example, as noted in the 2023 Proposal and this final rule, Larger Card Issuers could increase investments in payment reminders or automatic payments or provide lower-friction methods of payment, payment rescheduled for soon after regular deposits, or rewards for paying on time.[269] Larger Card Issuers could also increase minimum payment amounts or adjust credit limits to reduce credit risk associated with consumers who make late payments.

As discussed above, Larger Card Issuers could also increase other prices in a way that would offset some revenue lost from reduced late fees. In general, Larger Card Issuers will set the terms of credit cards to maximize profits, and it is not clear that limiting late fees will directly affect the existing profit-maximizing finance charge or account maintenance fee, for example. However, a reduction in late fee revenue could cause Larger Card Issuers to change other terms if the lost late fee revenue reduced the profitability of issuing credit cards to the point at which issuers are faced with a choice between raising new revenue by changing other card terms or exiting the market segment. As discussed above, such offsetting price increases are most likely where profit margins are low since any reduction in revenue is likely to drive risk-adjusted returns on capital below market expectations, limiting supply and driving prices up for consumers. The recent profitability of consumer credit card businesses makes the CFPB expect the market to see exceedingly few exits and no change in entries.[270]

Larger Card Issuers' revenue loss from this final rule could be mitigated by the ability to use the cost analysis provisions in § 1026.52(b)(1)(i) rather than setting late fees at the safe harbor amount. Any Larger Card Issuer with costs greater than $8 per late payment will be able to set a higher fee using the cost analysis provisions, although doing so would likely involve some expense to conduct the relevant analysis, ensure that it complies with the existing rule's requirements and potential changes from this final rule, and ensure that the relevant data and analysis are documented in a way that would permit the issuer to demonstrate compliance to regulators. The CFPB understands that Larger Card Issuers already conduct sophisticated analyses of credit card operations, and the CFPB expects the cost of additional analyses to be small, with most additional costs to come from procedures needed to demonstrate compliance.

The $8 late fee safe harbor in this final rule will only apply to Larger Card Issuers, but changes to the terms of credit cards at these institutions could affect demand for similar products at financial institutions not covered by the $8 late fee safe harbor, and this could affect Smaller Card Issuers and their customers in turn. In general, Smaller Card Issuers will benefit from new limitations on the types of products that competing firms can offer. For example, if Larger Card Issuers were to increase account annual fees to offset some lost revenue from late fees, the credit cards of other issuers would become more attractive. The ability of consumers to switch to these products could mitigate any costs to consumers from offsetting interest or fee changes at Larger Card Issuers or from reduced access to credit cards. On the other hand, significant reductions in credit card late fees at Larger Card Issuers might create competitive pressure for Smaller Card Issuers to lower their own late fees, in which case their consumers could experience effects similar to those at Larger Card Issuers. Given the difficulty in predicting the market response of Larger Card Issuers to this final rule, it is uncertain whether cardholders of Smaller Card Issuers will experience net benefits or costs from this final rule, and whether Smaller Card Issuers will experience net benefits or costs from this final rule.

**Potential Benefits and Costs to Consumers and Covered Persons From Not Applying the Annual Adjustments to the $8 Safe Harbor Amount for Late Fees at Larger Card Issuers**

The CFPB will not apply the annual adjustments to reflect changes in the CPI to the $8 safe harbor amount for late fees imposed by Larger Card Issuers. Instead, the CFPB will continue to monitor the market and adjust the safe harbor amount as the CFPB determines is appropriate to reflect changes to pre-charge-off collection costs and other factors. The discussion below considers the effects of this change relative to a baseline in which the new $8 safe harbor amount applicable to late fees charged by Larger Card Issuers is adjusted to reflect changes in the CPI; however, the effects would be qualitatively similar at other safe harbor amounts.

The benefits and costs of this final rule to consumers and covered persons depend on whether future adjustments by the CFPB would be greater or less than the changes that would result from the CPI adjustments that are currently used. As discussed in the section-by-section analysis of § 1026.52(b)(1)(ii)(D) in part VII and illustrated in Figure 3, trends in collection costs for Larger Card Issuers and the CPI do not appear to be closely related.[271] If the safe harbor amount were to fall or to grow less rapidly through the CFPB's future adjustments than the current CPI adjustments, then consumers would benefit from the reduced real cost of late fees, and Larger Card Issuers using the late fee safe harbor amount would see lower revenue. Conversely, if the late fee safe harbor amount were adjusted in the future by more than it would be through the current CPI adjustments, consumers could face costs from the change, and Larger Card Issuers using the late fee safe harbor amount would see increased revenue.

Under this final rule, it is likely that the $8 late fee safe harbor amount applicable to late fees charged by Larger Card Issuers will be adjusted less frequently than under the current rule. Some consumers will benefit from the transparency and administrative ease of these late fee amounts changing less often. The cardholders who will benefit are those whose late fee amount is not

---

the lower late fee amount lessening the need for subprime cardholders to focus on avoiding late fees and instead allowing some subprime cardholders to start to pay more attention to the high cost of their revolving debt.

[269] A joint comment in response to the ANPR submitted by several industry trade associations stated that issuers promote on-time payments through a variety of means in addition to late fees, including multiple payment reminders sent via mail, email, or text notification depending on consumer preference. These commenters further stated that one issuer reported that as of five months after rollout of its new alert system, the issuer's gross monthly late fees were 20 percent lower and the late fee incidence rate per balance had fallen by nearly 25 percent. Similarly, a large credit union trade association noted that some credit unions already have systems in place or are currently contracting with third-party vendors to offer their members convenient reminders for upcoming payment due dates via text message and email.

[270] *See supra* note 247.

[271] The 2023 Proposal looked at costs and the CPI–U price index, as in Figure 3. As discussed elsewhere, the CFPB uses the CPI–W index to make adjustments pursuant to § 1026.52(b)(1)(ii)(D) and thus, this final rule considers the impact of eliminating the adjustment based on the CPI–W price index. As Figure 4 attests, the relationship between costs and this price index is fundamentally the same as the one in Figure 3.

set using the cost analysis provisions in § 1026.52(b)(1)(i), because the provision does not affect how often fees could be adjusted pursuant to the cost analysis provisions. The CFPB also notes that even if the CPI-based adjustments were to continue to apply to the late fee safe harbor threshold amount applicable to Larger Card Issuers, the lower $8 safe harbor amount combined with the requirement that if the cumulative change in the adjusted value derived from applying the annual CPI–W to the safe harbor amounts has risen by a whole dollar, means that the $8 would be adjusted less frequently using the annual adjustments than how often the late fee safe harbor amounts have changed recently. Similarly, the lower $8 safe harbor amount combined with the requirement that if the cumulative change in the adjusted value derived from applying the annual CPI–W level to the safe harbor amounts has decreased by a whole dollar, means that this $8 safe harbor amount would likely change less frequently using the annual adjustments than the current late fee safe harbor amounts.

To the extent that some Larger Card Issuers experience increases in collection costs that would have been addressed through CPI-based adjustments, these issuers will retain the option under this final rule to use the cost analysis provisions in § 1026.52(b)(1)(i) and thus recover their higher costs with higher late fee amounts. Their cardholders will still benefit from the elimination of the annual adjustments to the $8 late fee safe harbor amount if the cost analysis provisions result in less substantial increase than would have been the case under the CPI adjustments. If a rise in a fee stemming from the cost analysis provision were faster, the consumer would have seen the same fee rise from this issuer determining the late fee using the cost analysis provisions in § 1026.52(b)(1)(i), irrespective of this provision.

Larger Card Issuers with decreasing costs will lose out on a mechanical increase in their revenue above cost to reflect CPI adjustments unless the late fee safe harbor amount is otherwise adjusted. As shown in Figure 3 above in part VII, recent collection cost totals from the Y–14 portfolio data suggest that some issuers have been experiencing decreasing nominal collection costs even in the inflationary period of 2021–2022.

Potential Benefits and Costs to Consumers and Covered Persons of Applying Annual Adjustments to Safe Harbor Threshold Amounts for Penalty Fees Other Than Late Fees for All Card Issuers and for Late Fees at Smaller Card Issuers

This final rule revises the safe harbor threshold amounts in § 1026.52(b)(1)(ii)(A) and (B) to $32, except that it sets forth a safe harbor of $43 for each subsequent violation of the same type that occurs during the same billing cycle or in one of the next six billing cycles. These revised safe harbor threshold amounts of $32 and $43 apply to penalty fees other than late fees for all card issuers as well as late fees imposed by Smaller Card Issuers.

Based on a 2023 survey of credit card agreements submitted to the CFPB's Credit Card Agreement Database as discussed in part II.E, the CFPB estimates that 1 percent of Smaller Card Issuers charge the current safe harbor threshold amounts for late fees, representing far less than 1 percent of balances of consumer credit cards. The cardholders of these issuers will pay 6.7 percent more in fees for late payments, and 4.9 percent more for each subsequent late payment in one of the next six billing cycles. These Smaller Card Issuers will collect correspondingly higher revenue from these late fees.

The CFPB does not have specific data on the percentage of Larger and Smaller Card Issuers that charge the safe harbor amount for penalty fees other than late fees. The cardholders of these issuers will pay 6.7 percent more in fees for violations.

Annual adjustments in the future will operate the same way as in the baseline and thus have no additional impact.

Potential Benefits and Costs to Consumers and Covered Persons of Proposed Alternatives Lowering the Limitation on Late Fees to 25 Percent of the Minimum Payment Due

The CFPB considered whether to amend § 1026.52(b)(2)(i)(A) to limit the dollar amount associated with a late payment to 25 percent of the required minimum periodic payment due immediately before the assessment of the late fee. Currently, late fee amounts must not exceed 100 percent of the required payment. As discussed in part VII, the CFPB is not finalizing this proposed amendment for either Larger Card Issuers or Smaller Card Issuers because the CFPB determined the benefits the 25 percent limitation may have for consumers, such as requiring a more reasonable and proportional late

fee for instances where the minimum payment due is small, do not outweigh considerations of card issuers' ability to recoup their pre-charge-off collection costs when they are using the $8 safe harbor threshold amount. The CFPB also determined not to adopt the 25 percent limitation proposal in order to minimize impacts to minimum balances due.

A Courtesy Period That Would Prohibit Late Fees Imposed Within 15 Calendar Days After the Payment Due Date

In the 2023 Proposal, the CFPB considered an alternative approach in which § 1026.52(b)(2) would be amended to provide for a courtesy period that would prohibit late fees imposed within 15 calendar days after the payment due date. Such a courtesy period could apply only to late fees assessed if the card issuer is using the late fee safe harbor amount or, alternatively, could be applicable generally (regardless of whether the card issuer assesses late fees according to the safe harbor amount set forth in § 1026.52(b)(1)(ii) or the cost analysis provisions in § 1026.52(b)(1)(i)). The CFPB is not finalizing this alternative.

The CFPB has determined that, absent additional evidence, the potential impacts to card issuers' costs and consumers outweigh the benefits of a mandatory 15-day courtesy period. While the CFPB acknowledges the possible benefits raised by commenters, such as helping consumers who mail in their late payments avoid a penalty fee for any mail delivery issues, the potential for card issuers to recoup costs at half the safe harbor amount per late payment combined with other concerns about consumer confusion outweighs the possible benefits to consumers.

Eliminating the Safe Harbors for Late Fees

As discussed in part VII, the CFPB solicited comment on the alternative of proposing to eliminate the safe harbor provisions for late fees in § 1026.52(b)(1)(ii) altogether, in which case card issuers could only impose late fees under the cost analysis provisions in § 1026.52(b)(1)(i). The CFPB is not finalizing this alternative to revoke the late fees for Larger Card Issuers without replacing it with another safe harbor amount and thus, requiring Larger Card issuers to use the cost analysis provisions to determine the amount of late fees. As discussed in part VII, the CFPB has determined that revoking the safe harbor and then adopting the $8 late fee safe harbor amount for Larger Card Issuers—as this final rule does—better achieves its goals.

Applying the Changes to the Safe Harbor Provision With Respect to Other Penalty Fees

The CFPB considered an alternative that would apply the $8 safe harbor to other penalty fees, such as over-the-limit fees, returned-payment fees, and declined access check fees. In particular, the CFPB considered whether the new $8 late safe harbor threshold would apply to other penalty fees and whether, alternatively, if the CFPB were to eliminate the safe harbor provisions in § 1026.52(b)(1)(ii) for late fees charged, the CFPB should also eliminate the safe harbor for other penalty fees charged. This final rule does not adopt this alternative.

*F. Potential Specific Impacts of This Final Rule on Depository Institutions and Credit Unions With $10 Billion or Less in Total Assets, As Described in CFPA Section 1026*

As the lower $8 safe harbor amount in this final rule applies only to Larger Card Issuers (*i.e.,* card issuers that together with their affiliates have one million or more open credit card accounts), the CFPB expects no specific impact on Smaller Card Issuers as defined in § 1026.52(b)(3) (*i.e.,* card issuers that have less than one million open credit card accounts for the entire preceding calendar year) directly.[272]

Based on its review of both public and confidential data, the CFPB expects that there are approximately 30–35 Larger Card Issuers that together with their affiliates have one million or more open credit card accounts, and one dozen or fewer among them with $10 billion or less in assets.

As with other Larger Card Issuers, depository institutions and credit unions that together with their affiliates have one million or more open credit card accounts but the depository institutions and credit unions have $10 billion or less in total assets will generally lose fee revenue as a result of this final rule. The CFPB has no reason to believe that depository institutions and credit unions that are Larger Card Issuers and have $10 billion or less in total assets will experience effects qualitatively different from those discussed above in part IX.E.

Institutions with $10 billion or less in assets might experience indirect effects of the new $8 late fee safe harbor amount adopted in this final rule. As noted above, changes to the terms of credit cards at Larger Card Issuers could affect demand for similar products at financial institutions not covered by the

new $8 late fee safe harbor amount adopted in this final rule. For example, if some Larger Card Issuers were to increase some account APRs to offset some lost revenue from late fees, the credit cards of other institutions could become more attractive. On the other hand, significant reductions in late fees at Larger Card Issuers might create competitive pressure for financial institutions not directly affected by this final rule to lower their own late fees, and thus lose revenue. Given the difficulty in predicting the market response of Larger Card Issuers, it is uncertain whether financial institutions not covered by the $8 safe harbor threshold adopted in this final rule will experience net benefits or costs from this final rule.

*G. Potential Specific Impacts of This Final Rule on Consumer Access to Credit and on Consumers in Rural Areas*

The CFPB is concerned about the geographic concentration of current late fees and that areas with higher incidence of late fees tend to also be areas with higher numbers of consumers from disadvantaged groups, as summarized in part II.F above. While the CFPB has not analyzed the incidence of late fees in rural areas specifically, as explained in the 2023 Proposal, CFPB research has found that consumers in rural areas are somewhat less likely than other Americans to have a credit card, and not significantly more likely than other Americans to have a credit card delinquency.[273] These findings suggest that the effects of the rule on late fees paid by rural consumers may generally be similar to those of other Americans.

On the other hand, as discussed in the 2023 Proposal, consumers in rural areas have lower median household income, and lower median credit card balances, than consumers in non-rural areas.[274] Though high-income Americans have more credit cards, low-income areas have more late payments per card. As a result, there is no clear indication whether savings from this final rule will be greater or lesser for consumers in rural areas; however, reductions in fee amounts that are similar in dollar terms may be more meaningful on average for consumers with lower incomes, and given that consumers in rural areas may have lower median income, the reduction in late fees could result in

more meaningful on average benefits for consumers in rural areas.

As discussed above in part IX.D and in the 2023 Proposal, the CFPB acknowledges that late fee revenue has been concentrated in certain market segments, suggesting that any price responses to this final rule are also likely to be focused in those segments. In particular, interest rates or other terms could be less advantageous for subprime consumers or certain consumers in specific regions; for these consumers, some types of cards may become too expensive due to higher interest rates or less advantageous terms. Although, even if this were to happen, it would not result from a higher expected consumer cost of using credit cards but from greater transparency about the cards' actual anticipated cost of ownership. Lost credit to consumers consciously declining offers because the cards are too expensive is unlikely to harm and potentially may benefit consumers, particularly given the ability of consumers to shop and compare costs between cards.

**X. Regulatory Flexibility Act Analysis**

The RFA generally requires an agency to conduct an initial regulatory flexibility analysis (IRFA) and a final regulatory flexibility analysis of any rule subject to notice-and-comment rulemaking requirements unless the agency certifies that the rule will not have a SISNOSE.[275] The CFPB is also subject to specific additional procedures under the RFA involving convening a panel to consult with small business representatives before proposing a rule for which an IRFA is required.[276]

Small institutions, for the purposes of the Small Business Regulatory Enforcement Fairness Act (SBREFA) of 1996, are defined by SBA. Effective March 17, 2023, depository institutions with less than $850 million in total assets are determined to be small for the period used in the subsequent analysis.[277]

*A. The CFPB's Proposal*

In the 2023 Proposal, the CFPB determined that an IRFA is not required for the proposal because it would not have a SISNOSE.

The 2023 Proposal would have affected small entities that issue credit cards most directly by reducing late fee revenue from credit cards. To assess

---

[272] *See supra* note 5.

[273] CFPB, *Consumer Finances in Rural Appalachia,* at 12 (Sept. 1, 2022) (Appalachia Report), *https://www.consumerfinance.gov/data-research/research-reports/consumer-finances-in-rural-appalachia/.*

[274] *Id.* at 8, 12.

[275] 5 U.S.C. 601 *et seq.*

[276] 5 U.S.C. 609.

[277] *See* Small Business Administration, Table of size standards, *https://www.sba.gov/document/support—table-size-standards* (last visited on December 18, 2023).

whether the 2023 Proposal, if adopted, would have had a SISNOSE, the CFPB considered the significance of credit card late fee revenue as a share of the total revenue of affected small entities. As discussed in part VII of the 2023 Proposal, the CFPB did not have data with which to precisely estimate the effect of the 2023 Proposal on late fee revenue. The CFPB analyzed available information on total late fee revenue below because the CFPB considered total late fee revenue to be an upper bound on potential impacts of the 2023 Proposal, if adopted, on small entities.

In the 2023 Proposal, the CFPB estimated that there were approximately 3,780 small banks, of which approximately 498 reported outstanding credit card debt on their balance sheets.[278] In addition, the CFPB estimated that there were approximately 4,586 small credit unions, of which approximately 2,785 reported credit card assets.[279] Detailed information about sources of credit card revenue was not available for most small banks. However, FFIEC Call Reports included a measure of outstanding credit card debt held as assets. Revenue for banks was reported on the FFIEC Call Reports as net-interest income plus non-interest income. Interest income was partially reported by product type. For example, all banks were required to report "all interest, fees, and similar charges levied against or associated with all extensions of credit to individuals for household, family, or other personal expenditures arising from credit cards (in domestic offices)."[280] The CFPB considered this interest and fee income on outstanding credit card balances as a proxy for credit card revenue.

As discussed in the 2023 Proposal, credit cards represented a small fraction of both assets and revenue for small banks. Thus, for the vast majority of small banks, even a large reduction in credit card late fee revenue would have represented well below 1 percent of

bank revenue and, therefore, would not have had a significant economic impact.

As discussed in the 2023 Proposal, the CFPB did not have equivalent data on credit card revenue for small credit unions because credit unions were not required to separately report income from their credit card business in the NCUA Call Reports. However, NCUA Call Reports provided information on credit card assets as a share of total assets.

To obtain a rough estimate of credit card revenue shares at small credit unions, in the 2023 Proposal, the CFPB extrapolated using the relationship between credit card revenue share and credit card asset share in bank call report data. As with small banks, the small share of revenue coming from credit cards, together with the fact that late fees made up only a fraction of credit card revenue, implied that even a significant drop-in late fee revenue would not have had a significant economic impact for the large majority of small credit unions.

Accordingly, the Director certified that the 2023 Proposal would not have had a significant economic impact on a substantial number of small entities. Thus, neither an IRFA nor a small business review panel was required for the proposal.

## B. Comments Received

Many banks and credit unions, industry trade associations, and individuals on behalf of credit unions, the Office of Advocacy, an independent office within the SBA, and one law firm representing card issuers asserted that the 2023 Proposal, if adopted, would have a SISNOSE and thus the CFPB is required to hold a SBREFA panel under the RFA prior to finalizing the rulemaking. Many banks and credit unions, industry trade associations, and individuals on behalf of credit unions (1) expressed concern that the CFPB did not conduct a SBREFA panel to seek feedback from smaller issuers that would be significantly impacted by the proposal; (2) asserted that lowering the safe harbor as proposed would have a significant impact on small financial institutions; and (3) urged the CFPB to withdraw the proposal and convene a SBREFA panel in fulfillment of its statutory obligation under the SBREFA Act of 1996.

The agency that advocates for small businesses asserted that (1) the CFPB does not have the necessary data to develop an adequate factual basis for its SISNOSE certification and does not have sufficient information to indicate that small institutions contribute to the problem that is the target of the

proposal; and (2) without a factual basis, the CFPB may not certify under section 605(b) and must publish an Initial Regulatory Flexibility Analysis under section 603 of the RFA.

One law firm representing card issuers asserted that CFPB's failure to convene a SBREFA panel renders the 2023 Proposal not only statutorily unsound, but also arbitrary and capricious under the APA.

## C. The Final Rule

In the 2023 Proposal, the CFPB determined that an IRFA was not needed because the 2023 Proposal would not have had a SISNOSE. As described in the analysis included in the 2023 Proposal, the CFPB estimated that credit card assets and revenue held by small banks and small credit unions represent a small fraction of both total assets and revenue for those small entities.

As discussed in more detail in part VI, the CFPB is not finalizing the following provisions in this final rule for Smaller Card Issuers: (1) the repeal of the current safe harbor threshold amounts in § 1026.52(b)(1)(ii)(A) and (B), adoption of $8 late fee safe harbor threshold amount, and elimination of a higher late fee safe harbor dollar amount for subsequent violations of the same type that occur during the same billing cycle or in one of the next six billing cycles; and (2) the elimination of the annual adjustments for the safe harbor threshold dollar amounts set forth § 1026.52(b)(1)(ii)(D). This final rule defines the term "Smaller Card Issuer" in § 1026.52(b)(3) to mean a card issuer that together with its affiliates have fewer than one million open credit card accounts for the entire preceding calendar year.[281] For purposes of the definition of "Smaller Card Issuer," this final rule incorporates the definition of "open credit card account" from § 1026.58(b)(6), which defines the term to mean a credit card account under an open-end (not home-secured) consumer credit plan and either: (1) the cardholder can obtain extensions of credit on the account; or (2) there is an outstanding balance on the account that has not been charged off. As discussed below, the safe harbors in § 1026.52(b)(1)(ii)(A) and (B), as revised pursuant to the annual automatic adjustments in § 1026.52(b)(1)(ii)(D) in this final rule, will apply to late fees imposed by Smaller Card Issuers.

Pursuant to the annual adjustments for safe harbor dollar amounts in § 1026.52(b)(1)(ii)(D), this final rule revises the safe harbor threshold

---

[278] These estimates and others for small banks were based on data from the quarterly Federal Financial Institutions Examination Council (FFIEC) Consolidated Reports of Condition and Income (FFIEC Call Reports), and refer to the fourth quarter of 2021, unless otherwise noted. Fed. Fin. Insts. Examination Council, Call Reports, *https://cdr.ffiec.gov/public/ManageFacsimiles.aspx* (last visited Dec. 14, 2022).

[279] These estimates and others for small credit unions were based on data from NCUA Call Reports, and refer to the fourth quarter of 2021, unless otherwise noted. Nat'l Credit Union Admin., *Call Report Quarterly Data, https://www.ncua.gov/analysis/credit-union-corporate-call-report-data/quarterly-data* (last visited Dec. 14, 2022).

[280] *See* the Board's Micro Data Reference Manual, B485, *https://www.federalreserve.gov/apps/mdrm/data-dictionary* (last visited Dec. 14, 2022).

[281] *See supra* note 5.

amounts in § 1026.52(b)(1)(ii)(A) and (B) to $32, except that it sets forth a safe harbor of $43 for each subsequent violation of the same type that occurs during the same billing cycle or in one of the next six billing cycles. These revised safe harbor threshold amounts of $32 and $43 apply to penalty fees other than late fees for all card issuers (*i.e.*, Smaller Card Issuers and Larger Card Issuers) as well as late fees imposed by Smaller Card Issuers, as noted above.

Small institutions, for the purposes of the SBREFA of 1996, are defined by SBA. Effective March 17, 2023, financial institutions with less than $850 million in total assets are determined to be small.[282]

The CFPB has determined that nearly all small entities for purposes of the RFA will qualify as a "Smaller Card Issuer" as defined in this final rule, and therefore, the new, lower $8 late fee safe harbor amount and the elimination of the annual adjustments to the $8 late fee safe harbor amount will not apply to them. Accordingly, this final rule will not directly reduce revenue of a substantial number of small entities.

Accordingly, the Director hereby certifies that this final rule will not have a significant economic impact on a substantial number of small entities.

The CFPB notes that it is unconvinced by the comments related to the SISNOSE, and as explained in part VI, and that it appropriately certified in the 2023 Proposal that the 2023 Proposal would not have had a SISNOSE. As described above in the initial regulatory flexibility analysis included in the 2023 Proposal, the CFPB described the credit card market data that it used to develop an adequate basis for the Director's SISNOSE certification. Using this data, the CFPB estimated that credit card assets and revenue held by small banks and small credit unions (as defined by the RFA) represent a small fraction of both total assets and revenue for those small entities. Thus, pursuant to the RFA, the CFPB was not required to conduct a SBREFA panel prior to releasing the 2023 Proposal.

In fact, as discussed in part VI, the CFPB's determination that credit cards are not a significant revenue source for Smaller Card Issuers (in terms of total revenue for the institution) played a part in the CFPB's decision not to apply certain provisions of the 2023 Proposal to Smaller Card Issuers at this time.

---

[282] *See* Small Business Administration, Table of size standards, *https://www.sba.gov/document/support—table-size-standards* (last visited on October 24, 2023).

## XI. Paperwork Reduction Act

The information collections contained within TILA and Regulation Z are approved under Office of Management and Budget (OMB) Control Number 3170–0015. The current expiration date for this approval is May 31, 2025. The CFPB has determined that this final rule would not impose any new information collections or revise any existing recordkeeping, reporting, or disclosure requirements on covered entities or members of the public that would be collections of information requiring approval by OMB under the Paperwork Reduction Act.[283]

## XII. Severability

If any provision of this rule, or any application of a provision, is stayed or determined to be invalid, the remaining provisions or applications are severable and shall continue in effect. In particular, if the $8 safe harbor for Larger Card Issuers is stayed or determined to be invalid, the conclusion to repeal the existing safe harbor is severable and shall continue in effect.

## List of Subjects in 12 CFR Part 1026

Advertising, Banks, Banking, Consumer protection, Credit, Credit unions, Mortgages, National banks, Reporting and recordkeeping requirements, Savings associations, Truth-in-lending.

## Authority and Issuance

For the reasons set forth above, the CFPB amends Regulation Z, 12 CFR part 1026, as set forth below:

## PART 1026—TRUTH IN LENDING (REGULATION Z)

■ 1. The authority citation for part 1026 continues to read as follows:

**Authority:** 12 U.S.C. 2601, 2603–2605, 2607, 2609, 2617, 3353, 5511, 5512, 5532, 5581; 15 U.S.C. 1601 *et seq.*

## Subpart G—Special Rules Applicable to Credit Card Accounts and Open-End Credit Offered to College Students

■ 2. Section 1026.52 is amended by revising paragraph (b)(1)(ii) and adding paragraph (b)(3) to read as follows:

## § 1026.52    Limitation on fees.

\*    \*    \*    \*    \*

(b) \* \* \*

(1) \* \* \*

(ii) *Safe harbors.* Except as provided in paragraph (b)(1)(ii)(E) of this section, a card issuer may impose a fee for a late payment on an account if the dollar amount of the fee does not exceed $8.

---

[283] 44 U.S.C. 3506; 5 CFR part 1320.

A card issuer may impose a fee for other types of violations of the terms or other requirements of an account if the dollar amount of the fee does not exceed, as applicable:

(A) $32;

(B) $43 if the card issuer previously imposed a fee pursuant to paragraph (b)(1)(ii)(A) of this section for a violation of the same type that occurred during the same billing cycle or one of the next six billing cycles; or

(C) Three percent of the delinquent balance on a charge card account that requires payment of outstanding balances in full at the end of each billing cycle if the card issuer has not received the required payment for two or more consecutive billing cycles, notwithstanding the limitation on the amount of a late payment fee in paragraph (b)(1)(ii) of this section.

(D) The amounts in paragraphs (b)(1)(ii)(A) and (B) of this section will be adjusted annually by the Bureau to reflect changes in the Consumer Price Index.

(E) A smaller card issuer, as defined in paragraph (b)(3) of this section, may impose a fee for a late payment on an account if the dollar amount of the fee does not exceed the amount in paragraph (b)(1)(ii)(A) or (B) of this section, as applicable, notwithstanding the limitation on the amount of a late payment fee in this paragraph (b)(1)(ii).

\*    \*    \*    \*    \*

(3) *Smaller card issuer.* (i) Except as provided in paragraph (b)(3)(ii) of this section, a card issuer is a smaller card issuer for purposes of paragraph (b)(1)(ii)(E) of this section if the card issuer together with its affiliates had fewer than one million open credit card accounts, as defined in § 1026.58(b)(6), for the entire preceding calendar year. For purposes of this paragraph (b)(3), *affiliate* means any company that controls, is controlled by, or is under common control with another company, as set forth in the Bank Holding Company Act of 1956 (12 U.S.C. 1841 *et seq.*).

(ii) If a card issuer together with its affiliates had fewer than one million open credit card accounts for the entire preceding calendar year but meets or exceeds that number of open credit card accounts in the current calendar year, the card issuer will no longer be a smaller card issuer for purposes of paragraph (b)(1)(ii)(E) of this section as of 60 days after meeting or exceeding that number of open credit card accounts.

■ 3. Section 1026.58 is amended by revising paragraph (b)(6) to read as follows:

**§ 1026.58   Internet posting of credit card agreements.**

\*      \*      \*      \*      \*

(b) \* \* \*

(6) *Open accounts.* For purposes of this section and § 1026.52, an account is an ''open account'' or ''open credit card account'' if it is a credit card account under an open-end (not home-secured) consumer credit plan and either:

(i) The cardholder can obtain extensions of credit on the account; or

(ii) There is an outstanding balance on the account that has not been charged off. An account that has been suspended temporarily (for example, due to a report by the cardholder of unauthorized use of the card) is considered an ''open account'' or ''open credit card account.''

\*      \*      \*      \*      \*

■ 4. Appendix G to part 1026 is amended by revising the entries for G–10(B), G–10(C), G–10(E), G–17(B), G–

17(C), G–18(A), G–18(B), G–18(D), G–18(F), G–18(G), and G–21 to read as follows:

**Appendix G to Part 1026—Open-End Model Forms and Clauses**

\*      \*      \*      \*      \*

BILLING CODE 4810–AM–P

G–10(B) APPLICATIONS AND SOLICITATIONS SAMPLE (CREDIT CARDS)

| Interest Rates and Interest Charges | |
|---|---|
| Annual Percentage Rate (APR) for Purchases | **8.99%** to **19.99%** when you open your account, based on your creditworthiness. |
| | After that, your APR will vary with the market based on the Prime Rate. |
| APR for Balance Transfers | 15.99% |
| | This APR will vary with the market based on the Prime Rate. |
| APR for Cash Advances | 21.99% |
| | This APR will vary with the market based on the Prime Rate. |
| Penalty APR and When it Applies | 28.99% |
| | This APR may be applied to your account if you: |
| | 1) Make a late payment; |
| | 2) Go over your credit limit twice in a six-month period; |
| | 3) Make a payment that is returned; or |
| | 4) Do any of the above on another account that you have with us. |
| | **How Long Will the Penalty APR Apply?:** If your APRs are increased for any of these reasons, the Penalty APR will apply until you make six consecutive minimum payments when due. |
| How to Avoid Paying Interest on Purchases | Your due date is at least 25 days after the close of each billing cycle.  We will not charge you any interest on purchases if you pay your entire balance by the due date each month. |
| Minimum Interest Charge | If you are charged interest, the charge will be no less than $1.50. |
| For Credit Card Tips from the Consumer Financial Protection Bureau | To learn more about factors to consider when applying for or using a credit card, visit the website of the Consumer Financial Protection Bureau at http://www.consumerfinance.gov/learnmore |

| Fees | |
|---|---|
| Annual Fee | None |
| Transaction Fees | |
| • Balance Transfer | Either **$5** or **3%** of the amount of each transfer, whichever is greater (maximum fee: **$100**). |
| • Cash Advance | Either **$5** or **3%** of the amount of each cash advance, whichever is greater. |
| • Foreign Transaction | **2%** of each transaction in U.S. dollars. |
| Penalty Fees | |
| • Late Payment | Up to **$8**. |
| • Over-the-Credit Limit | Up to **$35**. |
| • Returned Payment | Up to **$35**. |
| Other Fees | |
| • Required Account Protector Plan | **$0.79** per $100 of balance at the end of each statement period.  See back for details. |

**How We Will Calculate Your Balance:** We use a method called ''average daily balance (including new purchases).''

G–10(C) APPLICATIONS AND SOLICITATIONS SAMPLE (CREDIT CARDS)

| Interest Rates and Interest Charges | |
|---|---|
| **Annual Percentage Rate (APR) for Purchases** | **8.99%, 10.99%, or 12.99%** introductory APR for one year, based on your creditworthiness.<br><br>After that, your APR will be **14.99%**. This APR will vary with the market based on the Prime Rate. |
| **APR for Balance Transfers** | **15.99%**<br><br>This APR will vary with the market based on the Prime Rate |
| **APR for Cash Advances** | **21.99%**<br><br>This APR will vary with the market based on the Prime Rate. |
| **Penalty APR and When it Applies** | **28.99%**<br><br>This APR may be applied to your account if you:<br>1) Make a late payment;<br>2) Go over your credit limit;<br>3) Make a payment that is returned; or<br>4) Do any of the above on another account that you have with us.<br><br>**How Long Will the Penalty APR Apply?:** If your APRs are increased for any of these reasons, the Penalty APR will apply until you make six consecutive minimum payments when due. |
| **How to Avoid Paying Interest on Purchases** | Your due date is at least 25 days after the close of each billing cycle. We will not charge you any interest on purchases if you pay your entire balance by the due date each month. |
| **Minimum Interest Charge** | If you are charged interest, the charge will be no less than $1.50. |
| **For Credit Card Tips from the Consumer Financial Protection Bureau** | **To learn more about factors to consider when applying for or using a credit card, visit the website of the Consumer Financial Protection Bureau at http://www.consumerfinance.gov/learnmore** |

| Fees | |
|---|---|
| **Set-up and Maintenance Fees** | NOTICE: Some of these set-up and maintenance fees will be assessed before you begin using your card and will reduce the amount of credit you initially have available. For example, if you are assigned the minimum credit limit of $250, your initial available credit will be only about $209 (or about $204 if you choose to have an additional card). |
| • Annual Fee | **$20** |
| • Account Set-up Fee | **$20** (one-time fee) |
| • Participation Fee | **$12** annually ($1 per month) |
| • Additional Card Fee | **$5** annually (if applicable) |
| **Transaction Fees** | |
| • Balance Transfer | Either **$5** or **3%** of the amount of each transfer, whichever is greater (maximum fee: **$100**). |
| • Cash Advance | Either **$5** or **3%** of the amount of each cash advance, whichever is greater. |
| • Foreign Transaction | **2%** of each transaction in U.S. dollars. |
| **Penalty Fees** | |
| • Late Payment | Up to **$8.** |
| • Over-the-Credit Limit | Up to **$29.** |
| • Returned Payment | Up to **$35.** |

**How We Will Calculate Your Balance:** We use a method called "average daily balance (including new purchases)."

**Loss of Introductory APR:** We may end your introductory APR and apply the Penalty APR if you make a late payment.

\*     \*     \*     \*     \*          G–10(E) APPLICATIONS AND SOLICITATIONS SAMPLE (CHARGE CARDS)

| Payment Information | |
|---|---|
| All charges made on this charge card are due and payable when you receive your periodic statement. | |

| Fees | |
|---|---|
| **Annual Fee** | **$50** |
| **Transaction Fees** | |
| • Balance Transfer | Either **$5** or **3%** of the amount of each transfer, whichever is greater (maximum fee: **$100**). |
| • Cash Advance | Either **$5** or **3%** of the amount of each cash advance, whichever is greater. |
| **Penalty Fees** | |
| • Late Payment | Up to **$8**. If you do not pay for two consecutive billing cycles, your fee will be **$8** or **3%** of the past due amount, whichever is greater. |
| • Over-the-Credit Limit | Up to **$35**. |
| • Returned Payment | Up to **$35**. |

\*    \*    \*    \*    \*        G–17(B) ACCOUNT-OPENING SAMPLE

G–17(B) ACCOUNT-OPENING SAMPLE

**19206**     **Federal Register** / Vol. 89, No. 52 / Friday, March 15, 2024 / Rules and Regulations

| Interest Rates and Interest Charges | |
|---|---|
| **Annual Percentage Rate (APR) for Purchases** | **8.99%**<br><br>This APR will vary with the market based on the Prime Rate. |
| **APR for Balance Transfers** | **15.99%**<br><br>This APR will vary with the market based on the Prime Rate. |
| **APR for Cash Advances** | **21.99%**<br><br>This APR will vary with the market based on the Prime Rate. |
| **Penalty APR and When it Applies** | **28.99%**<br><br>This APR may be applied to your account if you:<br>1) Make a late payment;<br>2) Go over your credit limit twice in a six-month period;<br>3) Make a payment that is returned; or<br>4) Do any of the above on another account that you have with us.<br><br>**How Long Will the Penalty APR Apply?:** If your APRs are increased for any of these reasons, the Penalty APR will apply until you make six consecutive minimum payments when due. |
| **Paying Interest** | Your due date is at least 25 days after the close of each billing cycle. We will not charge you any interest on purchases if you pay your entire balance by the due date each month. We will begin charging interest on cash advances and balance transfers on the transaction date. |
| **Minimum Interest Charge** | If you are charged interest, the charge will be no less than $1.50. |
| **For Credit Card Tips from the Consumer Financial Protection Bureau** | **To learn more about factors to consider when applying for or using a credit card, visit the website of the Consumer Financial Protection Bureau at http://www.consumerfinance.gov/learnmore** |

| Fees | |
|---|---|
| **Annual Fee** | None |
| **Transaction Fees** | |
| • Balance Transfer | Either **$5** or **3%** of the amount of each transfer, whichever is greater (maximum fee: **$100**). |
| • Cash Advance | Either **$5** or **3%** of the amount of each cash advance, whichever is greater. |
| • Foreign Transaction | **2%** of each transaction in U.S. dollars. |
| **Penalty Fees** | |
| • Late Payment | Up to **$8**. |
| • Over-the-Credit Limit | Up to **$35**. |
| • Returned Payment | Up to **$35**. |
| **Other Fees** | |
| • Required Account Protector Plan | **$0.79** per $100 of balance at the end of each statement period. See back for details. |

**How We Will Calculate Your Balance:** We use a method called "average daily balance (including new purchases)." See your account agreement for more details.

**Billing Rights:** Information on your rights to dispute transactions and how to exercise those rights is provided in your account agreement.

G–17(C) ACCOUNT-OPENING SAMPLE

| Interest Rates and Interest Charges | |
|---|---|
| **Annual Percentage Rate (APR) for Purchases** | **8.99%** introductory APR for one year.<br><br>After that, your APR will be **14.99%**. This APR will vary with the market based on the Prime Rate. |
| **APR for Balance Transfers** | 15.99%<br>This APR will vary with the market based on the Prime Rate. |
| **APR for Cash Advances** | 21.99%<br>This APR will vary with the market based on the Prime Rate. |
| **Penalty APR and When it Applies** | 28.99%<br>This APR may be applied to your account if you:<br>1) Make a late payment;<br>2) Go over your credit limit;<br>3) Make a payment that is returned; or<br>4) Do any of the above on another account that you have with us.<br><br>**How Long Will the Penalty APR Apply?:** If your APRs are increased for any of these reasons, the Penalty APR will apply until you make six consecutive minimum payments when due. |
| **Paying Interest** | Your due date is at least 25 days after the close of each billing cycle. We will not charge you any interest on purchases if you pay your entire balance by the due date each month. We will begin charging interest on cash advances and balance transfers on the transaction date. |
| **Minimum Interest Charge** | If you are charged interest, the charge will be no less than $1.50. |
| **For Credit Card Tips from the Consumer Financial Protection Bureau** | **To learn more about factors to consider when applying for or using a credit card, visit the website of the Consumer Financial Protection Bureau at http://www.consumerfinance.gov/learnmore.** |

| Fees | |
|---|---|
| **Set-up and Maintenance Fees** | NOTICE: Some of these set-up and maintenance fees will be assessed before you begin using your card and will reduce the amount of credit you initially have available. Based on your initial credit limit of $250, your initial available credit will be only about $209 (or about $204 if you choose to have an additional card).<br><br>You may still reject this plan, provided that you have not yet used the account or paid a fee after receiving a billing statement. If you do reject the plan, you are not responsible for any fees or charges. |
| • Annual Fee | $20 |
| • Account Set-up Fee | $20 (one-time fee) |
| • Participation Fee | $12 annually ($1 per month) |
| • Additional Card Fee | $5 annually (if applicable) |
| **Transaction Fees** | |
| • Balance Transfer | Either **$5** or **3%** of the amount of each transfer, whichever is greater (maximum fee: $100). |
| • Cash Advance | Either **$5** or **3%** of the amount of each cash advance, whichever is greater. |
| • Foreign Transaction | **2%** of each transaction in U.S. dollars. |
| **Penalty Fees** | |
| • Late Payment | Up to **$8**. |
| • Over-the-Credit Limit | Up to **$35**. |
| • Returned Payment | Up to **$35**. |

**How We Will Calculate Your Balance:** We use a method called "average daily balance (including new purchases)." See your account agreement for more details.

**Loss of Introductory APR:** We may end your introductory APR and apply the Penalty APR if you make a late payment.

**Billing Rights:** Information on your rights to dispute transactions and how to exercise those rights is provided in your account agreement.

\*    \*    \*    \*    \*     G–18(A) PERIODIC STATEMEMT TRANSACTIONS; INTEREST CHARGES; FEES SAMPLE

### Transactions

| Reference Number | Trans Date | Post Date | Description of Transaction or Credit | Amount |
|---|---|---|---|---|
| 5884186PS0388W6YM | 2/22 | 2/23 | Store #1 | $2.05 |
| 0544400060ZLV72VL | 2/24 | 2/25 | Store #2 | $12.11 |
| 854338203FS8OO0Z5 | 2/25 | 2/25 | Pymt Thank You | $423.00- |
| 5554186O705RDYD0X | 2/25 | 2/26 | Store #3 | $4.63 |
| 554328608008VV90M0 | 2/25 | 2/26 | Store #4 | $114.95 |
| 054830708LYMRPT4L | 2/25 | 2/26 | Store #5 | $7.35 |
| 5648915615456KOSHD | 2/25 | 2/26 | Store #6 | $14.35 |
| 841517877845AKOJlO | 2/25 | 2/26 | Store #7 | $40.35 |
| 895848561561894KOH | 2/26 | 2/27 | Store #8 | $27.68 |
| 18715561894565AMlKL | 2/26 | 2/27 | Store #9 | $124.76 |
| 1542202074TWWZV48 | 2/26 | 2/26 | Cash Advance | $121.50 |
| 256489418518l9LKDFID | 2/27 | 2/28 | Store #10 | $32.87 |
| 4545754784KOHUIOS | 2/27 | 3/1 | Balance Transfer | $785.00 |
| 2564561023184102315 | 2/28 | 3/1 | Store #11 | $14.76 |
| 1454784758l6KDDL564 | 2/28 | 2/28 | Cash Advance | $196.50 |
| 55542818705RASD0X | 3/1 | 3/2 | Store #12 | $3.76 |
| 28918919ASDS8744 | 3/1 | 3/3 | Store #13 | $13.45 |
| 178105417841045784 | 3/2 | 3/4 | Store #14 | $2.35 |
| 0451487145189798874 | 3/4 | 3/5 | Store #13 | $13.45- |
| 8456152156181SDSA | 3/5 | 3/6 | Store #15 | $25.00 |
| 3128910520564BAWD | 3/11 | 3/12 | Store #16 | $7.34 |
| 04518478415615ASD | 3/11 | 3/16 | Store #17 | $10.56 |
| 0547810544898718AF | 3/15 | 3/17 | Store #18 | $24.50 |
| 0564894132168480P | 3/16 | 3/17 | Store #19 | $8.76 |
| 05489456l564ASDW | 3/17 | 3/18 | Store #20 | $14.23 |
| 5648974891AD98156 | 3/19 | 3/20 | Store #21 | $23.76 |
| **Fees** | | | | |
| 9525156488SFD4545Q | 2/23 | 2/23 | Late Fee | $8.00 |
| 584156156447OJSNDS | 2/26 | 2/26 | Cash Advance Fee | $5.00 |
| 84151564SADS8745H | 2/27 | 2/27 | Balance Transfer Fee | $23.55 |
| 2564891561894515516L | 2/28 | 2/28 | Cash Advance Fee | $5.90 |
| | | | **TOTAL FEES FOR THIS PERIOD** | **$42.45** |
| **Interest Charged** | | | | |
| | | | Interest Charge on Purchases | $6.31 |
| | | | Interest Charge on Cash Advances | $4.58 |
| | | | **TOTAL INTEREST FOR THIS PERIOD** | **$10.89** |

| 2012 Totals Year-to-Date | |
|---|---|
| Total fees charged in 2012 | $90.14 |
| Total interest charged in 2012 | $18.27 |

G–18(B) LATE PAYMENT FEE SAMPLE

**Late Payment Warning:** If we do not receive your minimum payment by the date listed above, you may have to pay a $8 late fee and your APRs may be increased up to the Penalty APR of 28.99%.

\*     \*     \*     \*     \*          G–18(D) PERIODIC STATEMENT NEW BALANCE, DUE DATE, LATE PAYMENT AND MINIMUM PAYMENT SAMPLE (CREDIT CARDS)

App.092

**Payment Information**

| | |
|---|---|
| New Balance | $1,784.53 |
| Minimum Payment Due | $53.00 |
| Payment Due Date | 4/20/12 |

**Late Payment Warning:** If we do not receive your minimum payment by the date listed above, you may have to pay a $8 late fee and your APRs may be increased up to the Penalty APR of 28.99%.

**Minimum Payment Warning:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using this charge card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of ... |
|---|---|---|
| Only the minimum payment | 10 years | $3,284 |
| $62 | 3 years | $2,232 *(Savings=$1,052)* |

If you would like information about credit counseling services, call 1-800-xxx-xxxx.

\*     \*     \*     \*     \*          G–18(F) PERIODIC STATEMENT FORM

G–18(F) PERIODIC STATEMENT FORM

Page 1 of 2

**XXX Bank Credit Card Account Statement**
**Account Number XXXX XXXX XXXX XXXX**
**February 21, 2012 to March 22, 2012**

### Summary of Account Activity

| | |
|---|---|
| Previous Balance | $535.07 |
| Payments | -$423.00 |
| Other Credits | -$13.45 |
| Purchases | +$529.57 |
| Balance Transfers | +$785.00 |
| Cash Advances | +$318.00 |
| Past Due Amount | +$0.00 |
| **Fees Charged** | **+$42.45** |
| **Interest Charged** | **+$10.89** |
| New Balance | $1,784.53 |
| Credit limit | $2,000.00 |
| Available credit | $215.47 |
| Statement closing date | 3/22/2012 |
| Days in billing cycle | 30 |

**QUESTIONS?**
Call Customer Service    1-XXX-XXX-XXXX
Lost or Stolen Credit Card    1-XXX-XXX-XXXX

### Payment Information

| | |
|---|---|
| New Balance | $1,784.53 |
| Minimum Payment Due | $53.00 |
| Payment Due Date | 4/20/12 |

**Late Payment Warning:** If we do not receive your minimum payment by the date listed above, you may have to pay a $8 late fee and your APRs may be increased up to the Penalty APR of 28.99%.

**Minimum Payment Warning:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using this card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Only the minimum payment | 10 years | $3,284 |
| $62 | 3 years | $2,232 (Savings=$1,052) |

If you would like information about credit counseling services, call 1-800-xxx-xxxx.

Please send billing inquiries and correspondence to:
PO Box XXXX, Anytown, Anystate XXXXX

### Important Changes to Your Account Terms

The following is a summary of changes that are being made to your account terms. Changes to APRs described below are due to changes in market conditions. For more detailed information, please refer to the booklet enclosed with this statement.

These changes will impact your account as follows:

Transactions made on or after 4/9/12: As of 5/10/12, any changes to APRs described below will apply to these transactions.

Transactions made before 4/9/12: Current APRs will continue to apply to these transactions.

If you are already being charged a higher Penalty APR for purchases: In this case, any changes to APRs described below will not go into effect at this time. These changes will go into effect when the Penalty APR no longer applies to your account.

| Revised Terms, as of 5/10/12 | |
|---|---|
| **APR for Purchases** | 16.99% |

### Transactions

| Reference Number | Trans Date | Post Date | Description of Transaction or Credit | Amount |
|---|---|---|---|---|
| 5884186PS0388W6YM | 2/22 | 2/23 | Store #1 | $2.05 |
| 054440060ZLV72VL | 2/24 | 2/25 | Store #2 | $12.11 |
| 55541860705RDYD0X | 2/24 | 2/25 | Store #3 | $4.63 |
| 554328608008W90M0 | 2/24 | 2/25 | Store #4 | $114.95 |
| 054830709LYMRPT4L | 2/24 | 2/25 | Store #5 | $7.35 |
| 854338203FS8OO0Z5 | 2/25 | 2/25 | Pymt Thank You | $423.00– |

(transactions continued on next page)

NOTICE:  SEE REVERSE SIDE FOR IMPORTANT INFORMATION
Page 1 of 2

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Please detach this portion and return with your payment to issue proper credit. Retain upper portion for your records.

| | |
|---|---|
| **Account Number:** | XXXX XXXX XXXX XXXX |
| **New Balance** | $1,784.53 |
| **Minimum Payment Due** | $53.00 |
| **Payment Due Date** | 4/20/12 |

Please indicate address change and additional
cardholder requests on the reverse side.

**AMOUNT ENCLOSED:** $

XXX Bank
P.O. Box XXXX
Anytown, Anystate XXXXX

**XXX Bank Credit Card Account Statement**
**Account Number XXXX XXXX XXXX XXXX**
**February 21, 2012 to March 22, 2012**

Page 2 of 2

### Transactions (cont.)

| Reference Number | Trans Date | Post Date | Description of Transaction or Credit | Amount |
|---|---|---|---|---|
| 564891561545KOSHD | 2/25 | 2/26 | Store #6 | $14.35 |
| 841517877845AKOJIO | 2/25 | 2/26 | Store #7 | $40.35 |
| 895848561561894KOH | 2/26 | 2/27 | Store #8 | $27.68 |
| 187155618945 6SAMKL | 2/26 | 2/27 | Store #9 | $124.76 |
| 1542202074TWWZV45 | 2/26 | 2/26 | Cash Advance | $121.50 |
| 256489418518 9LKDFID | 2/27 | 2/28 | Store #10 | $32.87 |
| 4545754784KOHUIOS | 2/27 | 3/1 | Balance Transfer | $785.00 |
| 14547847586KDDL564 | 2/28 | 2/28 | Cash Advance | $196.50 |
| 256456102318 4102315 | 2/28 | 3/1 | Store #11 | $14.78 |
| 55542818705RASD0X | 3/1 | 3/2 | Store #12 | $3.76 |
| 289189194ASDS8744 | 3/1 | 3/3 | Store #13 | $13.45 |
| 178105417841045784 | 3/2 | 3/6 | Store #14 | $2.35 |
| 0451487145189 79874 | 3/4 | 3/5 | Store #13 | $13.45– |
| 8456152156181SDSA | 3/5 | 3/12 | Store #15 | $25.00 |
| 3128910520564 8AWD | 3/11 | 3/12 | Store #16 | $7.34 |
| 04518478415615ASD | 3/11 | 3/16 | Store #17 | $10.56 |
| 0547810544898718AF | 3/15 | 3/17 | Store #18 | $24.50 |
| 0564894132168 4OP | 3/16 | 3/17 | Store #19 | $8.76 |
| 054894561564ASDW | 3/17 | 3/18 | Store #20 | $14.23 |
| 564897489 1AD98156 | 3/19 | 3/20 | Store #21 | $23.76 |
| **Fees** | | | | |
| 9525156489SFD4545Q | 2/23 | 2/23 | Late Fee | $8.00 |
| 56415615647OJSNDS | 2/26 | 2/26 | Cash Advance Fee | $5.00 |
| 84151564SADS8745H | 2/27 | 2/27 | Balance Transfer Fee | $23.55 |
| 256489156188451516L | 2/28 | 2/28 | Cash Advance Fee | $5.90 |
| | | | **TOTAL FEES FOR THIS PERIOD** | **$42.45** |
| **Interest Charged** | | | | |
| | | | Interest Charge on Purchases | $6.31 |
| | | | Interest Charge on Cash Advances | $4.58 |
| | | | **TOTAL INTEREST FOR THIS PERIOD** | **$10.89** |

| 2012 Totals Year-to-Date | |
|---|---|
| Total fees charged in 2012 | $90.14 |
| Total interest charged in 2012 | $18.27 |

### Interest Charge Calculation

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charge |
|---|---|---|---|
| Purchases | 14.99% (v) | $529.57 | $6.31 |
| Cash Advances | 21.99% (v) | $253.50 | $4.58 |
| Balance Transfers | 0.00% | $637.50 | $0.00 |

(v) = Variable Rate

G–18(G) PERIODIC STATEMENT FORM





\*      \*      \*      \*      \*

G–21 CHANGE-IN-TERMS SAMPLE
(INCREASE IN FEES)

BILLING CODE 4810–AM–C

\*      \*      \*      \*      \*

■ 5. Supplement I to part 1026 is amended by:

■ a. Under *Section 1026.7—Periodic Statement*, revising *7(b)(11) Due Date; Late Payment Costs;*

■ b. Under *Section 1026.52—Limitations on Fees:*

■ i. Revising *52(a)(1) General rule, 52(b) Limitations on Penalty Fees, 52(b)(1) General Rule, 52(b)(1)(i) Fees Based on Costs, 52(b)(1)(ii) Safe Harbors, 52(b)(2) Prohibited fees, 52(b)(2)(i) Fees That Exceed Dollar Amount Associated With Violation,* and *52(b)(2)(ii) Multiple Fees Based on a Single Event or Transaction;* and

■ ii. Adding *52(b)(3) Smaller card issuer, 52(b)(3)(i),* and *52(b)(3)(ii)* in alphanumerical order; and

■ c. Under *Section 1026.60—Credit and Charge Card Applications and Solicitations,* revising *60(a)(2) Form of Disclosures; Tabular Format.*

The revisions and additions read as follows:

**Supplement I to Part 1026—Official Interpretations**

\*      \*      \*      \*      \*

*Section 1026.7—Periodic Statement*

\*      \*      \*      \*      \*

7(b)(11) Due Date; Late Payment Costs

1. *Informal periods affecting late payments.* Although the terms of the account agreement may provide that a card issuer may assess a late payment fee if a payment is not received by a certain date, the card issuer may have an informal policy or practice that delays the assessment of the late

payment fee for payments received a brief period of time after the date upon which a card issuer has the contractual right to impose the fee. A card issuer must disclose the due date according to the legal obligation between the parties, and need not consider the end of an informal "courtesy period" as the due date under § 1026.7(b)(11).

2. *Assessment of late payment fees.* Some State or other laws require that a certain number of days must elapse following a due date before a late payment fee may be imposed. In addition, a card issuer may be restricted by the terms of the account agreement from imposing a late payment fee until a payment is late for a certain number of days following a due date. For example, assume a payment is due on March 10 and the account agreement or State law provides that a late payment fee cannot be assessed before March 21. A card issuer must disclose the due date under the terms of the legal obligation (March 10 in this example), and not a date different than the due date, such as when the card issuer is restricted by the account agreement or State or other law from imposing a late payment fee unless a payment is late for a certain number of days following the due date (March 21 in this example). Consumers' rights under State law to avoid the imposition of late payment fees during a specified period following a due date are unaffected by the disclosure requirement. In this example, the card issuer would disclose March 10 as the due date for purposes of § 1026.7(b)(11), but could not, under State law, assess a late payment fee before March 21.

3. *Fee or rate triggered by multiple events.* If a late payment fee or penalty rate is triggered after multiple events, such as two late payments in six months, the card issuer may, but is not required to, disclose the late payment and penalty rate disclosure each month. The disclosures must be included on any periodic statement for which a late payment could trigger the late payment fee or penalty rate, such as after the consumer made one late payment in this example. For example, if a cardholder has already made one late payment, the disclosure must be on each statement for the following five billing cycles.

4. *Range of late fees or penalty rates.* A card issuer that imposes a range of late payment fees or rates on a credit card account under an open-end (not home-secured) consumer credit plan may state the highest fee or rate along with an indication lower fees or rates could be imposed. For example, a phrase indicating the late payment fee could be "up to $8" complies with this requirement.

5. *Penalty rate in effect.* If the highest penalty rate has previously been triggered on an account, the card issuer may, but is not required to, delete the amount of the penalty rate and the warning that the rate may be imposed for an untimely payment, as not applicable. Alternatively, the card issuer may, but is not required to, modify the language to indicate that the penalty rate has been increased due to previous late payments (if applicable).

6. *Same day each month.* The requirement that the due date be the same day each month

means that the due date must generally be the same numerical date. For example, a consumer's due date could be the 25th of every month. In contrast, a due date that is the same relative date but not numerical date each month, such as the third Tuesday of the month, generally would not comply with this requirement. However, a consumer's due date may be the last day of each month, even though that date will not be the same numerical date. For example, if a consumer's due date is the last day of each month, it will fall on February 28th (or February 29th in a leap year) and on August 31st.

7. *Change in due date.* A creditor may adjust a consumer's due date from time to time provided that the new due date will be the same numerical date each month on an ongoing basis. For example, a creditor may choose to honor a consumer's request to change from a due date that is the 20th of each month to the 5th of each month, or may choose to change a consumer's due date from time to time for operational reasons. *See* comment 2(a)(4)–3 for guidance on transitional billing cycles.

8. *Billing cycles longer than one month.* The requirement that the due date be the same day each month does not prohibit billing cycles that are two or three months, provided that the due date for each billing cycle is on the same numerical date of the month. For example, a creditor that establishes two-month billing cycles could send a consumer periodic statements disclosing due dates of January 25, March 25, and May 25.

9. *Payment due date when the creditor does not accept or receive payments by mail.* If the due date in a given month falls on a day on which the creditor does not receive or accept payments by mail and the creditor is required to treat a payment received the next business day as timely pursuant to § 1026.10(d), the creditor must disclose the due date according to the legal obligation between the parties, not the date as of which the creditor is permitted to treat the payment as late. For example, assume that the consumer's due date is the 4th of every month, and the creditor does not accept or receive payments by mail on Thursday, July 4. Pursuant to § 1026.10(d), the creditor may not treat a mailed payment received on the following business day, Friday, July 5, as late for any purpose. The creditor must nonetheless disclose July 4 as the due date on the periodic statement and may not disclose a July 5 due date.

\*    \*    \*    \*    \*

*Section 1026.52—Limitations on Fees*

52(a) Limitations During First Year After Account Opening

52(a)(1) General Rule

1. *Application.* The 25 percent limit in § 1026.52(a)(1) applies to fees that the card issuer charges to the account as well as to fees that the card issuer requires the consumer to pay with respect to the account through other means (such as through a payment from the consumer's asset account, including a prepaid account as defined in § 1026.61, to the card issuer or from another credit account provided by the card issuer). For example:

i. Assume that, under the terms of a credit card account, a consumer is required to pay $120 in fees for the issuance or availability of credit at account opening. The consumer is also required to pay a cash advance fee that is equal to five percent of the cash advance and a late payment fee of $8 if the required minimum periodic payment is not received by the payment due date (which is the twenty-fifth of the month). The card issuer is not a smaller card issuer as defined in § 1026.52(b)(3). At account opening on January 1 of year one, the credit limit for the account is $500. Section 1026.52(a)(1) permits the card issuer to charge to the account the $120 in fees for the issuance or availability of credit at account opening. On February 1 of year one, the consumer uses the account for a $100 cash advance. Section 1026.52(a)(1) permits the card issuer to charge a $5 cash-advance fee to the account. On March 26 of year one, the card issuer has not received the consumer's required minimum periodic payment. Section 1026.52(a)(2) permits the card issuer to charge a $8 late payment fee to the account. On July 15 of year one, the consumer uses the account for a $50 cash advance. Section 1026.52(a)(1) does not permit the card issuer to charge a $2.50 cash advance fee to the account. Furthermore, § 1026.52(a)(1) prohibits the card issuer from collecting the $2.50 cash advance fee from the consumer by other means.

ii. Assume that, under the terms of a credit card account, a consumer is required to pay $125 in fees for the issuance or availability of credit during the first year after account opening. At account opening on January 1 of year one, the credit limit for the account is $500. Section 1026.52(a)(1) permits the card issuer to charge the $125 in fees to the account. However, § 1026.52(a)(1) prohibits the card issuer from requiring the consumer to make payments to the card issuer for additional non-exempt fees with respect to the account during the first year after account opening. Section 1026.52(a)(1) also prohibits the card issuer from requiring the consumer to open a separate credit account with the card issuer to fund the payment of additional non-exempt fees during the first year after the credit card account is opened.

iii. Assume that a consumer opens a prepaid account accessed by a prepaid card on January 1 of year one and opens a covered separate credit feature accessible by a hybrid prepaid-credit card as defined by § 1026.61 that is a credit card account under an open-end (not home-secured) consumer credit plan on March 1 of year one. Assume that, under the terms of the covered separate credit feature accessible by the hybrid prepaid-credit card, a consumer is required to pay $50 in fees for the issuance or availability of credit at account opening. At credit account opening on March 1 of year one, the credit limit for the account is $200. Section 1026.52(a)(1) permits the card issuer to charge the $50 in fees to the credit account. However, § 1026.52(a)(1) prohibits the card issuer from requiring the consumer to make payments to the card issuer for additional non-exempt fees with respect to the credit account during the first year after account opening. Section 1026.52(a)(1) also prohibits

the card issuer from requiring the consumer to open an additional credit feature with the card issuer to fund the payment of additional non-exempt fees during the first year after the covered separate credit feature is opened.

iv. Assume that a consumer opens a prepaid account accessed by a prepaid card on January 1 of year one and opens a covered separate credit feature accessible by a hybrid prepaid-credit card as defined in § 1026.61 that is a credit card account under an open-end (not home-secured) consumer credit plan on March 1 of year one. Assume that, under the terms of the covered separate credit feature accessible by the hybrid prepaid-credit card, a consumer is required to pay $120 in fees for the issuance or availability of credit at account opening. The consumer is also required to pay a cash advance fee that is equal to 5 percent of any cash advance and a late payment fee of $8 if the required minimum periodic payment is not received by the payment due date (which is the 25th of the month). The card issuer is not a smaller card issuer as defined in § 1026.52(b)(3). At credit account opening on March 1 of year one, the credit limit for the account is $500. Section 1026.52(a)(1) permits the card issuer to charge to the account the $120 in fees for the issuance or availability of credit at account opening. On April 1 of year one, the consumer uses the account for a $100 cash advance. Section 1026.52(a)(1) permits the card issuer to charge a $5 cash advance fee to the account. On April 26 of year one, the card issuer has not received the consumer's required minimum periodic payment. Section 1026.52(a)(2) permits the card issuer to charge a $8 late payment fee to the account. On July 15 of year one, the consumer uses the account for a $50 cash advance. Section 1026.52(a)(1) does not permit the card issuer to charge a $2.50 cash advance fee to the account, because the total amount of non-exempt fees reached the 25 percent limit with the $5 cash advance fee on April 1 (the $8 late fee on April 26 is exempt pursuant to § 1026.52(a)(2)(i)). Furthermore, § 1026.52(a)(1) prohibits the card issuer from collecting the $2.50 cash advance fee from the consumer by other means.

2. *Fees that exceed 25 percent limit.* A card issuer that charges a fee to a credit card account that exceeds the 25 percent limit complies with § 1026.52(a)(1) if the card issuer waives or removes the fee and any associated interest charges or credits the account for an amount equal to the fee and any associated interest charges within a reasonable amount of time but no later than the end of the billing cycle following the billing cycle during which the fee was charged. For example, assuming the facts in the example in comment 52(a)(1)–1.i, the card issuer complies with § 1026.52(a)(1) if the card issuer charged the $2.50 cash advance fee to the account on July 15 of year one but waived or removed the fee or credited the account for $2.50 (plus any interest charges on that $2.50) at the end of the billing cycle.

3. *Changes in credit limit during first year.*
i. *Increases in credit limit.* If a card issuer increases the credit limit during the first year after the account is opened, § 1026.52(a)(1)

does not permit the card issuer to require the consumer to pay additional fees that would otherwise be prohibited (such as a fee for increasing the credit limit). For example, assume that, at account opening on January 1, the credit limit for a credit card account is $400 and the consumer is required to pay $100 in fees for the issuance or availability of credit. On July 1, the card issuer increases the credit limit for the account to $600. Section 1026.52(a)(1) does not permit the card issuer to require the consumer to pay additional fees based on the increased credit limit.

ii. *Decreases in credit limit.* If a card issuer decreases the credit limit during the first year after the account is opened, § 1026.52(a)(1) requires the card issuer to waive or remove any fees charged to the account that exceed 25 percent of the reduced credit limit or to credit the account for an amount equal to any fees the consumer was required to pay with respect to the account that exceed 25 percent of the reduced credit limit within a reasonable amount of time but no later than the end of the billing cycle following the billing cycle during which the credit limit was reduced. For example, assume that, at account opening on January 1, the credit limit for a credit card account is $1,000 and the consumer is required to pay $250 in fees for the issuance or availability of credit. The billing cycles for the account begin on the first day of the month and end on the last day of the month. On July 30, the card issuer decreases the credit limit for the account to $600. Section 1026.52(a)(1) requires the card issuer to waive or remove $100 in fees from the account or to credit the account for an amount equal to $100 within a reasonable amount of time but no later than August 31.

4. *Date on which account may first be used by consumer to engage in transactions.*
i. *Methods of compliance.* For purposes of § 1026.52(a)(1), an account is considered open no earlier than the date on which the account may first be used by the consumer to engage in transactions. A card issuer may consider an account open for purposes of § 1026.52(a)(1) on any of the following dates:

A. The date the account is first used by the consumer for a transaction (such as when an account is established in connection with financing the purchase of goods or services).

B. The date the consumer complies with any reasonable activation procedures imposed by the card issuer for preventing fraud or unauthorized use of a new account (such as requiring the consumer to provide information that verifies his or her identity), provided that the account may be used for transactions on that date.

C. The date that is seven days after the card issuer mails or delivers to the consumer account-opening disclosures that comply with § 1026.6, provided that the consumer may use the account for transactions after complying with any reasonable activation procedures imposed by the card issuer for preventing fraud or unauthorized use of the new account (such as requiring the consumer to provide information that verifies his or her identity). If a card issuer has reasonable procedures designed to ensure that account-opening disclosures that comply with § 1026.6 are mailed or delivered to

consumers no later than a certain number of days after the card issuer establishes the account, the card issuer may add that number of days to the seven-day period for purposes of determining the date on which the account was opened.

ii. *Examples.* A. Assume that, on July 1 of year one, a credit card account under an open-end (not home-secured) consumer credit plan is established in connection with financing the purchase of goods or services and a $500 transaction is charged to the account by the consumer. The card issuer may consider the account open on July 1 of year one for purposes of § 1026.52(a)(1). Accordingly, § 1026.52(a)(1) ceases to apply to the account on July 1 of year two.

B. Assume that, on July 1 of year one, a card issuer approves a consumer's application for a credit card account under an open-end (not home-secured) consumer credit plan and establishes the account on its internal systems. On July 5, the card issuer mails or delivers to the consumer account-opening disclosures that comply with § 1026.6. If the consumer may use the account for transactions on the date the consumer complies with any reasonable procedures imposed by the card issuer for preventing fraud or unauthorized use, the card issuer may consider the account open on July 12 of year one for purposes of § 1026.52(a)(1). Accordingly, § 1026.52(a)(1) ceases to apply to the account on July 12 of year two.

C. Same facts as comment 52(a)(1)–4.ii.B except that the card issuer has adopted reasonable procedures designed to ensure that account-opening disclosures that comply with § 1026.6 are mailed or delivered to consumers no later than three days after an account is established on its systems. If the consumer may use the account for transactions on the date the consumer complies with any reasonable procedures imposed by the card issuer for preventing fraud or unauthorized use, the card issuer may consider the account open on July 11 of year one for purposes of § 1026.52(a)(1). Accordingly, § 1026.52(a)(1) ceases to apply to the account on July 11 of year two. However, if the consumer uses the account for a transaction or complies with the card issuer's reasonable procedures for preventing fraud or unauthorized use on July 8 of year one, the card issuer may, at its option, consider the account open on that date for purposes of § 1026.52(a)(1), and therefore § 1026.52(a)(1) ceases to apply to the account on July 8 of year two.

\*     \*     \*     \*     \*

52(b) Limitations on Penalty Fees

1. *Fees for violating the account terms or other requirements.* For purposes of § 1026.52(b), a fee includes any charge imposed by a card issuer based on an act or omission that violates the terms of the account or any other requirements imposed by the card issuer with respect to the account, other than charges attributable to periodic interest rates. Accordingly, for purposes of § 1026.52(b), a fee does not include charges attributable to an increase in an annual percentage rate based on an act or omission that violates the terms or other requirements of an account.

i. The following are examples of fees that are subject to the limitations in § 1026.52(b) or are prohibited by § 1026.52(b):

A. Late payment fees and any other fees imposed by a card issuer if an account becomes delinquent or if a payment is not received by a particular date. A late payment fee or late fee is any fee imposed for a late payment. *See* § 1026.60(b)(9) and accompanying commentary.

B. Returned payment fees and any other fees imposed by a card issuer if a payment received via check, automated clearing house, or other payment method is returned.

C. Any fee or charge for an over-the-limit transaction as defined in § 1026.56(a), to the extent the imposition of such a fee or charge is permitted by § 1026.56.

D. Any fee imposed by a card issuer if payment on a check that accesses a credit card account is declined.

E. Any fee or charge for a transaction that the card issuer declines to authorize. *See* § 1026.52(b)(2)(i)(B).

F. Any fee imposed by a card issuer based on account inactivity (including the consumer's failure to use the account for a particular number or dollar amount of transactions or a particular type of transaction). *See* § 1026.52(b)(2)(i)(B).

G. Any fee imposed by a card issuer based on the closure or termination of an account. *See* § 1026.52(b)(2)(i)(B).

ii. The following are examples of fees to which § 1026.52(b) does not apply:

A. Balance transfer fees.

B. Cash advance fees.

C. Foreign transaction fees.

D. Annual fees and other fees for the issuance or availability of credit described in § 1026.60(b)(2), except to the extent that such fees are based on account inactivity. *See* § 1026.52(b)(2)(i)(B).

E. Fees for insurance described in § 1026.4(b)(7) or debt cancellation or debt suspension coverage described in § 1026.4(b)(10) written in connection with a credit transaction, provided that such fees are not imposed as a result of a violation of the account terms or other requirements of an account.

F. Fees for making an expedited payment (to the extent permitted by § 1026.10(e)).

G. Fees for optional services (such as travel insurance).

H. Fees for reissuing a lost or stolen card.

2. *Rounding to nearest whole dollar.* A card issuer may round any fee that complies with § 1026.52(b) to the nearest whole dollar. For example, if § 1026.52(b) permits a card issuer to impose a late payment fee of $5.50, the card issuer may round that amount up to the nearest whole dollar and impose a late payment fee of $6. However, if the late payment fee permitted by § 1026.52(b) were $5.49, the card issuer would not be permitted to round that amount up to $6, although the card issuer could round that amount down and impose a late payment fee of $5.

3. *Fees in connection with covered separate credit features accessible by hybrid prepaid-credit cards.* With regard to a covered separate credit feature and an asset feature on a prepaid account that are both accessible by a hybrid prepaid-credit card as defined in § 1026.61 where the credit feature

is a credit card account under an open-end (not home-secured) consumer credit plan, § 1026.52(b) applies to any fee for violating the terms or other requirements of the credit feature, regardless of whether those fees are imposed on the credit feature or on the asset feature of the prepaid account. For example, assume that a late fee will be imposed by the card issuer if the covered separate credit feature becomes delinquent or if a payment is not received by a particular date. This fee is subject to § 1026.52(b) regardless of whether the fee is imposed on the asset feature of the prepaid account or on the separate credit feature.

4. *Fees imposed on the asset feature of a prepaid account that are not charges imposed as part of the plan.* Section 1026.52(b) does not apply to any fee or charge imposed on the asset feature of the prepaid account that is not a charge imposed as part of the plan under § 1026.6(b)(3). *See* § 1026.6(b)(3)(iii)(D) and (E) and related commentary regarding fees imposed on the asset feature prepaid account that are not charges imposed as part of the plan under § 1026.6(b)(3) with respect to covered separate credit features accessible by hybrid prepaid-credit cards and non-covered separate credit features as those terms are defined in § 1026.61.

5. *Examples.* Any dollar amount examples in the commentary to § 1026.52(b) relating to the safe harbors in § 1026.52(b)(1) are based on the original historical safe-harbor thresholds of $25 and $35 for penalty fees other than late fees, and on the threshold of $8 for late fees applicable to card issuers other than smaller card issuers as defined in § 1026.52(b)(3).

52(b)(1) General Rule

1. *Relationship between § 1026.52(b)(1)(i) and (ii) and (b)(2).*

i. *Relationship between § 1026.52(b)(1)(i) and (ii).* A card issuer may impose a fee for violating the terms or other requirements of an account pursuant to either § 1026.52(b)(1)(i) or (ii).

A. A card issuer that complies with the safe harbors in § 1026.52(b)(1)(ii) is not required to determine that its fees represent a reasonable proportion of the total costs incurred by the card issuer as a result of a type of violation under § 1026.52(b)(1)(i).

B. A card issuer may impose a fee for one type of violation pursuant to § 1026.52(b)(1)(i) and may impose a fee for a different type of violation pursuant to § 1026.52(b)(1)(ii). For example, a card issuer may impose a late payment fee of $9 based on a cost determination pursuant to § 1026.52(b)(1)(i) but impose returned payment and over-the-limit fees of $25 or $35 pursuant to the safe harbors in § 1026.52(b)(1)(ii).

C. A card issuer that previously based the amount of a penalty fee for a particular type of violation on a cost determination pursuant to § 1026.52(b)(1)(i) may begin to impose a penalty fee for that type of violation that is consistent with § 1026.52(b)(1)(ii) at any time (subject to the notice requirements in § 1026.9), provided that the first fee imposed pursuant to § 1026.52(b)(1)(ii) is consistent with § 1026.52(b)(1)(ii)(A). For example, assume that consistent with § 1026.56, a

consumer has affirmatively consented to the payment of transactions that exceed the credit limit. A transaction occurs on January 15 that causes the account balance to exceed the credit limit and, based on a cost determination pursuant to § 1026.52(b)(1)(i), the card issuer imposes a $30 over-the-limit fee. The consumer's next monthly payment brings the account balance below the credit limit. On July 15, another transaction causes the account balance to exceed the credit limit. The card issuer may impose another $30 over-the-limit fee pursuant to § 1026.52(b)(1)(i) or may impose a $25 over-the-limit fee pursuant to § 1026.52(b)(1)(i)(A). However, the card issuer may not impose a $35 over-the-limit fee pursuant to § 1026.52(b)(1)(ii)(B). If the card issuer imposes a $25 fee pursuant to § 1026.52(b)(1)(ii)(A) for the July 15 over-the-limit transaction and on September 15 another transaction causes the account balance to exceed the credit limit, the card issuer may impose a $35 fee for the September 15 over-the-limit transaction pursuant to § 1026.52(b)(1)(ii)(B).

ii. *Relationship between § 1026.52(b)(1) and (2).* Section 1026.52(b)(1) does not permit a card issuer to impose a fee that is inconsistent with the prohibitions in § 1026.52(b)(2). For example, if § 1026.52(b)(2)(i) prohibits the card issuer from imposing a late payment fee that exceeds $7, § 1026.52(b)(1)(ii) does not permit the card issuer to impose a higher late payment fee.

52(b)(1)(i) Fees Based on Costs

1. *Costs incurred as a result of violations.* Section 1026.52(b)(1)(i) does not require a card issuer to base a fee on the costs incurred as a result of a specific violation of the terms or other requirements of an account. Instead, for purposes of § 1026.52(b)(1)(i), a card issuer must have determined that a fee for violating the terms or other requirements of an account represents a reasonable proportion of the costs incurred by the card issuer as a result of that type of violation. A card issuer may make a single determination for all of its credit card portfolios or may make separate determinations for each portfolio. The factors relevant to this determination include:

i. The number of violations of a particular type experienced by the card issuer during a prior period of reasonable length (for example, a period of twelve months).

ii. The costs incurred by the card issuer during that period as a result of those violations.

iii. At the card issuer's option, the number of fees imposed by the card issuer as a result of those violations during that period that the card issuer reasonably estimates it will be unable to collect. *See* comment 52(b)(1)(i)–5.

iv. At the card issuer's option, reasonable estimates for an upcoming period of changes in the number of violations of that type, the resulting costs, and the number of fees that the card issuer will be unable to collect. *See* illustrative examples in comments 52(b)(1)(i)–6 through –9.

2. *Amounts excluded from cost analysis.* The following amounts are not costs incurred by a card issuer as a result of violations of

the terms or other requirements of an account for purposes of § 1026.52(b)(1)(i):

i. Losses and associated costs (including the cost of holding reserves against potential losses, the cost of funding delinquent accounts, and any collection costs that are incurred after an account is charged off in accordance with loan-loss provisions).

ii. Costs associated with evaluating whether consumers who have not violated the terms or other requirements of an account are likely to do so in the future (such as the costs associated with underwriting new accounts). However, once a violation of the terms or other requirements of an account has occurred, the costs associated with preventing additional violations for a reasonable period of time are costs incurred by a card issuer as a result of violations of the terms or other requirements of an account for purposes of § 1026.52(b)(1)(i).

3. *Third-party charges.* As a general matter, amounts charged to the card issuer by a third party as a result of a violation of the terms or other requirements of an account are costs incurred by the card issuer for purposes of § 1026.52(b)(1)(i). For example, if a card issuer is charged a specific amount by a third party for each returned payment, that amount is a cost incurred by the card issuer as a result of returned payments. However, if the amount is charged to the card issuer by an affiliate or subsidiary of the card issuer, the card issuer must have determined that the charge represents a reasonable proportion of the costs incurred by the affiliate or subsidiary as a result of the type of violation. For example, if an affiliate of a card issuer provides collection services to the card issuer on delinquent accounts, the card issuer must have determined that the amounts charged to the card issuer by the affiliate for such services represent a reasonable proportion of the costs incurred by the affiliate as a result of late payments.

4. *Amounts charged by other card issuers.* The fact that a card issuer's fees for violating the terms or other requirements of an account are comparable to fees assessed by other card issuers does not satisfy the requirements of § 1026.52(b)(1)(i).

5. *Uncollected fees.* For purposes of § 1026.52(b)(1)(i), a card issuer may consider fees that it is unable to collect when determining the appropriate fee amount. Fees that the card issuer is unable to collect include fees imposed on accounts that have been charged off by the card issuer, fees that have been discharged in bankruptcy, and fees that the card issuer is required to waive in order to comply with a legal requirement (such as a requirement imposed by this part or 50 U.S.C. app. 527). However, fees that the card issuer chooses not to impose or chooses not to collect (such as fees the card issuer chooses to waive at the request of the consumer or under a workout or temporary hardship arrangement) are not relevant for purposes of this determination. *See* illustrative examples in comments 52(b)(2)(i)–6 through –9.

6. *Late payment fees.*

i. *Costs incurred as a result of late payments.* For purposes of § 1026.52(b)(1)(i), the costs incurred by a card issuer as a result of late payments include the costs associated

with the collection of late payments, such as the costs associated with notifying consumers of delinquencies and resolving delinquencies (including the establishment of workout and temporary hardship arrangements).

ii. *Examples.* A. *Late payment fee based on past delinquencies and costs.* Assume that, during year one, a card issuer experienced 1 million delinquencies and incurred $26 million in costs as a result of those delinquencies. For purposes of § 1026.52(b)(1)(i), a $26 late payment fee would represent a reasonable proportion of the total costs incurred by the card issuer as a result of late payments during year two.

B. *Adjustment based on fees card issuer is unable to collect.* Same facts as in comment 52(b)(1)(i)–6.ii.A except that the card issuer imposed a late payment fee for each of the 1 million delinquencies experienced during year one but was unable to collect 25% of those fees (in other words, the card issuer was unable to collect 250,000 fees, leaving a total of 750,000 late payments for which the card issuer did collect or could have collected a fee). For purposes of § 1026.52(b)(1)(i), a late payment fee of $35 would represent a reasonable proportion of the total costs incurred by the card issuer as a result of late payments during year two.

C. *Adjustment based on reasonable estimate of future changes.* Same facts as in comments 52(b)(1)(i)–6.ii.A and B except the card issuer reasonably estimates that—based on past delinquency rates and other factors relevant to potential delinquency rates for year two—it will experience a 2% decrease in delinquencies during year two (in other words, 20,000 fewer delinquencies for a total of 980,000). The card issuer also reasonably estimates that it will be unable to collect the same percentage of fees (25%) during year two as during year one (in other words, the card issuer will be unable to collect 245,000 fees, leaving a total of 735,000 late payments for which the card issuer will be able to collect a fee). The card issuer also reasonably estimates that—based on past changes in costs incurred as a result of delinquencies and other factors relevant to potential costs for year two—it will experience a 5% increase in costs during year two (in other words, $1.3 million in additional costs for a total of $27.3 million). For purposes of § 1026.52(b)(1)(i), a $37 late payment fee would represent a reasonable proportion of the total costs incurred by the card issuer as a result of late payments during year two.

7. *Returned payment fees.*

i. *Costs incurred as a result of returned payments.* For purposes of § 1026.52(b)(1)(i), the costs incurred by a card issuer as a result of returned payments include:

A. Costs associated with processing returned payments and reconciling the card issuer's systems and accounts to reflect returned payments;

B. Costs associated with investigating potential fraud with respect to returned payments; and

C. Costs associated with notifying the consumer of the returned payment and arranging for a new payment.

ii. *Examples.* A. *Returned payment fee based on past returns and costs.* Assume

that, during year one, a card issuer experienced 150,000 returned payments and incurred $3.1 million in costs as a result of those returned payments. For purposes of § 1026.52(b)(1)(i), a $21 returned payment fee would represent a reasonable proportion of the total costs incurred by the card issuer as a result of returned payments during year two.

B. *Adjustment based on fees card issuer is unable to collect.* Same facts as in comment 52(b)(1)(i)–7.ii.A except that the card issuer imposed a returned payment fee for each of the 150,000 returned payments experienced during year one but was unable to collect 15% of those fees (in other words, the card issuer was unable to collect 22,500 fees, leaving a total of 127,500 returned payments for which the card issuer did collect or could have collected a fee). For purposes of § 1026.52(b)(2)(i), a returned payment fee of $24 would represent a reasonable proportion of the total costs incurred by the card issuer as a result of returned payments during year two.

C. *Adjustment based on reasonable estimate of future changes.* Same facts as in comments 52(b)(1)(i)–7.ii.A and B except the card issuer reasonably estimates that—based on past returned payment rates and other factors relevant to potential returned payment rates for year two—it will experience a 2% increase in returned payments during year two (in other words, 3,000 additional returned payments for a total of 153,000). The card issuer also reasonably estimates that it will be unable to collect 25% of returned payment fees during year two (in other words, the card issuer will be unable to collect 38,250 fees, leaving a total of 114,750 returned payments for which the card issuer will be able to collect a fee). The card issuer also reasonably estimates that—based on past changes in costs incurred as a result of returned payments and other factors relevant to potential costs for year two—it will experience a 1% decrease in costs during year two (in other words, a $31,000 reduction in costs for a total of $3.069 million). For purposes of § 1026.52(b)(1)(i), a $27 returned payment fee would represent a reasonable proportion of the total costs incurred by the card issuer as a result of returned payments during year two.

8. *Over-the-limit fees.*

i. *Costs incurred as a result of over-the-limit transactions.* For purposes of § 1026.52(b)(1)(i), the costs incurred by a card issuer as a result of over-the-limit transactions include:

A. Costs associated with determining whether to authorize over-the-limit transactions; and

B. Costs associated with notifying the consumer that the credit limit has been exceeded and arranging for payments to reduce the balance below the credit limit.

ii. *Costs not incurred as a result of over-the-limit transactions.* For purposes of § 1026.52(b)(1)(i), costs associated with obtaining the affirmative consent of consumers to the card issuer's payment of transactions that exceed the credit limit consistent with § 1026.56 are not costs incurred by a card issuer as a result of over-the-limit transactions.

iii. *Examples.* A. *Over-the-limit fee based on past fees and costs.* Assume that, during year one, a card issuer authorized 600,000 over-the-limit transactions and incurred $4.5 million in costs as a result of those over-the-limit transactions. However, because of the affirmative consent requirements in § 1026.56, the card issuer was only permitted to impose 200,000 over-the-limit fees during year one. For purposes of § 1026.52(b)(1)(i), a $23 over-the-limit fee would represent a reasonable proportion of the total costs incurred by the card issuer as a result of over-the-limit transactions during year two.

B. *Adjustment based on fees card issuer is unable to collect.* Same facts as in comment 52(b)(1)(i)–8.iii.A except that the card issuer was unable to collect 30% of the 200,000 over-the-limit fees imposed during year one (in other words, the card issuer was unable to collect 60,000 fees, leaving a total of 140,000 over-the-limit transactions for which the card issuer did collect or could have collected a fee). For purposes of § 1026.52(b)(2)(i), an over-the-limit fee of $32 would represent a reasonable proportion of the total costs incurred by the card issuer as a result of over-the-limit transactions during year two.

C. *Adjustment based on reasonable estimate of future changes.* Same facts as in comments 52(b)(1)(i)–8.iii.A and B except the card issuer reasonably estimates that—based on past over-the-limit transaction rates, the percentages of over-the-limit transactions that resulted in an over-the-limit fee in the past (consistent with § 1026.56), and factors relevant to potential changes in those rates and percentages for year two—it will authorize approximately the same number of over-the-limit transactions during year two (600,000) and impose approximately the same number of over-the-limit fees (200,000). The card issuer also reasonably estimates that it will be unable to collect the same percentage of fees (30%) during year two as during year one (in other words, the card issuer was unable to collect 60,000 fees, leaving a total of 140,000 over-the-limit transactions for which the card issuer will be able to collect a fee). The card issuer also reasonably estimates that—based on past changes in costs incurred as a result of over-the-limit transactions and other factors relevant to potential costs for year two—it will experience a 6% decrease in costs during year two (in other words, a $270,000 reduction in costs for a total of $4.23 million). For purposes of § 1026.52(b)(1)(i), a $30 over-the-limit fee would represent a reasonable proportion of the total costs incurred by the card issuer as a result of over-the-limit transactions during year two.

9. *Declined access check fees.*

i. *Costs incurred as a result of declined access checks.* For purposes of § 1026.52(b)(1)(ii), the costs incurred by a card issuer as a result of declining payment on a check that accesses a credit card account include:

A. Costs associated with determining whether to decline on access checks;

B. Costs associated with processing declined access checks and reconciling the card issuer's systems and accounts to reflect declined access checks;

C. Costs associated with investigating potential fraud with respect to declined access checks; and

D. Costs associated with notifying the consumer and the merchant or other party that accepted the access check that payment on the check has been declined.

ii. *Example.* Assume that, during year one, a card issuer declined 100,000 access checks and incurred $2 million in costs as a result of those declined checks. The card issuer imposed a fee for each declined access check but was unable to collect 10% of those fees (in other words, the card issuer was unable to collect 10,000 fees, leaving a total of 90,000 declined access checks for which the card issuer did collect or could have collected a fee). For purposes of § 1026.52(b)(1)(ii), a $22 declined access check fee would represent a reasonable proportion of the total costs incurred by the card issuer as a result of declined access checks during year two.

52(b)(1)(ii) Safe Harbors

1. *Multiple violations of same type.*

i. *Same billing cycle or next six billing cycles.* A card issuer other than a smaller card issuer as defined in § 1026.52(b)(3) cannot impose a late fee in excess of $8 pursuant to § 1026.52(b)(1)(ii), regardless of whether the card issuer has imposed a late fee within the six previous billing cycles. For all other penalty fees, a card issuer cannot impose a fee for a violation pursuant to § 1026.52(b)(1)(ii)(B) unless a fee has previously been imposed for the same type of violation pursuant to § 1026.52(b)(1)(ii)(A). Once a fee has been imposed for a violation pursuant to § 1026.52(b)(1)(ii)(A), the card issuer may impose a fee pursuant to § 1026.52(b)(1)(ii)(B) for any subsequent violation of the same type until that type of violation has not occurred for a period of six consecutive complete billing cycles. A fee has been imposed for purposes of § 1026.52(b)(1)(ii) even if the card issuer waives or rebates all or part of the fee.

A. *Late payments.* For purposes of § 1026.52(b)(1)(ii), a late payment occurs during the billing cycle in which the payment may first be treated as late consistent with the requirements of this part and the terms or other requirements of the account.

B. *Returned payments.* For purposes of § 1026.52(b)(1)(ii), a returned payment occurs during the billing cycle in which the payment is returned to the card issuer.

C. *Transactions that exceed the credit limit.* For purposes of § 1026.52(b)(1)(ii), a transaction that exceeds the credit limit for an account occurs during the billing cycle in which the transaction occurs or is authorized by the card issuer.

D. *Declined access checks.* For purposes of § 1026.52(b)(1)(ii), a check that accesses a credit card account is declined during the billing cycle in which the card issuer declines payment on the check.

ii. *Relationship to §§ 1026.52(b)(2)(ii) and 1026.56(j)(1).* If multiple violations are based on the same event or transaction such that § 1026.52(b)(2)(ii) prohibits the card issuer from imposing more than one fee, the event or transaction constitutes a single violation for purposes of § 1026.52(b)(1)(ii).

Furthermore, consistent with § 1026.52(j)(1)(i), no more than one violation for exceeding an account's credit limit can occur during a single billing cycle for purposes of § 1026.52(b)(1)(ii). However, § 1026.52(b)(2)(ii) does not prohibit a card issuer from imposing fees for exceeding the credit limit in consecutive billing cycles based on the same over-the-limit transaction to the extent permitted by § 1026.56(j)(1). In these circumstances, the second and third over-the-limit fees permitted by § 1026.56(j)(1) may be imposed pursuant to § 1026.52(b)(1)(ii)(B). See comment 52(b)(2)(ii)–1.

iii. *Examples.* The following examples illustrate the application of § 1026.52(b)(1)(ii) introductory text and (b)(1)(ii)(A) and (B) with respect to credit card accounts under an open-end (not home-secured) consumer credit plan that are not charge card accounts. For purposes of these examples, assume that the card issuer is not a smaller card issuer as defined in § 1026.52(b)(3). Also assume that the billing cycles for the account begin on the first day of the month and end on the last day of the month and that the payment due date for the account is the twenty-fifth day of the month.

A. *Violations of same type (over the credit limit).* Consistent with § 1026.56, the consumer has affirmatively consented to the payment of transactions that exceed the credit limit. On March 20, a transaction causes the account balance to increase to $1,150, which exceeds the account's $1,000 credit limit. Consistent with § 1026.52(b)(1)(ii)(A), the card issuer imposes a $25 over-the-limit fee for the March billing cycle. The card issuer receives a $300 payment on March 25, bringing the account below the credit limit. In order for the card issuer to impose a $35 over-the-limit fee pursuant to § 1026.52(b)(1)(ii)(B), a second over-the-limit transaction must occur during the April, May, June, July, August, or September billing cycles.

*1.* Same facts as in the lead-in paragraph to comment 52(b)(1)(ii)–1.iii.A. On April 20, a transaction causes the account balance to increase to $1,200, which exceeds the account's $1,000 credit limit. Consistent with § 1026.52(b)(1)(ii)(B), the card issuer may impose a $35 over-the-limit fee for the April billing cycle. Furthermore, the card issuer may impose a $35 over-the-limit payment fee for any over-the-limit transaction or event that triggers an over-the-limit fee that occurs during the May, June, July, August, September, or October billing cycles, subject to the limitations in § 1026.56(j)(1).

*2.* Same facts as in the lead-in paragraph to comment 52(b)(1)(ii)–1.iii.A. The account remains below the limit from March 25 until October 20, when a transaction causes the account balance to exceed the credit limit. However, because this over-the-limit transaction did not occur during the six billing cycles following the March billing cycle, § 1026.52(b)(1)(ii) only permits the card issuer to impose an over-the-limit fee of $25.

B. *Violations of different types (late payment and over the credit limit).* The credit limit for an account is $1,000. Consistent with § 1026.56, the consumer has

affirmatively consented to the payment of transactions that exceed the credit limit. A required minimum periodic payment of $35 is due on August 25. On August 26, a late payment has occurred because no payment has been received. Accordingly, consistent with § 1026.52(b)(1)(ii), the card issuer imposes a $8 late payment fee on August 26. On August 30, the card issuer receives a $35 payment. On September 10, a transaction causes the account balance to increase to $1,150, which exceeds the account's $1,000 credit limit. On September 11, a second transaction increases the account balance to $1,350. On September 23, the card issuer receives the $50 required minimum periodic payment due on September 25, which reduces the account balance to $1,300. On September 30, the card issuer imposes a $25 over-the-limit fee, consistent with § 1026.52(b)(1)(ii)(A). On October 26, a late payment has occurred because the $60 required minimum periodic payment due on October 25 has not been received. Accordingly, consistent with § 1026.52(b)(1)(ii) the card issuer imposes a $8 late payment fee on October 26.

C. *Violations of different types (late payment and returned payment).* A required minimum periodic payment of $40 is due on July 25. On July 26, a late payment has occurred because no payment has been received. Accordingly, consistent with § 1026.52(b)(1)(ii), the card issuer imposes a $8 late payment fee on July 26. On July 30, the card issuer receives a $60 payment. A required minimum periodic payment of $40 is due on August 25. On August 24, a $40 payment is received. On August 27, the $40 payment is returned to the card issuer for insufficient funds. In these circumstances, § 1026.52(b)(2)(ii) permits the card issuer to impose either a late payment fee or a returned payment fee but not both, because the late payment and the returned payment result from the same event or transaction. Accordingly, for purposes of § 1026.52(b)(1)(ii), the event or transaction constitutes a single violation. However, if the card issuer imposes a late payment fee, § 1026.52(b)(1)(ii) permits the issuer to impose a fee of $8. If the card issuer imposes a returned payment fee, the amount of the fee may be no more than $25 pursuant to § 1026.52(b)(1)(ii)(A).

2. *Adjustments based on Consumer Price Index for penalty fees imposed pursuant to § 1026.52(b)(1)(ii)(A) and (B).* For purposes of § 1026.52(b)(1)(ii)(A) and (B), the Bureau shall calculate each year price level adjusted amounts using the Consumer Price Index in effect on June 1 of that year. When the cumulative change in the adjusted minimum value derived from applying the annual Consumer Price Level to the current amounts in § 1026.52(b)(1)(ii)(A) and (B) has risen by a whole dollar, those amounts will be increased by $1.00. Similarly, when the cumulative change in the adjusted minimum value derived from applying the annual Consumer Price level to the current amounts in § 1026.52(b)(1)(ii)(A) and (B) has decreased by a whole dollar, those amounts will be decreased by $1.00. The Bureau will publish adjustments to the amounts in § 1026.52(b)(1)(ii)(A) and (B).

i. *Historical thresholds.*

A. Card issuers were permitted to impose a fee for violating the terms of an agreement if the fee did not exceed $25 under § 1026.52(b)(1)(ii)(A) and $35 under § 1026.52(b)(1)(ii)(B), through December 31, 2013.

B. Card issuers were permitted to impose a fee for violating the terms of an agreement if the fee did not exceed $26 under § 1026.52(b)(1)(ii)(A) and $37 under § 1026.52(b)(1)(ii)(B), through December 31, 2014.

C. Card issuers were permitted to impose a fee for violating the terms of an agreement if the fee did not exceed $27 under § 1026.52(b)(1)(ii)(A) and $38 under § 1026.52(b)(1)(ii)(B), through December 31, 2015.

D. Card issuers were permitted to impose a fee for violating the terms of an agreement if the fee did not exceed $27 under § 1026.52(b)(1)(ii)(A), through December 31, 2016. Card issuers were permitted to impose a fee for violating the terms of an agreement if the fee did not exceed $37 under § 1026.52(b)(1)(ii)(B), through June 26, 2016, and $38 under § 1026.52(b)(1)(ii)(B) from June 27, 2016, through December 31, 2016.

E. Card issuers were permitted to impose a fee for violating the terms of an agreement if the fee did not exceed $27 under § 1026.52(b)(1)(ii)(A) and $38 under § 1026.52(b)(1)(ii)(B), through December 31, 2017.

F. Card issuers were permitted to impose a fee for violating the terms of an agreement if the fee did not exceed $27 under § 1026.52(b)(1)(ii)(A) and $38 under § 1026.52(b)(1)(ii)(B), through December 31, 2018.

G. Card issuers were permitted to impose a fee for violating the terms of an agreement if the fee did not exceed $28 under § 1026.52(b)(1)(ii)(A) and $39 under § 1026.52(b)(1)(ii)(B), through December 31, 2019.

H. Card issuers were permitted to impose a fee for violating the terms of an agreement if the fee did not exceed $29 under § 1026.52(b)(1)(ii)(A) and $40 under § 1026.52(b)(1)(ii)(B), through December 31, 2020.

I. Card issuers were permitted to impose a fee for violating the terms of an agreement if the fee did not exceed $29 under § 1026.52(b)(1)(ii)(A) and $40 under § 1026.52(b)(1)(ii)(B), through December 31, 2021.

J. Card issuers were permitted to impose a fee for violating the terms of an agreement if the fee did not exceed $30 under § 1026.52(b)(1)(ii)(A) and $41 under § 1026.52(b)(1)(ii)(B), through May 13, 2024.

3. *Delinquent balance for charge card accounts.* Section 1026.52(b)(1)(ii)(C) provides that, when a charge card issuer that requires payment of outstanding balances in full at the end of each billing cycle has not received the required payment for two or more consecutive billing cycles, the card issuer may impose a late payment fee that does not exceed three percent of the delinquent balance. For purposes of § 1026.52(b)(1)(ii)(C), the delinquent balance is any previously billed amount that remains

unpaid at the time the late payment fee is imposed pursuant to § 1026.52(b)(1)(ii)(C). Consistent with § 1026.52(b)(2)(ii), a charge card issuer that imposes a fee pursuant to § 1026.52(b)(1)(ii)(C) with respect to a late payment may not impose a fee pursuant to § 1026.52(b)(1)(ii)(B) with respect to the same late payment. The following examples illustrate the application of § 1026.52(b)(1)(ii)(C):

i. Assume that a charge card issuer requires payment of outstanding balances in full at the end of each billing cycle and that the billing cycles for the account begin on the first day of the month and end on the last day of the month. Also assume that the card issuer is not a smaller card issuer as defined in § 1026.52(b)(3). At the end of the June billing cycle, the account has a balance of $1,000. On July 5, the card issuer provides a periodic statement disclosing the $1,000 balance consistent with § 1026.7. During the July billing cycle, the account is used for $292 in transactions, increasing the balance to $1,292. At the end of the July billing cycle, no payment has been received and the card issuer imposes a $8 late payment fee consistent with § 1026.52(b)(1)(ii). On August 5, the card issuer provides a periodic statement disclosing the $1,300 balance consistent with § 1026.7. During the August billing cycle, the account is used for $200 in transactions, increasing the balance to $1,500. At the end of the August billing cycle, no payment has been received. Consistent with § 1026.52(b)(1)(ii)(C), the card issuer may impose a late payment fee of $39, which is 3% of the $1,300 balance that was due at the end of the August billing cycle. Section 1026.52(b)(1)(ii)(C) does not permit the card issuer to include the $200 in transactions that occurred during the August billing cycle.

ii. Same facts as in comment 52(b)(1)(ii)–3.i except that, on August 25, a $100 payment is received. Consistent with § 1026.52(b)(1)(ii)(C), the card issuer may impose a late payment fee of $36, which is 3% of the unpaid portion of the $1,300 balance that was due at the end of the August billing cycle ($1,200).

iii. Same facts as in comment 52(b)(1)(ii)–3.i except that, on August 25, a $200 payment is received. Consistent with § 1026.52(b)(1)(ii)(C), the card issuer may impose a late payment fee of $33, which is 3% of the unpaid portion of the $1,300 balance that was due at the end of the August billing cycle ($1,100). In the alternative, the card issuer may impose a late payment fee of $8 consistent with § 1026.52(b)(1)(ii). However, § 1026.52(b)(2)(ii) prohibits the card issuer from imposing both fees.

4. *Smaller card issuers.* Section 1026.52(b)(1)(ii)(E) provides that a card issuer meeting the definition of smaller card issuer in § 1026.52(b)(3) may impose a fee for a late payment on an account if the dollar amount of the fee does not exceed the amount in § 1026.52(b)(1)(ii)(A) or (B), as applicable, notwithstanding the $8 limit on the amount of a late fee in § 1026.52(b)(1)(ii). Thus, assuming that the original historical safe harbor threshold amounts apply, a smaller card issuer may impose a late fee of $25 for a first late payment violation and a

late fee of $35 for a late payment violation that occurs during the same billing cycle or one of the next six billing cycles, provided that those amounts are consistent with § 1026.52(b)(2).

*52(b)(2) Prohibited Fees*

1. *Relationship to § 1026.52(b)(1).* A card issuer does not comply with § 1026.52(b) if it imposes a fee that is inconsistent with the prohibitions in § 1026.52(b)(2). Thus, the prohibitions in § 1026.52(b)(2) apply even if a fee is consistent with § 1026.52(b)(1)(i) or (ii). For example, even if a card issuer has determined for purposes of § 1026.52(b)(1)(i) that a $27 fee represents a reasonable proportion of the total costs incurred by the card issuer as a result of a particular type of violation, § 1026.52(b)(2)(i) prohibits the card issuer from imposing that fee if the dollar amount associated with the violation is less than $27. Similarly, even if § 1026.52(b)(1)(ii) permits a card issuer to impose a $25 fee, § 1026.52(b)(2)(i) prohibits the card issuer from imposing that fee if the dollar amount associated with the violation is less than $25.

52(b)(2)(i) Fees That Exceed Dollar Amount Associated With Violation

1. *Late payment fees.* For purposes of § 1026.52(b)(2)(i), the dollar amount associated with a late payment is the amount of the required minimum periodic payment due immediately prior to assessment of the late payment fee. Thus, § 1026.52(b)(2)(i)(A) prohibits a card issuer from imposing a late payment fee that exceeds the amount of that required minimum periodic payment. For example:

i. Assume that a $15 required minimum periodic payment is due on September 25. The card issuer does not receive any payment on or before September 25. On September 26, the card issuer imposes a late payment fee. For purposes of § 1026.52(b)(2)(i), the dollar amount associated with the late payment is the amount of the required minimum periodic payment due on September 25 ($15). Thus, under § 1026.52(b)(2)(i)(A), the amount of that fee cannot exceed $15 (even if a higher fee would be permitted under § 1026.52(b)(1)).

ii. Same facts as in comment 52(b)(2)(i)–1.i except that, on September 25, the card issuer receives a $10 payment. No further payments are received. On September 26, the card issuer imposes a late payment fee. For purposes of § 1026.52(b)(2)(i), the dollar amount associated with the late payment is the full amount of the required minimum periodic payment due on September 25 ($15), rather than the unpaid portion of that payment ($5). Thus, under § 1026.52(b)(2)(i)(A), the amount of the late payment fee cannot exceed $15 (even if a higher fee would be permitted under § 1026.52(b)(1)).

iii. Assume that a $15 required minimum periodic payment is due on October 28 and the billing cycle for the account closes on October 31. The card issuer does not receive any payment on or before November 3. On November 3, the card issuer determines that the required minimum periodic payment due on November 28 is $50. On November 5, the card issuer imposes a late payment fee. For purposes of § 1026.52(b)(2)(i), the dollar

amount associated with the late payment is the amount of the required minimum periodic payment due on October 28 ($15), rather than the amount of the required minimum periodic payment due on November 28 ($50). Thus, under § 1026.52(b)(2)(i)(A), the amount of that fee cannot exceed $15 (even if a higher fee would be permitted under § 1026.52(b)(1)).

2. *Returned payment fees.* For purposes of § 1026.52(b)(2)(i), the dollar amount associated with a returned payment is the amount of the required minimum periodic payment due immediately prior to the date on which the payment is returned to the card issuer. Thus, § 1026.52(b)(2)(i)(A) prohibits a card issuer from imposing a returned payment fee that exceeds the amount of that required minimum periodic payment. However, if a payment has been returned and is submitted again for payment by the card issuer, there is no additional dollar amount associated with a subsequent return of that payment and § 1026.52(b)(2)(i)(B) prohibits the card issuer from imposing an additional returned payment fee. For example:

i. Assume that the billing cycles for an account begin on the first day of the month and end on the last day of the month and that the payment due date is the twenty-fifth day of the month. A minimum payment of $15 is due on March 25. The card issuer receives a check for $100 on March 23, which is returned to the card issuer for insufficient funds on March 26. For purposes of § 1026.52(b)(2)(i), the dollar amount associated with the returned payment is the amount of the required minimum periodic payment due on March 25 ($15). Thus, § 1026.52(b)(2)(i)(A) prohibits the card issuer from imposing a returned payment fee that exceeds $15 (even if a higher fee would be permitted under § 1026.52(b)(1)). Furthermore, § 1026.52(b)(2)(ii) prohibits the card issuer from assessing both a late payment fee and a returned payment fee in these circumstances. *See* comment 52(b)(2)(ii)–1.

ii. Same facts as in comment 52(b)(2)(i)–2.i except that the card issuer receives the $100 check on March 31 and the check is returned for insufficient funds on April 2. The minimum payment due on April 25 is $30. For purposes of § 1026.52(b)(2)(i), the dollar amount associated with the returned payment is the amount of the required minimum periodic payment due on March 25 ($15), rather than the amount of the required minimum periodic payment due on April 25 ($30). Thus, § 1026.52(b)(2)(i)(A) prohibits the card issuer from imposing a returned payment fee that exceeds $15 (even if a higher fee would be permitted under § 1026.52(b)(1)). Furthermore, § 1026.52(b)(2)(ii) prohibits the card issuer from assessing both a late payment fee and a returned payment fee in these circumstances. *See* comment 52(b)(2)(ii)–1.

iii. Same facts as in comment 52(b)(2)(i)–2.i except that, on March 28, the card issuer presents the $100 check for payment a second time. On April 1, the check is again returned for insufficient funds. Section 1026.52(b)(2)(i)(B) prohibits the card issuer from imposing a returned payment fee based on the return of the payment on April 1.

iv. Assume that the billing cycles for an account begin on the first day of the month and end on the last day of the month and that the payment due date is the twenty-fifth day of the month. A minimum payment of $15 is due on August 25. The card issuer receives a check for $15 on August 23, which is not returned. The card issuer receives a check for $50 on September 5, which is returned to the card issuer for insufficient funds on September 7. Section 1026.52(b)(2)(i)(B) does not prohibit the card issuer from imposing a returned payment fee in these circumstances. Instead, for purposes of § 1026.52(b)(2)(i), the dollar amount associated with the returned payment is the amount of the required minimum periodic payment due on August 25 ($15). Thus, § 1026.52(b)(2)(i)(A) prohibits the card issuer from imposing a returned payment fee that exceeds $15 (even if a higher fee would be permitted under § 1026.52(b)(1)).

3. *Over-the-limit fees.* For purposes of § 1026.52(b)(2)(i), the dollar amount associated with extensions of credit in excess of the credit limit for an account is the total amount of credit extended by the card issuer in excess of the credit limit during the billing cycle in which the over-the-limit fee is imposed. Thus, § 1026.52(b)(2)(i)(A) prohibits a card issuer from imposing an over-the-limit fee that exceeds that amount. Nothing in § 1026.52(b) permits a card issuer to impose an over-the-limit fee if imposition of the fee is inconsistent with § 1026.56. The following examples illustrate the application of § 1026.52(b)(2)(i)(A) to over-the-limit fees:

i. Assume that the billing cycles for a credit card account with a credit limit of $5,000 begin on the first day of the month and end on the last day of the month. Assume also that, consistent with § 1026.56, the consumer has affirmatively consented to the payment of transactions that exceed the credit limit. On March 1, the account has a $4,950 balance. On March 6, a $60 transaction is charged to the account, increasing the balance to $5,010. On March 25, a $5 transaction is charged to the account, increasing the balance to $5,015. On the last day of the billing cycle (March 31), the card issuer imposes an over-the-limit fee. For purposes of § 1026.52(b)(2)(i), the dollar amount associated with the extensions of credit in excess of the credit limit is the total amount of credit extended by the card issuer in excess of the credit limit during the March billing cycle ($15). Thus, § 1026.52(b)(2)(i)(A) prohibits the card issuer from imposing an over-the-limit fee that exceeds $15 (even if a higher fee would be permitted under § 1026.52(b)(1)).

ii. Same facts as in comment 52(b)(2)(i)–3.i except that, on March 26, the card issuer receives a payment of $20, reducing the balance below the credit limit to $4,995. Nevertheless, for purposes of § 1026.52(b)(2)(i), the dollar amount associated with the extensions of credit in excess of the credit limit is the total amount of credit extended by the card issuer in excess of the credit limit during the March billing cycle ($15). Thus, consistent with § 1026.52(b)(2)(i)(A), the card issuer may impose an over-the-limit fee of $15.

4. *Declined access check fees.* For purposes of § 1026.52(b)(2)(i), the dollar amount

associated with declining payment on a check that accesses a credit card account is the amount of the check. Thus, when a check that accesses a credit card account is declined, § 1026.52(b)(2)(i)(A) prohibits a card issuer from imposing a fee that exceeds the amount of that check. For example, assume that a check that accesses a credit card account is used as payment for a $50 transaction, but payment on the check is declined by the card issuer because the transaction would have exceeded the credit limit for the account. For purposes of § 1026.52(b)(2)(i), the dollar amount associated with the declined check is the amount of the check ($50). Thus, § 1026.52(b)(2)(i)(A) prohibits the card issuer from imposing a fee that exceeds $50. However, the amount of this fee must also comply with § 1026.52(b)(1)(i) or (ii).

5. *Inactivity fees.* Section 1026.52(b)(2)(i)(B)(*2*) prohibits a card issuer from imposing a fee with respect to a credit card account under an open-end (not home-secured) consumer credit plan based on inactivity on that account (including the consumer's failure to use the account for a particular number or dollar amount of transactions or a particular type of transaction). For example, § 1026.52(b)(2)(i)(B)(*2*) prohibits a card issuer from imposing a $50 fee when a credit card account under an open-end (not home-secured) consumer credit plan is not used for at least $2,000 in purchases over the course of a year. Similarly, § 1026.52(b)(2)(i)(B)(*2*) prohibits a card issuer from imposing a $50 annual fee on all accounts of a particular type but waiving the fee on any account that is used for at least $2,000 in purchases over the course of a year if the card issuer promotes the waiver or rebate of the annual fee for purposes of § 1026.55(e). However, if the card issuer does not promote the waiver or rebate of the annual fee for purposes of § 1026.55(e), § 1026.52(b)(2)(i)(B)(*2*) does not prohibit a card issuer from considering account activity along with other factors when deciding whether to waive or rebate annual fees on individual accounts (such as in response to a consumer's request).

6. *Closed account fees.* Section 1026.52(b)(2)(i)(B)(*3*) prohibits a card issuer from imposing a fee based on the closure or termination of an account. For example, § 1026.52(b)(2)(i)(B)(*3*) prohibits a card issuer from:

i. Imposing a one-time fee to consumers who close their accounts.

ii. Imposing a periodic fee (such as an annual fee, a monthly maintenance fee, or a closed account fee) after an account is closed or terminated if that fee was not imposed prior to closure or termination. This prohibition applies even if the fee was disclosed prior to closure or termination. *See also* comment 55(d)–1.

iii. Increasing a periodic fee (such as an annual fee or a monthly maintenance fee) after an account is closed or terminated. However, a card issuer is not prohibited from continuing to impose a periodic fee that was imposed before the account was closed or terminated.

7. *Declined transaction fees.* Section 1026.52(b)(2)(i)(B)(*1*) states that card issuers

must not impose a fee when there is no dollar amount associated with the violation, such as for transactions that the card issuer declines to authorize. With regard to a covered separate credit feature and an asset feature on a prepaid account that are both accessible by a hybrid prepaid-credit card as defined in § 1026.61 where the credit feature is a credit card account under an open-end (not home-secured) consumer credit plan, § 1026.52(b)(2)(i)(B)(*1*) prohibits a card issuer from imposing declined transaction fees in connection with the credit feature, regardless of whether the declined transaction fee is imposed on the credit feature or on the asset feature of the prepaid account. For example, if the prepaid card attempts to access credit from the covered separate credit feature accessible by the hybrid prepaid-credit card and the transaction is declined, § 1026.52(b)(2)(i)(B)(*1*) prohibits the card issuer from imposing a declined transaction fee, regardless of whether the fee is imposed on the credit feature or on the asset feature of the prepaid account. Fees imposed for declining a transaction that would have only accessed the asset feature of the prepaid account and would not have accessed the covered separate credit feature accessible by the hybrid prepaid-credit are not covered by § 1026.52(b)(2)(i)(B)(*1*).

### 52(b)(2)(ii) Multiple Fees Based on a Single Event or Transaction

1. *Single event or transaction.* Section 1026.52(b)(2)(ii) prohibits a card issuer from imposing more than one fee for violating the terms or other requirements of an account based on a single event or transaction. If § 1026.56(j)(1) permits a card issuer to impose fees for exceeding the credit limit in consecutive billing cycles based on the same over-the-limit transaction, those fees are not based on a single event or transaction for purposes of § 1026.52(b)(2)(ii). The following examples illustrate the application of § 1026.52(b)(2)(ii). Assume for purposes of these examples that the billing cycles for a credit card account begin on the first day of the month and end on the last day of the month and that the payment due date for the account is the twenty-fifth day of the month.

i. Assume that the required minimum periodic payment due on March 25 is $20 and the card issuer is not a smaller card issuer pursuant to § 1026.52(b)(3). On March 26, the card issuer has not received any payment and imposes a late payment fee. Consistent with § 1026.52(b)(1)(ii) and (b)(2)(i), the card issuer may impose an $8 late payment fee on March 26. However, § 1026.52(b)(2)(ii) prohibits the card issuer from imposing an additional late payment fee if the $20 minimum payment has not been received by a subsequent date (such as March 31).

A. On April 3, the card issuer provides a periodic statement disclosing that a $70 required minimum periodic payment is due on April 25. This minimum payment includes the $20 minimum payment due on March 25 and the $8 late payment fee imposed on March 26. On April 20, the card issuer receives a $20 payment. No additional payments are received during the April billing cycle. Section 1026.52(b)(2)(ii) does not prohibit the card issuer from imposing a

late payment fee based on the consumer's failure to make the $70 required minimum periodic payment on or before April 25. Accordingly, consistent with § 1026.52(b)(1)(ii) and (b)(2)(i), the card issuer may impose an $8 late payment fee on April 26.

B. On April 3, the card issuer provides a periodic statement disclosing that a $20 required minimum periodic payment is due on April 25. This minimum payment does not include the $20 minimum payment due on March 25 or the $8 late payment fee imposed on March 26. On April 20, the card issuer receives a $20 payment. No additional payments are received during the April billing cycle. Because the card issuer has received the required minimum periodic payment due on April 25 and because § 1026.52(b)(2)(ii) prohibits the card issuer from imposing a second late payment fee based on the consumer's failure to make the $20 minimum payment due on March 25, the card issuer cannot impose a late payment fee in these circumstances.

ii. Assume that the required minimum periodic payment due on March 25 is $30 and the card issuer is not a smaller card issuer pursuant to § 1026.52(b)(3).

A. On March 25, the card issuer receives a check for $50, but the check is returned for insufficient funds on March 27. Consistent with § 1026.52(b)(1)(ii) introductory text, (b)(1)(ii)(A), and (b)(2)(i)(A), the card issuer may impose a late payment fee of $8 or a returned payment fee of $25. However, § 1026.52(b)(2)(ii) prohibits the card issuer from imposing both fees because those fees would be based on a single event or transaction.

B. Same facts as in comment 52(b)(2)(ii)–1.ii.A except that that card issuer receives the $50 check on March 27 and the check is returned for insufficient funds on March 29. Consistent with § 1026.52(b)(1)(ii) introductory text, (b)(1)(ii)(A), and (b)(2)(i)(A), the card issuer may impose a late payment fee of $8 or a returned payment fee of $25. However, § 1026.52(b)(2)(ii) prohibits the card issuer from imposing both fees because those fees would be based on a single event or transaction. If no payment is received on or before the next payment due date (April 25), § 1026.52(b)(2)(ii) does not prohibit the card issuer from imposing a late payment fee.

iii. Assume that the required minimum periodic payment due on July 25 is $30 and the card issuer is not a smaller card issuer pursuant to § 1026.52(b)(3). On July 10, the card issuer receives a $50 payment, which is not returned. On July 20, the card issuer receives a $100 payment, which is returned for insufficient funds on July 24. Consistent with § 1026.52(b)(1)(ii)(A) and (b)(2)(i)(A), the card issuer may impose a returned payment fee of $25. Nothing in § 1026.52(b)(2)(ii) prohibits the imposition of this fee.

iv. Assume that the card issuer is not a smaller card issuer pursuant to § 1026.52(b)(3) and the credit limit for an account is $1,000 and that, consistent with § 1026.56, the consumer has affirmatively consented to the payment of transactions that exceed the credit limit. On March 31, the

balance on the account is $970 and the card issuer has not received the $35 required minimum periodic payment due on March 25. On that same date (March 31), a $70 transaction is charged to the account, which increases the balance to $1,040. Consistent with § 1026.52(b)(1)(ii) introductory text, (b)(1)(ii)(A), and (b)(2)(i)(A), the card issuer may impose a late payment fee of $8 and an over-the-limit fee of $25. Section 1026.52(b)(2)(ii) does not prohibit the imposition of both fees because those fees are based on different events or transactions. No additional transactions are charged to the account during the March, April, or May billing cycles. If the account balance remains more than $35 above the credit limit on April 26, the card issuer may impose an over-the-limit fee of $35 pursuant to § 1026.52(b)(1)(ii)(B), to the extent consistent with § 1026.56(j)(1). Furthermore, if the account balance remains more than $35 above the credit limit on May 26, the card issuer may again impose an over-the-limit fee of $35 pursuant to § 1026.52(b)(1)(ii)(B), to the extent consistent with § 1026.56(j)(1). Thereafter, § 1026.56(j)(1) does not permit the card issuer to impose additional over-the-limit fees unless another over-the-limit transaction occurs. However, if an over-the-limit transaction occurs during the six billing cycles following the May billing cycle, the card issuer may impose an over-the-limit fee of $35 pursuant to § 1026.52(b)(1)(ii)(B).

v. Assume that the credit limit for an account is $5,000 and that, consistent with § 1026.56, the consumer has affirmatively consented to the payment of transactions that exceed the credit limit. On July 23, the balance on the account is $4,950. On July 24, the card issuer receives the $100 required minimum periodic payment due on July 25, reducing the balance to $4,850. On July 26, a $75 transaction is charged to the account, which increases the balance to $4,925. On July 27, the $100 payment is returned for insufficient funds, increasing the balance to $5,025. Consistent with § 1026.52(b)(1)(ii)(A) and (b)(2)(i)(A), the card issuer may impose a returned payment fee of $25 or an over-the-limit fee of $25. However, § 1026.52(b)(2)(ii) prohibits the card issuer from imposing both fees because those fees would be based on a single event or transaction.

vi. Assume that the required minimum periodic payment due on March 25 is $50 and the card issuer is not a smaller card issuer pursuant to § 1026.52(b)(3). On March 20, the card issuer receives a check for $50, but the check is returned for insufficient funds on March 22. Consistent with § 1026.52(b)(1)(ii)(A) and (b)(2)(i)(A), the card issuer may impose a returned payment fee of $25. On March 25, the card issuer receives a second check for $50, but the check is returned for insufficient funds on March 27. Consistent with § 1026.52(b)(1)(ii) introductory text, (b)(1)(ii)(A) and (B), and (b)(2)(i)(A), the card issuer may impose a late payment fee of $8 or a returned payment fee of $35. However, § 1026.52(b)(2)(ii) prohibits the card issuer from imposing both fees because those fees would be based on a single event or transaction.

vii. Assume that the required minimum periodic payment due on February 25 is $100 and the card issuer is not a smaller card issuer pursuant to § 1026.52(b)(3). On February 25, the card issuer receives a check for $100. On March 3, the card issuer provides a periodic statement disclosing that a $120 required minimum periodic payment is due on March 25. On March 4, the $100 check is returned to the card issuer for insufficient funds. Consistent with § 1026.52(b)(1)(ii) introductory text, (b)(1)(ii)(A), and (b)(2)(i)(A), the card issuer may impose a late payment fee of $8 or a returned payment fee of $25 with respect to the $100 payment. However, § 1026.52(b)(2)(ii) prohibits the card issuer from imposing both fees because those fees would be based on a single event or transaction. On March 20, the card issuer receives a $120 check, which is not returned. No additional payments are received during the March billing cycle. Because the card issuer has received the required minimum periodic payment due on March 25 and because § 1026.52(b)(2)(ii) prohibits the card issuer from imposing a second fee based on the $100 payment that was returned for insufficient funds, the card issuer cannot impose a late payment fee in these circumstances.

52(b)(3) Smaller Card Issuer

52(b)(3)(i)

1. *Entire calendar year.* To meet the definition of smaller card issuer, a card issuer together with its affiliates must have fewer than one million open credit accounts for the entire preceding calendar year. Thus, for example, if a card issuer together with its affiliates had more than one million open credit card accounts from January through October of the preceding calendar year but had fewer than that threshold number in November and December, the card issuer is not a smaller card issuer in the next calendar year. Further, the card issuer is not a smaller card issuer until such time that the card issuer's number of open credit card accounts, together with those of its affiliates, remains below one million for an entire preceding calendar year.

52(b)(3)(ii)

1. *Meeting or exceeding threshold in current calendar year.* If a card issuer together with its affiliates have fewer than one million open credit card accounts for the entire preceding calendar year but meets or exceeds that number of open credit card accounts in the current calendar year, then the card issuer will no longer meet the definition of smaller card issuer and therefore may not impose a late fee pursuant to § 1026.52(b)(1)(ii)(E) as of 60 days after meeting or exceeding the threshold number of open credit card accounts. For purposes of imposing a late fee pursuant to the safe harbor provisions, the card issuer may impose a late fee of no more than $8 pursuant to § 1026.52(b)(1)(ii) as of the 60th day.

\*      \*      \*      \*      \*

*Section 1026.60—Credit and Charge Card Applications and Solicitations*

\*      \*      \*      \*      \*

60(a)(2) Form of Disclosures; Tabular Format

1. *Location of table.*

i. *General.* Except for disclosures given electronically, disclosures in § 1026.60(b) that are required to be provided in a table must be prominently located on or with the application or solicitation. Disclosures are deemed to be prominently located, for example, if the disclosures are on the same page as an application or solicitation reply form. If the disclosures appear elsewhere, they are deemed to be prominently located if the application or solicitation reply form contains a clear and conspicuous reference to the location of the disclosures and indicates that they contain rate, fee, and other cost information, as applicable.

ii. *Electronic disclosures.* If the table is provided electronically, the table must be provided in close proximity to the application or solicitation. Card issuers have flexibility in satisfying this requirement. Methods card issuers could use to satisfy the requirement include, but are not limited to, the following examples (whatever method is used, a card issuer need not confirm that the consumer has read the disclosures):

A. The disclosures could automatically appear on the screen when the application or reply form appears;

B. The disclosures could be located on the same web page as the application or reply form (whether or not they appear on the initial screen), if the application or reply form contains a clear and conspicuous reference to the location of the disclosures and indicates that the disclosures contain rate, fee, and other cost information, as applicable;

C. Card issuers could provide a link to the electronic disclosures on or with the application (or reply form) as long as consumers cannot bypass the disclosures before submitting the application or reply form. The link would take the consumer to the disclosures, but the consumer need not be required to scroll completely through the disclosures; or

D. The disclosures could be located on the same web page as the application or reply form without necessarily appearing on the initial screen, immediately preceding the button that the consumer will click to submit the application or reply.

2. *Multiple accounts.* If a tabular format is required to be used, card issuers offering several types of accounts may disclose the various terms for the accounts in a single table or may provide a separate table for each account.

3. *Information permitted in the table. See* the commentary to § 1026.60(b), (d), and (e)(1) for guidance on additional information permitted in the table.

4. *Deletion of inapplicable disclosures.* Generally, disclosures need only be given as applicable. Card issuers may, therefore, omit inapplicable headings and their corresponding boxes in the table. For example, if no foreign transaction fee is imposed on the account, the heading *Foreign transaction* and disclosure may be deleted from the table, or the disclosure form may contain the heading *Foreign transaction* and a disclosure showing *none.* There is an exception for the grace period disclosure; even if no grace period exists, that fact must be stated.

5. *Highlighting of annual percentage rates and fee amounts.*

i. *In general. See* Samples G–10(B) and G–10(C) of appendix G to this part for guidance on providing the disclosures described in § 1026.60(a)(2)(iv) in bold text. Other annual percentage rates or fee amounts disclosed in the table may not be in bold text. Samples G–10(B) and G–10(C) also provide guidance to issuers on how to disclose the rates and fees described in § 1026.60(a)(2)(iv) in a clear and conspicuous manner, by including these rates and fees generally as the first text in the applicable rows of the table so that the highlighted rates and fees generally are aligned vertically in the table.

ii. *Maximum limits on fees.* Section 1026.60(a)(2)(iv) provides that any maximum limits on fee amounts must be disclosed in bold text. For example, assume that a card issuer is not a smaller card issuer as defined in § 1026.52(b)(3) and consistent with § 1026.52(b)(1)(ii), the card issuer's late payment fee will not exceed $8. The maximum limit of $8 for the late payment fee must be highlighted in bold. Similarly, assume an issuer will charge a cash advance fee of $5 or 3 percent of the cash advance transaction amount, whichever is greater, but the fee will not exceed $100. The maximum limit of $100 for the cash advance fee must be highlighted in bold.

iii. *Periodic fees.* Section 1026.60(a)(2)(iv) provides that any periodic fee disclosed pursuant to § 1026.60(b)(2) that is not an annualized amount must not be disclosed in bold. For example, if an issuer imposes a $10 monthly maintenance fee for a card account, the issuer must disclose in the table that there is a $10 monthly maintenance fee, and that the fee is $120 on an annual basis. In this example, the $10 fee disclosure would not be disclosed in bold, but the $120 annualized amount must be disclosed in bold. In addition, if an issuer must disclose any annual fee in the table, the amount of the annual fee must be disclosed in bold.

6. *Form of disclosures.* Whether disclosures must be in electronic form depends upon the following:

i. If a consumer accesses a credit card application or solicitation electronically (other than as described under comment 60(a)(2)–6.ii), such as online at a home computer, the card issuer must provide the disclosures in electronic form (such as with the application or solicitation on its website) in order to meet the requirement to provide disclosures in a timely manner on or with the application or solicitation. If the issuer instead mailed paper disclosures to the consumer, this requirement would not be met.

ii. In contrast, if a consumer is physically present in the card issuer's office, and accesses a credit card application or solicitation electronically, such as via a terminal or kiosk (or if the consumer uses a terminal or kiosk located on the premises of an affiliate or third party that has arranged with the card issuer to provide applications or solicitations to consumers), the issuer may provide disclosures in either electronic or paper form, provided the issuer complies with the timing and delivery ("on or with") requirements of the regulation.

7. *Terminology.* Section 1026.60(a)(2)(i) generally requires that the headings, content, and format of the tabular disclosures be substantially similar, but need not be identical, to the applicable tables in appendix G to this part; but *see* § 1026.5(a)(2) for terminology requirements applicable to § 1026.60 disclosures.

\*    \*    \*    \*    \*

**Rohit Chopra,**
*Director, Consumer Financial Protection Bureau.*

[FR Doc. 2024–05011 Filed 3–14–24; 8:45 am]
**BILLING CODE 4810–AM–P**

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; FORT WORTH CHAMBER OF COMMERCE; LONGVIEW CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CONSUMER BANKERS ASSOCIATION; and TEXAS ASSOCIATION OF BUSINESS, | Case No. 4:24-CV-213 |
| Plaintiffs, | |
| v. | |
| CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, | |
| Defendants. | |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs respectfully move the Court for a preliminary injunction enjoining the

Consumer Financial Protection Bureau and Director Rohit Chopra from enforcing, applying, or

implementing the March 5, 2024 final rule regarding Credit Card Penalty Fees. *See* Credit Card

Penalty Fees (Regulation Z) (released Mar. 5, 2024), https://files.consumerfinance.gov/f/

documents/cfpb_credit-card-penalty-fees_final-rule_2024-01.pdf. As set forth in the

accompanying brief in support, Plaintiffs are likely to prevail on the merits; Plaintiffs and their

members will suffer irreparable harm absent the requested injunctive relief; and the balance of

equities and public interest considerations favor an order of preliminary injunction.

App.109

Further, expedited relief is necessary because the final rule is set to take effect sixty days after its publication such that credit card issuers must begin irreparably complying with its dictates within days.

WHEREFORE, for the reasons set forth in the accompanying brief, Plaintiffs respectfully request that the Court issue a preliminary injunction enjoining the Defendants from enforcing, applying, or implementing the final rule against Plaintiffs members anywhere within the Bureau's jurisdiction.

Dated:  March 7, 2024                                    Respectfully submitted,

                                                          /s/ Michael Murray
                                                         Michael Murray
                                                         D.C. Bar No. 1001680
                                                         *Application for pro hac vice forthcoming*
                                                         michaelmurray@paulhastings.com
                                                         Tor Tarantola
                                                         D.C. Bar No. 1738602
                                                         *Application for pro hac vice forthcoming*
                                                         tortarantola@paulhastings.com
                                                         PAUL HASTINGS LLP
                                                         2050 M Street NW
                                                         Washington, DC 20036
                                                         (202) 551-1730


                                                          /s/ Derek Carson
                                                         Philip Vickers
                                                         Texas Bar No. 24051699
                                                         pvickers@canteyhanger.com
                                                         Derek Carson
                                                         Texas Bar No. 24085240
                                                         dcarson@canteyhanger.com
                                                         CANTEY HANGER LLP
                                                         600 West 6th Street, Suite 300
                                                         Fort Worth, TX 76102
                                                         (817) 877-2800

                                                         *Attorneys for Plaintiffs*

Thomas Pinder
D.C. Bar No. 451114
*Application for pro hac vice forthcoming*
tpinder@aba.com
Andrew Doersam
D.C. Bar No. 1779883
*Application for pro hac vice forthcoming*
adoersam@aba.com
AMERICAN BANKERS ASSOCIATION
1333 New Hampshire Ave. NW
Washington, DC 20036

***Attorneys for Plaintiff American Bankers
Association***


Jennifer B. Dickey
D.C. Bar No. 1017247
*Application for pro hac vice forthcoming*
Jdickey@uschamber.com
Maria C. Monaghan
D.C. Bar No. 90002227
*Application for pro hac vice forthcoming*
mmonaghan@uschamber.com
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062

***Attorneys for Plaintiff Chamber of
Commerce of the United States of America***

**CERTIFICATE OF CONFERENCE**

I hereby certify that on March 7, 2024, the undersigned spoke by phone with George Padis, Deputy Civil Chief for the United States Attorney's Office, Northern District of Texas, regarding the relief requested in this motion.  Mr. Padis advised me that he will route the request to the appropriate person to speak on behalf of the Consumer Financial Protection Bureau and that he or that person will provide the government's position.   Plaintiffs will supplement this certificate of conference accordingly.

 /s/ Derek Carson
Derek Carson


**CERTIFICATE OF SERVICE**

I certify that on March 7, 2024, counsel for Plaintiffs notified counsel for Defendants of the foregoing motion and will provide a courtesy copy upon filing, including an email copy to Mr. Padis.

 /s/ Derek Carson
Derek Carson

EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; FORT WORTH CHAMBER OF COMMERCE; LONGVIEW CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CONSUMER BANKERS ASSOCIATION; and TEXAS ASSOCIATION OF BUSINESS, | |
| Plaintiffs, | Case No. 4:24-cv-213 |
| v. | |
| CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, | |
| Defendants. | |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY**

**INJUNCTION**

## TABLE OF CONTENTS

Table of Authorities ................................................................................................... ii

Introduction .............................................................................................................. 1

Background ............................................................................................................... 3

    I.    The Authorization of "Penalty Fees" for Late Credit Card Payments................................. 3

        A.    The Truth in Lending Act and the CARD Act of 2009 ................................ 3

        B.    The Federal Reserve Board's Rulemaking ................................................. 4

    II.    The CFPB's New Rule and Its Immediate Harms ................................................. 6

        A.    The Final Rule ................................................................................... 6

        B.    The Irreparable Harms of the Rule to Plaintiffs' Members ........................ 7

    III.    Procedural History................................................................................... 8

Argument ................................................................................................................. 8

    I.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims ...................... 9

        A.    The CFPB promulgated the Final Rule with funds drawn in violation of the Appropriations Clause. ..................................................................... 9

        B.    The Final Rule violates the CARD Act, TILA, and the APA. .................... 10

    II.    Irreparable Harms to Card Issuers ....................................................... 20

        A.    Compliance Costs ........................................................................... 21

        B.    Enforcement Actions ....................................................................... 23

        C.    Lost Revenue ................................................................................. 24

        D.    Collection Costs.............................................................................. 24

        E.    Changed Economics for Certain Accounts............................................ 24

        F.    Loss of Customer Good Will............................................................. 25

    III.    Balance of Harms and the Public Interest ............................................. 25

Conclusion ............................................................................................................. 25

App.115

## TABLE OF AUTHORITIES

**Cases**

*Chamber of Com. of the U.S. v. CFPB*, No. 6:22-CV-00381, _ F. Supp. 3d _,
2023 WL 5835951 (E.D. Tex. Sept. 8, 2023) ................................................. 8, 9, 10

*Clarke v. CFTC*, 74 F.4th 627 (5th Cir. 2023)................................................................. 8

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616 (5th Cir. 2022) ................................ 9

*Corley v. United States*, 556 U.S. 303 (2009).............................................................. 15

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
762 F.2d 464 (5th Cir. 1985) ....................................................................... 21

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).................................................. 14, 19

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ............................................ 12

*Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*, 944 F.2d 940 (D.C. Cir. 1991).............. 11

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ...................................................................... 19

*Monticello Banking Co. v. CFPB*, No. 6:23-cv-00148,
2023 WL 5983829 (E.D. Ky. Sept. 14, 2023) ....................................................... 10

*NFIB v. OSHA*, 595 U.S. 109 (2022)........................................................................... 10

*NFIB v. Sebelius*, 567 U.S. 519 (2012)........................................................................ 10, 11

*Rest. L. Ctr. v. United States Dep't of Lab.*, 66 F.4th 593 (5th Cir. 2023) ................................ 8

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) ............................................ 11

*Tex. Bankers Ass'n v. CFPB*, No. 7:23-CV-00144, _ F. Supp. 3d _,
2023 WL 4872398 (S.D. Tex. July 31, 2023)........................................................ 9

*Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016) .................................................................. 21

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994)........................................................ 21

*Tull v. United States*, 481 U.S. 412 (1987) ................................................................... 11

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) ........................................................... 14

*Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130 (5th Cir. 2021)............................ 21, 25

**Statutes**

12 U.S.C. § 5512(b)(2)(A)(i) ........................................................................... 6

15 U.S.C. § 1601(a) ........................................................................................ 3

15 U.S.C. § 1602 .......................................................................................... 20

15 U.S.C. § 1604(d) ................................................................................. 7, 20

15 U.S.C. § 1665d ................................................................................. passim

15 U.S.C. § 1665d(b) ................................................................................. 2, 4

15 U.S.C. § 1693o-2(a) ................................................................................ 18

15 U.S.C. § 1693o-2(a)(2) ........................................................................... 11

15 U.S.C. 1665d(e) ...................................................................................... 14

5 U.S.C. § 706 .............................................................................................. 10

51 U.S.C. § 60125(a) ................................................................................... 11

CARD ACT, Pub. L. No. 111-24, § 102(b)(1), 123 Stat. 1734 (2009) ........................................... 3

DODD-FRANK WALL STREET REFORM AND CONSUMER PROTECTION ACT, Pub. L. No. 111-203, 124 Stat. 1376, 2036 (2010) .................................................................... 5

**Other Authorities**

CFPB, *Financial Report of the Consumer Financial Protection Bureau, Fiscal Year 2022* (Nov. 15, 2022) ........................................................................... 9

Credit Card Accountability Responsibility and Disclosure Act of 2009, S. 414, 111th Cong. (2009) ................................................................................ 3, 12

**Regulations**

12 C.F.R. § 1026.52(b)(1)(i) ........................................................................ 23

12 C.F.R. § 1026.9(c)(iii)(2) ........................................................................ 22

12 C.F.R. § 226.52(b)(1)(i) ..................................................................... 5, 18

12 C.F.R. § 226.52(b)(1)(ii) .......................................................................... 4

12 CFR § 1026.6(b)(2)(viii) ........................................................................ 22

81 Fed. Reg. 25323 (Apr. 28, 2016) ............................................................. 6

Credit Card Penalty Fees (Regulation Z), 88 Fed. Reg. 18906 (Mar. 29, 2023) ...................... 6, 23

Truth in Lending (Regulation Z), 76 Fed. Reg. 79768 (Dec. 22, 2011) ......................................... 6

Truth in Lending, 75 Fed. Reg. 37526 (June 29, 2010) .................................................. 4, 5, 16, 18

App.118

## INTRODUCTION

The new rulemaking promulgated by the Consumer Financial Protection Bureau ("CFPB"), which upends the way that credit card issuers have assessed late fees for over a decade, is already imposing immediate and irreparable harm on the affected credit card issuers, who account for an estimated 95% of open credit card accounts in this country.[1] Such issuers must dispose of application, marketing, and monthly physical disclosure materials that reflect their existing late fees; design and print new versions; and ensure the accuracy of any periodic digital disclosures that they provide to the millions of customers with credit card accounts. Should such issuers take the CFPB's advice to mitigate the effect of the rule by changing other credit card terms, they would need to provide additional updated disclosures, with at least 45 days' notice to their customers. If such issuers are unable to complete these tasks within 60 days of the rule's publication in the Federal Register, they risk being out of compliance on the effective date, exposing themselves to civil enforcement actions. And they risk all of this for a regulation that both exceeds the CFPB's statutory authority and was issued with funds acquired in violation of our Constitution. Plaintiffs request preliminary injunctive relief to preserve the status quo while they litigate their claims. That status quo has served the interests of American consumers and credit card issuers alike for over a decade.

It is a commonly accepted, commonsense feature of American law that the failure to pay an obligation on time may incur consequences. In the context of credit cards, Congress expressly recognized that issuers may impose "penalty fee[s]" when customers violate their credit card agreements, so long as such fees are "reasonable and proportional to the omission or violation."

---

[1] Unless otherwise noted, references to "issuers" or "card issuers" in this brief refer to the larger card issuers who are subject to the Final Rule.

App.119

15 U.S.C. § 1665d(b). And it tasked federal agencies—first the Federal Reserve Board of Governors (the "Board"), and now the CFPB—with establishing standards for ensuring that such "penalty fees" are reasonable and proportional, taking into account the costs incurred by the issuer from such violation, the deterrence effects of a late fee, and the conduct of the cardholder. 15 U.S.C. § 1665d. A decade ago, the Board promulgated, and the CFPB subsequently adopted, a regulatory framework that attempted to incorporate those three statutory criteria into its late-fee safe harbor.

Now, the CFPB has effectively jettisoned two of those criteria and issued a rule that will prevent issuers from collecting the reasonable and proportional penalty fees that the Credit Card Accountability Responsibility and Disclosure Act of 2009 ("CARD Act") expressly authorize. The new rule will allow issuers to collect only a subset of the costs incurred as a result of late payments. This rule not only exceeds the CFPB's authority, it will also ultimately harm consumers. Issuers will be forced to try to recoup their unrecovered costs either by charging higher interest rates or annual fees to customers who do pay on time, or by restricting credit for customers who are more likely to pay late.

The CFPB (in another violation of federal law) has set the effective date of its regulation at 60 days from the date the rule is published in the Federal Register. That amount of time is inadequate, and it is imposing immediate and irreparable harm on issuers. Issuers respectfully request preliminary injunctive relief within 10 days, or as soon as possible thereafter, to prevent more irrecoverable harm.

App.120

## BACKGROUND

I.    **The Authorization of "Penalty Fees" for Late Credit Card Payments**

A.    **The Truth in Lending Act and the CARD Act of 2009**

Congress enacted the Truth in Lending Act ("TILA") in 1968 to make the terms of consumer credit agreements more transparent and thereby enhance competition and the responsible use of credit. *See* 15 U.S.C. § 1601(a). The TILA established a regime that is primarily disclosure-based. Credit card late fees long have been part of that regime.

In 2009, Congress expressly authorized the Board to create and maintain a regulatory regime that includes "penalty fees" for late payments. CARD ACT, Pub. L. No. 111-24, § 102(b)(1), 123 Stat. 1734, 1740 (2009). Specifically, the CARD Act required that "penalty fee[s]" imposed "in connection with any omission with respect to, or violation of, the cardholder agreement, including any late payment fee . . . be reasonable and proportional to such omission or violation." 15 U.S.C. § 1665d(a).

Congress's use of the term "penalty" was no accident. Congress had previously considered and rejected a legislative proposal that would have limited late fees to the costs credit card issuers incur as a result of late payments. *See, e.g.*, Credit Card Accountability Responsibility and Disclosure Act of 2009, S. 414, 111th Cong. § 103 (2009), available at https://www.congress.gov/bill/111th-congress/senate-bill/414/text?s=2&r=1 (emphasis added) (providing that "the amount of any fee or charge that a card issuer may impose in connection with any omission with respect to, or violation of, the cardholder agreement, including any late payment fee, . . . shall be reasonably related *to the cost to the card issuer* of such omission or violation").

In the CARD Act, Congress not only expressly authorized issuers to collect a "*penalty* fee," it made clear that issuer cost is only one factor relevant to determining what fee is reasonable and

App.121

proportional to the violation. Specifically, in directing the Board to establish "standards for assessing whether the amount of any penalty fee or charge . . . is reasonable and proportional to the omission or violation to which the fee or charge relates," Congress required the Board to consider "(1) the cost incurred by the creditor from such omission or violation; (2) the deterrence of such omission or violation by the cardholder; (3) the conduct of the cardholder; and (4) such other factors as the Board may deem necessary or appropriate." 15 U.S.C. § 1665d(b)-(c).

Congress also authorized the Board to set a safe harbor amount—again for "penalty fee[s]"—"that is presumed to be reasonable and proportional to the omission or violation to which the fee or charge relates." *Id*. § 1665d(e).

## B.    The Federal Reserve Board's Rulemaking

The Board implemented the relevant provision of the CARD Act in Regulation Z, establishing a safe harbor for late fees based on all three criteria and a standard for amounts exceeding the safe harbor based solely on cost. *See* Truth in Lending, 75 Fed. Reg. 37526 (June 29, 2010).

The Board concluded that the best means of taking into account all of the statutory criteria, including deterrence and consumer conduct, was to establish a safe-harbor maximum of $25, and $35 for subsequent late fees within the next six billing cycles, adjusted annually for inflation to account for "changes in issuers' costs and the deterrent effect of the safe harbor amounts." *Id*. at 37543, 37572 (codified at 12 C.F.R. § 226.52(b)(1)(ii)(A)-(B), now codified in 12 C.F.R. Part 1026); *id.* at 37533 ("the Board has revised the safe harbors in proposed § 226.52(b)(3) to better address concerns regarding deterrence and adopted those safe harbors in § 226.52(b)(1)(ii)"); *id.* at 37533 ("the safe harbors in § 226.52(b)(1)(ii) address consumer conduct . . ."). The Board had considered alternative standards, including a provision that would have deemed a penalty fee

reasonable and proportional "if the card issuer had determined that the dollar amount of the fee was reasonably necessary to deter that type of violation using an empirically derived, demonstrably and statistically sound model that reasonably estimated the effect of the amount of the fee on the frequency of violations." *See id*. at 37532. But the Board ultimately concluded that its proposal would "not provide card issuers with a meaningful ability to base penalty fees on deterrence," whereas the safe harbors would take deterrence into account while providing clarity and consistency. *Id.* at 37533. Similarly, the safe harbor addressed consumer conduct "by allowing issuers to impose higher penalty fees on consumers who violate the terms or other requirements of an account multiple times, while limiting the amount of the penalty fee for a consumer who engages in a single violation" and capping any penalty fee at the dollar amount associated with the violation. *Id.* at 37533-34. Finally, the Board believed that the amounts would "be generally sufficient to cover issuers' costs." *Id.* at 37532.

In light of its decision about the safe harbors, the Board's costs-based standard for penalty fees exceeding the safe harbor did not provide a mechanism for card issuers to account for deterrence or consumer conduct. Rather, an issuer could proceed outside the safe harbor and impose a higher fee only if the issuer "has determined that the dollar amount of the fee represents a reasonable proportion of the total costs incurred by the card issuer as a result of [the late payment]." *Id.* at 37536, 37571 (codified at 12 C.F.R. § 226.52(b)(1)(i)). The Board required the issuer to revisit that determination annually. *Id.*

Soon after the Board promulgated Regulation Z, Congress reassigned the responsibility to regulate late fees to the newly-created CFPB. *See* DODD-FRANK WALL STREET REFORM AND CONSUMER PROTECTION ACT, Pub. L. No. 111-203, §§ 1061(b)(1)(B), 1100A(2), 124 Stat. 1376, 2036, 2107 (2010). Congress required that the CFPB, when promulgating a rule, consider "the

potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule." 12 U.S.C. § 5512(b)(2)(A)(i).

The CFPB adopted the Board's earlier regulations, without revision or criticism, and maintained those regulations for ten years, across multiple administrations. *See* Truth in Lending (Regulation Z), 76 Fed. Reg. 79768 (Dec. 22, 2011) (interim final rule); 81 Fed. Reg. 25323 (Apr. 28, 2016) (finalizing the 2011 interim final rules, subject to any intervening final rules published by the Bureau); Credit Card Penalty Fees (Regulation Z), 88 Fed. Reg. 18906, 18908 (Mar. 29, 2023). From 2010 through 2023, the regulations were adjusted eight times for inflation and are currently set at $30 for a first violation and $41 for subsequent violations within 6 billing cycles. 88 Fed. Reg. at 18906.

## II.     The CFPB's New Rule and Its Immediate Harms

The CFPB's credit card late fees rule dramatically deviates from the status quo, goes into effect in 60 days, and imposes immediate and irreparable harm.

### A.     The Final Rule

The CFPB's new rule would reduce the late-fee safe harbor applicable to larger card issuers to $8, both for first and subsequent late payments, and would no longer adjust this amount for inflation. *See* Credit Card Penalty Fees (Regulation Z) (released Mar. 5, 2024), https://files.consumerfinance.gov/f/documents/cfpb_credit-card-penalty-fees_final-rule_2024-01.pdf [hereinafter "Final Rule" or "Rule"]. The Rule defines larger card issuers as those who, along with their affiliates, had at least one million open credit card accounts in the previous calendar year. Final Rule at 61. For card issuers who choose to set late fees above the $8 safe

6

harbor using the cost-based standard, the Rule would prohibit them from including post-charge-off collection costs in setting those fees.

The CFPB selected $8 for the reduced safe harbor because it will "cover pre-charge-off collection costs for Larger Card Issuers on average." Final Rule at 123. And the Bureau suggested that issuers could mitigate the harm from the lower safe harbor by increasing "other prices," such as interest rates, "account maintenance fee[s]," or "other card terms." *Id.* at 251-52.

The Final Rule provides only a 60-day effective date after publication in the Federal Register, instead of complying with the statutory requirement that any CFPB rules requiring disclosures different from those previously required "shall have an effective date of that October 1 which follows by at least six months the date of promulgation." 15 U.S.C. § 1604(d). The effective date also gives insufficient time to conduct a cost-based analysis, effectively forcing issuers into the new safe harbor. *See* Final Rule at 219 (explaining that larger card issuers choosing to use the cost-analysis provisions must do so by the Rule's effective date or, alternatively, adopt the $8 safe harbor amount while separately conducting a cost analysis).

**B.     The Irreparable Harms of the Rule to Plaintiffs' Members**

The Final Rule imposes six types of harm on Plaintiffs' members, one of which is already occurring, and all of which are discussed in more detail *infra*. First, most issuers must immediately begin updating their disclosures and statements for millions of existing and prospective credit card accounts. Second, issuers that cannot come into compliance by the Rule's effective date will risk civil enforcement actions and unrecoverable penalties. Third, the Rule will make consumers more likely to pay late, which will increase costs to issuers and may lead to higher costs for all consumers. Fourth, issuers will lose revenue—including smaller issuers not subject to the Rule but who must lower their late fees to remain competitive—even if they are eventually able to change

App.125

other terms and conditions. Fifth, issuers will lose money on accounts that they never would have opened if they were limited to (or had anticipated) an $8 late fee. And finally, issuers face the prospect of losing customer goodwill from needing to change other terms, or from the yo-yo effect if issuers are forced into the safe harbor but are later able to raise late fees again in response to an order vacating the Rule or through annual cost analyses.

### III.    Procedural History

Plaintiffs brought this action under the Administrative Procedure Act ("APA") on March 7, 2024, two days after the Final Rule was released, and moved for a preliminary injunction the same day.

### ARGUMENT

To obtain a preliminary injunction, a plaintiff must demonstrate (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction does not issue; (3) that the threatened injury outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction is in the public interest; with the latter two factors "merg[ing] when the Government is the opposing party." *Rest. L. Ctr. v. United States Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023); *Clarke v. CFTC*, 74 F.4th 627, 643 (5th Cir. 2023). Plaintiffs satisfy all four of these elements: Plaintiffs have a substantial likelihood of success because the Fifth Circuit already has held that the CFPB is unconstitutionally structured. In addition, the CFPB is exceeding its statutory authority with respect to the Final Rule. In light of the Supreme Court's forthcoming decision on the CFPB's funding mechanism, this Court may wish to reach Plaintiffs' statutory challenges to the Rule now, or at least structure any preliminary injunction to afford time to review those challenges at a later date. *See Chamber of Com. of the U.S. v. CFPB*, No. 6:22-CV-00381, _ F. Supp. 3d _, 2023 WL 5835951, at *10 (E.D. Tex. Sept. 8, 2023) (granting summary judgment

App.126

against CFPB action on Appropriations Clause and statutory claim and explaining that "[t]he court sees fit to reach the latter claim because the Appropriations Clause issue is on review in the Supreme Court"). The Final Rule imposes immediate and irremediable harm on Plaintiffs' members. And granting a preliminary injunction will protect Plaintiffs' members and their customers from volatility, unnecessary costs, and confusion while the Rule's validity is addressed by this Court.

## I.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims

### A.    The CFPB promulgated the Final Rule with funds drawn in violation of the Appropriations Clause.

The Fifth Circuit has ruled that the CFPB's funding structure, which draws funds from the Federal Reserve without congressional appropriation, violates the Appropriations Clause. *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 635-42 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 978 (2023). When a rulemaking is funded through this mechanism, a plaintiff challenging the rule is entitled to have it set aside. *Id.* at 643; *Chamber of Com.*, 2023 WL 5835951, at *10.

The challenged rulemaking appears to have been funded through the same mechanism as the rule at issue in *Community Financial*. *See* 51 F.4th at 638 n.11 (establishing that the CFPB has no other funding source for promulgating regulations); CFPB, *Financial Report of the Consumer Financial Protection Bureau, Fiscal Year 2022*, at 74-76 (Nov. 15, 2022), https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/cfpb_financial-report_fy2022.pdf (making clear that only funds transferred from the Federal Reserve may be used for the CFPB's regulatory operations). Consequently, as others district courts have recently held, Plaintiffs are likely to succeed on the merits of their constitutional claim and are entitled to a preliminary injunction. *See Tex. Bankers Ass'n v. CFPB*, No. 7:23-CV-00144, _ F. Supp. 3d _, 2023 WL 4872398, at *1 (S.D. Tex. July 31, 2023) (preliminarily enjoining defendants from

App.127

implementing and enforcing a final rule based on the Appropriations Clause); *Monticello Banking Co. v. CFPB*, No. 6:23-cv-00148, 2023 WL 5983829, at *1 (E.D. Ky. Sept. 14, 2023) (same); *see also Chamber of Com.*, 2023 WL 5835951, at *7 (granting "summary judgment for plaintiffs given the binding force of the Fifth Circuit's decision").

**B.      The Final Rule violates the CARD Act, TILA, and the APA.**

Under the APA, agency action must be vacated if it is "not in accordance with law" or is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A) & (C). The APA further directs that a court "shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, [or] an abuse of discretion." *Id.* § 706(2)(A). Here, the CFPB's Final Rule rests on an unlawful interpretation of the CARD Act. It also has an effective date that violates TILA.

**1.      The Final Rule violates the CARD Act.**

In addition to the constitutional problem of its funding, the CFPB's Final Rule runs aground on its purported statutory authority. "[A]gencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *NFIB v. OSHA*, 595 U.S. 109, 117 (2022). "[T]he best evidence of Congress's intent is the statutory text." *NFIB v. Sebelius*, 567 U.S. 519, 544 (2012). In the CARD Act, Congress authorized issuers to collect a "penalty fee" that is "reasonable and proportional to [an] omission or [a] violation" of the cardholder agreement, and it allowed the CFPB to create a safe harbor for such a "penalty fee." 15 U.S.C. § 1665d. The CFPB's Final Rule is inconsistent with that text in at least three ways.

**a.      The Final Rule misconstrues a "penalty fee" for the "violation of the cardholder agreement."**

First, the Final Rule does not allow issuers to collect a reasonable and proportional "penalty fee" for the violation of a cardholder agreement. Although at first blush this standard might seem

App.128

malleable, statutory text and context reveal that the CFPB has exceeded its authority. To begin, Congress expressly denominated a late fee a "penalty fee" for a "violation," which is by its plain meaning a fee that deters the violation and accounts for the conduct of the violation; it is not solely compensatory, but is more akin to special damages. *See Tull v. United States*, 481 U.S. 412, 422-23 (1987) (discussing how civil penalties should consider conduct and deterrence); *Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*, 944 F.2d 940, 947 (D.C. Cir. 1991) ("A fine or penalty, in contrast, is not understood to be dollar-for-dollar recompense. Rather, it is a pecuniary form of punishment for the commission of an act society finds repugnant and seeks to deter."); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (noting that special damages are aimed at deterrence).

Congress's enumeration of statutory criteria for the CFPB confirms that a "penalty fee" is not a "cost fee." In identifying what is relevant to assessing the reasonableness and proportionality of such a fee, Congress specifically listed not only the "cost incurred by the creditor from [an] omission or [a] violation" of the cardholder agreement, but also "deterrence of such omission or violation by the cardholder" and "the conduct of the cardholder." 15 U.S.C. § 1665d(c). "Where Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally." *NFIB v. Sebelius*, 567 U.S. at 544.

Indeed, the very same Congress that enacted the CARD Act directed an agency to focus on cost—and cost alone—in determining whether a different fee is reasonable and proportional. The Durbin Amendment provided that "[t]he amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be *reasonable and proportional to the cost incurred by the issuer* with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2) (emphasis added); *see also* 51 U.S.C. § 60125(a) ("The Secretary, pursuant to this

11

App.129

subchapter, may license such system if it meets all conditions of this subchapter and (1) the system operator agrees to reimburse the Government in a timely manner for all related costs incurred with respect to such utilization, including a reasonable and proportionate share of fixed, platform, data transmission, and launch costs . . . .") (also enacted by the 111th Congress). In contrast, the same Congress directed the CFPB in the CARD Act to set a standard for credit card late fees that ensures they are "reasonable and proportional to the violation or omission," requiring that the CFPB consider deterrence and cardholder conduct in addition to cost. If Congress had wanted credit card late fees to be tied only to costs, it knew how to say so.

Notably, Congress also considered but declined to enact an earlier version of the CARD Act, which would have authorized late fees "reasonably related *to the cost* to the card issuer of such omission or violation." Credit Card Accountability Responsibility and Disclosure Act of 2009, S. 414, 111th Cong. § 103 (as reported by S. Comm. on Banking, Hous., & Urb. Affs., Apr. 29, 2009) (emphasis added) (providing that "the amount of any fee or charge that a card issuer may impose in connection with any omission with respect to, or violation of, the cardholder agreement, including any late payment fee, . . . shall be reasonably related *to the cost to the card issuer* of such omission or violation"). The Supreme Court has rejected efforts by agencies to adopt a position that Congress has previously considered and rejected. *See, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 147-48 (2000).

The statutory text and context is thus clear: Congress intended to authorize issuers to collect a "penalty fee" that is reasonable and proportional to the omission or violation. By its nature, such penalty fee must thus deter the violation, account for the conduct of the violation, and compensate the issuer for its costs. That makes sense, as such fees incentivize timely payment and ultimately encourage responsible credit use, which is critical for banks' ability to engage in credit card lending

App.130

in a safe and sound manner. Indeed, paying at least the minimum payment on a credit card at the time prescribed for doing so is at the core of a cardholder's responsibilities. Issuers would not lend credit if they did not reasonably expect that money to be repaid in accordance with their agreements. Congress too would not have authorized issuers to collect penalty fees for violations of those agreements if they did not agree that such violations were worthy of penalty.

Yet the CFPB's Final Rule does not allow issuers to collect such penalty fees. Instead, the Final Rule would allow only much lower fees to recoup (a subset of) issuers' costs from late payments. Specifically, the CFPB narrowed the cost-analysis standard and lowered the safe harbor to $8 because it believed that amount will "cover pre-charge-off collection costs for Larger Card Issuers on average." Final Rule at 123. This is no accident: the CFPB explicitly stated that its new rule includes a "safe harbor amount set based on costs." *Id.* at 124. As the CFPB put it, "costs are the best guide to what constitutes a 'reasonable and proportional' fee" and, indeed, other factors such as "deterrence and consumer conduct" can only "help corroborate a safe harbor amount set based on costs." *Id.*

The CFPB believed that "the cost factor deserves the most weight of th[e statutory] factors in setting the precise late fee safe harbor amount because it is most closely correlated to the consequences to the issuer of a consumer's late payment," *id.*, but that ignores Congress's express decisions in the statute. Congress authorized card issuers to continue charging "penalty fee[s]" for violations of a cardholder agreement, so long as they were reasonable and proportional to the omission or violation, and Congress instructed the CFPB to consider not just the cost incurred by issuers, but the deterrence of violations and the conduct of the cardholder in setting standards for assessing what is reasonable and proportional. *See* 15 U.S.C. § 1665d(a)-(c). That broader focus is meaningful, because Congress clearly thought the consequences to the issuer were not the only

relevant factor in assessing fees; instead, Congress thought that violating a cardholder agreement is conduct that should be deterred and could quite reasonably generate a penalty. The CFPB contends that Congress only expressly required consideration of these factors in rulemaking that is "required" by the CARD Act, not in rulemaking related to a safe harbor, *see* Final Rule at 123, but any bottom-line safe harbor that is "presumed to be reasonable and proportional to the omission or violation to which the fee or charge relates" must be one that is consistent with those factors. Otherwise, the safe harbor would be meaningless and inconsistent with Congress's own understanding of what it means for a "penalty fee" to be "reasonable and proportional to the omission or violation." 15 U.S.C. 1665d(e); *see also Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). And that is only more evident here, where the only alternative the CFPB leaves issuers with is a cost-based analysis that does not account for the other "penalty" factors and has never been used by issuers. *Infra* at 16; *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not, for example, . . . simply disregard rules that are still on the books.").

To be sure, the CFPB did discuss deterrence in setting the new safe harbor: it claimed that lowering the safe harbor would not wholly undermine any deterrent effect of late fees, although it may lower it by an indeterminate amount. *See* Final Rule at 125. But that continues to misconstrue the statute: It is not enough to assert that the promulgated safe harbor has a nonzero deterrent effect. A fee of one dollar, or even one cent, would arguably meet a nonzero deterrence test. The CARD Act expressly authorizes issuers to charge a "penalty fee" that is reasonable and proportional to the violation, which necessarily is one that has a *meaningful* deterrent effect, incentivizing on-time payment and responsible use of credit. The CFPB's contrary reading violates

"one of the most basic interpretive canons, that [a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009).

A fair reading of the Final Rule suggests that the CFPB simply disagrees with Congress's determination that penalty fees are appropriate for late payments. The CFPB repeatedly recognizes that consumers are already paying late a significant amount of the time, *see* Final Rule at 13, and that "consumers may engage in more late payments when they are less costly to consumers," *id.* at 128. But instead of using that information to craft reasonable and appropriate safe harbor amounts, the CFPB brushes it aside and touts its decision as providing "additional flexibility that a lower late fee will afford" to consumers to pay late. *Id.* at 240. That policy judgment contradicts the one that Congress made in enacting the CARD Act.

The CFPB's flawed statutory interpretation is similarly evident in its treatment of repeated late payments. The statute ties reasonableness and proportionality to the *violation*, not merely to costs. Thus, as the Board and the CFPB have recognized for more than a decade, repeated violations within a six-month period reflect higher-risk cardholder conduct, and a higher "penalty fee" for subsequent late payments is accordingly "reasonable and proportional." Yet the CFPB abandoned the settled approach that a higher penalty fee is appropriate for worse cardholder conduct based on the myopic view that the agency must consider the cost to the issuer above all else. *See* Final Rule at 110.

To the extent the CFPB considered consumer conduct, it did so only with respect to credit risk. *See, e.g.*, Final Rule at 145 ("[I]t is not clear that multiple violations during a relatively short period are associated with increased credit risk and thus reflect a more serious consumer violation."); *id.* at 146 ("[F]or risk management purposes, the industry itself does not appear to

15

consider the consumer's conduct in paying late to be a serious form of consumer conduct until the consumer is 30 or more days late."). But that position finds no footing in the CARD Act. Congress thought that penalty fees could appropriately be charged for violations of the cardholder agreement, regardless of whether those violations were associated with increased credit risk or justified a report to a credit bureau. *See* 15 U.S.C. § 1665d. And with respect to late payments, the reason is obvious: issuers must know when payments will be made in order to manage cash flow and other expectations, even if the cardholder later repays the money in full.

The CFPB's apparent disagreement with Congress is further evidenced in its consideration of the relationship between the safe harbor and the cost-based standard. The CFPB reasoned that, if the safe harbor amount is too low, issuers could rely on the cost-based standard to implement late fees outside of the safe harbor. Indeed, it stated expressly that if a court were to enjoin or vacate its $8 safe harbor, it would seek to treat its repeal of the existing safe harbor amount separately, thus leaving issuers with only the option to use a pared-down version of the cost-based standard to set late fees. *See* Final Rule at 108–09. The problem with that position is that it *still* does not account for the statutory mandate that issuers be allowed to recover "penalty fees" that are reasonable and proportional to the violation, taking into account deterrence, cardholder conduct, and costs. Indeed, the record is clear that the Board adopted the existing cost-based standard *only* because the safe harbor captured some of the statutory criteria that the cost-based analysis did not. *See* 75 Fed. Reg. at 37533. The CFPB cannot turn a blind eye to the interaction of these provisions, especially when the result of its actions is to prohibit issuers from collecting the very fees that the CARD Act protects.

Moreover, the CFPB's expedited timeline makes the alleged option to use the cost-based approach effectively a non-option. By giving issuers 60 days from the date of publication, the

16

App.134

CFPB is all but guaranteeing that issuers will have to at least temporarily transition to the drastically reduced safe harbor, because issuers have insufficient time to perform the necessary cost analyses to justify a higher fee and make any required changes to their disclosures.

That the CFPB exempted what it defined as "Smaller Card Issuers" from the Final Rule only confirms the problems with the rule. The CFPB justified this exemption on the ground that "Smaller Card Issuers may face additional challenges in recouping pre-charge off collection costs using late fees," particularly because of the burdens posed by the cost-based standard. Final Rule at 60. While Plaintiffs certainly agree that the CFPB's proposal would have imposed significant and unjustified burdens on smaller issuers, there is little reason to think that a "penalty fee" is reasonable and proportional to the violation of paying late when one obtains one's credit card from an issuer with less than one million open credit card accounts but not when one obtains a credit card from an issuer with more than one million open credit card accounts. Even recognizing that smaller issuers have some differences in their ability to recoup costs due to different economies of scale, the statutory language is keyed to the violation, not solely to costs. And nothing in the CARD Act suggests that the CFPB is authorized to maintain standards for penalty fees that account for all of the penalty factors for one subset of issuers but not for another.

In short, the CFPB has exceeded its statutory authority. In setting rules to ensure that "penalty fees" are reasonable and proportional to the violation of paying late, the CFPB has in fact prohibited issuers from collecting such reasonable and proportional fees. And it has implemented the very policy—allowing fees only to recover costs—that Congress considered and rejected.

**b.     The Final Rule misconstrues "costs."**

Second, the CFPB restricted its already blinkered focus on costs to "pre-charge-off collection costs," both in the cost-based standard (that the CFPB purports to merely "clarify") and

in setting the new safe harbor. The CARD Act requires consideration of "the cost incurred by the creditor from such omission or violation" of the cardholder agreement. In 2010, the Board interpreted this phrase to exclude "losses" but to include the "total costs incurred by the card issuer as a result of that type of violation." 12 C.F.R. § 226.52(b)(1)(i). And the Board recognized that "collections generally continue after the account has been charged off" so that "an account that has been charged off is not necessarily a total loss." 75 Fed. Reg. at 37538 n.35. The Board thus permitted issuers to consider as part of their costs "the collection of late payments." *Id.* at 37586. Now, the CFPB says that card issuers may consider only "pre-charge-off collection costs."

There is no basis in the statutory text to distinguish among costs in this way, and the CFPB's rationale—that "post-charge-off collection costs" are "related to mitigating a loss" (Final Rule at 27-28)—makes no sense: these costs arise because of the late payment. Indeed, Congress knew how to direct an agency to distinguish among types of costs, and it did so in Dodd-Frank. *See* 15 U.S.C. § 1693o-2(a)(3)(A), (4)(B)(i)-(ii) (in prescribing regulations establishing standards for "whether the amount of any interchange transaction fee . . . is reasonable and proportional to the cost incurred by the issuer with respect to the transaction," the Board must "distinguish between (i) the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered . . . ; and (ii) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered"). Congress did not similarly task the CFPB with distinguishing between fixed and incremental costs, or any other types of costs, in promulgating its late-fee standard.

The CFPB's claim that this change is a mere "clarification" of the Board's prior regulation digs an even deeper hole for the agency: an agency must acknowledge a departure from a prior

App.136

rule, *FCC v. Fox Television Stations, Inc*., 556 U.S. at 515, and interpret its own regulations reasonably, *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). It cannot satisfy its APA obligations by sleight of hand. This error infects the entire Rule because it not only permeates the cost-based standard but also reduces the safe harbor.

> **2.    The Final Rule violates the statutory requirements on timing.**

Finally, CFPB rules that require new disclosures to consumers "shall have an effective date of that October 1 which follows by at least six months the date of promulgation." 15 U.S.C. § 1604(d). The Final Rule contravenes that requirement by setting its effective date 60 days after publication in the Federal Register. The CFPB acknowledges that many issuers will need to change their late fees in response to the Final Rule, and even that they will likewise need to change their disclosures (in applications, card agreements, statements, and customer education materials). *See* Final Rule at 218-19 ("Larger Card Issuers would have 60 days to delete the existing late fee figure in their disclosures and replace it with $8 or another number computed using the cost analysis provisions, and this change would only have to appear on disclosures mailed or delivered to consumers 60 days after publication of this final rule in the *Federal Register*."). Further, by changing the safe harbor late fee amount and not allowing sufficient time for issuers to complete a cost analysis, at least some card issuers will be forced to go to $8 initially and then send an updated change-in-terms with any new late fee amount once a cost calculation can be performed. Those issuers too must update their disclosures, requiring an October 1, 2024, effective date. The Final Rule's effective date is thus unlawful.

None of the CFPB's arguments for excusing itself from its obligations under TILA is persuasive. The CFPB first asserts that changing the amount of the late fee does not alter the general requirements for late fees, so TILA's effective date provision is inapplicable. *See* Final

Rule at 220–21. But that simply ignores the plain meaning of this provision of TILA, which requires the Board to give an effective date of the October 1 at least six months after promulgation of *any* regulation of the Bureau "requiring any disclosure which differs from the disclosures previously required." 15 U.S.C. § 1604(d). The statutory context clearly suggests that regulations requiring alteration of the amount of particularly disclosed fees would qualify. *See, e.g.*, 15 U.S.C. § 1602(v) (defining the more specific term "material disclosures" to include specific aspects of disclosures like "the annual percentage rate" and "the amount of the finance charge" and "the number and amount of payments"); *id.* § 1602(aa) ("The disclosure of an amount or percentage which is greater than the amount or percentage required to be disclosed under this subchapter does not in itself constitute a violation of this subchapter."). The CFPB's second argument that card issuers occasionally change disclosure of late fee amounts such as for inflation without waiting until October 1 is even less persuasive, as the October 1 date is not set as a date that *issuers* are required to follow, but rather that the *CFPB* must follow in order to give issuers adequate time to adjust their disclosures. And the CFPB's third argument that the safe harbor is optional ignores its own concession that issuers representing the vast majority of open credit card accounts in this country will be required to adjust their disclosures for such accounts going forward in light of this new rule, whether that is because they adopt the reduced safe harbor amount or choose to conduct a separate cost analysis and impose a different rate. *See* Final Rule at 218-19. Outside of a few narrow circumstances not present here, Congress required agencies to afford issuers at least six months to be able to make such adjustments, and the CFPB lacks the authority to afford less.

## II.    Irreparable Harms to Card Issuers

Card issuers, including many of Plaintiffs' members, will suffer at least six types of irreparable harm if the final rule is allowed to take effect: (1) compliance costs; (2) risk of

App.138

enforcement actions; (3) lost late-fee revenue; (4) increased late-payment costs; (5) changed economics of accounts which would never have been issued, or would not have been issued on their particular terms, had issuers been limited to (or had anticipated) an $8 late fee; and (6) loss of customer goodwill. Economic losses are irreparable injuries when they cannot be redressed "in the course of the litigation." *Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016). Whether a plaintiff could theoretically offset these losses through price increases (which the CARD Act limits for existing balances) is irrelevant. *See id.* at 434 n.41. Here, the federal government's sovereign immunity, among other issues, will prevent Plaintiffs' members from recovering on the economic injuries that they are already suffering and will continue to suffer if the Final Rule is not enjoined. *See Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021).

### A.    Compliance Costs

"[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d at 433 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and in the judgment)). The CFPB's Final Rule is no exception. Plaintiffs' members will have to (1) update disclosures to cardholders; (2) train staff on the new requirements; and (3) for those who opt to maintain fees above the $8 safe harbor, conduct initial and then annual cost-justification studies. The costs of these requirements will be substantial, and issuers must begin incurring these costs *now*. *See Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985) (cleaned up) ("Federal courts have long recognized that, when the threatened harm is more than de minimis, it is not so much the magnitude but the irreparability that counts for purposes of a preliminary injunction.").

First, many card issuers who lower their fees will need to update the fee disclosures provided to cardholders and prospective cardholders. *See* 12 CFR §§ 1026.6(b)(2)(viii), 1026.9(c)(iii)(2); App'x 57, Decl. of Matthew Susser ¶¶ 10, 12. There are hundreds of millions of credit card accounts that will need to have their periodic disclosures updated, and issuers will need to destroy many existing applications and other disclosure documents and reprint them with the updated amounts. *See* App'x 3, Decl. of Bruce Bowman ¶ 10; App'x 7-8, Decl. of Kelly Hall ¶¶ 7, 9; App'x 15, Decl. of Glenn Hamer ¶¶ 9, 11; App'x 21-22, Decl. of Steve Montgomery ¶¶ 7, 9; App'x 29, Decl. of David Pommerehn ¶¶ 8, 10; App'x 36-37, Decl. of Thomas Quaadman ¶¶ 8, 10; App'x 44, Decl. of Baron Schlachter ¶ 10; App'x 49-50, Decl. of Jess Sharp ¶¶ 8, 10; App'x 57, Susser Decl. ¶¶ 10, 12. One large credit card processor informed the CFPB that the new disclosures contemplated by the proposed rule would take approximately 10 months to print and distribute. App'x 61, Letter from Kimberly Ford to CFPB (Aug. 10, 2023) ("Fiserv Letter"). In addition, if a card issuer increases rates or minimum payments to mitigate the effects of its rule, as the CFPB advises, the issuer would be required to send updated disclosures to its current cardholders at least 45 days before implementing the new terms. *See* 12 C.F.R. § 1026.9(c)(iii)(2). For those issuers whose programs are linked to retail partners, changes in terms may be the subject of contractual negotiations, which adds costs to the process. App'x 37, Quaadman Decl. ¶ 10.

Second, card issuers will need to train compliance, customer-service, and other staff on the Final Rule's new requirements. *See* App'x 4, Bowman Decl. ¶ 11; App'x 44-45, Schlachter Decl. ¶ 11; App'x 57, Susser Decl. ¶ 11.

Third, any card issuer who opts to charge a late fee above the new safe harbor will incur the cost of performing an initial and then annual cost-justification study under 12 C.F.R. § 1026.52(b)(1)(i). *See* App'x 4, Bowman Decl. ¶ 15; App'x 38, Quaadman Decl. ¶ 15; App'x 45,

App.140

Schlachter Decl. ¶ 15; App'x 52, Sharp Decl. ¶ 16; App'x 56-57, Susser Decl. ¶ 9. These studies are expensive and complex. Indeed, even the CFPB acknowledges that it "did not find evidence of issuers using the cost analysis provision to charge an amount higher than the safe harbor." Final Rule at 11; *see also* 88 Fed. Reg. at 18919 (acknowledging the "administrative burden and complexity of using the cost analysis provisions"). And because the CFPB has not yet provided updated guidance on this process, issuers will likely be forced to adopt the safe harbor in the interim even if they intend to switch to the cost-analysis provision, creating a yo-yo effect that will only confuse consumers and cause issuers to incur unnecessary costs, as well.

**B.     Enforcement Actions**

The CFPB's rushed effective date will expose members to the risk of enforcement actions. There is a significant risk that it will be impossible to approve and print all of the required physical disclosures in the 60-day timeline set by the CFPB. *See* App'x 10, Hall Decl. ¶ 16; App'x 31, Pommerehn Decl. ¶ 16; App'x 39, Quaadman Decl. ¶ 18; App'x 53, Sharp Decl. ¶ 18.

Indeed, Fiserv, Inc., which processes credit card accounts and provides print capabilities for issuing statements and notices to many issuers, told the CFPB that it would take approximately 10 months for it to source, print, mail merge, and mail printed disclosures. App'x 60-61. Fiserv explained that when a credit card issuer wants to modify its accountholder disclosure information, it typically requests "at least 4 months of advance notice," and if "all issuers will request updated materials to be produced and mailed by their service providers at the same time, the industry that supports this work will be physically unable to meet the demand due to capacity limitations of the printers, paper stock, and the sorting and packaging machines." *Id.* at 62.

App.141

### C.     Lost Revenue

As the CFPB acknowledges, "late fees are by far the most prevalent penalty fees charged by card issuers," and the Final Rule will reduce card issuers' revenues by between $5 and $9 billion, including on accounts that issuers never would have issued had they been limited to an $8 safe harbor. *See* Final Rule at 158, 236-37. Plaintiffs estimate that their members subject to the Final Rule, most of whom are likely to lower their late fees to $8, would lose significant amounts of late-fee revenue. *See* App'x 4, Bowman Decl. ¶ 14; App'x 45, Schlachter Decl. ¶ 14. These losses would only increase over the first year, since the safe-harbor amount would no longer be adjusted for inflation. Even Plaintiffs' members that are not subject to the Final Rule will lose revenue as a result of the downward competitive pressure the Rule will put on their late fees. App'x 24, Montgomery Decl. ¶ 15; App'x 39, Quaadman Decl. ¶ 16; App'x 53, Sharp Decl. ¶ 17.

### D.     Collection Costs

The Rule also will make consumers more likely to make late payments, as the CFPB acknowledges. An increase in late payments will increase "overhead and staffing costs for members from the increased number of collection efforts and customer-service contacts that will be required to address such payments." App'x 38, Quaadman Decl. ¶ 13.

### E.     Changed Economics for Certain Accounts

In deciding whether to open new credit card accounts, many issuers factored in the current late fee safe harbor as a means of mitigating the risk of late payments. Some issuers relied heavily upon the safe harbor in making decisions to issue particular accounts. *See* App'x 44, Schlachter Decl. ¶ 9.  Thus, in addition to the lost revenues discussed above, such issuers will be left with accounts with diminished economic value. *See id.*

App.142

F.      **Loss of Customer Good Will**

Finally, issuers face the prospect of losing customer goodwill. *See* App'x 38, Quaadman Decl. ¶ 14. This may happen if issuers are forced to drop their late fees to $8 only to raise them later, either through the cost-analysis provisions or this litigation. Moreover, given the competitive nature of the credit card market, efforts to change other rates or eliminate rewards to recoup lost late-fee revenue will similarly cause unrecoverable losses to goodwill. *See* 88 Fed. Reg. at 18908 ("Survey data suggest that other factors, such as rewards, annual fees, and annual percentage rate(s) (APR), drive credit card usage.").

III.     **Balance of Harms and the Public Interest**

The equities favor a stay pending resolution of this case. "[T]he maintenance of the *status quo* is an important consideration in granting a stay." *Wages & White Lion*, 16 F.4th at 1143. The harms to Plaintiffs' members will be substantial, while the harms to the CFPB in delaying the effective date of its rulemaking are negligible. The existing framework has been in place for more than a decade, supported by CFPB directors across administrations, and is well-understood by the American people. It has allowed issuers to give higher-risk customers the opportunity to build their credit by mitigating the risks of doing so. And because the Final Rule would likely lead to more late payments, higher interest rates, constricted access to credit, and other less favorable terms, *see* 88 Fed. Reg. at 18934, the public interest would be served by delaying these effects while the case is decided. In all events, "[t]he public interest is in having governmental agencies abide by the federal laws that govern their existence and operations. And there is generally no public interest in the perpetuation of unlawful agency action." *Wages & White Lion*, 16 F.4th at 1143 (cleaned up).

**CONCLUSION**

This Court should preliminarily enjoin the Final Rule during the pendency of this case.

App.143

Dated: March 7, 2024                                    Respectfully submitted,


                                                          /s/ Michael Murray
                                                        Michael Murray
                                                        D.C. Bar No. 1001680
                                                        *Application for pro hac vice forthcoming*
                                                        michaelmurray@paulhastings.com
                                                        Tor Tarantola
                                                        D.C. Bar No. 1738602
                                                        *Application for pro hac vice forthcoming*
                                                        tortarantola@paulhastings.com
                                                        PAUL HASTINGS LLP
                                                        2050 M Street NW
                                                        Washington, DC 20036
                                                        (202) 551-1730


                                                          /s/ Derek Carson
                                                        Philip Vickers
                                                        Texas Bar No. 24051699
                                                        pvickers@canteyhanger.com
                                                        Derek Carson
                                                        Texas Bar No. 24085240
                                                        dcarson@canteyhanger.com
                                                        CANTEY HANGER LLP
                                                        600 West 6th Street, Suite 300
                                                        Fort Worth, TX 76102
                                                        (817) 877-2800


                                                        ***Attorneys for Plaintiffs***

                                                        Thomas Pinder
                                                        D.C. Bar No. 451114
                                                        *Application for pro hac vice forthcoming*
                                                        tpinder@aba.com
                                                        Andrew Doersam
                                                        D.C. Bar No. 1779883
                                                        *Application for pro hac vice forthcoming*
                                                        adoersam@aba.com
                                                        AMERICAN BANKERS ASSOCIATION
                                                        1333 New Hampshire Ave. NW
                                                        Washington, DC 20036

                                                        ***Attorneys for Plaintiff American Bankers
                                                        Association***

26

Jennifer B. Dickey
D.C. Bar No. 1017247
*Application for pro hac vice forthcoming*
Jdickey@uschamber.com
Maria C. Monaghan
D.C. Bar No. 90002227
*Application for pro hac vice forthcoming*
mmonaghan@uschamber.com
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062

*Attorneys for Plaintiff Chamber of
Commerce of the United States of America*

## CERTIFICATE OF SERVICE

I certify that on March 7, 2024, counsel for Plaintiffs notified counsel for Defendants of

the foregoing motion and will provide a courtesy copy upon filing, including an email copy to

Mr. Padis.

  /s/ Derek Carson
Derek Carson

App.145