

1700 G Street NW, Washington, D.C. 20552

April 11, 2024

**<u>VIA CM/ECF</u>**

Lyle W. Cayce, Clerk of Court
United States Court of Appeals for the Fifth Circuit
Office of the Clerk
F. Edward Herbert Building
600 S. Maestri Place
New Orleans, LA 70130

Re:    *In re Chamber of Commerce*, No. 24-10248

Dear Mr. Cayce:

      This letter responds to the Court's request that the parties submit letter briefs regarding whether an ownership interest in a nonparty large credit card issuer would be substantially affected by the outcome of this litigation. As explained below, the outcome of this litigation could substantially affect an ownership interest in any of the 30-35 large card issuers affected by the Rule. Those issuers gain substantial revenue from the late fees at issue in the Rule. The Bureau has projected that the Rule, if it goes into effect, could reduce late fees charged—and thus issuers' late fee revenue— by $10 billion annually. Beyond that, an ownership interest in a nonparty large credit card issuer would trigger a judge's recusal obligations because for the kind of financial interests involved here—i.e., an interest in the subject matter of the litigation—the Code of Conduct for United States Judges and the related statutory provision require recusal regardless of whether the interest would be "substantially affected." In addition, the appearance of partiality created by an ownership stake in a large card issuer could also trigger a judge's recusal obligation.

**A. The outcome of this litigation could substantially affect an ownership interest in a nonparty large credit card issuer.**

The Court's directive asked whether an ownership interest in a large card issuer would be substantially affected by the outcome of this litigation. It could.

Several principles guide this analysis. *First*, in its advisory opinions, the Judicial Conference of the United States' Committee on Codes of Conduct—which this Court has relied on as persuasive authority, *In re Cameron Int'l Corp.*, 393 F. App'x 133, 135 (5th Cir. 2010)—has observed that, in determining whether there is a substantial effect on a judge's interest, "[t]he key inquiry is not the size of the interest, but the size of the impact on the interest." *See* Committee on Codes of Conduct Advisory Op. 69 (June 2009).[1] As a result, whether any change in the relevant interest affects "the judge's overall financial condition is irrelevant." Comm. on Codes of Conduct Advisory Op. 106 (Mar. 2011). *Second*, in evaluating whether any interest could be substantially affected by the litigation, "courts appear to weigh two factors": "the remoteness of the interest and its extent or degree." 13D Wright & Miller, Fed. Prac. & Proc. Juris. § 3547 (3d ed. Apr. 2023 update); *see also Hill v. Hunt*, No. 3:07-CV-2020-O, 2012 WL 12985445, at *5 (N.D. Tex. May 15, 2012) (evaluating whether possible effect is "direct," rather than "remote, contingent or speculative" (quoting *In re Placid Oil Co.*, 802 F.2d 783, 286–87 (5th Cir. 1986)). For example, when considering whether litigation involving a subsidiary could substantially affect an interest in a parent company, courts have factored in both the importance of the litigation to the subsidiary's finances and how tied up the parent's finances are in the subsidiary's success. *See, e.g., Key Pharms., Inc. v. Mylan Lab'ys Inc.*, 24 F. Supp. 2d 480, 484 (W.D. Pa. 1998) (noting that litigation involved only one product line of one subsidiary, and parent company had "diverse interests and revenues in the billions"). *Third*, in the context of judicial stock ownership, courts have generally looked to "the impact of the litigation on the share price of the stock" to evaluate substantial effect. 13D Wright & Miller, Fed. Prac. & Proc. Juris. § 3546 (3d ed. Apr. 2023 update).

Applying these principles, the outcome of this litigation could substantially affect an ownership interest in large credit card issuers. To begin, there is a *direct* connection between this case—a facial challenge to a regulation governing the late

---

[1] All Committee on Conduct advisory opinions are available at
   https://www.uscourts.gov/sites/default/files/guide-vol02b-ch02.pdf.

fees that can be charged by the 30 to 35 largest card issuers in the country—and the revenue streams of those directly regulated entities. It is therefore distinguishable from *In re Placid Oil Co.*, where this Court rejected a claim that investment in a competitor justified recusal, despite the party's argument that rulings in the case could have "a dramatic impact on the entire . . . industry." *See* 802 F.2d at 786–87. Such a claim, the court found, was "indirect and speculative." *Id.* But in *Placid Oil*, only the competitor—not the entire industry—was before the court. Here, "the whole industry"—every large card issuer affected by the Rule—"*is* before the court." *Sollenbarger v. Mountain States Tel. & Tel. Co.*, 706 F. Supp. 776, 782–83 (D.N.M. 1989). Plaintiffs admit such a direct involvement, claiming standing to sue "on behalf of their members who will be adversely affected by the challenged regulations." Compl. ¶¶ 18, 20, Dist. Ct. Dkt. No. 1. Those large card issuers will be directly and invariably affected by the outcome of this case; none will have to comply with the Late Fee Rule if Plaintiffs prevail, and all will have to comply if they do not.

And while it is difficult to say with precision how the Late Fee Rule—or the litigation challenging it—would affect card issuers' revenue and thus profitability (which could in turn affect share prices), industry analysts have predicted a possible substantial effect. For instance, a Goldman Sachs Equity Research analysis determined that, assuming banks take no other steps to offset the planned reduction in late fees, banks could see their earnings per share fall by 2.4 percent in 2025. *See Goldman: CFPB Late Fee Rules Will Hurt Citigroup the Most*, PYMNTS (Mar. 6, 2024).[2] The expected impacts varied by card issuer, with Goldman predicting that Citigroup "would be hit hardest" out of a group of major issuers (including PNC, Wells Fargo, Bank of America, JP Morgan Chase, and US Bank), with an estimated 6.4 percent impact on earnings per share in 2025, if no offsetting actions are taken. *Id.*; *Goldman Estimates Impact of CFPB's Late Fee Rule on Big Banks' Earnings*, Seeking Alpha (Mar. 5, 2024).[3]

Statements from the issuers themselves further suggest that they expect a possible substantial effect. In Capital One's earnings call for the fourth quarter of 2023—held a few months before the Late Fee Rule was finalized—the company's

---

[2] https://www.pymnts.com/news/cfpb/2024/goldman-cfpb-late-fee-rules-will-hurt-citigroup-the-most/ (last visited Apr. 11, 2024).

[3] https://seekingalpha.com/news/4076351-goldman-estimates-impact-of-cfpbs-late-fee-rule-on-big-banks-earnings (last visited Apr. 11, 2024).

CEO predicted that, if the proposed rule were implemented, "there w[ould] be a significant impact to our P&L [profits and losses] in the near term relative to what our path would have been." Capital One Financial, *Q4 2023 Earnings Call Transcript* (Jan. 25, 2024).[4] Those concerns were shared by the leadership of Bread Financial—the parent company of Comenity and Comenity Capital Bank, both of which submitted declarations in the district court, *see* App.149, App.190. Bread's CEO noted that, if the company took no steps to offset the losses in late fee revenue, the Rule "would have a significant impact on our business." Bread Financial Holdings, Inc., *FQ 2023 Earnings Call Transcript* (Jan. 25, 2024).[5] The company's CFO predicted a 25 percent reduction in total revenue in the first quarter after implementation. *Id.*

The Bureau's own analysis—based on projections incorporated in the Late Fee Rule—likewise suggests that the outcome of this case could affect large card issuers' profits, as follows. (1) Late fees are a significant source of revenue for large card issuers. They account, on an industry-wide basis, for about 10 percent of the total fees and interest charged to credit card customers annually. *See* Late Fee Rule, 81 Fed. Reg. 19128, 19130 (Mar. 15, 2024), App.014. (2) In turn, total fees and interest generally represent about 14 percent of all large card issuers' outstanding balances—a figure generally used as a measure of profitability of a given issuer. *See* CFPB, *The Consumer Credit Card Market* at 23 (Oct. 2023) (figure 7, totaling up interest and fees).[6] (3) This means that late fees, in particular, likely represent approximately 1.4 percent of outstanding balances across major issuers. (4) In the Late Fee Rule, the Bureau estimated that reducing the safe harbor to $8 would reduce late fees collected industry-wide by 72.3 percent. *See* 81 Fed. Reg. at 19194, App.078. (That number reflects the fact that some large card issuers can and may choose to charge late fees higher than $8, if such a charge is cost-justified, 12 C.F.R. § 1026.52(b)(1)(i).) (5) The Rule could therefore lead to a reduction in revenues equal to roughly 1 percent (or, 72 percent of 1.4 percent) of large card issuers' outstanding card receivables—although this may vary greatly by issuer. Of course, the degree to which any reduction in late

---

[4] https://www.fool.com/earnings/call-transcripts/2024/01/25/capital-one-financial-cof-q4-2023-earnings-call-tr/ (last visited Apr. 11, 2024).

[5] https://seekingalpha.com/article/4665034-bread-financial-holdings-inc-bfh-q4-2023-earnings-call-transcript (last visited Apr. 11, 2024).

[6] https://files.consumerfinance.gov/f/documents/cfpb_consumer-credit-card-market-report_2023.pdf (last visited Apr. 11, 2024).

fee revenue ultimately affects a given issuer's profits (and therefore share prices) will depend on multiple variables, including how each issuer chooses to adjust its business in response to the Rule's requirements. But the predicted reduction in revenue—an estimated $10 billion across all affected issuers, 81 Fed. Reg. at 19194, App.078—means a direct hit to profits cannot be ruled out.[7]

In sum, this litigation could substantially affect an ownership interest in one of the large card issuers directly affected by the Bureau's Late Fee Rule.

### B. Ownership of stock in a large card issuer would trigger recusal obligations.

In addition, ownership of stock in a large card issuer would trigger recusal obligations regardless of whether the litigation could substantially affect that ownership interest. In particular, "a financial interest in the subject matter in controversy or in a party to the proceeding," Canon 3C(1)(c), 28 U.S.C. § 455(b)(4),[8] is disqualifying regardless of whether it would be substantially affected by the outcome of the case. A financial interest in a non-party large card issuer would constitute a financial interest in the "subject matter in controversy," requiring recusal.

---

[7] To be clear, the impacts on large card issuers discussed here are ones that will only come into play after the Rule's May 14 effective date, once the lower late fee safe harbor is in place. These revenue and profits projections therefore are not relevant to a related question at this stage of the litigation—whether issuers faced a sufficient risk of *immediate* and irreparable harm in advance of the Rule's effective date such that the district court's consideration of Plaintiffs' preliminary injunction request on an already-expedited timeline somehow constituted an effective denial of that motion.

[8] The requirements of Canon 3C(1)(c) and § 455(b)(4) are identical. *See* Comm. on Code of Conduct Advisory Op. 66 (June 2009) ("Canon 3C of the Code closely tracks the language of § 455 . . ."). Accordingly, this letter refers to advisory opinions from the Judicial Committee on Codes of Conduct (Judicial Committee) addressing Canon 3C(1)(c) and judicial opinions addressing § 455(b)(4). *See In re Cameron Int'l Corp.*, 393 F. App'x 133, 135 (5th Cir. 2010) (noting the relationship of the provisions and the persuasive value of Judicial Committee opinions).

Canon 3C(1)(c) and § 455(b)(4) provide in relevant part that a judge should recuse if the judge "has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding."

A straightforward interpretation of the text demonstrates that the phrase "substantially affected by the outcome of the proceeding" modifies only "any other interest," and not the financial interests referenced in the preceding clause. "The grammatical rule of the last antecedent[,] according to which a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows," *Barnhart v. Thomas,* 540 U.S. 20, 26 (2003), demonstrates that the "substantially affected" modifier applies only to the "other interests" clause. *See also Black's Law Dictionary* 1532–33 (10th ed. 2014) ("[Q]ualifying words or phrases modify the words or phrases immediately preceding them and not words or phrases more remote, unless the extension is necessary from the context or the spirit of the entire writing.").

While the last antecedent "rule is not an absolute and can assuredly be overcome by other indicia of meaning," *id.*, the other indicia of meaning squarely support this interpretation. *See Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme"). For example, a different provision of the Canon and § 455 provides, as stated by the Canon, that "[n]otwithstanding the preceding provisions . . . if a judge would be disqualified because of a financial interest in a party (other than an interest that could be substantially affected by the outcome), disqualification is not required if the judge (or the judge's spouse or minor child) divests the interest that provides the grounds for disqualification." Canon 3C(4); *see also* 28 U.S.C. § 455(f). This provision establishes that there are two kinds of financial interests in a party— those that could be substantially affected and those that could not be. Either kind ordinarily requires recusal, but for financial interests that could not be substantially affected, divestiture is an alternative to recusal. This provision would be superfluous if the only kinds of financial interests that mattered for purposes of recusal were those that would be substantially affected—because those are the only type of interests that cannot be cured by divestiture. Other provisions of the Canon similarly support the interpretation that accords with the last antecedent rule, by creating exceptions that make sense only if, as a general matter, financial interests require recusal even if they

would not be substantially affected by the litigation. *See* Canon 3C(3)(c)(iii), Canon 3C(3)(c)(iv).

Accordingly, Courts and the Judicial Committee have consistently interpreted the modifier "substantially affected by the outcome of the proceeding" to apply to "any other interests" only, and not to the financial interests referenced in the preceding clause. For example, this Court, in *In re Cameron Int'l Corp*, adopted the interpretation of § 455 consistent with the last-antecedent rule, treating § 455(b)(4) as having two separate parts, and noting that the first part "speaks of a 'financial interest in the subject matter in controversy or in a party to the proceeding,'" while the "second part of § 455(b)(4) speaks of "any other interest that could be substantially affected by the proceeding" as an alternative basis for disqualification. *In re Cameron Int'l Corp.*, 393 F. App'x at 135–36.[9] And the Ninth Circuit even more explicitly adopted the same interpretation, explaining that a district court "correctly noted that in subsection (b)(4) of the statute, the phrase 'financial interest in the subject matter in controversy or in a party to the proceeding,' unlike the phrase 'or any other interest,' is not modified by the subsequent phrase 'that could be substantially affected by the outcome of the proceeding.'" *In re Cement Antitrust Litig.* (MDL No. 296), 688 F.2d 1297, 1308 (9th Cir. 1982), *aff'd sub nom. Arizona v. U.S. Dist. Ct. for Dist. of Arizona*, 459 U.S. 1191 (1983), and *supplemented sub nom. State of Ariz. v. U.S. Dist. Ct. for Dist. of Ariz.*, 709 F.2d 521 (9th Cir. 1983). Other courts have adopted the same interpretative framework. *See, e.g., Shell Oil Co. v. United States*, 672 F.3d 1283, 1289 (Fed. Cir. 2012); *Obduskey v. Wells Fargo*, 2023 WL 1831128, at *6 (10th Cir. Feb. 9, 2023). And Judicial Committee advisory opinions apply the Canon in like fashion. *See, e.g.*, Comm. on Codes of Conduct Advisory Op. 57 (Feb. 2024), at 1; Advisory Op. 20 (June 2009) at 1. In short, applying the "substantially affects" limitation to the financial interests provision would be inconsistent with the text and structure of the Canon and statute, as well as with precedent, because *any* financial interest the subject matter in

---

[9] *Sensley v. Albritton*, 385 F.3d 591, 600 (5th Cir. 2004), which predates *In re Cameron Int'l*, includes a vague recitation of the standard of § 455 that could be read to suggest that the "substantially affects" proviso applies to financial interests. But the court's statement is unclear, *id.*, and is dicta, in any case, because the court ultimately concluded that the plaintiffs had not demonstrated that the litigation would "directly affect any interest," *id.*

controversy or in a party requires recusal. That rule makes sense given that it can be difficult to predict what effect a case will have on such an ownership interest.

Having established that the "substantially affected by" limitation is inapplicable, the question for purposes of recusal under Canon 3C(1)(c) and § 455(b)(4) is whether a judge who owns stock in a non-party large card issuer "has a financial interest in the subject matter in controversy or in a party to the proceeding." The answer is yes.

The "subject matter in controversy" refers to the "matter acted upon, the matter presented for consideration, [ ]or the topic of dispute in a legal matter." *United States v. Nobel*, 696 F.2d 231, 234 (3d Cir. 1982) (cleaned up). A "remote, contingent, and speculative interest is not a financial interest within the meaning of the recusal statute." *In re Placid Oil Co.*, 802 F.2d at 787. Accordingly, "where [a] judge has a financial interest within § 455(d)(4) in a non-party, the court examines how direct an effect the litigation before it will have on the interested non-party" to determine whether that financial interest amounts to an interest in the "subject matter in controversy." *Sollenbarger v. Mountain States Tel. & Tel. Co.*, 706 F. Supp. 776, 781 (D.N.M. 1989); *Hill v. Hunt*, No. 3:07-CV-2020-O, 2012 WL 12985445, at *5 (N.D. Tex. May 15, 2012) (same).

An owner of stock in a non-party large card issuer has a financial interest in the subject matter in controversy—i.e., whether the Late Fee Rule violates the Administrative Procedure Act (APA) and should be vacated—because the litigation will have a direct effect on *all* large card issuers. Plaintiffs bring APA claims and seek, at bottom, an order vacating the challenged rule in its entirety. Compl., Prayer for Relief, ¶ b, at 40, Dist. Ct. Dkt. No. 1. And, presumably, they seek vacatur of the rule on a universal basis, not just as to the plaintiffs to this suit. *See, e.g., Career Colleges & Sch. of Texas v. United States Dep't of Educ.*, --- F.4th ----, 2024 WL 1461737, at *26 (5th Cir. Apr. 4, 2024). (And even if Plaintiffs were seeking vacatur only as to their own members, many if not all of the 30-35 issuers affected by the Rule are likely members of at least one of the party plaintiffs.). Thus, a non-party large card issuer will benefit from a judgment favorable to plaintiffs as much as it would if it were a party to the suit. There is nothing "remote, contingent, and speculative" about this interest. *In re Placid Oil Co.*, 802 F.2d at 787.

A judge who owns stock in a large card issuer, then, would have a disqualifying financial stake in the subject matter of this case, regardless of whether that interest would be "substantially affected." Indeed, the Ninth Circuit has used similar logic to

conclude that a judge who owned stock in an unnamed class member has a financial stake in the outcome of a proceeding: "Where it counts, class members and parties are identical. There is no question that class members are included in the benefits and burdens of a judgment on an equal basis with parties. For this reason, there appears to be no reason in logic why a financial interest however small in a named party to a litigation should be grounds for recusal, but that the same interest in a class member should not be." *In re Cement Antitrust Litig.,* 688 F.2d at 1310. The same basic logic applies here: "[w]here it counts," a non-party large card issuer is identical to a party because they will share the " benefits . . . of a judgment on an equal basis with parties."[10] Thus, the law requires any judge who owns stock in a large card issuer to recuse.[11]

---

[10] In fact, the non-party large card issuers will benefit more than the plaintiffs because the only plaintiffs here are associations, which are not subject to the rule.

[11] That the effect of the litigation on the stock price cannot be precisely determined, see above, does not render a judge's participation appropriate in this context. Federal court decisions and Judicial Committee advisory opinions make clear that stock ownership of a party creates a per se bar on participation by the stock-owning judge. *See, e.g., Shell Oil Co. v. United States*, 672 F.3d 1283, 1289 (Fed. Cir. 2012); *Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120, 127 (2d Cir. 2003); Comm. on Codes of Conduct Adv. Op. 20 (June 2009) at 1. There is no reason why stock ownership that gives a judge a financial interest in the "subject matter in controversy" should be treated any differently, especially where, as here, the non-party is akin to a party (given the benefit it will receive from a favorable judgment and given that the Plaintiff associations base their standing to sue on the non-party card issuers). Moreover, interpreting § 455 and the Canon to permit a judge to participate notwithstanding stock ownership in a large card issuer would leave open a question regarding the need for recusal under the Due Process Clause. *See, e.g., Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 877–79 (2009). Defendants have not addressed this issue given the clear need to recuse under the Canon and § 455.

**C. Risks to the appearances of impartiality could also counsel in favor of recusal if a judge had an ownership interest in a card issuer affected by the Rule.**

The Code of Conduct for United States Judges separately provides that a "judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned." Canon 3(C)(1). *See also* 28 U.S.C. § 455(a) (similar). Because the goal of this provision is to "avoid even the appearance of partiality," *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988), a judge "should recuse himself not only when he is actually biased or partial, but also when a reasonable observer might question his neutrality," *In re Literary Works in Elec. Databases Copyright Litig.*, 509 F.3d 136, 140 (2d Cir. 2007) (cleaned up). The test is an objective one: recusal is required "if a reasonable person" knowing "all of the circumstances . . . would harbor doubts about the judge's impartiality." *United States v. Anderson*, 160 F.3d 231, 233 (5th Cir. 1998).[12] Such doubts by a "reasonable person" can warrant recusal even if Canon 3C and § 455(b) would not otherwise require recusal. *See United States v. Rechnitz*, 75 F.4th 131, 144 (2d Cir. 2023) (finding facts "militate[] in favor of recusal by the district judge under § 455(a) [requiring recusal where judge's "impartiality might reasonably be questioned"], even though § 455(b) is not technically violated").

Here, a reasonable person might question the impartiality of a judge who has a financial interest in a large credit card issuer whose interests are both being represented in this litigation and will be affected by the outcome. If Plaintiffs are successful, the 30-35 large credit card issuers affected by the Rule will directly benefit

---

[12] Applying a similar test, shortly after its creation, the Bureau concluded that it "would cause a reasonable person to question the impartiality and objectivity with which agency programs are administered" for a Bureau employee or his or her spouse or minor child to hold a financial interest in any entity supervised by the Bureau—a class of entities that includes issuers covered by the Late Fee Rule. 77 Fed. Reg. 25015, 25017 (2012). Bureau ethics rules accordingly prohibit employees (and their covered family members) from holding any such interest at all, regardless of whether the employee works on any matter affecting any particular entity's interests and regardless of whether any action by the agency could affect the employee's ownership interest. 5 C.F.R. § 9401.106.

(to the tune of billions in annual revenue, collectively). Those facts could cause a reasonable person to "harbor doubts about [a] judge's impartiality." *Anderson*, 160 F.3d at 233. Thus, recusal could be warranted for this independent reason as well.

Respectfully submitted,

Seth Frotman
*General Counsel*
Steven Y. Bressler
*Deputy General Counsel*
Kristin Bateman
*Acting General Counsel*

/s/ Justin M. Sandberg
Justin M. Sandberg
Joseph Frisone
*Senior Counsel*
Stephanie B. Garlock
*Counsel*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
(202) 450-8786
justin.sandberg@cfpb.gov

*Counsel for Appellees*

CC:    Counsel of Record (via CM/ECF)