

April 11, 2024

Lyle W. Cayce, Clerk of Court
United States Court of Appeals for the Fifth Circuit
Office of the Clerk
F. Edward Herbert Building
600 S. Maestri Place, Suite 115
New Orleans, LA 70130

RE:   *Chamber of Commerce, et al. v. CFPB*, No. 24-10248
      *In re: Chamber of Commerce*, No. 24-10266
      Appellants' Response to Request for Supplemental Briefing

Dear Mr. Cayce:

     We appreciate the Court's careful consideration of the applicable recusal rules and offer this letter in response to the Court's order of April 8, 2024, which requests supplemental briefing on whether a judge's ownership interest in a non-party large credit card issuer[1] would be substantially affected by the outcome of this case.  *See* Memorandum to Counsel or Parties Below ("Briefing Order"), No. 24-10248, ECF No. 77 (Apr. 8, 2024).  Under the applicable rules and precedents, an ownership interest in a non-party will rarely (if ever) require recusal from mine-run regulatory litigation like this one, and certainly would not require recusal in this case.

     Judges are required to recuse based on ownership interests in non-parties only when it is easily ascertainable that those interests will be substantially affected by the outcome of litigation.  That is not the case when the potential effect on the ownership interest is indirect, speculative, or contingent, because judges are not tasked with economic omniscience, but rather a duty to decide cases.  For this reason, courts across the country, including this one, have been unwilling to require recusal in cases in which a judge owns stock in a company in the same industry as a party to the case.  That rule has been applied in rulemaking

---

[1] A larger card issuer is defined for these purposes as an issuer that, along with its affiliates, has at least one million open credit card accounts.  *See* Final Rule, 89 Fed. Reg. at 19128 n.3.



Supplemental Briefing
April 11, 2024
Page 2

challenges, as well. That result makes sense because the effect of a rule on a specific regulated entity's stock is wholly remote and speculative for multi-faceted businesses operating in complex regulatory environments. This case demonstrates this point, for the CFPB has repeatedly stated that the rule is likely to have limited effect on the bottom line of issuers. Judges' ability to fairly decide the cases before them deserves more respect than a contrary rule would provide.

I.  **Recusal is not required when the effect on a judge's ownership interest in a non-party is remote or speculative.**

As an initial matter, the Court correctly noted that this is not a case in which a judge could have a financial interest "in the subject matter in controversy or in a party to the proceeding." Canon 3C(1)(c), Code of Conduct for United States Judges. The trade-association plaintiffs are seeking an injunction, not damages, and they do not issue credit cards. As a result, recusal would be required only if a judge "knows that . . . [he has] any other interest that could be affected substantially by the outcome of the proceeding." *Id.*; *see also* Comm. on Codes of Conduct Advisory Op. No. 49 (finding "no impropriety in a judge serving in a proceeding where a trade association appears as a party, even though the judge owns a small percentage of the publicly-traded shares of one or more members of the association, so long as that interest could not be substantially affected by the outcome of the proceeding.").[2]

In a case involving a judge's ownership of stock in a non-party company, relevant authorities indicate that recusal is warranted under Canon 3C(1)(c) and 28 U.S.C. § 455 only if the judge knows that the outcome of the proceeding could substantially affect the value of the company's stock. *See* Advisory Opinion 57 (applying the standard whether the outcome would "substantially affect the value of the interest"). And because the touchstones in this circumstance are the judge's

---

[2] Advisory opinions of the Committee on Codes of Conduct (hereinafter "Advisory Opinions") are published in 2B *Guide to Judiciary Policy* (last revised Feb. 26, 2024), https://www.uscourts.gov/sites/default/files/guide-vol02b-ch02.pdf [https://perma.cc/V2NS-6J7V].



Supplemental Briefing
April 11, 2024
Page 3

knowledge and otherwise whether a judge's "impartiality might reasonably be questioned," 28 U.S.C. § 455(a), courts have held that recusal is not warranted under the applicable standard unless the litigation's substantial effect on the judge's interest is "easily ascertainable." *See Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120, 128-29 (2d Cir. 2003) (even a direct financial interest in a party must be "easily ascertainable" to create the appearance of a conflict of interest). As these authorities recognize, judges should not be placed under an unrealistic and unreasonable burden to determine every conceivable effect on non-parties.

An indirect, speculative, or contingent effect on a judge's ownership interest in a non-party is unlikely to be easily ascertainable as substantially affecting an ownership interest. *See In re Placid Oil Co.*, 802 F.2d 783, 786-87 (5th Cir. 1986) ("A remote, contingent, and speculative interest is not a financial interest within the meaning of the recusal statute, nor does it create a situation in which a judge's impartiality might reasonably be questioned." (internal citation omitted)). As the Eighth Circuit explained, when assessing whether ownership of a non-party's stock warranted recusal, "the administratively daunting task of identifying such tangential 'interests' outweighs any benefit of eliminating the remote possibility of consequential bias." *In re Kansas Pub. Emps. Ret. Sys.*, 85 F.3d 1353, 1362 (8th Cir. 1996).

II.   **The effect on a judge's ownership interest in a non-party is not easily ascertainable in most, if not all, challenges to agency rules.**

Applying these principles, courts across the country, including this one, have been "unwilling to adopt a rule requiring recusal in every case in which a judge owns stock of a company in the same industry as one of the parties to the case." *In re Placid Oil Co.*, 802 F.2d at 786-87. In *In re Placid*, for example, this Court held that a judge with investments in a non-party bank need not recuse himself from a case with a different bank as a party, even though the case might affect the banking industry. Other courts have reached similar outcomes. *See, e.g.*, *In re Kansas Public Retirement System*, 85 F.3d 1353, 1362 (8th Cir. 1996) ("[W]e are reluctant



Supplemental Briefing
April 11, 2024
Page 4

to fashion a rule requiring judges to recuse themselves from all cases that might remotely affect nonparty companies in which they own stock. We believe such a rule would paint with too broad a stroke.").

That principle—that recusal is not warranted for an ownership interest in a non-party, even in the relevant industry, when a substantial effect is not easily ascertainable—has been applied in the rulemaking context as well. In *Department of Energy v. Brimmer*, 673 F.2d 1287, 1295 (Emer. Ct. App. 1982), the court held that a judge owning stock in companies regulated by a federal rule did not need to recuse himself from a challenge to that rule by similar companies. The case involved a Department of Energy rule winding down a government program that effectuated oil price controls. Several oil companies challenged the rule. The Department moved to recuse the judge on the ground that he owned stock in four other, non-party oil companies that participated in the same program and thus were subject to the same rule. The judge declined to recuse, and the temporary court of appeals (created by statute in the 1970s, with sitting judges appointed by the Chief Justice) agreed, rejecting the argument that such ownership interests warranted recusal. After concluding that there was no "direct" financial interest in the case, the court explained that "[t]he question that remains is whether the judge had some other interest that could be substantially affected by the outcome of the proceeding." The court concluded that the answer was no: "[t]here is a possibility that the value of the shares held by the judge might be affected in some very small way by the outcome of this case, but this would be such a slight effect as not to be substantial." *Id.* at 1295.

The same result will be appropriate in the vast majority of, if not all, regulatory challenges. Whether, and to what extent, the outcome of a particular rulemaking challenge will affect a specific regulated entity's (or its parent's) stock price is speculative. This is especially true where the challenged regulation affects only a small portion of a regulated entity's revenue base and the entity is in a position to offset some or all of the costs or lost revenues caused by the new regulation. *See, e.g.*, Advisory Opinion 94 ("[E]ven if the suit were of that magnitude, it might not have the potential to substantially affect the judge's royalty



Supplemental Briefing
April 11, 2024
Page 5

interest if it is clear that the oil or gas could and would be marketed to others at a comparable price in the eventuality that the purchaser/party before the judge no longer remained a viable purchaser as a result of the suit."). Multifaceted businesses operating in complex regulatory environments can and do respond to new regulations in a variety of ways. For these reasons, it is wrong to assume that even hefty compliance costs or sharp decreases in revenue affecting an industry as a whole will necessarily result in a change to the value of an individual entity's stock—let alone a substantial one. And the recusal rules do not require judges to chart out the potential mitigating actions an entity might take and predict how those actions will affect his or her investment. That analysis will usually, if not always, fall well outside a judge's expertise.

**III. The CFPB's own conduct in this case confirms that the effect of the litigation on any ownership interest in a large credit card issuer is remote or speculative, not easily ascertainable.**

This case illustrates the point. It is not readily ascertainable whether the outcome of this litigation will substantially affect an ownership interest in a large credit card issuer. Indeed, the CFPB's views regarding the effect of its own regulation underscore that recusal is not warranted.

Specifically, the CFPB has stated in a variety of ways that the rule is likely to have limited effect on the bottom line of issuers; quite the contrary of an easily ascertainable substantial effect on any, much less *all*, of their stock prices. First, the CFPB argued below that, "[a]s for the large card issuers, they will be fine." ROA.286. Second, pointing to the size of the issuers and their revenue, the CFPB asserted that "while Plaintiffs . . . complain that issuers will incur 'millions of dollars' in compliance costs from printing new disclosures, that is hardly compelling given that the 30-35 issuers actually affected by the Rule collectively have over $10 trillion in assets and take in over $130 billion each year just in interest and fees charged to credit card customers." Opp'n to Emergency Mot. for Inj. Pending Appeal 21, ECF No. 56 (citation omitted). And third, according to the



Supplemental Briefing
April 11, 2024
Page 6

CFPB, credit card late fees make up less than 10 percent of the total interest and fees collected on the largest general-purpose mass-market credit card accounts.[3]

The CFPB has also stated that larger card issuers have options to offset, at least partially, the impact that the regulation will have on their revenues. *See, e.g.*, Final Rule, 89 Fed. Reg. at 19192 ("[I]ssuers can mitigate the costs of the proposal to some extent by taking other measures (e.g., increasing interest rates or changing rewards)."); *id.* at 19197 ("Larger Card Issuers can offset losses to consumer revenue to some extent by taking other measures … and the reduction in late fees could affect consumer choices or market competition in ways that may create benefits or costs to Larger Card Issuers."); *id.* ("CFPB expects that collection costs to Larger Card Issuers will not increase by more than fee income derived from any additional late payments."); *id.* at 19198 ("Larger Card Issuers can take other steps to help reduce the likelihood of consumers missing payments, which would mitigate potential costs of this final rule from increased delinquencies."); *id.* ("The recent profitability of consumer credit card businesses makes the CFPB expect the market to see exceedingly few exits and no change in entries."). Although the CFPB is not entirely accurate in its understandings, it is possible that some issuers may be able to offset some of the impact. But which issuers may do so and to what extent is entirely speculative at this point.

It is difficult at best to understand how, in light of these agency representations, the CFPB could claim that it can be "easily ascertained" that there

---

[3] *See* CFPB, *Credit Card Late Fees* 13 (Mar. 29, 2022), https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/cfpb_credit-card-late-fees_report_2022-03.pdf [https://perma.cc/F2MX-BSYQ]; CFPB, *Credit Card Late Fees: Revenue and Collection Costs at Large Bank Holding Companies* 6-8 tbl.1 (Feb. 2023), https://files.consumerfinance.gov/f/documents/cfpb_credit-card-late-fees-revenue-collection-costs-large-bank_2023-01.pdf [https://perma.cc/MHX4-CFUS]; *see also* Credit Card Penalty Fees (Regulation Z), 89 Fed. Reg. 19128, 19130 (Mar. 15, 2024) [hereinafter "Final Rule"] ("For the Larger Card Issuers in the Y–14+ data, late fees represented 10 percent of charges to consumers in 2020, but individual card issuers' revenue from late fees varied.").



Supplemental Briefing
April 11, 2024
Page 7

will be a substantial effect on the stock price—rather than revenue—of any particular credit card issuer.

      The CFPB may argue that Appellants' showing of irreparable harm from the challenged rule suggests that the outcome of this litigation will have a "substantial effect" on the stock price of issuers or their parent companies. That reasoning would be legally and economically flawed. As a legal matter, "[i]t is not so much the magnitude but the irreparability [of harm] that counts for purposes of a preliminary injunction." *Canal Auth. v. Callaway*, 489 F.2d 567, 575 (5th Cir. 1974). Consequently, a showing of irreparable harm based on compliance costs, risks of enforcement, or even lost revenues is a showing that the challenger will suffer harms that cannot be recovered *from the government* through ordinary litigation, not that the challengers will see a decrease (let alone a substantial one) in their stock price. As an economic matter, the fact that issuers will incur costs or will suffer reduced revenues, even in substantial amounts, from a regulation does not with any certainty mean that their stock price—which is a function of a complex regulatory and macroeconomic environment as well as numerous business decisions for large corporations—will be affected at all, let alone substantially.[4]

---

[4] Because a substantial effect is not easily ascertainable in this case, Appellants are unable to offer a specific calculation or mathematical methodology. While courts have generally refrained from mathematical calculations, the Committee on Codes of Conduct and case law suggest that the degree of impact must be high—far higher than any impact that could be reasonable predicted in this case. Discussing the relevant canon, the Committee explained that "a $0.60 per month increase would not have a substantial effect on a judge's utility bill, but that the doubling of a utility bill from $10 to $20 per month would be substantial." Advisory Op. 94. It would be highly speculative to conclude that even a 10% change in stock price could arise from this regulation, let alone a 100% change. *See also Pi-Net Int'l, Inc. v. Citizens Fin. Grp.*, No. 12-355-RGA, 2015 WL 1283196, at *5 n.11 (D. Del. 2015) (finding that $100,000 worth of shares losing $9.33 of value would have "no potential effect on the value of a holding . . . that any individual investor would notice"); *cf. United States v. Lauersen*, 348 F.3d 329, 336-37 (2d Cir. 2003) ("[R]ecusal is required only where the extent of the judge's interest in the crime



Supplemental Briefing
April 11, 2024
Page 8

      Finally, if recusal were required in regulatory challenges like this one—based on a judge's ownership interest in the stock of a non-party—courts and parties alike would face an unworkable system. Judges are not financial analysts equipped to forecast how any particular regulation will affect the stock price of corporations operating in complex regulatory environments. The same is true for many of the plaintiffs required to submit certificates of interested parties. Moreover, questions would arise about how far the rule would extend. In this case, for example, non-parties other than large credit card issuers could be impacted by the rule—such as retailers that partner with issuers to offer store-branded cards to customers, or small credit card issuers that face competitive pressure to lower their late fees in the wake of the CFPB's rule. Will plaintiffs be required to identify and name these kinds of entities in certificates of interested parties, and will judges be required to analyze how their ownership interests in each of them may be affected by the outcome of the case?

      The uncertainty of such a system would introduce needless complexity into routine litigation, incentivize gamesmanship, and undermine the integrity of the judicial system. Neither the relevant statutes nor the canons of judicial conduct contemplate these results. Accordingly, Appellants respectfully submit that recusal would not be required in this case based solely on a judge's ownership interest in a non-party issuer. Judges, and their integrity, deserve more credit than that.

---

victim is so substantial, or the amount that the victim might recover as restitution is so substantial, that an objective observer would have a reasonable basis to doubt the judge's impartiality."), *as amended* (Nov. 25, 2003), *adhered to on reh'g*, 362 F.3d 160 (2d Cir. 2004), *cert. granted, judgment vacated on other grounds*, 543 U.S. 1097 (2005); *In re Virginia Elec. & Power Co.*, 539 F.2d 357, 366-67 (4th Cir. 1976) (explaining that the judge's interest in the possible refund of up to $100 in utility costs depending on the outcome of the litigation was "so speculative" that it was "clear that he had no 'financial interest' in the subject matter in controversy").




Supplemental Briefing
April 11, 2024
Page 9

\* \* \*

Thank you for the opportunity to provide briefing on this important issue.

Sincerely,


/s/

Michael F. Murray
of PAUL HASTINGS LLP

Counsel for Appellants