No. 24-10248

# In the United States Court of Appeals for the Fifth Circuit

---

Chamber of Commerce for the United States of America; Fort Worth Chamber of Commerce; Longview Chamber of Commerce; American Bankers Association; Consumer Bankers Association; Texas Association of Business,

*Plaintiffs-Appellants*,

v.

Consumer Financial Protection Bureau; Rohit Chopra, in his official capacity as Director of the Consumer Financial Protection Bureau,

*Defendants-Appellees*.

*On Appeal from the United States District Court for the Northern District of Texas, Fort Worth Division*

---

## BRIEF OF PLAINTIFFS-APPELLANTS

---

Michael Murray
D.C. Bar No. 1001680
michaelmurray@paulhastings.com
Tor Tarantola
D.C. Bar No. 1738602
tortarantola@paulhastings.com
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036
(202) 551-1730

Philip Vickers
Texas Bar No. 24051699
pvickers@canteyhanger.com
Derek Carson
Texas Bar No. 24085240
dcarson@canteyhanger.com
CANTEY HANGER LLP
600 West 6th Street, Suite 300
Fort Worth, TX 76102
(817) 877-2800

*Counsel for Plaintiffs-Appellants*

Thomas Pinder
D.C. Bar No. 451114
tpinder@aba.com
Andrew Doersam
D.C. Bar No. 1779883
adoersam@aba.com
AMERICAN BANKERS
ASSOCIATION
1333 New Hampshire Ave. NW
Washington, DC 20036

*Counsel for American Bankers Association*

Tara S. Morrissey
D.C. Bar No. 991019
tmorrissey@uschamber.com
Maria C. Monaghan
D.C. Bar No. 90002227
mmonaghan@uschamber.com
U.S. CHAMBER LITIGATION
CENTER
1615 H Street NW
Washington, DC 20062

*Counsel for Chamber of Commerce of the United States of America*

## CERTIFICATE OF INTERESTED PERSONS

*Chamber of Commerce of the United States, et al. v. Consumer Financial Protection Bureau, et al.*, No. 24-10248

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Chamber of Commerce of the United States of America;

2. Fort Worth Chamber of Commerce;

3. Longview Chamber of Commerce;

4. American Bankers Association;

5. Consumer Bankers Association;

6. Texas Association of Business;

7. Consumer Financial Protection Bureau;

8. Rohit Chopra, in his official capacity as Director of the Consumer Financial Protection Bureau;

9. Paul Hastings LLP, counsel for Plaintiffs-Appellants; and

10. Cantey Hanger LLP, counsel for Plaintiffs-Appellants.

 /s/ Michael Murray
Michael Murray
Attorney of Record for Plaintiffs-Appellants

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellants Chamber of Commerce of the United States of America, Fort Worth Chamber of Commerce, Longview Chamber of Commerce, American Bankers Association, Consumer Bankers Association, and Texas Association of Business ("Plaintiffs") respectfully request oral argument. The Consumer Financial Protection Bureau's ("CFPB") final rule regarding Credit Card Penalty Fees ("Final Rule"), 89 Fed. Reg. 19128 (Mar. 15, 2024), prevents credit card issuers from collecting the reasonable and proportional late fees that Congress authorized and marks a dramatic shift from the way in which issuers have assessed those fees for over a decade.[1]

Plaintiffs filed a motion for an injunction pending appeal on March 25, 2024, the CFPB filed its opposition to that motion on March 29, and Plaintiffs filed a reply in support of that motion on March 29. ECF Nos. 7, 56, 60. Absent a decision on that motion, or in the event of a denial, Plaintiffs respectfully request that oral argument proceed on an expedited basis. The Final Rule continues to impose irreparable harm on Plaintiffs' members and, with each day that passes, the need for preliminary injunctive relief becomes more urgent.

---

[1] Unless otherwise noted, references to "issuers" or "card issuers" in this brief refer to the larger card issuers who are subject to the Final Rule. *See* 89 Fed. Reg. at 19128.

# TABLE OF CONTENTS

**Page**

Introduction ......................................................................................1

Statement of Jurisdiction................................................................4

Statement of Issues..........................................................................6

Statement of the Case......................................................................6

    I.     The Authorization of "Penalty Fees" for Late Credit Card
        Payments ...........................................................................6

        A.    The Truth in Lending Act and the CARD Act of 2009 ............6

        B.    The Federal Reserve Board's Rulemaking ................................8

    II.    The CFPB's New Rule ....................................................11

    III.   This Case's Procedural History and the CFPB's Attempts to
        Delay a Ruling on the Merits ...........................................12

Summary of Argument.................................................................16

Standard of Review........................................................................21

Argument........................................................................................22

    I.     Plaintiffs are likely to succeed on the merits of their claims. ............22

        A.    The CFPB promulgated the Final Rule with funds drawn
            in violation of the Appropriations Clause.................................23

        B.    The Final Rule violates the CARD Act and TILA. .................24

            1.    The Final Rule Violates the CARD Act. ......................24

                a.    The Final Rule misconstrues a "penalty fee"
                    for the "violation of the cardholder
                    agreement.".........................................................25

                b.    The Final Rule misconstrues "costs." .................34

            2.    The Final Rule violates TILA's timing
                requirements. ...............................................................36

    II.    Plaintiffs are experiencing and will continue to experience
        irreparable harm absent an injunction from this Court. ....................40

        A.    The undisputed record indicates that Plaintiffs' members
            will suffer six types of irreparable harm.................................41

# TABLE OF CONTENTS
### (continued)

**Page**

1.    Compliance Costs .........................................................41

2.    Lost Revenue ...............................................................44

3.    Enforcement and Private Actions ..................................46

4.    Collection Costs...........................................................46

5.    Changed Economics for Certain Accounts....................47

6.    Loss of Customer Goodwill...........................................47

B.    The CFPB's belated attempts to attack Plaintiffs'
uncontested showing of irreparable harm are unavailing. .......48

III.    The balance of harms and the public interest weigh in favor of a
preliminary injunction. ........................................................51

Conclusion ...............................................................................53

Certificate of Service ...............................................................56

Certificate of Compliance ........................................................57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Canal Auth. v. Callaway*,
    489 F.2d 567 (5th Cir. 1974) ..................................................................40

*In re Chamber of Commerce*,
    No. 24-10266, slip op. (5th Cir. Apr. 5, 2024) .......................................4, 15, 50

*Clarke v. CFTC*,
    74 F.4th 627 (5th Cir. 2023) ..................................................................5

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*,
    51 F.4th 616 (5th Cir. 2022) ..................................................................16, 17, 23

*Corley v. United States*,
    556 U.S. 303 (2009)...............................................................................31

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)...............................................................................36

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)...............................................................................27

*Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*,
    944 F.2d 940 (D.C. Cir. 1991)..............................................................25

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019)...........................................................................36

*Koon v. United States*,
    518 U.S. 81 (1996).................................................................................21

*NFIB v. OSHA*,
    595 U.S. 109 (2022)...............................................................................24

*NFIB v. Sebelius*,
    567 U.S. 519 (2012)...............................................................................24, 26

*Polymer80, Inc. v. Garland*,
    No. 4:23-cv-00029, 2023 WL 3605430 (N.D. Tex. Mar. 19, 2023) ...........49, 50

*Rest. L. Ctr. v. U.S. Dep't of Lab.*,
  66 F.4th 593 (5th Cir. 2023) ...............................................21, 40, 50

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003) ...............................................................25

*Texas v. EPA*,
  829 F.3d 405 (5th Cir. 2016) .......................................................40, 41

*Tull v. United States*,
  481 U.S. 412 (1987)................................................................25

*USPPS, Ltd. v. Avery Dennison Corp.*,
  647 F.3d 274 (5th Cir. 2011) .......................................................5

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014)................................................................29

*Wages & White Lion Invs., LLC v. FDA*,
  16 F.4th 1130 (5th Cir. 2021) ...............................................*passim*

**Statutes**

5 U.S.C. § 706(2)(A).................................................................24

5 U.S.C. § 706(2)(A) & (C) ...........................................................17, 24

12 U.S.C. § 5512(b)(2)(A)(i) ...........................................................10

15 U.S.C. § 1601(a) .................................................................6

15 U.S.C. § 1602(v) ................................................................38

15 U.S.C. § 1604(d) .............................................................*passim*

15 U.S.C. § 1637(i).................................................................43

15 U.S.C. § 1665d(b) (West 2009) ....................................................7

15 U.S.C. § 1665d.................................................................3, 24, 32

15 U.S.C. § 1665d(a) .................................................................6

15 U.S.C. § 1665d(a)-(c).............................................................29

15 U.S.C. § 1665d(c) ........................................................................6, 17, 26

15 U.S.C. § 1665d(e) ..............................................................................7, 29

15 U.S.C. § 1693o-2(a)(2) ..........................................................................26

15 U.S.C. § 1693o-2(a)(3)(A) .....................................................................35

15 U.S.C. § 1693o-2(a)(4)(B)(i)-(ii) ...........................................................35

28 U.S.C. § 1292(a)(1) ..................................................................................4

28 U.S.C. § 1331 ...........................................................................................4

28 U.S.C. § 1404(a) .....................................................................................14

51 U.S.C. § 60125(a) ...................................................................................26

CARD Act, Pub. L. No. 111-24, 123 Stat. 1734 (2009) ..................... *passim*

Credit Card Accountability Responsibility and Disclosure Act of
    2009, S. 414, 111th Cong. (2009) ......................................................7, 27

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub.
    L. No. 111-203, §§ 1061(b)(1)(B), 1100A(2), 124 Stat. 1376,
    2036, 2107 (2010) ............................................................................10

**Other Authorities**

12 C.F.R. Part 1026 .......................................................................................8

12 C.F.R. § 226.52(b)(1)(i) ..............................................................8, 9, 10, 34

12 C.F.R. § 226.52(b)(1)(ii)(A)-(B) ..............................................................8

12 C.F.R. § 226.52(b)(3) ...............................................................................8

12 C.F.R. § 1026.5(c) ..................................................................................38

12 C.F.R. § 1026.6(b)(2)(viii) .....................................................................42

12 C.F.R. § 1026.9(c)(iii)(2) ..................................................................20, 43

12 C.F.R. § 1026.52(b)(1)(i) ........................................................................44

75 Fed. Reg. 37526 (June 29, 2010) ..............................................................8, 33, 35

76 Fed. Reg. 79768 (Dec. 22, 2011) ..........................................................................10

81 Fed. Reg. 25323 (Apr. 28, 2016) ..........................................................................10

88 Fed. Reg. 18906 (Mar. 29, 2023)......................................................3, 10, 33, 47

89 Fed. Reg. 19128 (Mar. 15, 2024)................................................................*passim*

CFPB, *CFPB Bans Excessive Credit Card Late Fees, Lowers Typical Fee from $32 to $8* (Mar. 5, 2024), https://www.consumerfinance.gov/aboutus/newsroom/cfpb-bans-excessive-credit-card-late-fees-lowers-typical-fee-from-32-to-8/ .....................12

Kate Fitzgerald, *Bread Financial 'Feverishly' Preps for CFPB Late-Fee Rule Scenarios*, American Banker (Apr. 25, 2024)....................................46

Polo Rocha, *Synchrony Hikes Interest Rates on Credit Cards to Offset Late-Fee Rule*, American Banker (Apr. 24, 2024) ............................................46

Report of the Consumer Financial Protection Bureau, Fiscal Year 2022, at 74-76 (Nov. 15, 2022), https://files.consumerfinance.gov/f/documents/cfpb_financial-report_fy2022.pdf ........................................................................................ 23

## INTRODUCTION

With each passing day, credit card issuers are incurring substantial, unrecoverable costs to comply with the CFPB's Final Rule. The Final Rule effectively slashes credit card late fees by 75 percent to $8, requiring affected issuers to act now to undertake the burdensome and costly process of designing and printing hundreds of millions of pages of new application, marketing, and disclosure materials, disposing of the old materials, updating their systems, and training their staff on the new $8 fees—all before the rapidly approaching effective date of May 14, 2024, a mere 60 days after the Final Rule was adopted. Because these materials must be available to consumers by May 14, they must be finalized—and distributed to hundreds of thousands of locations—well before that date. The sheer number of sample forms identified and modified by the CFPB in the Final Rule (over ten pages) illustrates the enormous burdens facing issuers. *See* 89 Fed. Reg. at 19203-12. But even those do not fully capture the operational complexity and labor-intensive nature of the work required to comply with the Final Rule.

If the Final Rule goes into effect on May 14, issuers will suffer even greater irreparable harm. The CFPB itself estimates that the 75 percent drop in late fees will result in lost revenues upward of $9 billion. 89 Fed. Reg. at 19193-94. While the Final Rule notes that issuers can make other adjustments to credit card terms to try to mitigate lost revenue from late fees, those mitigating steps—even if successful—

impose their own harm: issuers must create and distribute updated disclosure materials for those new terms, and customer goodwill will inevitably suffer as issuers raise rates and other fees. Moreover, issuers must provide at least 45 days' notice before implementing these mitigating steps.

An injunction before the effective date is necessary to prevent issuers from incurring unrecoverable costs and lost revenues. Allowing the Final Rule to go into effect for even one day would mean that the late fee terms of both new and existing credit cards (many hundreds of millions of accounts) will default to $8. By regulation, issuers must continue to apply the $8 late fee limit to those accounts until they provide customers the requisite 45 days' advance written notice of an increased late fee, subject to the cardholder's right to opt out of such a change. Increasing the amount of the late fee from $8 would again require changes to application, marketing, and disclosure materials for new applicants and accounts. In short, if issuers must implement $8 late fees for even one day, they must maintain those $8 fees for at least 45 days, plus the time it takes to prepare and commence delivery of those materials. This process would result in a substantial loss of both revenue and customer goodwill and would create confusion for customers.

Congress did not authorize the CFPB to slash late fees in this manner. In the Credit Card Accountability Responsibility and Disclosure Act of 2009 ("CARD Act"), Congress provided that the "penalty fees" credit card issuers charge to

2

customers who pay late must be "reasonable and proportional" to the violation and authorized the agency to establish a safe harbor amount presumed to meet this standard. Because the agency ultimately relied upon the safe harbor as part of the standard for establishing whether a late fee is reasonable and proportional, credit card issuers throughout the country have relied on that safe harbor amount in setting late fees for their customers.

Congress set forth three criteria that inform whether a "penalty fee" is "reasonable and proportional": the costs incurred by the issuer from the violation, the deterrence effects of a late fee, and the conduct of the cardholder. 15 U.S.C. § 1665d. Over a decade ago, the Federal Reserve Board of Governors ("the Federal Reserve") promulgated—and the CFPB subsequently adopted—a regulatory framework that attempted to incorporate those three statutory criteria into its standard through the safe harbor amount. Now, the CFPB has effectively jettisoned two of those criteria and issued a new safe harbor that will allow issuers to collect only a subset of the costs they incur as a result of late payments. This new restriction is inconsistent with the statutory text and, as the CFPB admits, will likely lead to more late payments, higher interest rates, constricted access to credit, and other less favorable credit card terms for consumers nationwide, including those who make their payments on time. *See* Credit Card Penalty Fees (Regulation Z), 88 Fed. Reg. 18906, 18934 (proposed Mar. 29, 2023).

In addition to rewriting the terms of the CARD Act, the Final Rule also violates the Truth in Lending Act ("TILA"), which requires the CFPB to give issuers a minimum of 6 months before this type of change can take effect. Instead of allowing 6 months, the CFPB gave issuers a mere 60 days to come into compliance with the Final Rule. This rushed, unworkable timeline compounds the irreparable harm facing issuers as they attempt to create and print hundreds of millions of pages of new disclosures, make (and test) system changes, train staff, and take necessary steps to ensure that rolling out a new—and unlawful—late fee goes as smoothly as possible.

Making matters worse, the CFPB issued this Final Rule in the shadow of precedent from this Court holding that the CFPB's funding structure, which draws funds from the Federal Reserve without congressional appropriation, violates the Appropriations Clause.

This Court's continued swift intervention is needed to prevent issuers from suffering even more irreparable harm, which increases every single day.

## STATEMENT OF JURISDICTION

This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1). The district court has jurisdiction under 28 U.S.C. § 1331. Plaintiffs filed a timely notice of appeal on March 25, 2024, after the district court effectively denied their motion for a preliminary injunction, which was filed on March 7, 2024.

This Court has jurisdiction over district court actions that effectively deny a motion for a preliminary injunction. An effective denial occurs when a district court does "not explicitly deny[] a preliminary injunction," but its actions "nonetheless ha[ve] the practical effect of doing so and might cause irreparable harm absent immediate appeal." *Clarke v. CFTC*, 74 F.4th 627, 635 (5th Cir. 2023) (cleaned up). In granting Plaintiffs' petition for mandamus, this Court held that "the district court effectively denied the preliminary injunction," and, as a result, "there is an appealable order before us." *In re Chamber of Commerce*, No. 24-10266, slip op. at 9 (5th Cir. Apr. 5, 2024). That ruling is the law of the case and of the circuit. *See USPPS, Ltd. v. Avery Dennison Corp.*, 647 F.3d 274, 282 (5th Cir. 2011).

It is also correct. Plaintiffs provided a thorough explanation of the harms they would face absent swift relief. Without even acknowledging those harms, the district court declined to act before the date by which Plaintiffs stated they would need to seek review in this Court to protect their rights; it also denied Plaintiffs' request to expedite consideration of the motion before evaluating whether to order a discretionary transfer. Taken in context, these actions had the practical effect of denying their motion. *See Clarke*, 74 F.4th at 635 (finding effective denial where "the district court did not rule on the preliminary injunction motion, even after Appellants moved to expedite its consideration in light of [a] looming deadline").

## STATEMENT OF ISSUES

Whether the district court abused its discretion in effectively denying Plaintiffs' motion for a preliminary injunction.

## STATEMENT OF THE CASE

## I.     The Authorization of "Penalty Fees" for Late Credit Card Payments

### A.     The Truth in Lending Act and the CARD Act of 2009

Congress enacted the Truth in Lending Act ("TILA") in 1968 to make the terms of consumer credit agreements more transparent and thereby enhance competition and the responsible use of credit. *See* 15 U.S.C. § 1601(a). TILA established a regime that is primarily disclosure-based. Credit card late fees have long been part of that regime.

In 2009, Congress expressly authorized the Federal Reserve to create and maintain a regulatory regime that includes "penalty fees" for late payments. CARD Act, Pub. L. No. 111-24, § 102(b)(1), 123 Stat. 1734, 1740 (2009). Specifically, the CARD Act required that "penalty fee[s]" imposed "in connection with any omission with respect to, or violation of, the cardholder agreement, including any late payment fee . . . be reasonable and proportional to such omission or violation." 15 U.S.C. § 1665d(a).

Congress's use of the term "penalty" was no accident. Congress had previously considered and rejected a legislative proposal that would have limited

6

late fees to the costs credit card issuers incur as a result of late payments. *See, e.g.*, Credit Card Accountability Responsibility and Disclosure Act of 2009, S. 414, 111th Cong. § 103 (2009), available at https://www.congress.gov/bill/111th-congress/senate-bill/414/text?s=2&r=1 (providing that "the amount of any fee or charge that a card issuer may impose in connection with any omission with respect to, or violation of, the cardholder agreement, including any late payment fee, . . . shall be reasonably related to the cost to the card issuer of such omission or violation").

In the CARD Act, Congress not only expressly authorized issuers to collect a "penalty fee," it made clear that issuer cost is only one factor relevant to determining whether a fee is reasonable and proportional to the violation. Specifically, in directing the Federal Reserve "to establish standards for assessing whether the amount of any penalty fee or charge . . . is reasonable and proportional to the omission or violation to which the fee or charge relates," 15 U.S.C. § 1665d(b) (West 2009), Congress required the Federal Reserve to consider "(1) the cost incurred by the creditor from such omission or violation; (2) the deterrence of such omission or violation by the cardholder; (3) the conduct of the cardholder; and (4) such other factors as the Board may deem necessary or appropriate," *id.* § 1665d(c).

Congress also authorized the Federal Reserve to set a safe harbor amount—again for "penalty fee[s]"—"that is presumed to be reasonable and proportional to the omission or violation to which the fee or charge relates." *Id.* § 1665d(e).

### B.     The Federal Reserve Board's Rulemaking

The Federal Reserve implemented the relevant provision of the CARD Act in Regulation Z, establishing (1) a safe harbor amount for late fees based on all three criteria and (2) a standard for amounts exceeding the safe harbor based solely on cost. *See* Truth in Lending, 75 Fed. Reg. 37526 (June 29, 2010).

The Federal Reserve concluded that the best means of taking into account all of the statutory criteria, including issuer costs as well as deterrence and consumer conduct, was to establish a safe-harbor maximum of $25, and $35 for subsequent late fees within the next six billing cycles, adjusted annually for inflation to account for "changes in issuers' costs and the deterrent effect of the safe harbor amounts." *Id.* at 37543, 37572 (codified at 12 C.F.R. § 226.52(b)(1)(ii)(A)-(B), now codified in 12 C.F.R. Part 1026); *id.* at 37533 ("the Board has revised the safe harbors in proposed § 226.52(b)(3) to better address concerns regarding deterrence and adopted those safe harbors in § 226.52(b)(1)(ii)"); *id.* ("the safe harbors in § 226.52(b)(1)(ii) address consumer conduct . . .," the third statutory criteria). The Federal Reserve had considered alternative standards, including a provision that would have deemed a penalty fee reasonable and proportional "if the card issuer had determined that the

dollar amount of the fee was reasonably necessary to deter that type of violation using an empirically derived, demonstrably and statistically sound model that reasonably estimated the effect of the amount of the fee on the frequency of violations." *Id*. at 37532. But the Federal Reserve ultimately concluded that its proposal would "not provide card issuers with a meaningful ability to base penalty fees on deterrence," whereas the safe harbors would take deterrence into account while providing clarity and consistency. *Id*. at 37533. Similarly, the safe harbor addressed consumer conduct "by allowing issuers to impose higher penalty fees on consumers who violate the terms or other requirements of an account multiple times, while limiting the amount of the penalty fee for a consumer who engages in a single violation" and capping any penalty fee at the dollar amount associated with the violation. *Id*. at 37533-34. Finally, the Federal Reserve believed that the amounts would "be generally sufficient to cover issuers' costs." *Id*. at 37532.

The Federal Reserve's costs-based standard for penalty fees exceeding the safe harbor did not provide a mechanism for card issuers to account for deterrence or consumer conduct. Rather, an issuer could proceed outside the safe harbor and impose a higher fee only if the issuer "has determined that the dollar amount of the fee represents a reasonable proportion of the total costs incurred by the card issuer as a result of [the late payment]." *Id*. at 37536, 37571 (codified at 12 C.F.R. §

226.52(b)(1)(i)). The Federal Reserve required the issuer to revisit that determination annually. *Id*.

Soon after the Federal Reserve promulgated Regulation Z, Congress reassigned the responsibility to regulate late fees to the newly created CFPB. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, §§ 1061(b)(1)(B), 1100A(2), 124 Stat. 1376, 2036, 2107 (2010). Congress required that the CFPB, when promulgating a rule, consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule." 12 U.S.C. § 5512(b)(2)(A)(i).

The CFPB adopted the Federal Reserve's earlier regulations, without revision or criticism, and maintained those regulations for ten years, across multiple administrations. *See* Truth in Lending (Regulation Z), 76 Fed. Reg. 79768 (Dec. 22, 2011) (interim final rule); 81 Fed. Reg. 25323 (Apr. 28, 2016) (finalizing the 2011 interim final rules, subject to any intervening final rules published by the Bureau); Credit Card Penalty Fees (Regulation Z), 88 Fed. Reg. at 18908. From 2010 through 2023, the CFPB adjusted the regulations for inflation eight times, having currently set them at $30 for a first violation and $41 for subsequent violations within six billing cycles. 88 Fed. Reg. at 18906.

## II.    The CFPB's New Rule

The CFPB's Final Rule reduces the late-fee safe harbor applicable to larger card issuers to $8, both for first and subsequent late payments, and no longer adjusts this amount for inflation. *See* 89 Fed. Reg. at 19128. The Final Rule defines larger card issuers as those who, along with their affiliates, had at least one million open credit card accounts in the previous calendar year. *Id.* This encompasses credit card issuers representing an estimated 95 percent of the market. *Id.* at 19144. For larger card issuers who choose to set late fees above the $8 safe harbor using the cost-based standard, the Final Rule prohibits them from including post-charge-off collection costs in setting those fees—that is, costs incurred after a debt is treated as a loss.

In selecting $8 for the reduced safe harbor, the CFPB stated that the amount will "cover pre-charge-off collection costs for Larger Card Issuers on average." *Id.* at 19162. It further suggested that issuers could mitigate the harm from the lower safe harbor by increasing "other prices," such as interest rates, "account maintenance fee[s]," or "other card terms." *Id.* at 19198.

The Final Rule was published in the Federal Register on March 15, 2024, and becomes effective 60 days later, on May 14, 2024. Under TILA, the effective date should be at least six months after promulgation, because any CFPB rules requiring disclosures different from those previously required "shall have an effective date of that October 1 which follows by at least six months the date of promulgation." 15

11

U.S.C. § 1604(d). Therefore, the Final Rule—published in the Federal Register on March 15, 2024—should not be effective until October 1, 2024. The May 14 effective date deprives issuers of more than four months of statutorily mandated time to come into compliance with the Final Rule. It also gives issuers limited time to conduct a cost-based analysis to justify late fees higher than $8, effectively forcing many issuers into the new safe harbor at least temporarily. *See* 89 Fed. Reg. at 19188 (explaining that larger card issuers choosing to use the cost-analysis provisions must do so by the Rule's effective date or, alternatively, adopt the $8 safe harbor amount while separately conducting a cost analysis).

The Final Rule recognizes that issuers will face substantial harm. For example, the Final Rule provides no fewer than ten pages of several sample forms that issuers will need to revise, print, and distribute. 89 Fed. Reg. at 19203-13. It also estimates that issuers will lose fee revenue between $5 and $9 billion. 89 Fed. Reg. at 19194.

### III.    This Case's Procedural History and the CFPB's Attempts to Delay a Ruling on the Merits

On March 5, two days before President Biden's State of the Union address and the corresponding one-year anniversary of the President's promise to reduce late fees "by 75%," the CFPB announced the Final Rule. *See* CFPB, *CFPB Bans Excessive Credit Card Late Fees, Lowers Typical Fee from $32 to $8* (Mar. 5, 2024),

https://www.consumerfinance.gov/about-us/newsroom/cfpb-bans-excessive-credit-card-late-fees-lowers-typical-fee-from-32-to-8/ [https://perma.cc/2ZX6-ASL4].

On March 7, Plaintiffs promptly filed suit and moved for a preliminary injunction, requesting an expedited ruling. ROA.6, 60-62. Plaintiffs decided not to request a temporary restraining order out of consideration for district court resources, but requested expedited briefing and a decision within ten days (by March 17). ROA.70. They explained that the process of designing, printing, and distributing new disclosures had to begin immediately, as it typically takes four months when done on an issuer-by-issuer basis and would take much longer with issuers representing 95 percent of the affected accounts forced to act at once. *See* ROA.88-91. The next day, Judge O'Connor granted Plaintiffs' motion for expedited briefing for "good cause" and set a briefing schedule that concluded on March 14. ROA.202. Judge O'Connor then recused himself on March 14, and Judge Mark Pittman was assigned to the case. ROA.10.

In that expedited briefing, the CFPB did not contest likelihood of success on the merits for the Plaintiffs' Appropriations Clause claim and did not contest irreparable harm. ROA.257-89. Instead, the CFPB argued that Plaintiffs could not show a likelihood of success because venue was improper in Fort Worth (despite the case being brought by the Fort Worth Chamber of Commerce) and that the balance of equities did not favor a preliminary injunction.

On March 18, four days after the preliminary-injunction motion was fully briefed, Judge Pittman issued an order inviting the CFPB to file a motion for discretionary transfer under 28 U.S.C. § 1404(a) and setting a briefing schedule on venue that would continue over a week. ROA.11-12, 362-63. The CFPB gave notice on March 19 of its intention to file such a motion. ROA.11, 364-66.

In light of the accruing irreparable harm and concern that a transfer would both cause additional irreparable harm and deny Plaintiffs' appellate review in this Court, on March 19 Plaintiffs filed a motion for expedited consideration of their preliminary-injunction motion, asking the district court to resolve that motion before considering any discretionary transfer and in all events by Friday, March 22, so as not to effectively deny relief. ROA.367-69, 387. Plaintiffs further requested that, if the court denied their motion, it issue an injunction pending appeal. *Id*. Plaintiffs explained that because venue is proper in the Fort Worth Division, any question of discretionary transfer did not go to the propriety of injunctive relief. Plaintiffs further noted that, although they had presented other claims in their motion, the court could grant an injunction by relying solely on this Court's binding precedent regarding the Appropriations Clause and Plaintiffs' uncontested showing of irreparable harm. The district court denied that motion, citing its demanding docket and not addressing the harms cited by Plaintiffs. ROA.395-96.

That same day, the CFPB filed a motion to transfer the case to the U.S. District Court for the District of Columbia. ROA.397-98. Plaintiffs opposed that motion on March 25 and, simultaneously, filed a notice of appeal in this court because the district court had not yet ruled on the fully-briefed motion for a preliminary injunction. ROA.494-98. Plaintiffs also filed a motion for an injunction pending appeal and administrative stay on March 25 due to the ongoing (and increasing) irreparable harm their members faced. ECF No. 7. Before the CFPB was due to file its response to that motion in this Court, the district court granted the CFPB's motion to transfer and electronically transferred the case. ROA.528, 560-66.

Plaintiffs then petitioned for emergency mandamus relief ordering the district court to reopen this case and/or request that this case be transferred back to Fort Worth from the District of Columbia. Emergency Pet. for Writ of Mandamus & Administrative Stay, *In re Chamber of Commerce*, No. 24-10266 (Mar. 29, 2024), ECF No. 5. This Court granted the petition for mandamus, ordering the case to return to the district court. *In re Chamber*, No. 24-10266, slip op. at 13. In so ruling, this Court held that "the district court effectively denied the Chamber's motion for a preliminary injunction by not promptly ruling on it," *id.* at 9; that this effective denial was "properly before" the court on appeal, *id.* at 13; and that the district court

therefore lacked jurisdiction to transfer the case, *id*.[2] The district court reopened the case and provided notice to the District of Columbia court that its transfer order "was without jurisdiction and should be disregarded." *Chamber of Commerce v. CFPB*, No. 24-cv-213 (N.D. Tex. Apr. 8, 2024), ECF No. 71. The District of Columbia court subsequently closed the case on its docket. *See* Minute Order, *Chamber of Commerce v. CFPB*, No. 1:24-cv-00915 (D.D.C. Apr. 10, 2024).

While this Court was considering Plaintiffs' mandamus petition, Plaintiffs' motion for an injunction pending appeal in this Court became fully briefed, as of March 29, and remains pending.

## SUMMARY OF ARGUMENT

The district court should have granted Plaintiffs' motion for a preliminary injunction, which easily satisfies all four preliminary injunction factors.

**I.  Likelihood of Success on the Merits.** Plaintiffs have a strong likelihood of success on each of the claims presented in their motion for a preliminary injunction.

**A.**  First, this Court has already ruled that the CFPB's funding structure, which draws funds from the Federal Reserve without congressional appropriation, violates the Appropriations Clause. *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th

---

[2] On April 18, 2024, the CFPB filed a petition for panel rehearing on this Court's decision granting mandamus. The following day, this Court requested that Plaintiffs file a response by April 29, 2024.

616, 635-42 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 978 (2023). The CFPB has not contested in the district court or in their response to Plaintiffs' pending motion for an injunction pending appeal that the Final Rule was funded through the same means as the rule at issue in *Community Financial*. *See* 51 F.4th at 638 n.11 (establishing that the CFPB has no other funding source for promulgating regulations); ROA.264. Nor have they contested in any briefing to date that Plaintiffs are not likely to succeed on the merits of this claim.

**B.**  Second, the CFPB exceeded its statutory authority under the CARD Act. *See* 5 U.S.C. § 706(2)(A) & (C). Congress expressly denominated a late fee a "penalty fee" for a "violation," which is by its plain meaning a fee that deters cardholders from paying late and accounts for the conduct of the violation. Indeed, Congress enumerated precisely these criteria when directing the agency to establish standards for assessing whether the amount of any penalty fee is reasonable and proportional to the violation. 15 U.S.C. § 1665d(c) (requiring the CFPB to consider not only the "cost incurred by the creditor from [an] omission or [a] violation" of the cardholder agreement, but also "deterrence of such omission or violation by the cardholder" and "conduct of the cardholder"). Yet the CFPB's Final Rule allows issuers to collect only much lower fees to recoup issuers' costs from late payments.

Compounding this problem, the CFPB restricted the term "costs" to include only "pre-charge-off collection costs." This not only affected the safe harbor amount

that the CFPB selected, but also limits issuers' ability to justify a higher fee under the alternative, cost-based standard. There is no basis in the statute to distinguish between pre- and post-charge-off collection costs, and until the Final Rule, neither the Federal Reserve nor the CFPB had ever done so.

**C.**    Third, the Final Rule's 60-day effective date violates TILA, which mandates that rules requiring new disclosures to consumers "shall have an effective date of that October 1 which follows by at least six months the date of promulgation." 15 U.S.C. § 1604(d). The CFPB acknowledges that issuers representing an estimated 95 percent of open credit card accounts will need to change their late fees in response to the Final Rule, and that they will likewise need to change their disclosures (in applications, card agreements, statements, and customer education materials). *See* 89 Fed. Reg. at 19198 ("Larger Card Issuers would have 60 days to delete the existing late fee figure in their disclosures and replace it with $8 or another number computed using the cost analysis provisions, and this change would only have to appear on disclosures mailed or delivered to consumers 60 days after publication of this final rule in the Federal Register."). Yet the CFPB blithely set a 60-day effective date, depriving issuers of more than four months of time required by statute.

**II.  Irreparable Harm.** Plaintiffs have established that the Final Rule will cause their members irreparable harm, and that this harm is increasing exponentially

as the May 14 effective date approaches. Indeed, the CFPB did not even contest irreparable harm in its opposition to Plaintiffs' motion for a preliminary injunction or in its opposition to Plaintiffs' motion for an injunction pending appeal. This was for good reason.

The Final Rule goes into effect on May 14. It imposes six types of irreparable harm on Plaintiffs' members, one of which is already occurring before the effective date, and all of which are discussed in more detail below. *Infra* 41-51.

First, issuers are already incurring substantial costs to come into compliance with the Final Rule, and those costs are rapidly escalating with each passing day. Issuers must act immediately to update their applications, marketing materials, and disclosures for millions of existing and prospective credit card accounts, as evidenced by the myriad sample forms accompanying the CFPB's Final Rule, 89 Fed. Reg. at 19203-12. They must do all of this sufficiently in advance of May 14 to ensure that there is time to mail disclosures by May 14, as well as to physically send materials to "hundreds of thousands of merchant locations" for distribution to customers by that date. ROA.153. On top of all that, issuers must make system changes, conduct quality and assurance checks, and train customer-facing representatives, compliance officers, and other staff. ROA.153. If the Final Rule goes into effect for even one day, only to be enjoined at a later date, issuers wishing to revert to their prior late fees must create entirely new disclosure materials (with

45 days' notice to consumers), resulting in even more unrecoverable costs. *See* 12 C.F.R. § 1026.9(c)(iii)(2).

Second, if preliminary relief is not granted before the Final Rule goes into effect, issuers will suffer substantial lost revenue. And even if the Final Rule is quickly enjoined after the effective date, issuers that wish to revert to their prior late fees cannot do so until they create new disclosure materials and provide 45 days' notice—all while lost revenues continue to mount.

Third, issuers that cannot come into compliance by the Rule's effective date will risk civil enforcement actions and unrecoverable penalties, as well as private litigation. Despite the best efforts of issuers to comply with the Final Rule, errors are inevitable given that they must rush compliance efforts across multiple channels on an unrealistic timeline.

Fourth, the Rule will make consumers more likely to pay late, which will increase costs to issuers and may lead to higher costs for all consumers.

Fifth, issuers will lose money on existing accounts that they never would have opened if they were limited to (or had anticipated) an $8 late fee.

And finally, issuers face the prospect of losing customer goodwill from needing to change other terms, or from the yo-yo effect if issuers are forced into the dramatically reduced safe harbor but are later able to raise late fees again in response to an order enjoining or vacating the Final Rule, or through annual cost analyses.

**III.  Balance of the Equities.** The equities favor a preliminary injunction. "[T]he maintenance of the status quo is an important consideration in granting a stay." *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021) (citation omitted). The harms to Plaintiffs' members will be substantial, while the harms to the CFPB in delaying the effective date of its rulemaking are negligible. In addition, The CFPB itself acknowledges that cardholders who pay on time may in fact be harmed by the Final Rule. 89 Fed. Reg. at 19144. The existing framework has been in place for more than a decade, supported by CFPB directors across administrations, and is well-understood by the American people.

## STANDARD OF REVIEW

In deciding a motion for a preliminary injunction, a district court considers four factors: (1) a substantial threat of irreparable harm to the movant absent the injunction, (2) the likelihood of the movant's ultimate success on the merits, (3) the balance of harms to the parties, and (4) the public interest. *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023).

This Court reviews a district court's denial of a preliminary injunction for abuse of discretion, reviewing factual findings for clear error and legal conclusions de novo. *Id*. "A district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996).

## ARGUMENT

Plaintiffs satisfy all four of the preliminary-injunction factors. They are likely to succeed on the merits of their constitutional and statutory claims—indeed, the CFPB concedes that binding precedent compels that conclusion for Plaintiffs' constitutional claim. The CFPB also does not meaningfully contest Plaintiffs' showing of irreparable harm. And the final two factors—the balance of the equities—clearly favor Plaintiffs because the Final Rule upends over a decade of precedent.

## I.      Plaintiffs are likely to succeed on the merits of their claims.

Plaintiffs are likely to succeed on both their constitutional and statutory claims. The CFPB, as it admits, issued this Final Rule in the shadow of precedent from this Court holding that the CFPB's funding structure, which draws funds from the Federal Reserve without congressional appropriation, violates the Appropriations Clause.

In addition, the CFPB violated the CARD Act by effectively jettisoning two of the criteria that Congress directed it to consider and focusing solely on a subset of the costs that issuers incur as a result of late payments. And it imposed a 60-day effective date that is not only unworkable for credit card issuers, but violates TILA's provision that any rules "requiring any disclosure which differs from the disclosures previously required by this part . . . shall have an effective date of that October 1

which follows by at least six months the date of promulgation." 15 U.S.C. § 1604(d),

Accordingly, the Final Rule plainly exceeds the CFPB's statutory authority.

### A.    The CFPB promulgated the Final Rule with funds drawn in violation of the Appropriations Clause.

This Court has ruled that the CFPB's funding structure, through which the

agency draws funds from the Federal Reserve without congressional appropriation,

violates the Appropriations Clause. *See Community Financial*, 51 F.4th at 635-42.

When the CFPB funds a rulemaking through this unconstitutional mechanism, a

plaintiff challenging the rule is entitled to have it set aside. *Id.* at 643.

The rulemaking in the instant case appears to have been funded through the

same mechanism as the rule in *Community Financial*. *See id.* at 638 n.11

(establishing that the CFPB has no other funding source for rulemakings); CFPB,

Financial Report of the Consumer Financial Protection Bureau, Fiscal Year 2022, at

74-76 (Nov. 15, 2022), https://files.consumerfinance.gov/f/documents/

cfpb_financial-report_fy2022.pdf (making clear that only funds transferred from the

Federal Reserve may be used for the CFPB's regulatory operations)

[https://perma.cc/XA5J-DYGM]. Indeed, the CFPB itself has conceded that

*Community Financial* controls in this case. *See* ROA.264 n.1 ("[T]he Bureau

recognizes that this Court is presently bound by the decision in [*Community*

*Financial*]."). And by its own admission, the CFPB's only defense is that

*Community Financial* "is mistaken." *See id.* Therefore, barring a contrary decision

from the Supreme Court, Plaintiffs are likely to succeed on the merits of their constitutional claim.

**B.     The Final Rule violates the CARD Act and TILA.**

Plaintiffs are also likely to succeed on the merits of their statutory claims. Under the Administrative Procedure Act ("APA"), a court "shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA further directs that an agency action must be vacated if it is "in excess of statutory jurisdiction, authority, or limitations." *Id.* § 706(2)(C). Here, the CFPB's Final Rule rests on an unlawful interpretation of the CARD Act and has an effective date that violates TILA.

**1.     The Final Rule Violates the CARD Act.**

"[A]gencies are creatures of statute" and "possess only the authority that Congress has provided." *NFIB v. OSHA*, 595 U.S. 109, 117 (2022). The "best evidence" of Congress's intent is the statutory text. *NFIB v. Sebelius*, 567 U.S. 519, 544 (2012). Here, Congress authorized issuers to collect a "penalty fee" that is "reasonable and proportional to [an] omission or [a] violation" of the cardholder agreement, and it allowed the CFPB to create a safe harbor for such a "penalty fee." 15 U.S.C. § 1665d. The CFPB's Final Rule is inconsistent with that statutory text in three ways.

24

**a.    The Final Rule misconstrues a "penalty fee" for the "violation of the cardholder agreement."**

First, the Final Rule does not allow issuers to collect a reasonable and proportional "penalty fee" for the violation of paying late. Congress expressly denominated a late fee a "penalty fee" for a "violation." *Id.* A "penalty fee" is not solely compensatory, but more akin to special damages that aim to deter violations and address cardholder conduct. *See Tull v. United States*, 481 U.S. 412, 422-23 (1987) (discussing how civil penalties should consider conduct and deterrence); *Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*, 944 F.2d 940, 947 (D.C. Cir. 1991) ("A fine or penalty, in contrast, is not understood to be dollar-for-dollar recompense. Rather, it is a pecuniary form of punishment for the commission of an act society finds repugnant and seeks to deter."); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) ("By contrast [to compensatory damages], punitive damages serve a broader function; they are aimed at deterrence and retribution."). By its plain meaning, the term Congress used to describe a credit card late fee encompasses more than issuer costs.

Congress' enumeration of statutory criteria for the CFPB confirms that a "penalty fee" is not a "cost fee." In identifying the factors relevant to assessing the reasonableness and proportionality of such a fee, Congress specifically listed not only the "cost incurred by the creditor from [an] omission or [a] violation" of the

cardholder agreement, but also "deterrence of such omission or violation by the cardholder" and "the conduct of the cardholder." 15 U.S.C. § 1665d(c).

Indeed, the very same Congress that enacted the CARD Act expressly directed a *different* agency to focus exclusively on cost to determine whether a *different* fee is reasonable and proportional. In the Durbin Amendment, Congress provided that "[t]he amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be *reasonable and proportional to the cost incurred by the issuer with respect to the transaction*." 15 U.S.C. § 1693o-2(a)(2) (emphasis added); *see also* 51 U.S.C. § 60125(a) ("The Secretary … may license such system if it meets all conditions of this subchapter and (1) the system operator agrees to reimburse the Government in a timely manner for all related costs incurred with respect to such utilization, including a reasonable and proportionate share of fixed, platform, data transmission, and launch costs . . . .") (also enacted by the 111th Congress). That same Congress used different language in the provision relevant here, directing the CFPB to set a standard for credit card late fees that ensures they are "reasonable and proportional to the violation or omission," requiring that the CFPB consider deterrence and cardholder conduct in addition to cost. This context confirms that, to Congress, a "penalty fee" is not a "cost fee." *See NFIB v. Sebelius*, 567 U.S. at 544 ("Where Congress uses certain language in one part of a statute and different language in another, it is generally presumed that

Congress acts intentionally."). Had Congress wanted credit card late fees to be based solely on costs, it could have done just that.

Notably, Congress also considered but declined to enact an earlier version of the CARD Act, which would have authorized late fees "reasonably related *to the cost* to the card issuer of such omission or violation." Credit Card Accountability Responsibility and Disclosure Act of 2009, S. 414, 111th Cong. § 103 (as reported by S. Comm. on Banking, Hous., & Urb. Affs., Apr. 29, 2009) (emphasis added) (providing that "the amount of any fee or charge that a card issuer may impose in connection with any omission with respect to, or violation of, the cardholder agreement, including any late payment fee, . . . shall be reasonably related to the cost to the card issuer of such omission or violation"). It would be surprising if the agency could take the position that the enacted statutory text has the same meaning as the rejected statutory text. *See, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 147-48 (2000).

The statutory text and context is thus clear: Congress intended to authorize issuers to collect a "penalty fee" that is reasonable and proportional to the violation. A penalty fee must, by its nature, deter the violation, account for the conduct of the violation, and compensate the issuer for costs incurred as a result of the violation. That conclusion is not only dictated by the statute that Congress enacted, but it is logical. Penalty fees encourage timely payment and responsible credit use, without

which banks cannot engage responsibly in credit card lending. Indeed, paying at least the minimum payment on a credit card at the time prescribed for doing so is at the core of a cardholder's responsibilities. Issuers would not extend credit if they did not reasonably expect to be repaid in accordance with their cardholder agreements. Nor would Congress have permitted issuers to collect penalty fees for violations of those agreements if they did not agree that such violations merited a penalty.

Yet, despite the CARD Act's mandate, the Final Rule does not allow issuers to collect such penalty fees. Instead, the Final Rule allows only much lower fees to recoup (a subset of) the cost issuers incur as a result of late payments. Specifically, the CFPB lowered the safe harbor to $8 because it believed that amount would "cover pre-charge-off collection costs for Larger Card Issuers on average." 89 Fed. Reg. at 19162. This implicit substitution of "cost fee" for "penalty fee" was intentional: the CFPB explicitly states that its new rule includes a "safe harbor amount set based on costs," that "costs are the best guide to what constitutes a 'reasonable and proportional' fee" and, indeed, that the other factors of "deterrence and consumer conduct" can only "help corroborate a safe harbor amount set based on costs." *Id.*

In asserting that "the cost factor deserves the most weight of th[e statutory] factors in setting the precise late fee safe harbor amount because it is most closely correlated to the consequences to the issuer of a consumer's late payment," *id*., the

CFPB ignores Congress's express decision otherwise. Congress authorized card issuers to continue charging reasonable and proportional "penalty fee[s]" for violations of a cardholder agreement, and it directed the CFPB to consider not just the costs incurred by issuers, but also the deterrence of violations and the conduct of the cardholder when setting standards to assess the reasonableness and proportionality of a fee to the violation. *See* 15 U.S.C. § 1665d(a)-(c). That broader focus demonstrates that, regardless of the CFPB's own view on the matter, Congress thought the consequences to the issuer were not the only relevant factor in assessing fees but rather that violating a cardholder agreement is conduct that should be deterred and reasonably could generate a penalty.

The CFPB contends that the three statutory factors—costs, deterrence, and cardholder conduct—apply only to the reasonable-and-proportional standard that it was "required" to promulgate, not to its optional safe harbor. *See* 89 Fed. Reg. at 19162. But any safe harbor that is "presumed to be reasonable and proportional to the omission or violation to which the fee or charge relates" must still comport with the factors enumerated by Congress, or the safe harbor would be inconsistent with Congress's own understanding of what it means for a "penalty fee" to be "reasonable and proportional." 15 U.S.C. § 1665d(e); *see also Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014) (citation omitted) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). It

would be nonsensical for the CFPB to consider these factors when setting a standard only to disregard them when deciding which fees presumptively meet it. And here, the CFPB writes against the backdrop of a "standard" that is solely cost-based and relies upon the safe harbor to reflect the other statutory criteria. Thus, even if the CFPB could have decided against providing any safe harbor ab initio, it could not have adopted one like that adopted here. The $8 safe harbor was not calculated to be a presumptively reasonable penalty fee related to the violation of paying late, and it thus falls outside the CFPB's statutory authority to create the safe harbor. That renders the entire regulatory scheme outside of the agency's authority to prescribe "standards" for reasonable and proportional penalties in the first place.

To be sure, the CFPB did discuss deterrence in setting the new safe harbor: it claimed that lowering the safe harbor would not wholly undermine any deterrent effect of late fees, although it may diminish its effect by an indeterminate amount. *See* 89 Fed. Reg. at 19162. But asserting that the promulgated safe harbor has a nonzero deterrent effect does not satisfy the mandate of the CARD Act. A fee of even one cent would arguably meet a nonzero deterrence test, but the CARD Act expressly authorizes issuers to charge a "penalty fee" that is reasonable and proportional to the violation, which necessarily is one that has a *meaningful* deterrent effect and incentivizes on-time payment and responsible use of credit. The CFPB thus was required to ensure that the rule allows issuers to charge fees that have a

meaningful deterrent effect, and it is clear from the Final Rule that the CFPB did not even attempt to meet that requirement. The CFPB's contrary reading of its authority to limit the deterrent effect of late fees violates "one of the most basic interpretive canons, that [a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (citation omitted).

The CFPB's flawed statutory interpretation is similarly evident in its treatment of repeated late payments. The statute ties reasonableness and proportionality to the *violation,* not merely to costs. Thus, as the Federal Reserve and the CFPB have recognized for more than a decade, repeated violations within a six-month period reflect higher-risk cardholder conduct, and a higher "penalty fee" for subsequent late payments is accordingly "reasonable and proportional." 89 Fed. Reg. at 19150. Yet the CFPB abandoned that settled approach in favor of the myopic view that the agency must consider the cost to the issuer above all else. *See* 89 Fed. Reg. at 19157.

To the extent the CFPB considered consumer conduct, it did so only with respect to credit risk. *See, e.g.*, 89 Fed. Reg. at 19168 ("[I]t is not clear that multiple violations during a relatively short period are associated with increased credit risk and thus reflect a more serious consumer violation."). But that position finds no footing in the text of the CARD Act. Congress thought that penalty fees could

appropriately be charged for violations of the cardholder agreement, regardless of the relationship between those violations and credit risk. *See* 15 U.S.C. § 1665d.

A fair reading of the Final Rule suggests that the CFPB simply disagrees with Congress's determination that penalty fees are appropriate for late payments. The Final Rule repeatedly recognizes that consumers are already paying late a significant amount of the time, *see* 89 Fed. Reg. at 19131, and that "consumers may engage in more late payments when they are less costly to consumers," *id.* at 19163. But rather than use that information to craft reasonable and appropriate safe-harbor amounts, the CFPB emphasizes instead the "additional flexibility that a lower late fee will afford" to consumers who pay late. *Id.* at 19194. That policy judgment directly contravenes the one Congress made in enacting the CARD Act.

The CFPB's apparent disagreement with Congress is also evident in the CFPB's consideration of the relationship between the safe harbor and the alternative cost-based standard. The CFPB reasoned that, if the safe harbor amount is too low, issuers could rely on the cost-based standard to implement late fees outside of the safe harbor. Indeed, the CFPB expressly stated that if a court were to enjoin or vacate its $8 safe harbor, it would seek to treat its repeal of the existing safe harbor amount separately, leaving issuers with only the pared-down version of the cost-based standard to set late fees. *See* 89 Fed. Reg. at 19156. But that position *still* disregards the statutory mandate that issuers be allowed to recover "penalty fees" that are

reasonable and proportional to the violation, taking into account deterrence, cardholder conduct, and costs. The record is clear that the Federal Reserve adopted the existing cost-based standard only because the safe harbor captured some of the statutory criteria that the cost-based analysis did not. *See* 75 Fed. Reg. at 37533. The CFPB cannot ignore how these provisions interact, especially when the result is to prohibit issuers from collecting the very fees that the CARD Act protects.

Moreover, the CFPB's expedited timeline effectively renders the cost-based approach under the Final Rule a non-option. Sixty days is not enough time to perform the necessary cost analyses to justify a higher fee and make any required changes to disclosures. As a result, the CFPB has all but guaranteed that issuers will have to at least temporarily transition to a new $8 late fee under the safe harbor. Indeed, the CFPB said as much in the Final Rule. *E.g.*, 88 Fed. Reg. at 18919.

That the CFPB exempted what it defined as "Smaller Card Issuers" from the new safe harbor only confirms the problems with the Final Rule. The CFPB justified this exemption on the ground that "Smaller Card Issuers may face additional challenges in recouping pre-charge off collection costs using late fees," particularly because of the burdens posed by the alternative cost-based standard. 89 Fed. Reg. at 19144. While Plaintiffs certainly agree that the CFPB's proposal would impose significant and unjustified burdens on smaller issuers, there is little reason to think that whether a "penalty fee" is reasonable and proportional to the violation of paying

33

late differs depending on whether one obtains a credit card from an issuer with fewer or more than one million open credit card accounts. Even recognizing that smaller issuers have some differences in their ability to recoup costs due to different economies of scale, the statutory language is keyed to the violation, not solely to costs. Nothing in the CARD Act suggests that the CFPB is authorized to maintain standards for penalty fees that account for all of the penalty factors for one subset of issuers but not for another.

In sum, the CFPB's rulemaking is a striking departure from the statutory text of the CARD Act and the policy judgment Congress made in enacting it.

### b.     The Final Rule misconstrues "costs."

Second, the CFPB restricted its already blinkered focus on costs to "pre-charge-off collection costs," both in the cost-based standard (that the CFPB purports to merely "clarify") and in setting the new safe harbor. This is at odds with the statutory text and marks a shift from the existing regulatory regime.

The CARD Act requires the agency to consider, among other things, "the cost incurred by the creditor from such omission or violation" of the cardholder agreement, which the Federal Reserve interpreted in 2010 to exclude "losses" but to include the "total costs incurred by the card issuer as a result of that type of violation." 12 C.F.R. § 226.52(b)(1)(i). The Federal Reserve recognized that "collections generally continue after the account has been charged off" so that "an

account that has been charged off is not necessarily a total loss." 75 Fed. Reg. at 37538 n.35. Thus, the Federal Reserve allowed issuers to consider "the collection of late payments" as part of their costs. *Id.* at 37586. Now, the CFPB arbitrarily limits card issuers to considering only "pre-charge-off collection costs."

There is no basis in the statutory text to distinguish between these types of costs, and the CFPB's rationale for doing so—that "post-charge-off collection costs" are "related to mitigating a loss," 89 Fed. Reg. at 19135—makes little sense because post-charge-off collection costs arise from the late payment. Indeed, Congress knew how to direct an agency to distinguish among types of costs, and it did so in Dodd-Frank. *See* 15 U.S.C. §§ 1693o-2(a)(3)(A), (4)(B)(i)-(ii) (directing the Federal Reserve to "distinguish between (i) the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered . . . ; and (ii) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered"). Congress chose not to do so when directing the CFPB to promulgate this late-fee standard.

The CFPB's claim that this change is nothing more than a "clarification" of the Federal Reserve's prior regulation is incorrect. Limiting issuers to post-charge-off collection costs materially changes the relevant rules for late fees. And agencies must both acknowledge a departure from a prior rule, *FCC v. Fox Television*

35

*Stations, Inc.*, 556 U.S. 502, 515 (2009), and interpret their own regulations reasonably, *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). The CFPB cannot satisfy its APA obligations by sleight of hand, and its attempt to do so infects the entire Final Rule. The new limitation permeates the cost-based standard and improperly reduces the safe harbor amount.

### 2.    The Final Rule violates TILA's timing requirements.

Finally, TILA required the CFPB to provide issuers with at least six months to come into compliance with the Final Rule. Instead, the CFPB forced issuers to rush to compliance within 60 days.

TILA's six-month timeframe is designed to provide issuers with sufficient time to "adjust their forms to accommodate new requirements." 15 U.S.C. § 1604(d). The relevant statutory provision states:

> Any regulation of the [CFPB], or any amendment or interpretation thereof, requiring any disclosure which differs from the disclosures previously required by this part, part D, or part E of this subchapter or by any regulation of the [CFPB] promulgated thereunder shall have an effective date of that October 1 which follows by at least six months the date of promulgation . . . .

*Id.*

Therefore, the CFPB must allow at least six months for issuers to comply with rules requiring new or different disclosures, such as the Final Rule. The CFPB substantially curtailed that period by making the Final Rule effective on May 14,

2024, a mere 60 days after its publication in the Federal Register on March 15, 2024. The Final Rule thus violates TILA, which directs that the Rule should not be effective for another four-and-a-half months, until October 1, 2024, to allow sufficient time for issuers to come into compliance. *See* 15 U.S.C. § 1604(d).

The CFPB's circumvention of TILA has significant implications for issuers. The CFPB acknowledges that issuers representing an estimated 95 percent of open credit card accounts will need to change their late fees in response to the Final Rule, and that they will likewise need to change their disclosures (in applications, card agreements, statements, and customer education materials). *See* 89 Fed. Reg. at 19189 ("Larger Card Issuers would have 60 days to delete the existing late fee figure in their disclosures and replace it with $8 or another number computed using the cost analysis provisions, and this change would only have to appear on disclosures mailed or delivered to consumers 60 days after publication of this final rule in the Federal Register."). Further, because the Final Rule changes the safe harbor amount and does not allow sufficient time for issuers to complete a cost analysis that would justify a higher fee, card issuers that seek to rely on the alternative cost-based standard will be forced to go to $8 initially and then send *another set* of updated disclosures with any new late fee amount once a cost calculation can be performed. As a result, *all* issuers—those intending to adopt the safe harbor going forward and those intending

to eventually complete a cost analysis to justify the imposition of higher fee—must, by the CFPB's own admission, update their disclosures.

None of the CFPB's arguments for excusing itself from its obligations under TILA is persuasive. The CFPB's first argument is that changing the amount of the late fee does not alter the general disclosure requirements for late fees, so TILA's effective date provision does not apply. *See* 89 Fed. Reg. at 19189. But that ignores the plain meaning of the TILA provision at issue, which requires the Federal Reserve to give an effective date of October 1 at least six months after promulgation of *any* regulation "requiring any disclosure which differs from the disclosures previously required" by a CFPB regulation. 15 U.S.C. § 1604(d). CFPB regulations indisputably require disclosure of late fees. *See* 12 C.F.R. § 1026.5(c). And the statutory context clearly indicates that regulations requiring issuers to alter the amount of specific fees in required disclosures would qualify. *See, e.g.*, 15 U.S.C. § 1602(v) (defining the more specific term "material disclosures" to include specific aspects of disclosures like "the annual percentage rate" and "the amount of the finance charge" and "the number and amount of payments").

The CFPB's second argument is that card issuers occasionally update their disclosures in response to annual inflation adjustments before October 1. This point is even less persuasive. The October 1 date is not set as a date that *issuers* are required to follow, but rather one that the *CFPB* must follow to give issuers sufficient

38

time to adjust their disclosures—particularly where, as here, the CFPB requires issuers to dramatically lower late fee amounts. It is beside the point that some issuers may be capable of updating their disclosures sooner when there is not an industry-wide requirement and deadline to do so. In addition, Plaintiffs submitted a sworn declaration explaining that, when it comes to annual inflation adjustments, issuers are often able to predict the new safe harbor amount that the CFPB will adopt and begin preparation prior to its announcement. ROA.489.

Finally, the CFPB argues that the safe harbor is optional, so TILA's October 1 effective date does not apply. But, in making this argument, the CFPB ignores the realities of the Final Rule. The CFPB has admitted that issuers representing the vast majority of the open credit card accounts in this country will be required to adjust their disclosures for such accounts in light of the Final Rule, whether that is because they adopt the optional reduced safe-harbor amount *or* because they choose to conduct a separate cost analysis and impose a different rate. *See* 89 Fed. Reg. at 19188-89. The CFPB's very purpose in promulgating the Final Rule is to force issuers to reduce their late fees. Outside of a few limited exceptions not relevant here, TILA requires agencies to afford issuers at least six months to make such adjustments, and the CFPB lacks the authority to afford less.

**II.    Plaintiffs are experiencing and will continue to experience irreparable harm absent an injunction from this Court.**

An irreparable harm is one that cannot later be recovered "in the course of the litigation." *Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016). "[I]t is not so much the magnitude but the irreparability [of harm] that counts for purposes of a preliminary injunction." *Canal Auth. v. Callaway*, 489 F.2d 567, 575 (5th Cir. 1974). Such harm need only "be more than de minimis." *Rest. L. Ctr.*, 66 F.4th at 600 (cleaned up). And whether a plaintiff could theoretically offset these losses over time through price increases (which the CARD Act limits for existing balances) is irrelevant. *See Texas v. EPA*, 829 F.3d at 434 n.41. Here, the federal government's sovereign immunity, among other issues, will prevent Plaintiffs' members from recovering on the economic injuries that they are already suffering and will continue to suffer if the Final Rule is not enjoined. *See Wages & White Lion*, 16 F. 4th at 1142.

In this case, card issuers, including many of Plaintiffs' members, will suffer at least six types of irreparable harm if the Final Rule is allowed to take effect, including compliance costs that "almost always" constitute irreparable harm. *Texas v. EPA*, 829 F.3d at 433. Indeed, the CFPB did not even contest Plaintiffs' showing of irreparable harm in their opposition to Plaintiffs' motion for a preliminary injunction or their opposition to Plaintiffs' motion for an injunction pending appeal. The CFPB eventually got around to obliquely attempting to attack Plaintiffs' uncontested showing of irreparable harm, but their belated arguments, to the extent

they are not forfeited (which they are), are contrary to the law, the CFPB's own statements, and the undisputed record.

### A. The undisputed record indicates that Plaintiffs' members will suffer six types of irreparable harm.

As explained at length in uncontested declarations submitted in the district court, if implementation of the Final Rule is not enjoined, Plaintiffs' members face six types of irreparable harm.

### 1. Compliance Costs

In response to the Final Rule, credit card issuers are being forced to incur substantial and unrecoverable compliance costs that grow by the day. In this Circuit, "complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d at 433 (internal citation omitted). And here, in light of the short effective date, those compliance costs are significant.

First, as the CFPB recognizes in Appendix G of Regulation Z, federal law requires issuers to distribute myriad disclosures to prospective and existing customers. 89 Fed. Reg. at 19203-12 (providing pages of sample forms). To reflect the new $8 limit, issuers must design and print new versions of all application, marketing, and disclosure materials that state their existing late fees, as well as update the disclosures that are periodically provided (or provided on request) to the millions of customers with open credit card accounts—all by the May 14 effective

date. *See* 12 C.F.R. §§ 1026.6(b)(2)(viii), 1026.9(c)(2)(iii); ROA.99, 103-04, 111, 117-18, 125, 132-33, 140, 145-46, 153. This must be done for potentially "hundreds of unique credit card programs." ROA.153. In comments to the proposed rule, one large credit card processor, FiServ, estimated that these new disclosures would take approximately 10 months to print and distribute. ROA.157. FiServ explained that when a credit card issuer wants to modify its accountholder disclosure information, it typically requests "at least 4 months of advance notice," and if "all issuers will request updated materials to be produced and mailed by their service providers at the same time, the industry that supports this work will be physically unable to meet the demand due to capacity limitations of the printers, paper stock, and the sorting and packaging machines." *Id.*

And that does not include the time it takes to change systems, conduct quality and assurance checks, or physically distribute materials to various points where issuers engage with consumers, including "hundreds of thousands of merchant locations." ROA.153. As a result of the unlawfully short effective date and the district court's failure to grant preliminary injunctive relief, issuers must act now to update these disclosures on a highly expedited basis. Issuers incur additional costs with each passing day, as May 14 grows nearer.

Second, issuers that seek to mitigate lost revenue from lower late fees by changing other terms must incur significant costs to provide disclosures with new

terms. The CFPB repeatedly advised that credit card issuers can mitigate the harm from lower late fees by changing other terms, such as increasing rates or other fees. *E.g.*, 89 Fed. Reg. at 19192 ("issuers can mitigate the costs of the proposal to some extent by taking other measures (*e.g.*, increasing interest rates . . .)"). But to increase rates, issuers must send a change-in-terms notice to their current cardholders at least 45 days in advance, and increases may be subject to the cardholder's opt-out right. *See* 15 U.S.C. § 1637(i); 12 C.F.R. § 1026.9(c)(iii)(2). And for those issuers whose programs are linked to retail partners, changes in terms may be the subject of contractual negotiations, which adds further delays and costs to the process.

Third, if the Final Rule takes effect on May 14, issuers will face an entirely new set of burdensome disclosure obligations *even if* a court later enjoins or vacates the rule and permits issuers to reinstate the lawful late fees they previously charged. Issuers that reinstate their prior rates will once again be required to update all of their materials to state the adjusted amount, and because that amount would reflect a fee *increase*, issuers will be required under federal law to provide customers with 45 days' advance written notice (and opt-out rights) to cardholders whose late fees had been reduced to $8. *See* 15 U.S.C. § 1637(i); 12 C.F.R. § 1026.9(c)(iii)(2). Thus, if the Final Rule takes effect for even *one day*, issuers will suffer lost revenue for a minimum of *46 days* (and likely much longer given the time it will take to

print and mail the necessary notices and disclosures). Meanwhile, consumers will suffer confusion and frustration due to the changing fees.

Fourth, as May 14 approaches, card issuers must train compliance, customer-service, and other staff on the Final Rule's new requirements. *See* ROA.100, 140-41, 153. This training must take place before the May 14 deadline, so that staff are prepared to take appropriate steps on the effective date. And if the Final Rule takes effect on May 14 but is later enjoined or vacated by a court, issuers that reinstate prior fees must train their staff all over again, including training customer representatives to field questions and complaints from customers.

Fifth, any card issuer who opts to charge a late fee above the new safe harbor will incur the cost of performing an initial and then annual cost review under 12 C.F.R. § 1026.52(b)(1)(i). This can be expensive and complex. And because of the compressed timeframes resulting from the final rule becoming effective in 60 days, many issuers may be forced to adopt the reduced safe harbor amount in the interim even if they intend to switch to the cost-analysis provision, creating a yo-yo effect that will only further confuse consumers and cause issuers to incur unnecessary costs.

### 2.    Lost Revenue

The CFPB acknowledges that "late fees are by far the most prevalent penalty fees charged by card issuers," 89 Fed. Reg. at 19132, and the Final Rule will reduce

card issuers' revenues by between $5 billion and $9 billion, *id.* at 19193-94. Plaintiffs estimate that most of their members who are subject to the Final Rule are likely to lower their late fees to $8, rather than conduct the cost review on this compressed timeline, and consequently lose significant amounts of late-fee revenue. These losses would only increase over the first year, since the safe-harbor amount would no longer be adjusted for inflation. Even Plaintiffs' members that are not subject to the Final Rule will lose revenue as a result of the downward competitive pressure the rule will put on their late fees.

If the Final Rule is permitted to go into effect for even one day, it will have an exponential impact on lost revenues. If the Final Rule is later enjoined, issuers cannot reinstate their prior late fees on accounts that had late fees reduced to $8 without providing 45 days of advance notice to consumers, plus the time it takes to prepare new disclosure materials.

Moreover, although the CFPB assured issuers that they could make mitigating changes to offset their lost revenue, 89 Fed. Reg. at 19192, the rushed effective date has limited the ability of issuers to make these changes. If issuers sought to make these mitigating changes contemporaneous with the May 14 effective date, they would have had to send updated disclosures by March 29, 2024. Because that date has come and gone, issuers that have yet to send out these notices will be forced to

endure substantially lower late fees without any mitigating changes for at least some period of time absent injunctive relief.[3]

### 3. Enforcement and Private Actions

The CFPB's rushed effective date will expose members to the risk of enforcement actions, civil penalties, and private rights of action. ROA.100, 106, 114, 120, 127. There is a significant risk that certain issuers will not be able to approve and publish all of the required physical disclosures in the 60-day timeline set by the CFPB. ROA.140-41. As the uncontested declarations in the record explain, updated disclosures are needed for "hundreds of unique credit card programs" and must be distributed "at hundreds of thousands of merchant locations." ROA.153. Despite the best efforts of issuers to comply with the Rule, errors are inevitable given that they must rush compliance efforts on an unrealistic timeline.

### 4. Collection Costs

The Final Rule will make consumers more likely to make late payments, as the CFPB acknowledges. 89 Fed. Reg. at 19197. An increase in late payments will increase "overhead and staffing costs for members from the increased number of

---

[3] Some issuers have already begun attempting to mitigate the effects of the Final Rule. Polo Rocha, *Synchrony Hikes Interest Rates on Credit Cards to Offset Late-Fee Rule*, American Banker (Apr. 24, 2024); Kate Fitzgerald, *Bread Financial 'Feverishly' Preps for CFPB Late-Fee Rule Scenarios*, American Banker (Apr. 25, 2024).

collection efforts and customer-service contacts that will be required to address such payments." ROA.134.

### 5.    Changed Economics for Certain Accounts

In deciding whether to open new credit card accounts, many issuers factored in the current late fee safe harbor as a means of mitigating the risks associated with late payments. Some issuers relied heavily upon the current safe harbor in making decisions to issue particular accounts and to set the terms of those accounts. *See* ROA.99, 140. Thus, in addition to the lost revenues discussed above, such issuers will be left with accounts with diminished economic value. *See* ROA.140.

### 6.    Loss of Customer Goodwill

Finally, issuers face the prospect of losing customer goodwill if they are forced to drop their late fees only to raise them later, either through the cost-analysis provisions or this litigation. Moreover, given the competitive nature of the credit card market, efforts to increase rates or other fees or eliminate rewards to recoup lost late-fee revenue will similarly cause unrecoverable losses to goodwill. *See* ROA.134; 88 Fed. Reg. at 18908 ("Survey data suggest that other factors, such as rewards, annual fees, and annual percentage rate(s) (APR), drive credit card usage.").

**B.    The CFPB's belated attempts to attack Plaintiffs' uncontested showing of irreparable harm are unavailing.**

The CFPB did not contest any of these harms in its opposition to Plaintiffs' motion for a preliminary injunction or motion for an injunction pending appeal. In later briefing on other motions, however, the CFPB has suggested that some of these harms should be discounted or are de minimis for several reasons. Because the CFPB failed to raise these arguments earlier, they are forfeited. *See Wages & White Lion*, 16 F.4th at 1142-43. But even if this Court overlooked that problem, the CFPB's belated arguments still would not justify the denial of preliminary injunctive relief.

First, in its brief in support of its motion to transfer before the district court, the CFPB emphasized that one issuer in one instance was able to notify its customers of an upcoming changed late fee in roughly five weeks. ROA.414-16. But that case involved *months* of preparatory work that the issuer was able to undertake only because the precise amount of the CFPB's inflationary adjustment to the safe harbor was knowable in advance. ROA.468-69. In this case, of course, issuers could not know what safe harbor amount the CFPB would ultimately adopt until the Final Rule was announced on March 5, 2024. And even if issuers were routinely able to provide notice in a matter of weeks—a proposition that the CFPB has failed to support and that the FiServ letter discussed above flatly refutes—it would not undermine the key point for preliminary injunctive relief: issuers will

incur substantial and unrecoverable costs to update their disclosures in response to the Final Rule.

Second, the CFPB has repeatedly suggested that issuers cannot point to any harms of pursuing mitigating changes—such as increasing other fees and rates—because those mitigating changes are not required by the Final Rule. ROA.415-16; Resp'ts' Opp'n to Emergency Pet. for Writ of Mandamus at 10, *In re Chamber*, No. 24-10266 (5th Cir. Apr. 2, 2024), ECF No. 23 ("Mandamus Opp'n"); *see also* Pet. for Panel Reh'g at 5 n.2, *In re Chamber*, No. 24-10266 (5th Cir. Apr. 18, 2024), ECF No. 61 (advancing similar argument). That argument does not withstand scrutiny. Throughout the Final Rule, the CFPB *repeatedly* suggested that credit card issuers could make these changes to offset the losses from lower late fees. *See e.g.*, 89 Fed. Reg. at 19149 ("Larger Card Issuers generally can adjust other fees or interest rates in order to recover any lost revenue."). The CFPB cannot—on the one hand—justify its decision to slash late fees by recommending that issuers make mitigating changes, and then—on the other hand—completely ignore the harms of making those mitigating changes when opposing a preliminary injunction. Because the harms of these mitigating changes flow directly from the Final Rule, they constitute the type of irreparable harm that a preliminary injunction is designed to avoid. *See, e.g.*, *Polymer80, Inc. v. Garland*, No. 4:23-cv-00029, 2023 WL

3605430, at *10 (N.D. Tex. Mar. 19, 2023) (regulated party satisfies irreparable harm requirement when it "faces irreparable injury whatever course it takes").

Third, in its mandamus opposition, the CFPB urged that the compliance costs of the Final Rule are "negligible in light of the enormous resources that affected card issuers have." Mandamus Opp'n at 11. But alleged compliance costs need only be "more than de minimis," *Rest. Law Ctr.*, 66 F.4th at 600, and the uncontested declarations in this case demonstrate more than de minimis expenditures; they demonstrate millions of dollars in costs. ROA.99, 103-04, 111, 117-18, 125, 132-33, 140, 145-46, 153. This Court already recognized that very point in its opinion granting Plaintiffs' petition for mandamus. *See* Order at 9, *In re Chamber*, No. 24-10266 (5th Cir. Apr. 18, 2024) ("CFPB does not contradict the Chamber's summary of the timeline or what the Final Rule requires credit card issuers to do by the effective date. It only counters that the issuers' compliance costs, which the Chamber says are substantial, are in fact negligible. On this limited record, however, the Chamber has made the case that its urgency is justified.").

Fourth, in a footnote in its petition for panel rehearing of the mandamus opinion, the CFPB claimed that because issuers already have to print disclosures for new customers, any additional cost for changing those disclosures is de minimis. Petition for Reh'g at 5 n.2. That argument is directly contrary to the undisputed record that issuers must update periodic disclosures for hundreds of millions of

credit card accounts *and destroy and reprint* many existing documents. *See* ROA.99, 103-04, 111, 117-18, 125, 132-33, 140, 145-46, 153. The CFPB's rule, in other words, will require issuers to re-do what they already have done, without any recompense should the rule be invalidated.

Finally, even if the CFPB had not waived these arguments, and even if all of them were meritorious, they still would not justify the denial of preliminary injunctive relief because they speak only to the amount (but not the existence) of some (but not all) compliance costs. The CFPB has still not disputed that issuers *will* face many other forms of irreparable harm because of the Final Rule, including substantial compliance costs between now and when this Final Rule takes effect on May 14, 2024. Plaintiffs have satisfied this element.

## III.    The balance of harms and the public interest weigh in favor of a preliminary injunction.

The equities favor an injunction pending resolution of this case. "[T]he maintenance of the status quo is an important consideration in granting a stay." *Wages & White Lion*, 16 F.4th at 1143. The harms to Plaintiffs' members will be substantial, while the harms to the CFPB in delaying the effective date of its rulemaking are negligible. The existing framework has been in place for more than a decade, supported by CFPB directors across administrations, and is well-understood by the American people. It has allowed issuers to give higher-risk customers the opportunity to build their credit by mitigating the risks of doing so.

And because the Final Rule would likely lead to more late payments, higher interest rates, constricted access to credit, and other less favorable terms, the public interest would be served by delaying these effects while the case is decided. Maintaining the status quo during the pendency of this litigation will prevent widespread consumer confusion that would result from allowing the Final Rule to go into effect before it is permanently enjoined.

In all events, "[t]he public interest is in having governmental agencies abide by the federal laws that govern their existence and operations. And there is generally no public interest in the perpetuation of unlawful agency action." *Id.* at 1143 (cleaned up).

In earlier briefing, the CFPB has asserted that the Final Rule is good policy and thus that the equities disfavor an injunction. Opp'n to Motion for Inj. Pending Appeal at 20-21, ECF No. 56. That is debatable at best, given that the CFPB itself acknowledges that cardholders who pay on time may in fact be harmed by the Final Rule. 89 Fed. Reg. at 19144. But in any event, whether an agency considers a rulemaking to be good policy is not the relevant question. Particularly not where, as here, the CFPB has acted in violation of this Court's precedent, as well as three federal statutes, and admits that its Final Rule helps some consumers but harms others. "[O]ur system does not permit agencies to act unlawfully even in pursuit of desired ends." *Wages & White Lion*, 16 F.4th at 1143 (citation omitted). A

preliminary injunction is necessary to pause the CFPB's unlawful actions and the irreparable harm they are imposing on Plaintiffs' members.

## CONCLUSION

The district court abused its discretion in effectively denying Plaintiffs' motion for a preliminary injunction. Plaintiffs respectfully ask that the Court order the issuance of a preliminary injunction of the CFPB's Credit Card Penalty Fees Rule.

Dated:  April 26, 2024                    Respectfully submitted,

                                          */s/ Michael Murray*
                                          Michael Murray
                                          D.C. Bar No. 1001680
                                          michaelmurray@paulhastings.com
                                          Tor Tarantola
                                          D.C. Bar No. 1738602
                                          tortarantola@paulhastings.com
                                          PAUL HASTINGS LLP
                                          2050 M Street NW
                                          Washington, DC 20036
                                          (202) 551-1730

                                          Philip Vickers
                                          Texas Bar No. 24051699
                                          pvickers@canteyhanger.com
                                          Derek Carson
                                          Texas Bar No. 24085240
                                          dcarson@canteyhanger.com
                                          CANTEY HANGER LLP
                                          600 West 6th Street, Suite 300
                                          Fort Worth, TX 76102
                                          (817) 877-2800

                                          *Counsel for Plaintiffs-Appellants*

                                          Thomas Pinder
                                          D.C. Bar No. 451114
                                          tpinder@aba.com
                                          Andrew Doersam
                                          D.C. Bar No. 1779883
                                          adoersam@aba.com
                                          AMERICAN BANKERS
                                          ASSOCIATION
                                          1333 New Hampshire Ave. NW
                                          Washington, DC 20036

                                          *Counsel for American Bankers
                                          Association*

Tara S. Morrissey
D.C. Bar No. 991019
tmorrissey@uschamber.com
Maria C. Monaghan
D.C. Bar No. 90002227
mmonaghan@uschamber.com
U.S. CHAMBER LITIGATION
CENTER
1615 H Street NW
Washington, DC 20062

*Counsel for Chamber of Commerce of the United States Of America*

## CERTIFICATE OF SERVICE

This is to certify that the foregoing instrument has been served via the

Court's ECF filing system in compliance with Rule 25(b) and (c) of the Federal

Rules of Appellate Procedure, on April 26, 2024, on all registered counsel of

record, and has been transmitted to the Clerk of the Court.


*/s/ Michael Murray*
Michael Murray
*Attorney for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE**

This document complies with the word limit of Fed. R. App. P.

32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R.

App. P. 32(f), it contains 12,769 words. This brief also complies with the typeface

requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type-style

requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a

proportionally spaced typeface using Microsoft Word in 14-point Times New

Roman font. Additionally, I certify that any required redactions have been made in

compliance with 5th Cir. R. 25.2.13.

Dated: April 26, 2024

> */s/ Michael Murray*
> Michael Murray
> *Attorney for Plaintiffs-Appellants*

Statutory Addendum

United States Code Annotated
  Title 15. Commerce and Trade
    Chapter 41. Consumer Credit Protection (Refs & Annos)
      Subchapter I. Consumer Credit Cost Disclosure (Refs & Annos)
        Part A. General Provisions (Refs & Annos)

15 U.S.C.A. § 1604

§ 1604. Disclosure guidelines

Effective: January 13, 2021

Currentness

**(a) Promulgation, contents, etc., of regulations**

The Bureau shall prescribe regulations to carry out the purposes of this subchapter. Except with respect to the provisions of section 1639 of this title that apply to a mortgage referred to in section 1602(aa) of this title, such regulations may contain such additional requirements, classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for all or any class of transactions, as in the judgment of the Bureau are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate compliance therewith.

**(b) Model disclosure forms and clauses; publication, criteria, compliance, etc.**

The Bureau shall publish a single, integrated disclosure for mortgage loan transactions (including real estate settlement cost statements) which includes the disclosure requirements of this subchapter in conjunction with the disclosure requirements of the Real Estate Settlement Procedures Act of 1974 that, taken together, may apply to a transaction that is subject to both or either provisions of law. The purpose of such model disclosure shall be to facilitate compliance with the disclosure requirements of this subchapter and the Real Estate Settlement Procedures Act of 1974, and to aid the borrower or lessee in understanding the transaction by utilizing readily understandable language to simplify the technical nature of the disclosures. In devising such forms, the Bureau shall consider the use by creditors or lessors of data processing or similar automated equipment. Nothing in this subchapter may be construed to require a creditor or lessor to use any such model form or clause prescribed by the Bureau under this section. A creditor or lessor shall be deemed to be in compliance with the disclosure provisions of this subchapter with respect to other than numerical disclosures if the creditor or lessor (1) uses any appropriate model form or clause as published by the Bureau, or (2) uses any such model form or clause and changes it by (A) deleting any information which is not required by this subchapter, or (B) rearranging the format, if in making such deletion or rearranging the format, the creditor or lessor does not affect the substance, clarity, or meaningful sequence of the disclosure.

**(c) Procedures applicable for adoption of model forms and clauses**

Model disclosure forms and clauses shall be adopted by the Bureau after notice duly given in the Federal Register and an opportunity for public comment in accordance with section 553 of Title 5.

**(d) Effective dates of regulations containing new disclosure requirements**

Any regulation of the Bureau, or any amendment or interpretation thereof, requiring any disclosure which differs from the disclosures previously required by this part, part D, or part E or by any regulation of the Bureau promulgated thereunder shall have an effective date of that October 1 which follows by at least six months the date of promulgation, except that the Bureau may at its discretion take interim action by regulation, amendment, or interpretation to lengthen the period of time permitted for creditors or lessors to adjust their forms to accommodate new requirements or shorten the length of time for creditors or lessors to make such adjustments when it makes a specific finding that such action is necessary to comply with the findings of a court or to prevent unfair or deceptive disclosure practices. Notwithstanding the previous sentence, any creditor or lessor may comply with any such newly promulgated disclosure requirements prior to the effective date of the requirements.

**(e) Disclosure for charitable mortgage loan transactions**

With respect to a mortgage loan transaction involving a residential mortgage loan offered at 0 percent interest with only bonafide and reasonable fees and that is primarily for charitable purposes by an organization described in section 501(c)(3) of Title 26 and exempt from taxation under section 501(a) of such title, forms HUD-1 and GFE (as defined under section 1024.2(b) of title 12, Code of Federal Regulations) together with a disclosure substantially in the form of the Loan Model Form H-2 (as depicted in Appendix H to part 1026 of title 12, Code of Federal Regulations) shall, collectively, be an appropriate model form for purposes of subsection (b) of this section.

**(f) Exemption authority**

**(1) In general**

The Bureau may exempt, by regulation, from all or part of this subchapter all or any class of transactions, other than transactions involving any mortgage described in section 1602(aa) of this title, for which, in the determination of the Bureau, coverage under all or part of this subchapter does not provide a meaningful benefit to consumers in the form of useful information or protection.

**(2) Factors for consideration**

In determining which classes of transactions to exempt in whole or in part under paragraph (1), the Bureau shall consider the following factors and publish its rationale at the time a proposed exemption is published for comment:

**(A)** The amount of the loan and whether the disclosures, right of rescission, and other provisions provide a benefit to the consumers who are parties to such transactions, as determined by the Bureau.

**(B)** The extent to which the requirements of this subchapter complicate, hinder, or make more expensive the credit process for the class of transactions.

**(C)** The status of the borrower, including--

**(i)** any related financial arrangements of the borrower, as determined by the Bureau;

**(ii)** the financial sophistication of the borrower relative to the type of transaction; and

**(iii)** the importance to the borrower of the credit, related supporting property, and coverage under this subchapter, as determined by the Bureau;

**(D)** whether the loan is secured by the principal residence of the consumer; and

**(E)** whether the goal of consumer protection would be undermined by such an exemption.

## (g) Waiver for certain borrowers

### (1) In general

The Bureau, by regulation, may exempt from the requirements of this subchapter certain credit transactions if--

**(A)** the transaction involves a consumer--

**(i)** with an annual earned income of more than $200,000; or

**(ii)** having net assets in excess of $1,000,000 at the time of the transaction; and

**(B)** a waiver that is handwritten, signed, and dated by the consumer is first obtained from the consumer.

### (2) Adjustments by the Bureau

The Bureau, at its discretion, may adjust the annual earned income and net asset requirements of paragraph (1) for inflation.

## (h) Deference

Notwithstanding any power granted to any Federal agency under this subchapter, the deference that a court affords to the Bureau with respect to a determination made by the Bureau relating to the meaning or interpretation of any provision of this subchapter, other than section 1639e or 1639h of this title, shall be applied as if the Bureau were the only agency authorized to apply, enforce, interpret, or administer the provisions of this subchapter.

## (i) Authority of the Board to prescribe rules

Notwithstanding subsection (a), the Board shall have authority to prescribe rules under this subchapter with respect to a person described in section 5519(a) of Title 12. Regulations prescribed under this subsection may contain such classifications, differentiations, or other provisions, as in the judgment of the Board are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate compliance therewith.

**CREDIT(S)**

(Pub.L. 90-321, Title I, § 105, May 29, 1968, 82 Stat. 148; Pub.L. 96-221, Title VI, § 605, Mar. 31, 1980, 94 Stat. 170; Pub.L. 103-325, Title I, § 152(e)(2)(A), Sept. 23, 1994, 108 Stat. 2194; Pub.L. 104-208, Div. A, Title II, §§ 2102(b), 2104, Sept. 30, 1996, 110 Stat. 3009-399, 3009-401; Pub.L. 111-203, Title X, § 1100A(2), (4) to (7), Title XIV, § 1472(c), July 21, 2010, 124 Stat. 2107, 2108, 2190; Pub.L. 116-342, § 2(a), Jan. 13, 2021, 134 Stat. 5134.)

Notes of Decisions (33)

15 U.S.C.A. § 1604, 15 USCA § 1604
Current through P.L. 118-41. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 15. Commerce and Trade
    Chapter 41. Consumer Credit Protection (Refs & Annos)
      Subchapter I. Consumer Credit Cost Disclosure (Refs & Annos)
        Part C. Credit Advertising and Limits on Credit Card Fees (Refs & Annos)

15 U.S.C.A. § 1665d

§ 1665d. Reasonable penalty fees on open end consumer credit plans

Currentness

**(a) In general**

The amount of any penalty fee or charge that a card issuer may impose with respect to a credit card account under an open end consumer credit plan in connection with any omission with respect to, or violation of, the cardholder agreement, including any late payment fee, over-the-limit fee, or any other penalty fee or charge, shall be reasonable and proportional to such omission or violation.

**(b) Rulemaking required**

The Bureau, in consultation with the Comptroller of the Currency, the Board of Directors of the Federal Deposit Insurance Corporation, the Director of the Office of Thrift Supervision, and the National Credit Union Administration Board, shall issue final rules not later than 9 months after May 22, 2009, to establish standards for assessing whether the amount of any penalty fee or charge described under subsection (a) is reasonable and proportional to the omission or violation to which the fee or charge relates. Subsection (a) shall become effective 15 months after May 22, 2009.

**(c) Considerations**

In issuing rules required by this section, the Bureau shall consider--

**(1)** the cost incurred by the creditor from such omission or violation;

**(2)** the deterrence of such omission or violation by the cardholder;

**(3)** the conduct of the cardholder; and

**(4)** such other factors as the Bureau may deem necessary or appropriate.

**(d) Differentiation permitted**

In issuing rules required by this subsection, the Bureau may establish different standards for different types of fees and charges, as appropriate.

**(e) Safe harbor rule authorized**

The Bureau, in consultation with the Comptroller of the Currency, the Board of Directors of the Federal Deposit Insurance Corporation, the Director of the Office of Thrift Supervision, and the National Credit Union Administration Board, may issue rules to provide an amount for any penalty fee or charge described under subsection (a) that is presumed to be reasonable and proportional to the omission or violation to which the fee or charge relates.

**CREDIT(S)**

(Pub.L. 90-321, Title I, § 149, as added Pub.L. 111-24, Title I, § 102(b)(1), May 22, 2009, 123 Stat. 1740; amended Pub.L. 111-203, Title X, § 1100A(2), July 21, 2010, 124 Stat. 2107.)

15 U.S.C.A. § 1665d, 15 USCA § 1665d
Current through P.L. 118-41. Some statute sections may be more current, see credits for details.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.